IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| FRANK GAYLORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-539C |
| | ) | |
| THE UNITED STATES, | ) | Judge Thomas C. Wheeler |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S STATEMENT OF THE PROPOSED CONCLUSIONS OF LAW**

GREGORY G. KATSAS
Acting Assistant Attorney General

JOHN J. FARGO
Director

SCOTT BOLDEN
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, DC 20530
Telephone: (202) 307-0262
Facsimile: (202) 307-0345

May 16, 2008

Attorneys for Defendant the United States

**TABLE OF CONTENTS**


I. AFFIRMATIVE DEFENSES TO COPYRIGHT INFRINGEMENT . . . . . . . . . . . . . . . . 1

A. Proposed Conclusion of Law – The Postal Service's Use of John Alli's Photograph of the KWVM Was a Fair Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

1. Citation to Primary Supporting Authorities . . . . . . . . . . . . . . . . . . . . . . . . 1

2. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

a. The Postal Service's and John Alli's use of "The Column" is transformative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

b. The public nature of "The Column" supports a finding of fair use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

c. Mr. Alli used only a limited portion of "The Column" . . . . . . . . . 5

d. The Postal Service's use of "The Column" has had no effect upon the value of "The Column" or Frank Gaylord's potential market . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

B. Proposed Conclusion of Law – A Joint Owner of "The Column" Granted the Government an Unlimited, Paid-Up License in the Work . . . . . . . . . . . . . . . . 7

1. Citation to Primary Supporting Authorities . . . . . . . . . . . . . . . . . . . . . . . . 7

2. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

a. Gaylord, CLA, the VAB, and the FAC jointly own the copyright in "The Column" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

b. By virtue of its contractual relationship with CLA, the government possesses an unlimited license with respect to CLA's KWVM copyrights . . . . . . . . . . . . . . . . . . . . . 11

C. Proposed Conclusion of Law – Mr. Gaylord Does Not Have the "Right to Prevent the Making, Distributing, or Public Display of Pictures [Or] Photographs" of the KWVM. . . . . . . . . . . . . . . . . . . . . . . . . . 12

1. Citation to Primary Supporting Authorities . . . . . . . . . . . . . . . . . . . . . . . 12

2. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

D. Proposed Conclusion of Law – The Visual Artists Rights Act is Not Applicable to The Present Case . . . . . 15

1. Citation to Primary Supporting Authorities . . . . . 15

2. Discussion . . . . . 15

II. DAMAGES . . . . . 16

A. Proposed Conclusion of Law – Assuming Liability, Gaylord Is Not Entitled to Compensation in Excess of Minimum Statutory Damages . . . . . 16

1. Citation to Primary Supporting Authorities . . . . . 16

2. Discussion . . . . . 16

a. Actual Damages are Improper Because Gaylord Cannot Prove Any Damages . . . . . 19

b. Actual Damages are Improper Because the Postal Service Did Not Proximately Cause Injury to the Market Value of "The Column" . . . . . 21

c. Mr. Gaylord Failed to Prove a Reasonable Royalty and His Request is Speculative and Improper . . . . . 23

d. Mr. Gaylord's Maximum Recovery is $750 . . . . . 24

CONCLUSION . . . . . 26

## TABLE OF AUTHORITIES

**Cases**

Abeshouse v. Ultragraphics, Inc.,
754 F.2d 467 (2d Cir. 1985) . . . . . . . . . . 18

Atari Games Corp. v. Nintendo of America Inc.,
975 F.2d 832 (Fed. Cir. 1992) . . . . . . . . . . 2

Blanch v. Koons,
467 F.3d 244 (2d Cir. 2006) . . . . . . . . . . 3-4

BMG Music v. Gonzalez,
430 F.3d 888 (7th Cir. 2005) . . . . . . . . . . 25

Brooktree Corp. v. Advanced Micro Devices, Inc.,
977 F.2d 1555 (Fed. Cir. 1992) . . . . . . . . . . 17

Campbell v. Acuff-Rose Music, Inc.,
510 U.S. 569 (1994) . . . . . . . . . . *passim*

Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.,
150 F.3d 132 (2d Cir. 1998) . . . . . . . . . . 3

Childress v. Taylor,
798 F. Supp. 981 (S.D.N.Y.1992) . . . . . . . . . . 18

Community for Creative Non-Violence v. Reid,
846 F.2d 1485 (D.C. Cir. 1988) . . . . . . . . . . 7, 10-11

Community for Creative Non-Violence v. Reid,
490 U.S. 730 (1989) . . . . . . . . . . 10, 11

Community for Creative Non-Violence v. Reid,
1991 WL 415523 (D.D.C. Jan. 7, 1991) (No. Civ. A. 86-1507(TPJ)) . . . . . . . . . . 11

Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,
447 U.S. 102 (1980) . . . . . . . . . . 24

Data General Corp. v. Grumman Systems Support Corp.,
36 F.3d 1147 (1st Cir. 1994) . . . . . . . . . . 18

Edward B. Marks Music Corp. v. Jerry Vogel Music Co.,
140 F.2d 266 (2d Cir. 1944) . . . . . . . . . . 7, 8

Encyclopaedia Britannica Educ. Corp. v. Crooks,
558 F. Supp. 1247 (W.D.N.Y. 1983) . . . . . . . . . . 25

Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.,
772 F.2d 505 (9th Cir. 1985) . . . . . . . . . . 16, 18

Gargoyles, Inc. v. United States,
113 F.3d 1572 (Fed. Cir. 1997) . . . . . . . . . . 17

Georgia Pacific Corp. v. United States Plywood Corp.,
318 F. Supp. 1116 (S.D.N.Y. 1970) . . . . . . . . . . 23

Gnossos Music v. Mitken, Inc.,
653 F.2d 117 (4th Cir. 1981) . . . . . . . . . . 25

Harper & Row Publishers, Inc. v. Nation Enterprises,
471 U.S. 539 (1985) . . . . . . . . . . 2

Hohn v. United States,
524 U.S. 236 (1998) . . . . . . . . . . 25

Kawaauhau v. Geiger,
523 U.S. 57 (1998) . . . . . . . . . . 25

Kelly v. Arriba Soft Corp.,
336 F.3d 811 (9th Cir. 2003) . . . . . . . . . . 1, 23

Leesona v. United States,
599 F.2d 958 (Ct. Cl. 1979) . . . . . . . . . . 16, 17

Leicester v. Warner Bros.,
232 F.3d 1212 (9th Cir. 2000) . . . . . . . . . . 12, 14, 15

Mackie v. Rieser,
296 F.3d 909 (9th Cir. 2002) . . . . . . . . . . 19

Mackey v. Lanier Collection Agency & Service, Inc.,
486 U.S. 825 (1988) . . . . . . . . . . 25

Motorola, Inc. v. United States,
729 F.2d 765 (Fed. Cir. 1984) . . . . . . . . . . 16

PAR Microsystems, Inc. v. Pinnacle Development Corp.,
995 F. Supp. 658 (N.D.Tex. 1998) . . . . . . . . . . 16, 22

Paymaster Techs., Inc. v. United States,
61 Fed. Cl. 593 (2004) . . . . . . . . . . 23

Perfect 10, Inc. v. Amazon.com, Inc.,
487 F.3d 701 (9th Cir. 2007) . . . . . . . . . . 1, 6

Perrin v. United States,
444 U.S. 37 (1979) . . . . . . . . . . 24

Polar Bear Productions, Inc. v. Timex Corp.,
384 F.3d 700 (9th Cir. 2004) . . . . . . . . . . 17, 18

Scott v. Dixon,
309 F. Supp. 2d 395 (E.D.N.Y. 2004) . . . . . . . . . . 15

Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.,
161 F.2d 406 (2d Cir. 1947) . . . . . . . . . . 7, 10

Tektronix, Inc. v. United States,
552 F.2d 343 (Ct. Cl. 1977) . . . . . . . . . . 17

Thomson v. Larson,
147 F.3d 195 (2d Cir. 1998) . . . . . . . . . . 8

Wechsberg v. United States,
54 Fed. Cl. 158 (2002) . . . . . . . . . . 19, 24, 25, 26

**Statutes**

17 U.S.C. § 101 . . . . . . . . . . 7, 8

17 U.S.C. § 106A . . . . . . . . . . 15

17 U.S.C. § 107 . . . . . . . . . . 2, 5, 15

17 U.S.C. § 120 . . . . . . . . . . 12-15

17 U.S.C. § 201 . . . . . . . . . . 7, 12

28 U.S.C. § 1498 . . . . . . . . . . *passim*

41 U.S.C. § 605 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Architectural Works Copyright Protection Act,
Pub. L. No. 101-650, Tit. VII, 104 Stat. 5133 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . 13

**Other Authorities**

37 C.F.R. § 202.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

American Heritage College Dictionary (3d ed. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Fifth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

H.R. Rep. 101-735
(101st Cong., 2nd Sess. 1990, reprinted in 1990 U.S.C.C.A.N. 6935) . . . . . . . . . . . . . . 13

H.R. Rep. No. 94-1476,
(reprinted in 1976 U.S.C.C.A.N. 5659) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 25

Nimmer On Copyright . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

S. Rep. No. 1877,
(86th Cong., 2nd Sess. 1960, reprinted in 1960 U.S.C.C.A.N. 3444, 3446) . . . . . . . . . . 16

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| FRANK GAYLORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-539C |
| | ) | |
| THE UNITED STATES, | ) | Judge Thomas C. Wheeler |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S STATEMENT OF THE PROPOSED CONCLUSIONS OF LAW**

Pursuant to the Court's Order of March 5, 2008, Defendant the United States ("the government") hereby respectfully submits its Statement of the Proposed Conclusions of Law.

# I. AFFIRMATIVE DEFENSES TO COPYRIGHT INFRINGEMENT

## A. Proposed Conclusion of Law – The Postal Service's Use of John Alli's Photograph of the KWVM Was a Fair Use

### *1. Citation to Primary Supporting Authorities*

17 U.S.C. § 107

Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569 (1994)

Blanch v. Koons, 467 F.3d 244 (2d Cir. 2006)

Perfect 10, Inc. v. Amazon.com, Inc., 487 F.3d 701 (9th Cir. 2007)

Kelly v. Arriba Soft Corp., 336 F.3d 811 (9th Cir. 2003)

### *2. Discussion*

To advance progress in the arts and sciences, the fair use defense encourages the free and unfettered use of copyrighted works under certain circumstances. As stated by the Supreme Court:

> From the infancy of copyright protection, some opportunity for fair use of copyrighted materials has been thought necessary to fulfill copyright's very purpose, "[t]o promote the Progress of Science and useful Arts . . . ." U.S. Const., Art. I, § 8,

> cl. 8. For as Justice Story explained, "[i]n truth, in literature, in science and in art, there are, and can be, few, if any, things, which in an abstract sense, are strictly new and original throughout. Every book in literature, science and art, borrows, and must necessarily borrow, and use much which was well known and used before."
>
> . . . .
>
> The fair use doctrine thus "permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster."

Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 574-77 (1994) (citations omitted). Recognizing the common law history of copyright fair use and the express purpose in the Constitution, Congress outlined the fair use defense in Section 107 of Title 17. See, e.g., Atari Games Corp. v. Nintendo of America Inc., 975 F.2d 832, 842 (Fed. Cir. 1992) ("Under the Act, society is free to exploit facts, ideas, processes, or methods of operation in a copyrighted work."). Section 107 requires that courts consider four different factors to determine whether the affirmative defense applies:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. "Fair use is a mixed question of law and fact." Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 560 (1985). As discussed below, the four statutorily-enumerated factors weigh strongly in favor of a finding of fair use.

*a. The Postal Service's and John Alli's use of "The Column" is transformative*

With respect to the first factor – the purpose and character of the use – the Supreme Court has stated that the critical inquiry is whether the accused work "merely supersedes" the original work, or whether it "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." Campbell, 510 U.S. at 578-79. In other words, courts must inquire "whether and to what extent the new work is *transformative*." Id. (emphasis added). If a court concludes that the accused work is transformative, that finding tends to weigh heavily in the defendant's favor for purposes of fair use. See, e.g., id. ("[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use.").

In this case, the evidence will show that the Stamp and the Alli Photo are both transformative works when compared with "The Column." To determine whether a subsequent work is transformative, courts consider whether the work "adds value to the original." See Blanch v. Koons, 467 F.3d 244, 251-52 (2d Cir. 2006) (quoting Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc., 150 F.3d 132, 137 (2d Cir. 1998)). This characteristic has been met in this case because Mr. Gaylord admitted that the Postal Service's use of the Alli Photo actually increased the value of "The Column." See DX[1] 43 (Response to Request for Admission No. 20). Beyond the question of whether value has been added, courts consider whether the subsequent work has a different purpose and meaning than the original. See Blanch, 467 F.3d at 252. The government will prove that the

[1] Citations to "DX" refer to the corresponding exhibit number in Defendant's Exhibit List. Citations to "Stip. Fact" and "Gov't Fact" refer to the corresponding numbered paragraphs of the Stipulated Uncontested Material Facts and the Defendant's Statement of the Contested Fact Issues, respectively.

purposes and meanings of the Stamp and the Alli Photo were both different than the purpose and meaning of "The Column." See Gov't Fact ¶¶ 11-15; see also Stip. Fact ¶ 13 (stipulating that the purpose of the Stamp was to "commemorat[e] the fiftieth anniversary of the armistice of the Korean War").

The facts in this case are very similar to the facts in the Second Circuit's Blanch decision. See Blanch, 467 F.3d at 246-48. In Blanch, the court held that an artist fairly used a copyrighted photograph in a collage painting. Id. at 259. In support of its conclusion that the use of the photograph in the collage painting was transformative, the court cited the new and different artistic features in the subsequent work, such as the different: colors, background, medium, size of objects pictured, and details of the objects pictured. Id. at 253.

The factors cited in the Blanch case are directly relevant and applicable to the present case. As a result, the Court should hold that the Stamp and the Alli Photo are both transformative.

*b. The public nature of "The Column" supports a finding of fair use*

The second fair use factor, the nature of the copyrighted work, "recogni[zes] that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish." Campbell, 510 U.S. at 586. To analyze this factor, courts make two distinctions with respect to the copied work. First, courts inquire whether the work is expressive and creative, as opposed to factual and informational. See Blanch, 467 F.3d at 256-57. Expressive and creative works are generally afforded more protection and are often less subject to fair use. Id. Second, courts inquire whether the work is published or unpublished. Id. Unpublished works are generally afforded more protection against fair use. Id.

In this case, the public nature of "The Column" outweighs the fact that "The Column" is an expressive and creative work of art. "The Column" was specifically created for incorporation into the Korean War Veterans Memorial – a national monument on the National Mall – that is open to public viewing without restriction and is viewed by hundreds of people each day. See generally Stip. Fact ¶ 5.

*c. Mr. Alli used only a limited portion of "The Column"*

The third fair use factor is "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. § 107. This factor directly depends on the purpose of the accused work. Certain uses, by their nature, require more copying than other uses. See Campbell, 510 U.S. at 586-87 ("[W]e recognize that the extent of permissible copying varies with the purpose and character of the use."). In addition, "this factor calls for thought not only about the quantity of the materials used, but about their quality and importance, too." Id.

This factor weighs in favor of fair use because Mr. Alli copied only portions of "The Column," and the portions he copied have been transformed into a new work of art. First, Mr. Alli's work is a two-dimensional photograph, as opposed to a larger-than-life three-dimensional sculpture. See Gov't Fact ¶ 19. By the very nature of comparing a photograph to a sculpture, a photograph copies only one perspective of a sculpture. Second, Mr. Alli's photograph depicts only 10 of the 19 individual soldier statues in his photograph. See Gov't Fact ¶ 21. Indeed, the first soldier in the sculpture stands prominently in front; the next four fall behind the first and become partially obscured by the perspective; and the remaining soldier statues fade into the background. Third, Mr. Alli's photograph uses the fresh snow to obscure many of the individual details of each soldier statue and to enhance the sense of the forbidding conditions faced by the soldiers. See Gov't Fact ¶ 22

In addition, the snow functions to sharply increase the contrast of the photograph, resulting in a photo that washes-out the colors of "The Column," creating an austere grey coloration. See Gov't Fact ¶ 23.

*d. The Postal Service's use of "The Column" has had no effect upon the value of "The Column" or Frank Gaylord's potential market*

The fourth fair use factor, the effect on the market of the original work, "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original." Campbell, 510 U.S. at 590 (citations omitted). Courts should account for any harm to the value of the original work, as well as harm to the market for derivative works. Id. When the accused work is transformative, market harm cannot be presumed. Id. at 591; Perfect 10, 487 F.3d at 724.

The "market effect" factor weighs heavily in favor of fair use. Mr. Gaylord did not attempt to commercialize "The Column" after the late-1990s. See Gov't Fact ¶ 24. He never sold photographs of "The Column." See Gov't Fact ¶ 25. After he completed his last commercial project in 2001, he sold his studio and retired from commercial sculpting. See Gov't Fact ¶ 26. In response to a request for admission, Mr. Gaylord admitted that the Postal Service's use of Mr. Alli's photograph had not harmed any of his actual business prospects. See DX 43 (Response to Request for Admission No. 18). Despite Mr. Gaylord's unsupported allegations that the Postal Service's use of the photograph harmed "unknown, but foreseeable business," it is unclear how the use of a photograph could affect the market for a sculpture, especially when the sculptor had retired and was not seeking to commercialize the sculpture. Id. As part of a denial to a different request for admission, Mr. Gaylord argued that the Postal Service's use of Mr. Alli's photograph had actually

*increased* the value of "The Column," rather than harming the value of "The Column." See DX 43 (Response to Request for Admission No. 20).

Thus, each of the four factors weigh strongly in favor of fair use. Mr. Alli made a transformative, limited use of a sculpture incorporated into a national monument, and the Postal Service's use of that photograph did not harm the market for "The Column." As a result, the Court should conclude that the Postal Service's use of "The Column" was fair.

### B. Proposed Conclusion of Law – A Joint Owner of "The Column" Granted the Government an Unlimited, Paid-Up License in the Work

#### *1. Citation to Primary Supporting Authorities*

17 U.S.C. §§ 101, 201(a)

Community for Creative Non-Violence v. Reid, 846 F.2d 1485 (D.C. Cir. 1988)

Edward B. Marks Music Corp. v. Jerry Vogel Music Co., 140 F.2d 266 (2d Cir. 1944)

Shapiro, Bernstein & Co. v. Jerry Vogel Music Co., 161 F.2d 406 (2d Cir. 1947)

#### *2. Discussion*

Section 201 of Title 17 recognizes that a single copyright may jointly vest in several authors. See 17 U.S.C. § 201(a) ("The authors of a joint work are co-owners of copyright in the work"). "Joint authors co-owning copyright in a work are deemed to be tenants in common, with each having an independent right to use or license the copyright, subject only to a duty to account to the other co-owner for any profits earned thereby." Community for Creative Non-Violence v. Reid, 846 F.2d 1485, 1498 (D.C. Cir. 1988). The Copyright Act defines a "joint work" as:

> a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.

17 U.S.C. § 101. The touchstone of joint authorship is "a joint laboring in furtherance of a common design." See Edward B. Marks Music Corp. v. Jerry Vogel Music Co., 140 F.2d 266, 267 (2d Cir. 1944) (citation omitted). It is not necessary, however, that the authors work together or that the authors know each other. See id. A joint work will be found where the authors intend their contributions "be complementary in the sense that they are to be embodied in a single work." Id.

The intention to merge the contributions must exist at the moment of creation, not some later date. See generally H.R. Rep. No. 1476 (reprinted in 1976 U.S.C.C.A.N 5659, 5736) ("The touchstone here is the intention, at the time the [work] is [created], that the parts be absorbed or combined . . . .").[2] In the absence of a *pre-existing* agreement of copyright ownership, courts determine joint ownership based upon circumstantial evidence of intent. This circumstantial evidence can take many forms, but one of the most important is that of decision-making authority. See Thomson v. Larson, 147 F.3d 195, 202-03 (2d Cir. 1998).

*a. Gaylord, CLA, the VAB, and the FAC jointly own the copyright in "The Column"*

In this case, the circumstantial facts demonstrate that Cooper-Lecky Architects (CLA), the Veterans Advisory Board (VAB), and the Fine Arts Commission (FAC) intended to merge their contributions into a unified monument, despite Mr. Gaylord's disagreements with CLA regarding copyright ownership. First, the parties labored to create the sculpture as a unitary whole. Second, CLA, the VAB, and the FAC motivated the creation of the monument as a whole, including "The

[2] After the design, appearance, and configuration of "The Column" was established, Mr. Gaylord and CLA entered into a copyright license agreement that purported to resolve the issue of copyright ownership. See DX 18 (Licensing Agreement). This post-creation copyright license agreement cannot rebut the circumstantial evidence that the parties intended to merge their efforts into "The Column." Furthermore, the document is not signed by a representative of the government and therefore is not binding on the government.

Column." Third, these groups exercised decision-making authority by directing Mr. Gaylord's efforts to produce what they wanted, rather than what he wanted. Finally, these groups monitored Mr. Gaylord's work to guide his expression and to coordinate his efforts with the other parts of the memorial. The control of CLA, the VAB, and the FAC over all aspects of the project is also evidenced by the modifications of the BL3 design and the resulting disputes relating to that design. See, e.g., Gov't Fact ¶¶ 1-7.

In particular, most of the significant design elements of "The Column" resulted from decisions made by CLA, the VAB, and the FAC. The facts will demonstrate that these entities were responsible for making decisions with respect to: (1) the overall design of the monument; (2) the number of soldiers in "The Column"; (3) the positioning of the soldiers in "The Column"; (4) the ethnicity of the soldiers in "The Column"; (5) the military service of the soldiers in "The Column"; (6) the soldiers' equipment, such as radios, weaponry, and helmets; (7) the soldiers' use of ponchos; (8) the texture and appearance of the ponchos; (9) the size of the soldiers; (10) the appearance of the soldiers' faces, such as whether they were clean-shaven or bearded; and (11) the impressionistic style of the soldiers' faces. See Gov't Fact ¶¶ 34-43. Often, Mr. Gaylord was simply instructed to implement these decisions, and his advice was not requested. See generally Gov't Fact ¶ 44. Sometimes, his advice was sought and followed. Other times, changes were made to "The Column" despite his advice and over his objections. See generally Gov't Fact ¶ 47. These decisions went far beyond the idea of a group of soldier statues; these decisions directly impacted the copyrightable expression of "The Column."

The fact that Mr. Gaylord was the only sculptor with respect to "The Column" does not change the conclusion that CLA, the VAB, and the FAC are joint owners of "The Column" because

each merged their efforts into the final product. By way of analogy, the fact that there is one lyricist does not preclude joint authorship of a song. See Shapiro, Bernstein & Co. v. Jerry Vogel Music Co., 161 F.2d 406, 409 -410 (2d Cir. 1947) ("The words and music of a song constitute a 'musical composition' in which the two contributions merge into a single work to be performed as a unit for the pleasure of the hearers; they are not a 'composite' work, like the articles in an encyclopedia, but are as little separable for purposes of the copyright as are the individual musical notes which constitute the melody."). Similarly, a movie is more than the sole creation of the lead writer; the contributions of the director must be considered.

The most relevant case with respect to the facts is CCNV v. Reid, 846 F.2d 1485 (D.C. Cir. 1988). In that case, the Community for Creative Non-Violence entered into an oral agreement with a sculptor to produce a statue for display at a Christmas pageant. See id. at 1487. The sculptor created the statue in his studio, but his efforts were directed and reviewed by CCNV. See id. at 1487-88; see also id. at 1497. CCNV also was responsible for creating the sculpture's base, in the form of a steam grate. See id. at 1488. The parties filed competing copyright registration certificates and proceeded to court to determine copyright ownership.

The primary issue in the CCNV case was whether the statue was a "work made for hire" within the definition of Section 101 of Title 17. That issue was appealed to the Supreme Court, see CCNV v. Reid, 490 U.S. 730 (1989), but that issue is not at issue in this case. Instead, the main relevance is that the Court of Appeals noted that the CCNV facts "might qualify as a *textbook example* of a jointly-authored work in which the joint authors co-own the copyright." CCNV, 846 F.2d at 1497 (emphasis added). In support of its statement, the court cited that: CCNV had created the sculpture's base; the parties labored to create the sculpture as a unitary whole; CCNV motivated

the creation of the sculpture; CCNV directed the effort to produce what it wanted, rather than the sculptor; and CCNV monitored the sculptor's work to guide the sculptor's expression and coordinate his effort with CCNV's contributions. See id. at 1495-98. These facts are nearly identical to the facts in this case. Since the CCNV district court never considered the issue of joint ownership, the case was remanded to the district court after the Supreme Court's decision. See CCNV, 490 U.S. at 753 n.32 (noting that neither party sought review of the joint ownership issue or the remand order, and therefore, the Court would not "pass judgment" as to that order). The case ultimately settled without a decision on the merits with respect to joint ownership. See CCNV v. Reid, 1991 WL 415523 (D.D.C. Jan. 7, 1991) (No. Civ. A. 86-1507(TPJ)).

The facts cited in CCNV are directly relevant to the present case. Accordingly, the Court should conclude that Gaylord, CLA, the VAB, and the FAC jointly own the copyright in "The Column."

*b. By virtue of its contractual relationship with CLA, the government possesses an unlimited license with respect to CLA's KWVM copyrights*

Since CLA is a joint owner of the copyright in "The Column," CLA has the ability to license others to use "The Column." CLA's contract with the government contained at least two separate clauses that provided an unlimited license to the government. First, contract clause I.28 states that:

> The Government shall have unlimited rights, in all drawings, designs, specifications, notes and other works developed in the performance of this contract . . . . The Contractor hereby grants to the Government a paid-up license throughout the world to all such works to which he may assert or establish any claim under design patent or copyright laws.

DX 2 (Contract No. DACA31-90-C-0057, Contract Clause I.28 - DFARS Clause 52.227-7022). Accordingly, if CLA is a joint owner of "The Column," CLA has contractually granted the

government an unlimited paid-up license in "The Column." This conclusion is reinforced by the subsequent contract clause:

> All designs, drawings, specifications, notes and other works developed in the performance of this contract shall become the sole property of the Government and may be used on any other design or construction without additional compensation to the Contractor. The Government shall be considered the "person for whom the work was prepared" for the purpose of authorship in any copyrightable work under 17 U.S.C. 201(b). With respect thereto, the Contractor agrees not to assert or authorize other to assert any rights nor establish any claim under the design patent or copyright laws.

DX 2 (Contract No. DACA31-90-C-0057, Contract Clause I.29 - DFARS Clause 52.227-7023).

In addition, the issue of whether the government held a license in the KWVM copyrights was directly addressed by a contracting officer's decision on February 23, 2000. In the decision, the contracting officer analyzed the clauses cited above and found that, *inter alia*, the government held "an unlimited license with respect to any copyrights derived of the KWVM." DX 30 (Contracting Officer's Decision at 7). A copy of the February 23, 2000 decision was sent to Mr. Gaylord. CLA did not appeal the decision. As a result, the contracting officer's decision is final and conclusive. See 41 U.S.C. § 605(b).

Accordingly, the Court should conclude that CLA is a joint owner of the copyright in "The Column," and that CLA granted an unlimited, paid-up license to the government.

### C. Proposed Conclusion of Law – Mr. Gaylord Does Not Have the "Right to Prevent the Making, Distributing, or Public Display of Pictures [Or] Photographs" of the KWVM.

#### *1. Citation to Primary Supporting Authorities*

17 U.S.C. § 120(a)

Leicester v. Warner Bros., 232 F.3d 1212 (9th Cir. 2000)

### *2. Discussion*

In 1990, Congress extended copyright protection to architectural works. See Architectural Works Copyright Protection Act, Pub. L. No. 101-650, Tit. VII, 104 Stat. 5133 (1990). Congress, however, afforded architectural works only partial copyright protection. Citing "the important public purpose" of architecture, Congress explicitly allowed the public to make, distribute, and display pictures and photographs of the work, free from claims of copyright infringement. H.R. Rep. 101-735 (101st Cong., 2nd Sess. 1990, reprinted in 1990 U.S.C.C.A.N. 6935, 6953). Congress codified the exemption in Section 120 of Title 17:

> (a) Pictorial representations permitted. – The copyright in an architectural work that has been constructed does not include the right to prevent the making, distributing, or public display of pictures, paintings, photographs, or other pictorial representations of the work, if the building in which the work is embodied is located in or ordinarily visible from a public place.

17 U.S.C. § 120. Indeed, the legislative history reveals that Congress considered photographs and other pictorial representations of architectural works to be presumptive fair uses of the works. As such, Congress explicitly provided the exemption as a bright-line alternative to the fair use inquiry:

> Architecture is a public art form and is enjoyed as such. Millions of people visit our cities every year and take back home photographs, posters, and other pictorial representations of prominent works of architecture as a memory of their trip. Additionally, numerous scholarly books on architecture are based on the ability to use photographs of architectural works.
>
> These uses do not interfere with the normal exploitation of architectural works. Given the important public purpose served by these uses and the lack of harm to the copyright owner's market, the Committee chose to provide an exemption, rather than rely on the doctrine of fair use, which requires *ad hoc* determinations.

H.R. Rep. 101-735 (101st Cong., 2nd Sess. 1990, reprinted in 1990 U.S.C.C.A.N. 6935, 6953).

In this case, Section 120 operates as an affirmative defense to Mr. Gaylord's claim of copyright infringement. First, Mr. Gaylord cannot dispute that the Postal Service is accused of

making and distributing pictorial representations of the work. See Complaint. Second, Mr. Gaylord cannot dispute that "The Column" is part of and embodied in the KWVM. See DX 43 (Response to Request for Admission No. 6) ("Plaintiff admits that the work-in-suit is understood in a common sense way to be part of the overall KWVM.") Third, Mr. Gaylord does not dispute that the KWVM is located in a public place. See DX 43 (Response to Request for Admission No. 7). Thus, the remaining issue for the Court is whether the KWVM is a "building" within the meaning of the statute.

The KWVM should be considered a "building" within the context of Section 120. Congress did not define the word "building" in the Copyright Act. As defined by the Copyright Office:

> The term building means humanly habitable structures that are intended to be both permanent and stationary, such as houses and office buildings, and other permanent and stationary structures designed for human occupancy, including but not limited to churches, museums, gazebos, and garden pavilions.

37 C.F.R. § 202.11(b)(2). Under this definition, the KWVM should be considered a building because it is a permanent and stationary structure that was designed to be occupied and viewed by the public in the same manner as a "gazebo" or "garden pavilion." In a response to a request for admission, Mr. Gaylord admitted that the KWVM:

> is intended to be "permanent" within the lives of those persons now living and foreseeable future generations. Admitted that the KWVM is stationary and accessible to the public.

DX 43 (Response to Request for Admission No. 8).

The facts of the present case are similar to the facts recited and discussed in the Ninth Circuit's Leicester decision. See Leicester v. Warner Bros., 232 F.3d 1212 (9th Cir. 2000). In Leicester, a sculptor created a work of public art in a building courtyard. Id. at 1214. The work of art included a fountain, a garden, benches for the public, and a series of towers and gates. Id. The

sculptor later sued Warner Brothers after the building was used as a set piece in the movie *Batman Forever*. Id. at 1213. The Ninth Circuit affirmed the trial court's fact findings that the plaintiff's sculpture was part of the overall architectural work, and that the affirmative defense in Section 120 applied. Id. at 1219-20.

### D. Proposed Conclusion of Law – The Visual Artists Rights Act is Not Applicable to The Present Case

#### *1. Citation to Primary Supporting Authorities*

17 U.S.C. § 106A

#### *2. Discussion*

Plaintiff incorrectly argues that the government has infringed Mr. Gaylord's rights under the Visual Artists Rights Act. See 17 U.S.C. § 106A. Plaintiff's argument has no basis. The purpose of Section 106A is to protect the right of an artist to preserve a single work of art after it has been sold. See Scott v. Dixon, 309 F. Supp. 2d 395, 400 (E.D.N.Y. 2004). The statute has no bearing on later derivative works. See 17 U.S.C. § 106A(c)(3) ("The rights described in paragraphs (1) and (2) . . . shall not apply to any reproduction, depiction, portrayal, or other use of a work . . . ."); see also 17 U.S.C. § 106A(e)(2). Furthermore, the statute is inapplicable where a fair use has been proven. See 17 U.S.C. § 106A(a) ("Subject to section 107 . . . ."); 17 U.S.C. § 107 ("Notwithstanding . . . sections 106 and 106A . . ."). Finally, if "The Column" is found to be a joint work, "a waiver of [Section 106A] rights . . . by one such author waives such rights for all such authors." 17 U.S.C. § 106A(e)(1).

## II. DAMAGES

### A. Proposed Conclusion of Law – Assuming Liability, Gaylord Is Not Entitled to Compensation in Excess of Minimum Statutory Damages

#### *1. Citation to Primary Supporting Authorities*

28 U.S.C. § 1498(b)

Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505 (9th Cir. 1985)

PAR Microsystems, Inc. v. Pinnacle Development Corp., 995 F. Supp. 658 (N.D.Tex. 1998)

#### *2. Discussion*

Section 1498(b), the sole jurisdictional basis for this lawsuit, invokes the eminent domain principles of the Fifth Amendment by allowing the recovery of "reasonable and entire compensation":

> the exclusive action which may be brought for such infringement shall be an action by the copyright owner against the United States in the Court of Federal Claims for the recovery of his reasonable and entire compensation as damages for such infringement, including the minimum statutory damages as set forth in section 504(c) of title 17.

28 U.S.C. § 1498(b). The legislative history for Section 1498(b) and canons of statutory construction support the conclusion that "reasonable and entire compensation" is the equivalent of just compensation under the Fifth Amendment. See Leesona v. United States, 599 F.2d 958, 968 (Ct. Cl. 1979); see also S. Rep. No. 1877 (86th Cong., 2nd Sess. 1960, reprinted in 1960 U.S.C.C.A.N. 3444, 3446). Under Section 1498, the United States is not an ordinary infringer, but rather a compulsory, nonexclusive licensee. See Motorola, Inc. v. United States, 729 F.2d 765, 768 (Fed. Cir. 1984). The proper focus is "what the owner has lost, not what the taker has gained." Leesona, 599 F.2d at 969.

The analysis of reasonable and entire compensation in Section 1498(b) is somewhat similar to the analysis that the district courts use to assess actual damages for non-government copyright infringements. To prove actual damages under Title 17, a plaintiff must show both loss and causation. Section 504(b) contains two distinct monetary remedies – actual damages and recovery of the infringer's profits.[3] See 17 U.S.C. § 504(b). The plain language of the statute mandates that actual damages must be suffered "as a result of the infringement," and profits must be "attributable to the infringement."[4] Id.

For actual damages, a plaintiff must first prove a loss in value to the copyrighted work. See, e.g., Brooktree Corp. v. Advanced Micro Devices, Inc., 977 F.2d 1555, 1579 (Fed. Cir. 1992) (analogizing to copyright law "wherein actual damages may be measured in terms of the diminished market value of the copyrighted work"). A plaintiff must then prove that the defendant proximately caused the loss in value. See Polar Bear Productions, Inc. v. Timex Corp., 384 F.3d 700, 708 (9th Cir. 2004) ("[I]t is apparent that a causal link between the infringement and the monetary remedy sought is a predicate to recovery of both actual damages and profits . . . a plaintiff in a § 504(b) action must establish this causal connection."). To put it another way, a plaintiff must prove "that,

---

[3] This remedy is only available in Title 17 copyright actions between private entities. Under Title 28, the infringer's profits are never recoverable because they do not represent a loss by the copyright owner. See Leesona, 599 F.2d at 969 (the focus is "what the owner has lost, not what the taker has gained").

[4] One important distinction between Section 1498(b) and Section 504(b) is that Section 504(b) permits a recovery of profits, whereas Section 1498(b) does not mention profits as a measure for compensation. Pursuant to the principles of sovereign immunity and eminent domain, profits are generally unavailable as a remedy under Section 1498(b). See, e.g., Tektronix, Inc. v. United States, 552 F.2d 343, 349 (Ct. Cl. 1977) (holding that if lost profits are available at all, they should be awarded subject to "the strictest proof"); but see Gargoyles, Inc. v. United States, 113 F.3d 1572, 1575-77 (Fed. Cir. 1997) (discussing the proper standard).

**but for** the defendant's infringement, the plaintiff would not have suffered the loss." Data General Corp. v. Grumman Systems Support Corp., 36 F.3d 1147, 1171 (1st Cir. 1994) (emphasis added).

Thus, actual damages cannot be based on "undue speculation." Abeshouse v. Ultragraphics, Inc., 754 F.2d 467, 470 (2d Cir. 1985); see also Childress v. Taylor, 798 F. Supp. 981, 991-92 (S.D.N.Y.1992) (declining to award actual damages because copyright owner's play was a commercial failure and estimates of damages were unduly speculative). According to the Ninth Circuit:

> [A] copyright owner is required to do more initially than toss up an undifferentiated gross revenue number; the revenue stream must bear a legally significant relationship to the infringement. The result is that a plaintiff seeking to recover indirect profits must formulate the initial evidence of gross revenue duly apportioned to relate to the infringement.

Polar Bear, 384 F.3d at 711 (citing 4 Nimmer On Copyright § 14.03[B], 14-39); see also Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505, 517 (9th Cir. 1985) ("a court may deny recovery of a defendant's profits if they are only remotely or speculatively attributable to the infringement").

In private copyright infringement actions, a copyright owner can only recover statutory damages without proof of loss and causation. Congress has provided for the recovery of statutory damages in the absence of proof of actual damages. See 17 U.S.C. §§ 504(b), 504(c); H.R. Rep. No. 94-1476 (reprinted in 1976 U.S.C.C.A.N. 5659, 5777) (stating that a copyright infringement plaintiff is "not obligated to submit proof of damages and profits and may choose to rely on the provision for minimum statutory damages"). Congress also explicitly incorporated "minimum statutory damages" as a measure of reasonable compensation in Section 1498(b). See 28 U.S.C. § 1498(b) ("reasonable and entire compensation . . . including the minimum statutory damages as set forth in section 504(c)

of title 17"). This concept was recognized *in dicta* by the Court of Federal Claims in Wechsberg. See Wechsberg, 54 Fed. Cl. at 166 ("Where a plaintiff lacks proof of actual damages, Section 1498(b)'s reference to minimum statutory damages serves as both a floor and a ceiling on recovery.").

Accordingly, in order for Mr. Gaylord to recover "reasonable and entire compensation" in the form of actual damages, Mr. Gaylord must demonstrate that: (1) "The Column" lost fair market value; and (2) the government's actions proximately caused the loss in market value. As described below, Mr. Gaylord has produced no evidence of either loss or causation. As a result, Mr. Gaylord may only recover minimum statutory damages.

*a. Actual Damages are Improper Because Gaylord Cannot Prove Any Damages*

Mr. Gaylord has offered no proof that "The Column" has lost market value or that he has been otherwise damaged. A copyright owner can provide relevant, objective evidence of market value in a number of ways. See Mackie v. Rieser, 296 F.3d 909, 917 (9th Cir. 2002) (holding that the proof must be objective, as opposed to plaintiff's personal, subjective evidence of market value). Mr. Gaylord, however, has offered no objective evidence of diminished market value. He did not produce evidence that he was retailing goods when the Postal Service began using the image in 2003. He did not produce evidence that he had any actual or potential business prospects after 2000. He never produced any evidence that he personally sold or licensed any photographs or other representations of "The Column" after 2000.

Indeed, the available evidence indicates that "The Column" has little to no market value at all. Both Mr. Gaylord and Mr. Triano believed that there was no market for "The Column." In a

letter to the CEO of World Travel, Mr. Triano acknowledged that World Travel had largely failed in its efforts to sell KWVM-related retail goods. Mr. Triano rationalized:

> At this point in time [February 8, 1996], the veterans have very little interest in the Memorial's products.

DX 25 (Triano - Learst Letter). Mr. Gaylord also believed that there was no market for his products. In an undated letter to Colonel Bill Weber, a member of the Veterans Advisory Board, Mr. Gaylord stated that:

> We plan to test market one soldier, no. 5[,] in a quarter page ad[] in the Greybeards soon just to see if there is any interest out there. The Franklin Mint, the Danbury Mint, Bradford Exchange and several other sources of marketing[;] they simply are not interested. So, we will proceed with a small scale marketing attempt of our own.

DX 28 (Gaylord - Weber Letter). Thus, both Mr. Gaylord and Mr. Triano believed that there was no market value in "The Column" during 1996 and thereafter. Mr. Gaylord and Mr. Triano provided no evidence that their assessment of the market changed between that time and 2003, when the Postal Service began using the Alli Photo. See generally DX 44 (Responses to Interrogatory Nos. 8-10).

Even if "The Column" is presumed to have market value, there is no genuine issue of material fact that "The Column" has not lost market value. Mr. Gaylord has admitted "that the Postal Service's use of the Alli Image as part of the Stamp has not harmed any actual business prospects of Plaintiff." DX 43 (Response to Request for Admission No. 18). Although he admitted that request, Mr. Gaylord argued that the Postal Service's activities harmed "unknown, but forseeable business." DX 43 (Response to Request for Admission No. 18). Since he provided no evidence that any business existed or would have been "forseeable," Mr. Gaylord's comment must be disregarded as pure speculation.

*b. Actual Damages are Improper Because the Postal Service Did Not Proximately Cause Injury to the Market Value of "The Column"*

Mr. Gaylord's damages argument is fatally flawed because the Postal Service's activities have no causal relationship with Mr. Gaylord's failure to obtain revenue from "The Column." Indeed, Mr. Gaylord's failure to obtain revenue from "The Column" is attributable to his retirement two years before the issuance of the Stamp; his lack of efforts to commercialize or license "The Column"; and the significant differences between the Postal Service's products and Mr. Gaylord's products.

First, Mr. Gaylord's retirement from commercial sculpting in 2001 indicates that the Postal Service's activities in 2003 had nothing to do with Mr. Gaylord's failure to obtain revenue from licensing "The Column." Mr. Gaylord's last commercial project was completed in 2001, and following the completion of that project, he sold his studio.

Second, Mr. Gaylord and Mr. Triano have not made any efforts to commercialize "The Column" in the last five years. Furthermore, there appears to be no evidence that either individual made any efforts to commercialize or license the work in the past ten years.

Mr. Gaylord's financial records support the conclusion that neither Mr. Triano nor Mr. Gaylord made any efforts to commercialize "The Column" in the last five to ten years. A document that identifies Mr. Gaylord's KWVM income and expenses indicates that he received no income related to the project in the last five years. See DX 40 (Financial Summary). Indeed, the document only identifies two sources of royalty income, and the second source – for $650 – was the result of a cease and desist letter, rather than any direct sale of merchandise. See DX 40 (Financial Summary).

Taken together, Mr. Gaylord's retirement and his failure to commercialize "The Column" demonstrate that there was no causation between the Postal Service's activities and Mr. Gaylord's claim for a royalty. Similarly, in PAR Microsystems, a district court entered judgment in favor of the defendants where the plaintiff "had no product to sell and did not lose any sales due to [defendant's] infringement." PAR Microsystems, Inc. v. Pinnacle Development Corp., 995 F. Supp. 658, 662 (N.D.Tex. 1998). In that case, the former licensee of a computer program accused a later licensee of infringing a copyright. See id. at 659-61. The former licensee, however, did not and could not market its own program during the time period of the defendant's infringement. See id. at 661-62. The court held that no reasonable jury could have awarded plaintiff actual damages because:

> PAR's inability to sell its copyrighted software was not caused in fact by Pinnacle's infringement. PAR did not demonstrate a reasonable probability that, but for Pinnacle's infringement, PAR would not have suffered the losses. Pinnacle's infringement was not the proximate cause of the lost sales that were the subject of PAR's trial evidence.

Id. at 622. The same logic rules out the existence of proximate cause in the present case.

Finally, the significant differences between the products sold by the Postal Service and the products sold by Mr. Gaylord demonstrate that Postal Service could not have affected Mr. Gaylord's business. The Postal Service's products were all based on the Stamp which was based on John Alli's photograph of "The Column." See, e.g., DX 24 (Alli Photo). Mr. Gaylord's products consisted of t-shirts and miniature statues produced by World Travel. See DX 23 (Invoices). The Postal Service's products all were largely two-dimensional in nature; whereas "The Column" is a three-dimensional sculpture. The image of the KWVM on the Postal Service's products depicts the sculptures obscured by snow in an abstract fashion; the use of "The Column" in Mr. Gaylord's

products is realistic. The Postal Service's products are minuscule in size in comparison to the copyrighted work.[5] Given these differences, it is impossible to conclude that the Postal Service's sales of its products affected the market for "The Column."

The Ninth Circuit's analysis of a similar situation in the Arriba Soft decision supports the conclusion that these product differences could not have affected the market for "The Column." See Kelly v. Arriba Soft Corp, 336 F.3d 811 (9th Cir. 2003). In Arriba Soft, a professional photographer argued that an internet search engine had infringed his copyrights in a series of photographs by displaying "thumbnail" images in response to search requests. See id. at 815-16. In addressing the issue of whether the search engine fairly used the copyrighted images, the Ninth Circuit held that the thumbnail images could not have affected the market for the full-sized images. See id. at 821-22. The court cited the fact that the smaller images could "not be a substitute for the full-sized images" and that those who obtained the smaller images could not recreate the copyrighted works from the images. Id. Using the logic of the Ninth Circuit, the Postal Service's use of the Alli Photo as part of the Stamp could not have affected the market for "The Column," because the stamp image could never have substituted for the copyrighted work.

*c. Mr. Gaylord Failed to Prove a Reasonable Royalty and His Request is Speculative and Improper*

Mr. Gaylord erroneously argues that he is entitled to damages in the form of a reasonable royalty. See, e.g., Georgia Pacific Corp. v. United States Plywood Corp., 318 F. Supp. 1116 (S.D.N.Y. 1970); Paymaster Techs., Inc. v. United States, 61 Fed. Cl. 593 (2004).

---

[5] For example, the Stamp measures 1.56 inches wide by 0.99 inches tall. Each individual soldier in "The Column" is approximately 7.5 feet tall.

Mr. Gaylord's request for a royalty is flawed because he cannot prove either diminished value or causation. As previously indicated, Mr. Gaylord made no efforts to commercialize or license "The Column" during the past ten years. As a result, Mr. Gaylord's legal arguments cannot provide the proper factual basis for the award of a reasonable royalty.

*d. Mr. Gaylord's Maximum Recovery is $750*

In the absence of actual damages, Mr. Gaylord's maximum recovery is governed by the plain language of Section 1498(b), which allows "minimum statutory damages as set forth in section 504(c)" as a measure for reasonable compensation. 28 U.S.C. § 1498(b). The only interpretation of this phrase that does justice to the words of the statute is that minimum statutory damages is $750.

The starting point for interpreting "minimum statutory damages" is the language of the statute itself. See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980). "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." Perrin v. United States, 444 U.S. 37, 42 (1979). "Minimum" is defined as "[t]he least possible degree or quantity" and "[a] lower limit permitted by law or other authority." American Heritage College Dictionary 868 (3d ed. 2000). Therefore, under the current statutory limits, the plain meaning of "minimum" is $750 based on the ordinary, common meaning of the word. See 17 U.S.C. § 504(c)(1) (establishing the range of statutory damages, with the minimum amount set at $750, and the maximum amount set at $30,000).

This conclusion is at odds with the Court of Federal Claims's conclusion in the Wechsberg case. See Wechsberg, 54 Fed. Cl. at 165-66. The Wechsberg court, in *dicta*, construed "minimum

statutory damages" to include the entire range of statutory damages.[6] Id. To support this, the court suggested that the word "including" should be read "but at least." Id. This interpretation, however, reads out the word "minimum" from the plain language of the statute, because anything other than $750 is not "minimum statutory damages." The court's interpretation of the statute renders that portion superfluous, in violation of the principles of statutory interpretation. See Hohn v. United States, 524 U.S. 236, 249 (1998); Kawaauhau v. Geiger, 523 U.S. 57, 62 (1998) (quoting Mackey v. Lanier Collection Agency & Service, Inc., 486 U.S. 825, 837 (1988)). In addition, the court incorrectly substituted its judgment for that of Congress by inferring that plaintiffs would have "no logical reason" to choose minimum statutory damages if they were limited to $750. Wechsberg, 54 Fed. Cl. at 166; compare with H.R. Rep. No. 94-1476 (reprinted in 1976 U.S.C.C.A.N. 5659, 5777) (stating that a copyright infringement plaintiff is "not obligated to submit proof of damages and profits and may choose to rely on the provision for minimum statutory damages"); BMG Music v. Gonzalez, 430 F.3d 888, 892 (7th Cir. 2005) (affirming award of minimum statutory damages, and defining $750 per work as "the statutory minimum award"); Gnossos Music v. Mitken, Inc., 653 F.2d 117, 118 (4th Cir. 1981) (noting that the plaintiffs "waived any recovery in excess of the $250.00 minimum statutory damages" and that plaintiffs seeking minimum statutory damages are "relieved of the often difficult burden of proving actual damages or infringer's profits"); Encyclopaedia Britannica Educ. Corp. v. Crooks, 558 F. Supp. 1247, 1252, 1256 (W.D.N.Y. 1983) (awarding minimum statutory damages to plaintiffs seeking the same where plaintiffs contended

[6] The parties in Wechsberg never briefed this issue. The court's interpretation of "including the minimum statutory damages" is pure *dicta* because the court did not award any statutory damages whatsoever. See id. at 167. As a result, the government could not appeal the court's conclusions.

actual damages were incalculable and where plaintiffs offered no proof of damages). Because Section 1498(b) is susceptible to a plausible reading under which sovereign immunity is not waived for statutory damages above $750, the statute fails to establish an unambiguous waiver for statutory damages above $750 and sovereign immunity therefore bars statutory damages above $750. For this reason, this Court should adopt the plain meaning of the statute and decline to follow Wechsberg.

## CONCLUSION

In view of the foregoing, the government did not infringe Mr. Gaylord's copyright. Plaintiff is not entitled to any damages.

Respectfully submitted,

GREGORY G. KATSAS
Acting Assistant Attorney General

JOHN J. FARGO
Director

s/ Scott Bolden
SCOTT BOLDEN
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, DC 20530
Telephone: (202) 307-0262
Facsimile: (202) 307-0345

May 16, 2008

Attorneys for Defendant the United States