IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| FRANK GAYLORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-539C |
| | ) | |
| THE UNITED STATES, | ) | Judge Thomas C. Wheeler |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S POST-TRIAL BRIEF

GREGORY G. KATSAS
Assistant Attorney General

JOHN J. FARGO
Director

SCOTT BOLDEN
OF COUNSEL:                          Senior Trial Counsel
ERIC F. MULCH                        Commercial Litigation Branch
United States Postal Service         Civil Division
                                     Department of Justice
                                     Washington, DC  20530
                                     Telephone:    (202) 307-0262
August 20, 2008                      Facsimile:    (202) 307-0345

Attorneys for Defendant the United States

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

PROPOSED FINDINGS OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    I.     PROPOSED FACTS RELATING TO BACKGROUND ISSUES . . . . . . . . . . . 3

    II.    PROPOSED FACTS RELATING TO FAIR USE AND DAMAGES . . . . . . . . 6

    III.   PROPOSED FACTS RELATING TO THE ARCHITECTURAL
         WORK EXCEPTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

    IV.   PROPOSED FACTS RELATING TO OWNERSHIP . . . . . . . . . . . . . . . . . . . 11

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    I.     THE POSTAL SERVICE'S USE OF THE KWVM AS DEPICTED
         IN THE STAMP IS A FAIR USE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

         A.    The Postal Service's and Mr. Alli's Uses of "The Column"
              Are Transformative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

              1.    The Alli Photo and the Stamp each have a different purpose
                   and character than Mr. Gaylord's work, and are transformative
                   works of art . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

              2.    Blanch is directly analogous . . . . . . . . . . . . . . . . . . . . . . . . . 19

              3.    Artists create new art from pre-existing sources . . . . . . . . . . . . . 20

         B.    The Public Nature of "The Column" Supports a Finding of
              Fair Use . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

         C.    Mr. Alli Used Only a Limited Portion of "The Column" . . . . . . . . . . . 22

         D.    The Postal Service's Use of "The Column" Had No Effect
              upon the Value of "The Column" or Mr. Gaylord's
              Potential Market . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

II.   THE POSTAL SERVICE'S USE OF A PHOTOGRAPH OF THE KWVM
      WAS NONINFRINGING UNDER THE ARCHITECTURAL
      WORKS COPYRIGHT PROTECTION ACT . . . . . . . . . . . . . . . . . . . . . . . . . . 27

III.  A JOINT OWNER OF THE SOLDIER STATUES AND
      "THE COLUMN" GRANTED THE GOVERNMENT AN
      UNLIMITED, PAID-UP LICENSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

      A.   Mr. Gaylord, CLA, the VAB, and the CFA Jointly Own the
           Copyright in the Soldier Statues . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

           1.   The joint collaboration spanned the entire scope
                of the project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

           2.   CLA, the CFA, and the VAB each contributed
                copyrightable expression to the soldier statues . . . . . . . . . . . . . 38

      B.   CLA, the VAB, and the CFA Jointly Own the Copyright for
           "The Column" as Installed in the KWVM . . . . . . . . . . . . . . . . . . . . . . 41

      C.   The Analysis Used in CCNV v. Reid Is Highly Relevant . . . . . . . . . . . 43

      D.   The Government Possesses an Unlimited, Paid-Up License with
           Respect to CLA's Copyrights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

      E.   As a Result of the Contributions of the VAB and the CFA, the
           Government Has an Independent Right to Use the Soldier Statues
           and "The Column" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

IV.   THE VISUAL ARTISTS RIGHTS ACT IS NOT APPLICABLE
      TO THE PRESENT CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

V.    ASSUMING LIABILITY, MR. GAYLORD IS NOT
      ENTITLED TO COMPENSATION IN EXCESS OF
      MINIMUM STATUTORY DAMAGES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

      A.   Actual Damages are Improper Because Gaylord Cannot Prove
           Any Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

      B.   Actual Damages are Improper Because the Postal Service
           Did Not Proximately Cause Injury to the Market Value of the
           Soldier Statues . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

      C.   Mr. Gaylord's Maximum Recovery is $750 . . . . . . . . . . . . . . . . . . . . . 54

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

# TABLE OF AUTHORITIES

**Cases**

Abeshouse v. Ultragraphics, Inc.,
   754 F.2d 467 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Atari Games Corp. v. Nintendo of America Inc.,
   975 F.2d 832 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Baker v. Robert I. Lappin Charitable Foundation,
   415 F. Supp. 2d 473 (S.D.N.Y. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Berman v. Johnson,
   518 F. Supp. 2d 791 (E.D.Va. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Bill Graham Archives v. Dorling Kindersley Ltd.,
   448 F.3d 605 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Blanch v. Koons,
   467 F.3d 244 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

BMG Music v. Gonzalez,
   430 F.3d 888 (7th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Brooktree Corp. v. Advanced Micro Devices, Inc.,
   977 F.2d 1555 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Campbell v. Acuff-Rose Music, Inc.,
   510 U.S. 569 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.,
   150 F.3d 132 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Community for Creative Non-Violence v. Reid,
   846 F.2d 1485 (D.C. Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43-44

Community for Creative Non-Violence v. Reid,
   1991 WL 415523 (D.D.C. Jan. 7, 1991) (No. Civ. A. 86-1507(TPJ)) . . . . . . . . . . . . . 44

Community for Creative Non-Violence v. Reid,
   490 U.S. 730 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

Childress v. Taylor,
    798 F. Supp. 981 (S.D.N.Y.1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,
    447 U.S. 102 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Data General Corp. v. Grumman Systems Support Corp.,
    36 F.3d 1147 (1st Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Edward B. Marks Music Corp. v. Jerry Vogel Music Co.,
    140 F.2d 266 (2d Cir. 1944) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Emerson v. Davies,
    8 F. Cas. 615 (No. 4,436) (CCD Mass. 1845) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Encyclopaedia Britannica Educ. Corp. v. Crooks,
    558 F. Supp. 1247 (W.D.N.Y. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Erickson v. Trinity Theatre, Inc.,
    13 F.3d 1061 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.,
    772 F.2d 505 (9th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

Gnossos Music v. Mitken, Inc.,
    653 F.2d 117 (4th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Harper & Row Publishers, Inc. v. Nation Enterprises,
    471 U.S. 539 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

Herbert v. United States,
    36 Fed. Cl. 299 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

Hohn v. United States,
    524 U.S. 236 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Kawaauhau v. Geiger,
    523 U.S. 57 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Kelly v. Arriba Soft Corp.,
    336 F.3d 811 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 54

Leesona v. United States,
    599 F.2d 958 (Ct. Cl. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 49

Leibovitz v. Paramount Pictures Corp.,
137 F.3d 109 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Leicester v. Warner Bros.,
232 F.3d 1212 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

Lennon v. Premise Media Corp.,
556 F. Supp. 2d 310 (S.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Lucas v. United States Army Corps of Engineers,
1991 WL 229941 (D.D.C. 1991),
aff'd, 990 F.2d 1377 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Lucas v. United States Army Corps of Engineers,
789 F. Supp. 14 (D.D.C. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Lucas v. United States,
25 Cl. Ct. 298 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Mackey v. Lanier Collection Agency & Service, Inc.,
486 U.S. 825 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Mackie v. Rieser,
296 F.3d 909 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Motorola, Inc. v. United States,
729 F.2d 765 (Fed. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

PAR Microsystems, Inc. v. Pinnacle Development Corp.,
995 F. Supp. 658 (N.D.Tex. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Perfect 10, Inc. v. Amazon.com, Inc.,
487 F.3d 701 (9th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26

Perrin v. United States,
444 U.S. 37 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Polar Bear Productions, Inc. v. Timex Corp.,
384 F.3d 700 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49, 50

Quintanilla v. Texas Television Inc.,
139 F.3d 494 (5th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Scott v. Dixon,
       309 F. Supp. 2d 395 (E.D.N.Y. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Stewart v. Abend,
       495 U.S. 207 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Thomson v. Larson,
       147 F.3d 195 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 33

Wechsberg v. United States,
       54 Fed. Cl. 158 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 51, 55, 56

Yankee Candle Co. v. New England Candle Co.,
       14 F. Supp. 2d 154 (D.Mass. 1998),
       vacated pursuant to settlement, 29 F. Supp. 2d 44 (D.Mass. 1998) . . . . . . . . . . . . . . . . 29


**Statutes**

17 U.S.C. § 101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 43, 46, 47

17 U.S.C. § 102 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

17 U.S.C. § 105 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46, 47

17 U.S.C. § 106 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 48

17 U.S.C. § 106A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47-48

17 U.S.C. § 107 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 15, 47-48

17 U.S.C. § 120 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27-28, 30

17 U.S.C. § 201 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 45

17 U.S.C. § 504 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48-50, 54-55

28 U.S.C. § 1498 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

39 U.S.C. § 3621 (2000) (repealed 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

40 U.S.C. §§ 1001-1010 (Supp. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

40 U.S.C. § 1008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

40 U.S.C. § 8711 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

40 U.S.C. § 8904 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

40 U.S.C. §§ 9101-04 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

41 U.S.C. § 605 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Pub. L. No. 99-572, 100 Stat. 3226 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-4

Pub. L. No. 101-650, 104 Stat. 5133 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

**Other Authorities**

37 C.F.R. § 202.11 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28-29

American Heritage College Dictionary (3d ed. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Fifth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 48

H.R. Rep. No. 94-1476 (<u>reprinted in</u> 1976 U.S.C.C.A.N 5659) . . . . . . . . . . . . . . . 33, 45, 50, 55

H.R. Rep. No. 101-735 (<u>reprinted in</u> 1990 U.S.C.C.A.N. 6935) . . . . . . . . . . . . . . . . . . . . 27, 29

Melville B. Nimmer & David Nimmer, <u>Nimmer on Copyright</u> . . . . . . . . . . . . . . . . . . . . . . . . 50

S. Rep. No. 1877 (<u>reprinted in</u> 1960 U.S.C.C.A.N. 3444) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| FRANK GAYLORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 06-539C |
| | ) | |
| THE UNITED STATES, | ) | Judge Thomas C. Wheeler |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S POST-TRIAL BRIEF

Pursuant to the Court's Order of July 23, 2008, Defendant the United States ("the government") hereby respectfully submits its Post-Trial Brief.

## SUMMARY OF ARGUMENT

First, the Postal Service's use of the KWVM as depicted in the Stamp is a fair use. The doctrine of fair use recognizes that people create new works from pre-existing materials, and attempts to strike a balance between individual property interests and the societal interest in fostering creativity. Section 107 of Title 17 identifies four factors that courts must consider to determine fair use, and all four factors weigh in the favor of the Postal Service. The Alli Photo and the Stamp are transformative works of art of a national monument. Both copy a limited portion of "The Column." The Stamp did not harm any of Mr. Gaylord's actual or potential business prospects.

Second, the Postal Service's use of a photograph of the KWVM was noninfringing under the Architectural Works Copyright Protection Act, which provides that the public is free to make, distribute, and display pictures and photographs of an architectural work. The KWVM fits within

- 1 -

the definition of the Act, and allowing photographs of the Memorial serves an important public purpose.

Third, a joint owner of the soldier statues and "The Column" granted the government an unlimited, paid-up license in the works.  Mr. Gaylord, CLA, the VAB, and the CFA jointly collaborated to create the soldier statues, and each contributed copyrightable expression to the final work.  In addition, CLA, the VAB, and the CFA jointly collaborated to install the soldier statues in the setting of the KWVM, creating "The Column."  The contract between the government and CLA automatically granted the government an unlimited, paid-up license in CLA's copyrights.  In addition, the government possesses the exclusive rights of a joint owner for both works by virtue of the contributions of the VAB and the CFA.

Fourth, the Visual Artists Rights Act is not applicable to the present case.  The Act protects certain rights of an artist in a single work of art, and has no bearing on later derivative works, such as the Alli Photo or the Stamp.

Finally, assuming liability, Mr. Gaylord's compensation is limited to minimum statutory damages.  "Reasonable and entire compensation" under Section 1498(b) is akin to just compensation under the Fifth Amendment.  Mr. Gaylord offered no proof of harm to his actual or potential business prospects, and speculation of harm is improper.  Accordingly, assuming liability, Mr. Gaylord's reasonable and entire compensation is limited to minimum statutory damages.

## ISSUES PRESENTED

1.       Whether the Postal Service's use of the KWVM as depicted in the Stamp is a fair use.

2.       Whether the Postal Service's use of a photograph of the KWVM was noninfringing under the Architectural Works Copyright Protection Act.

3.       Whether a joint owner of the soldier statues or "The Column" granted the government an unlimited, paid-up license.

4.       Whether the Visual Artists Rights Act is not applicable to the present case.

5.       Assuming liability, whether Mr. Gaylord is entitled to compensation in excess of minimum statutory damages.

## PROPOSED FINDINGS OF FACT

The Stipulated Uncontested Material Facts, filed with the Court on May 16, 2008, are incorporated by reference (hereinafter "Stip. Fact ¶ X").

## I.       PROPOSED FACTS RELATING TO BACKGROUND ISSUES

1.       On October 28, 1986, Congress enacted legislation to construct a memorial on the National Mall to honor veterans of the Korean War.  See Pub. L. No. 99-572, 100 Stat. 3226 (1986). Section 1 of the legislation authorized the American Battle Monuments Commission (ABMC), an independent commission of the United States Government, to establish the Korean War Veterans Memorial (KWVM).   See id.  Section 2 of the legislation created the Korean War Veterans Memorial Advisory Board ("Veterans Advisory Board" or VAB), consisting of twelve Korean War veterans, and made the group responsible for:  recommending the site for the KWVM; selecting the design for the memorial; promoting the establishment of the memorial; and obtaining private funds

for construction and upkeep of the KWVM.  See id.  The ABMC retained the United States Army Corps of Engineers (USACE) as its agent in the design and construction of the memorial.  See generally Tr. at 467:22-68:11 (Lecky); DX 2 (Contract).

2.     The legislation also provided that the memorial was to be established in accordance with the National Capital Memorials and Commemorative Works Act.  See Pub. L. No. 99-572, 100 Stat. 3226 (1986); see generally 40 U.S.C. §§ 1001-1010 (Supp. 1988).  Pursuant to the Act, the Commission of Fine Arts (CFA), the National Capital Planning Commission, and the National Capital Memorial Commission were required to approve the final design of the KWVM.  See 40 U.S.C. § 1008(a); see also GX 2 at G7-12 (Contract).

3.     The VAB, the CFA, the National Capital Planning Commission, and the National Capital Memorial Commission are all government entities.  See Pub. L. No. 99-572, 100 Stat. 3226, Section 2 (1986) (VAB); 40 U.S.C. §§ 9101-04 (CFA); 40 U.S.C. § 8711 (NCPC); 40 U.S.C. § 8904 (NCMC).

4.     On June 1, 1989, a team of architects from Pennsylvania State University ("the Penn State team") won a contest sponsored by the ABMC to design the KWVM.  The members of the team were Veronica Burns Lucas, Don Leon, John Lucas, and Eliza Pennypacker Oberholtzer.  See PX 1 at 2 ¶ 1 (Sculptor Selection Brochure).

5.     The Penn State team's design for the KWVM consisted of 38 granite soldiers in formation.  The individual soldiers were designed to be representative of the military branches and personnel that served in the Korean War.  The soldiers were to be depicted as moving from an area of dogwood trees, symbolizing peace, through an area of conflict, towards an American flag.  See

Tr. at 465:14-66:13 (Lecky)[1]; see also PX 1 at 2 ¶ 2 (Sculptor Selection Brochure); Lucas v. United States, 25 Cl. Ct. 298, 301 (1992).

6.      The USACE selected Cooper-Lecky Architects P.C. (CLA) as the architects-of-record for the KWVM.  See Tr. at 463:8-16 (Lecky).  The two principals of CLA were Kent Cooper and William Lecky.  See Tr. at 459:12-18, 473:5-8 (Lecky).

7.      After CLA made many significant modifications to the Penn State team's proposed design to meet the concerns of the reviewing agencies, the Penn State team sued the government in the United States Claims Court for breach of contract.  See Lucas v. United States, 25 Cl. Ct. 298 (1992); see also Tr. at 463:17-64:2, 466:14-67:15, 473:8-19 (Lecky).  In addition, the Penn State team sued the government and CLA in the United States District Court for the District of Columbia, claiming that the VAB had exceeded its statutory authority, and arbitrarily and capriciously violated its promulgated rules.  See Lucas v. United States Army Corps of Engineers, 1991 WL 229941 (D.D.C. 1991), aff'd, 990 F.2d 1377 (D.C. Cir. 1993); Lucas v. United States Army Corps of Engineers, 789 F. Supp. 14 (D.D.C. 1992).

8.      The Penn State team withdrew from the KWVM project, and the USACE selected CLA as the architectural/engineering (A/E) firm to design the KWVM.  See Tr. at 473:20-23 (Lecky).  On April 11, 1990, the USACE and CLA entered into Contract No. DACA31-90-C-0057 with respect to CLA's A/E services for the KWVM project.  See DX 2 at G1-G2, G6-G12 (Contract).

---

[1] Pursuant to the Court's Order of July 23, 2008, citations to the transcript are in the form of "Tr. at xxx:yy (zzzzz)", where "xxx" represents the page number, "yy" represents the line number, and "zzzzz" represents the name of the witness or other speaker.

9.     During 1990, CLA sponsored an open competition to select the figural sculptor for the sculptural component to be included in the KWVM. Mr. Gaylord participated in the competition and was selected as the sculptor. See Stip. Fact ¶ 4.

10.     The work-in-suit is a sculpture that features 19 statues representing a platoon of soldiers in formation. It is entitled "The Column" and it is part of the KWVM on the National Mall in Washington D.C. See Stip. Fact ¶ 5.

11.     Mr. Gaylord was assisted by his son-in-law, John Triano. Mr. Triano helped Mr. Gaylord with some of the labor of creating "The Column," and was responsible for handling the business, the accounting, and the paperwork for Mr. Gaylord's studio. See Stip. Fact ¶ 6.

## II.     PROPOSED FACTS RELATING TO FAIR USE AND DAMAGES

12.     Mr. Gaylord agreed to create the soldier statues because he wanted to obtain a national commission. See Tr. at 160:12-18 (Gaylord); see also Tr. at 137:25-38:4 (Gaylord) (stating that the installation of the soldier statues on the Mall was the pinnacle of his career because it was the largest commission he had ever had).

13.     John Alli created the Alli Photo[2] because he wanted to give his father "a gift for his retirement from government service and service in the Marine Corps and Korean War." Tr. at 376:13-16 (Alli).

14.     Mr. Alli created the Alli Photo to evoke the surrealistic sense that the viewer was in the Korean War, experiencing freezing conditions. See Tr. at 377:7-78:3 (Alli).

---

[2] The "Alli Photo" was defined by the parties in Stip. Fact ¶ 12.

15.     The Alli Photo is a work of art.  See Tr. at 169:16-24 (Gaylord) (describing the photograph as "beautiful"); Tr. at 377:7-78:3, 380:25-81:20 (Alli); see also Tr. at 16:21-22 (Harvey) ("The photograph, after all, is art in its own right . . . .").

16.     The Postal Service created the Stamp[3] to commemorate the fiftieth anniversary of the armistice of the Korean War.  See Stip. Fact ¶ 13; see also Tr. at 585:22-86:9 (McCaffrey).

17.     The Alli Photo and the Stamp depict a new and unique artistic view of the KWVM through the selection of the scene, the timing of the photograph, the new graphic elements introduced, and the controlled lighting.  See DX 24 (Alli Photo), DX 37 (Stamp), compare with DX 42 (KWVM Images); see also Tr. at 373:8-81:20 (Alli) (discussing his numerous efforts to create the final photograph); Tr. at 580:1-19, 583:7-85:13 (McCaffrey) (discussing the Postal Service's selection of and modifications to the Alli Photo to create the Stamp Image).

18.     "The Column" is visited by thousands of people each day, and photographed by many of them.  See Tr. at 17:6-8 (Harvey) ("['The Column'] is installed on the Mall, and thousands of people photograph it every day, they say.  That's true."); see also DX 42 (KWVM Photos).

19.     Mr. Gaylord was aware of the public purpose and location planned for the KWVM during his work on the project.  See PX 1 [all pages] (Sculptor Selection Brochure); see also Tr. at 160:12-18 (Gaylord).

20.     The Stamp and the Alli Photo are two-dimensional pictorial works, as opposed to a three-dimensional sculpture.  See DX 24 (Alli Photo), DX 37 (Stamp), compare with DX 42 (KWVM Photos).

---

[3] The "Stamp" was defined by the parties in Stip. Fact ¶ 14.

21.     The Stamp and the Alli Photo depict only one perspective of "The Column."  See DX 24 (Alli Photo), DX 37 (Stamp), compare with DX 42 (KWVM Photos).

22.     The Stamp and the Alli Photo depict a limited number of the 19 individual soldier statues.  See Tr. at 188:21-89:15 (Gaylord) (identifying six of the soldier statues in the Alli Photo); DX 24 (Alli Photo), DX 37 (Stamp), compare with DX 42 (KWVM Photos).

23.     Most of the soldier statues depicted in the Stamp and the Alli Photo are partially or completely obscured.  See Tr. at 188:21-89:15 (Gaylord) (stating that, "after that, they are masking each other and it's hard to tell what numbers go with them"); DX 24 (Alli Photo), DX 37 (Stamp), compare with DX 42 (KWVM Photos).

24.     The Alli Photo uses other graphical elements to obscure portions of "The Column."  See Tr. at 377:18-20 (Alli) ("There's snow, and you can't tell really if the people are people or statues."); DX 24 (Alli Photo), DX 37 (Stamp), compare with DX 42 (KWVM Photos).

25.     Mr. Gaylord has never sold photographs of "The Column."  See Tr. at 208:21-23 (Gaylord).

26.     Between March 13, 1995 and December 31, 1996, Mr. Gaylord licensed his copyrights to Korean War Veterans Memorial Dedication Foundation, Inc., also known as World Travel.  See PX 18 (License Agreement).  The only products sold by World Travel pursuant to this license agreement were T-shirts and miniature statues.  See DX 27 at FG 691 (World Travel Report).  These products depicted one or more of the individual solider statutes, and did not depict the soldier(s) as installed in the KWVM.  See Tr. at 327:19-28:19 (Triano).

27.     After December 31, 1996, Mr. Gaylord has not licensed any copyright related to "The Column," other than in the context of the settlement agreement with Mr. Alli.  See generally Tr. at 308:12-17 (Triano); DX 46 (Accounting Ledger).

28.     Mr. Gaylord's last royalty payment from World Travel was for $18.36, received on April 28, 1997.  See DX 46 at G2605 (Accounting Ledger); Tr. at 339:23-40:14 (Triano).

29.     After April 28, 1997, Mr. Gaylord has not received any money from licensed third-parties related to "The Column."  See DX 46 at G2606-09 (Accounting Ledger).

30.     Between November 24, 1997, and December 3, 1997, Mr. Gaylord sold two miniature soldier statues.  See DX 46 at G2606 (Accounting Ledger).

31.     Between July 15, 1999, and August 21, 2000, Mr. Gaylord sold one complete set of miniature soldier statues.  See DX 46 at G2607-08 (Accounting Ledger).

32.     Since August 22, 2000, Mr. Gaylord has not sold any products related to "The Column."  See DX 46 at G2607-09 (Accounting Ledger).  Approximately five years ago, Mr. Gaylord permitted the foundry to destroy the molds used to make the miniature statues.  See Tr. at 199:18-200:2 (Gaylord).

33.     Since August 22, 2000, Mr. Gaylord has not attempted to commercialize "The Column."  See Tr. at 194:12-13, 196:4-11, 208:10-14, 209:14-16 (Gaylord); Tr. at 331:15-18 (Triano); DX 40 (Financial Summary); DX 46 at G2607-09 (Accounting Ledger).

34.     Since August 22, 2000, the only income that Mr. Gaylord has received related to "The Column" is a check for $650 for a release from past liability received as a result of a cease and desist letter in 2002.  See DX 40 (Financial Summary); PX 25 (Letter).

35.     Mr. Gaylord's last commercial project was completed in 2002.  <u>See</u> DX 46 at G2609 (Accounting Ledger).  After completing that project, Mr. Gaylord closed his studio and retired from commercial sculpting.  <u>See</u> Tr. at 207:3-23 (Gaylord); Tr. at 320:20-21:2, 337:3-7 (Triano).

36.     In 2002, the Postal Service entered into an agreement with Mr. Alli, whereby the Postal Service paid Mr. Alli a one-time fee of $1500 for the right to use the Alli Photo as part of the stamp.  <u>See</u> DX 47 (Alli Income Summary); Tr. at 383:11-25 (Alli).

37.     The Postal Service has never paid more than a one-time fee of $5000 to acquire the right to use an image as part of a postage stamp.  <u>See</u> Tr. at 587:11-25 (McCaffrey).

38.     The Postal Service cannot pay an artist a royalty based on stamp revenue to acquire the right to use an image as part of a postage stamp.  <u>See</u> Tr. at 588:1-3 (McCaffrey).

39.     The Postal Service's use of the Alli Photo did not harm any of Mr. Gaylord's actual business prospects.  <u>See</u> Tr. at 209:7-10 (Gaylord).

40.     The Postal Service's use of the Alli Photo did not harm any of Mr. Gaylord's potential business prospects.  <u>See</u> Tr. at 209:11-13 (Gaylord).

## III.  PROPOSED FACTS RELATING TO THE ARCHITECTURAL WORK EXCEPTION

41.     "The Column" is a part of the KWVM.  <u>See</u> DX 43 at Request No. 6 (RFAs).

42.     The KWVM is a permanent and stationary structure.  <u>See</u> DX 43 at Request No. 8 (RFAs).

43.     The KWVM was designed for humans to visit, walk through, and spend time in.  <u>See</u> Tr. at 496:8-21 (Lecky); DX 42 (KWVM Photos).

## IV.    PROPOSED FACTS RELATING TO OWNERSHIP

44.    CLA and the CFA changed the number of individual soldier statues in "The Column" from 38 statues to 19 statues.  <u>See</u> Tr. at 105:18-24 (Gaylord); Tr. at 479:23-80:2, 488:5-13 (Lecky); <u>see also</u> DX 2 at G142 (Contract).

45.    CLA, Mr. Gaylord, and the VAB were responsible for determining the positioning of the individual soldier statues in "The Column."  <u>See</u> Tr. at 121:8-13, 189:25-90:9 (Gaylord) (stating that the VAB and Mr. Gaylord were responsible); Tr. at 490:2-91:9 (Lecky) (stating that CLA was responsible, with some input from Mr. Gaylord).

46.    The VAB was responsible for determining the ethnicity of the individual soldier statues in "The Column."  <u>See</u> Tr. at 132:1-10, 200:3-22 (Gaylord); Tr. at 483:21-84:1, Tr. at 489:1-20 (Lecky).

47.    The VAB was responsible for determining the military service of the individual soldier statues in "The Column."  <u>See</u> Tr. at 200:14-22 (Gaylord); Tr. at 483:21-84:1, 489:1-20 (Lecky); <u>see also</u> Tr. at 157:4-17 (Gaylord).

48.    The VAB was responsible for determining the equipment of the individual soldier statues in "The Column."  <u>See</u> Tr. at 117:18-20, 200:14-22 (Gaylord); Tr. at 483:21-84:1, 489:1-20 (Lecky); <u>see also</u> Tr. at 157:4-17 (Gaylord).

49.    CLA, Mr. Gaylord, and Mr. Nelson jointly decided that the individual soldier statues should wear ponchos in "The Column," and the decision was approved by the CFA.  <u>See</u> Tr. at 110:18-11:14, 184:4-12 (Gaylord); Tr. at 484:10-17 (Lecky).

50.    CLA and the CFA decided that Mr. Gaylord's soldier statues depicted too much wind movement in the ponchos.  <u>See</u> Tr. at 167:1-9 (Gaylord); Tr. at 485:15-86:8 (Lecky).

51.     After Mr. Lecky informed Mr. Gaylord of CLA's decision regarding the wind movement in the ponchos, Mr. Gaylord told Mr. Lecky to rework the soldier statues.  Mr. Lecky spent three days reworking all of the soldier statues to depict less wind movement in the ponchos. See Tr. at 486:9-17 (Lecky).

52.     CLA and the CFA determined the height and size of the individual soldier statues in "The Column."  See Tr. at 487:8-25 (Lecky).

53.     CLA, the VAB, and the CFA were responsible for determining several key aspects of the appearance of the faces of the individual soldier statues in "The Column."  See Tr. at 132:1-10, 200:3-13 (Gaylord) (instructing Mr. Gaylord to change the appearance of a face); Tr. at 185:7-14 (Gaylord) (instructing Mr. Gaylord to depict certain statues as clean-shaven, with buckled chin-straps); Tr. at 491:16-25 (Lecky) (deciding on creases in the faces).

54.     CLA was responsible for positioning trees and rocks in the KWVM.  See Tr. at 489:21-90:1 (Lecky).

55.     Mr. Gaylord initially modeled the lead soldier statue, Soldier No. 1, in a "celebratory" pose, with his arms raised over his head.  CLA rejected Mr. Gaylord's proposal, and decided that Soldier No. 1 should be depicted in a non-celebratory pose.  See Tr. at 106:19-07:4 (Gaylord); Tr. at 492:1-11 (Lecky); see also DX 2 at G138 (Contract).

56.     Mr. Gaylord later modeled Soldier No. 1 with a substantial amount of wind movement in the soldier's poncho.  CLA instructed Mr. Gaylord to reduce the amount of wind movement depicted in the solider's poncho, contrary to Mr. Gaylord's preference.  See Tr. at 174:21-77:12, 179:9-25 (Gaylord).

57.     Mr. Gaylord later modeled Soldier No. 1 in a squatting position.  Shortly before the statues were cast, the CFA rejected Mr. Gaylord's design, and CLA reworked the statue into a standing position.  See Tr. at 492:10-25 (Lecky).

58.     At times, Mr. Gaylord's suggestions regarding the appearance of the soldier statues were rejected by CLA.  See Tr. at 172:19-73:3 (Gaylord).

59.     As part of the reviewing and approval process, Mr. Gaylord created over 200 different sculptures to show to CLA.  See Tr. at 107:13-16, 166:8-14 (Gaylord).

60.     Mr. Gaylord's work on "The Column" was subject to review and approval by CLA, the VAB, and the CFA.  See Tr. at 178:23-79:3, 180:1-12 (Gaylord); see also PX 9-12 (Copyright Registrations) (indicating that the work was "fully approved by all federal commissions").

61.     CLA exercised decision-making authority over Mr. Gaylord's work on "The Column."  See Tr. at 125:8-26:12, 165:23-25, 174:6-7 (Gaylord); PX 8 at FG 149-50 (Letter Agreement) (Section I:  Task 4, Task 9; Section II).

62.     On February 23, 2000, the KWVM USACE contracting officer issued a contracting officer's decision to Mr. Lecky of CLA, stating, *inter alia*, that the government held "an unlimited license with respect to any copyrights derived of the KWVM."  DX 30 at FG 751 (Contracting Officer's Decision).

**ARGUMENT**

I.   **THE POSTAL SERVICE'S USE OF THE KWVM AS DEPICTED IN THE STAMP IS A FAIR USE**

The doctrine of fair use is a critical component of a stable and just system of copyright protection. While Congress has specifically been granted the power to create a copyright system "[t]o promote the Progress of Science and useful Arts," the courts have long recognized that:

> [i]n truth, in literature, in science and in art, there are, and can be, few, if any, things, which in an abstract sense, are strictly new and original throughout. Every book in literature, science and art, borrows, and must necessarily borrow, and use much which was well known and used before.

Emerson v. Davies, 8 F. Cas. 615, 619 (No. 4,436) (CCD Mass. 1845). The Supreme Court prominently cited this principle in its Campbell v. Acuff-Rose Music, Inc. decision:

> The fair use doctrine thus "permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster."

510 U.S. 569, 574-77 (1994) (quoting Stewart v. Abend, 495 U.S. 207, 236 (1990)). Similarly, the Federal Circuit stated that the Copyright Act "encourages others to build freely upon the ideas and information conveyed by a work" because the ultimate purpose is progress in the arts and sciences, rather than "the rewarding of authors." Atari Games Corp. v. Nintendo of America Inc., 975 F.2d 832, 842 (Fed. Cir. 1992) (citations omitted).

Whether a particular use should be considered fair depends heavily on the unique facts and requires a case-by-case approach by a court. See Campbell, 510 U.S. at 577; Harper & Row Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 560-61 (1985). Recognizing this, Congress outlined four specific factors that courts must use to determine whether the affirmative defense applies:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107.  These four factors, while mandatory, are neither exclusive nor exhaustive.  See Harper & Row, 471 U.S. at 560.  The Supreme Court cautioned judges from presuming either infringing conduct or fair use; and stressed that the proper approach required a "sensitive balancing of interests."  Campbell, 510 U.S. at 584-85.

As discussed below, the statutorily-enumerated factors weigh strongly in favor of a finding of fair use.

**A.      The Postal Service's and Mr. Alli's Uses of "The Column" Are Transformative**

With respect to the first factor – the purpose and character of the use – the Postal Service and Mr. Alli transformed a unique, single-perspective view of "The Column" into completely new and different works of art.  As such, this factor weighs heavily in favor of a finding of fair use.

According to the Supreme Court, the critical inquiry is whether the accused work "merely supersedes" the original work, or whether it "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message."  Campbell, 510 U.S. at 578-79.  In other words, courts must inquire "whether and to what extent the new work is **transformative**."  Id. (emphasis added).  If a court concludes that the accused work is transformative, that finding favors fair use.  See, e.g., id. ("[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a

finding of fair use."). To determine whether a subsequent work is transformative, courts often consider whether the work "adds value to the original," by incorporating "new information, new aesthetics, new insights and understandings." Blanch v. Koons, 467 F.3d 244, 251-52 (2d Cir. 2006) (quoting Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc., 150 F.3d 132, 137 (2d Cir. 1998)). In this case, the first factor supports a finding of fair use because: (1) each of the works has a different purpose and character; and (2) the Alli Photo and the Stamp are transformative works of art.

      *1.     The Alli Photo and the Stamp each have a different purpose and character than Mr. Gaylord's work, and are transformative works of art*

First, each of the works – the soldier statues, the Alli Photo, and the Stamp – has a different purpose and character. Mr. Gaylord testified that his primary purpose in participating in the KWVM project was personal achievement and the honor of obtaining a national commission. See Gov. Fact ¶ 12; Tr. at 160:12-18 (Gaylord); see also Tr. at 137:25-38:4 (Gaylord) (stating that the installation of the soldier statues on the Mall was the pinnacle of his career because it was the largest commission he had ever had). He also appears to have been motivated, in part, to honor his friends and colleagues. See Tr. at 113:8-19 (Gaylord) (sculpting Soldier No. 11 in the loose image of a friend); Tr. at 117:21-18:7 (Gaylord) ("several of [the soldier statues] are pretty good look-alikes of friends of mine," and sculpting Soldier No. 5 as a loose self-portrait); Tr. at 121:14-23 (Gaylord) (sculpting Soldier No. 16 in the image of Col. Bill Weber); Tr. at 129:9-17 (Gaylord) (sculpting Soldier No. 1 in the image of John Triano's father); see also Tr. at 128:21-29:8, 130:23-31:10, 132:1-33:10 (Gaylord) (sculpting many other statues to look like friends and colleagues). Mr. Alli, on the other hand, created the Alli Photo as a gift for his father, rather than as an effort of personal achievement and to gain fame. See Gov. Fact ¶ 13; Tr. at 376:13-16 (Alli). The Postal Service had

- 16 -

yet another purpose in mind when it created the Stamp.  The Postal Service sought to commemorate the fiftieth anniversary of the armistice of the Korean War.  <u>See</u> Gov. Fact ¶ 16; Stip. Fact ¶ 13; <u>see also</u> Tr. at 585:22-86:9 (McCaffrey).

Second, the Alli Photo and the Stamp use a single-perspective view of "The Column" as raw material to create new works of art in their own right.  Mr. Alli took hundreds of pictures of different aspects of the KWVM before he achieved the results he sought.  <u>See</u> Tr. at 373:10-18 (Alli) (taking photos with different angles, exposures, lighting conditions, and subjects); Tr. at 377:3-4 (Alli) ("I took pictures in the spring, in the summer, in the fall; daytime, nightime.").  Mr. Alli also exercised creative control over a number of additional variables to achieve the specific graphic effects he desired.  <u>See</u> Tr. at 375:1-6 (Alli) (using a flash and a tripod); Tr. at 378:11-16 (Alli) (opting for slide film); Tr. at 379:11-20 (Alli) (choosing glossy prints).  During trial, Mr. Alli explained the exact results he was trying to achieve with the Alli Photo:

> Q   And you might have already answered this, but what results did you want?
>
> A   I wanted something that would give you the feeling that you were there, over in Korea.  And for all the vets, a lot of them, it was the freezing conditions.
>
> Q   And do you feel that this picture achieved the results you wanted?
>
> A   Yes.
>
> Q   And how does this picture achieve the results you wanted?
>
> A   It's, I think it's surreal.  There's snow, and you can't tell really if the people are people or statues.
>
> Q   And by "surreal," what do you mean by the use of that word?
>
> A   Not quite real.
>
> Q   And in what ways is this photograph not quite real?

A   I think it's not quite real because they look a little bit real; because people have mistaken the photograph for actual people in the snow.

Tr. at 377:7-78:3 (Alli).  Critically, the artistic expression that Mr. Alli sought to capture with his photograph differs materially from the artistic expression in the soldier statues.  See generally Gov. Fact ¶ 17.  The artistic expression of the soldier statues is essentially a three-dimensional sculptural snapshot of group of soldiers on an undefined mission in the Korean War, captured as a single moment in time.  See Tr. at 105:3-4 (Gaylord); see generally PX 1 (Sculpture Selection Brochure). The 19 statues, their spatial relationship, and the surrounding landscape are combined into a unitary composition.  See Tr. at 105:3-8 (Gaylord) (testifying that the composition requirement "meant something, because each [statue] would not have to function as a piece of sculpture by itself, because it was a part of something larger").  Mr. Alli sought to transform this expression in a surrealistic fashion, whereby the viewer steps inside the frame of the photograph to experience the freezing conditions with the Korean War soldiers.  See Gov. Fact ¶ 14; Tr. at 377:7-78:3 (Alli).  In addition, certain soldiers appear to be singled out by the camera perspective, while others are obscured by the elements and the lighting conditions and recede into the background.  Overall, the artistic expression in the Alli Photo seems to be of cold, darkness, isolation, and surrealism.  The Alli Photo was hailed as a work of art.  See Gov. Fact ¶ 15; Tr. at 169:16-24 (Gaylord) (describing the photograph as "beautiful"); Tr. at 377:7-78:3, 380:25-81:20 (Alli); see also Tr. at 16:21-22 (Harvey) ("The photograph, after all, is art in its own right . . . .").

The Postal Service also altered the artistic expression to achieve its goals.  Terry McCaffrey, Manager of Stamp Development, stated that the Postal Service sought to both simplify and enhance aspects of the Alli Photo to function as a more effective image on a postage stamp.  See Tr. at 584:13-17 (McCaffrey).  In particular, McCaffrey testified that the Postal Service:

changed the color in the photograph to make it grayer and appear more colder, and more Korean War-like, for lack of a better phrase; to get that cold effect, rather than the cool blue, which we felt didn't typify what we were trying to convey.

Tr. at 583:19-24 (McCaffrey).  The Postal Service also added a number of graphical elements to convey that the image is a stamp image.  See Tr. 585:9-13 (McCaffrey).  Accordingly, the different purpose and character of each of the works, as well as the transformative nature of the Alli Photo and the Stamp, weigh in favor of the government for the first fair use factor.  As discussed below, this conclusion is supported by similar cases.

2.    *Blanch is directly analogous*

The Second Circuit's analysis of similar facts in the Blanch case is highly relevant.  See Blanch, 467 F.3d at 246-48.  In Blanch, the court held that an artist fairly used a copyrighted photograph in a collage painting.  See id. at 259.  The defendant created his collage painting by superimposing scanned images from advertisements against background landscapes.  See id. at 247.  One of the images used by the defendant was a photograph taken by the plaintiff, an "accomplished professional fashion and portrait photographer."  Id.  The Second Circuit noted that the defendant's objective was not to repackage the plaintiff's photograph, but to employ it as a commentary on mass media.  See id. at 252-53; see also Lennon v. Premise Media Corp., 556 F. Supp. 2d 310, 322-24 (S.D.N.Y. 2008) (holding that the use of a 15 second clip of a song in a documentary was a transformative fair use because the defendants "put the song to a different purpose . . . containing the ideas they wished to critique").  Thus, with respect to the first fair use factor, the Second Circuit held that the defendant's collage painting was transformative.  In support of its conclusion, the court cited the new and different artistic features in the subsequent work, such as the different:  colors, background, medium, size of objects pictured, and details of the objects pictured.  See id. at 253.

The factors cited in the <u>Blanch</u> case are directly relevant and applicable to the present case. As a result, the Court should hold that the Stamp and the Alli Photo are both transformative.

### 3. *Artists create new art from pre-existing sources*

Each of the relevant cases with respect to fair use carries an explicit or implicit subtext – that there is almost nothing that is strictly new and original, including art. An extreme example of this principle is parody, which necessarily copies liberally from an original work. <u>See</u> <u>Campbell</u>, 510 U.S. at 588; <u>Leibovitz v. Paramount Pictures Corp.</u>, 137 F.3d 109, 114-16 (2d Cir. 1998) (holding that a parody of a digital copy of a well-known photograph was fair). Some degree of copying is necessary and permitted in the area of historical research. <u>See</u> <u>Bill Graham Archives v. Dorling Kindersley Ltd.</u>, 448 F.3d 605, 609-10 (2d Cir. 2006) (holding that the use of images of Grateful Dead event posters as "historical artifacts" in a biography was a transformative fair use).

And, as discussed above, copying frequently occurs in art, where artists transform pre-existing works into new works of art. <u>See</u> <u>Blanch</u>, 467 F.3d at 251-52. Indeed, the present case includes several examples of an artist transforming a pre-existing work into a new work of art. Mr. Gaylord testified that he sometimes consulted pre-existing photographs to create new sculptures. To create a sculpture of his granddaughter playing soccer, Mr. Gaylord consulted a photograph of American soccer player Mia Hamm:

> Q     . . . . How did you, what did you have as a model for this sculpture?
>
> A     We used a book. Mia Hamm. I used Mia Hamm's figure, and I used my granddaughter's head for a likeness.

Tr. at 91:16-20 (Gaylord); <u>see also</u> DX 35A at 120.jpg, 121.jpg (Retrospective); <u>see also</u> Tr. at 98:4-15 (Gaylord) (testifying that he consulted a photojournalism book of U.S. Marines in the Korean War to prepare his models for the sculptor selection competition). In another instance, Mr. Gaylord

was inspired to create a new work of sculptural art directly from a particular photograph.  At trial,

Mr. Gaylord described the graphical elements he added and created in order to transform the original

photograph into a new work of art:

> I created, I found a picture in a book very similar to [DX 49].  Only it didn't, it had
> no anatomy, of course, because it was a photograph of lions in the actual act of
> mating.  And I was impressed with it.  And so I decided to sculpturize it.  But I added
> the anatomy, and I stylized the mane, the lion's mane.  I stylized the grass.  I made
> it sculptural.

Tr. at 201:12-18 (Gaylord); see also DX 49 (Gaylord Lion Sculpture) compare with DX 52 (Lion

Photo).  These examples highlight the fact that artists frequently use pre-existing works as "raw

material" in the creation of new works, and that the practice should be protected to promote the

object of the fair use doctrine.  See Blanch, 467 F.3d at 253.  Accordingly, the Postal Service's and

Mr. Alli's use of a single-perspective view of "The Column" as raw material for completely new and

different works of art should weigh in favor of fair use.

### B.    The Public Nature of "The Column" Supports a Finding of Fair Use

With respect to the second fair use factor – the nature of the copyrighted work – the public

nature of "The Column" weighs in favor of fair use.  This factor "recogni[zes] that some works are

closer to the core of intended copyright protection than others, with the consequence that fair use

is more difficult to establish."  Campbell, 510 U.S. at 586.  This factor, however, "may be of limited

usefulness where the creative work of art is being used for a transformative purpose."  See Blanch,

467 F.3d at 257.  To analyze this factor, courts make two distinctions with respect to the copied

work.  First, courts inquire whether the work is expressive and creative, as opposed to factual and

informational.  See id. at 256-57.  Expressive and creative works are generally afforded more

protection and are often less subject to fair use.  See id.  Second, courts inquire whether the work

is published or unpublished.  See id.  Unpublished works are generally afforded more protection against fair use.  See id.

In this case, the public nature of "The Column" outweighs the fact that the soldier statues are expressive and creative works of art.  The soldier statues were specifically created for incorporation into the Korean War Veterans Memorial – a national monument on the National Mall – that is open to public viewing without restriction and is viewed and photographed by hundreds of people each day.  See Gov. Fact ¶ 18; see generally Stip. Fact ¶ 5; DX 42 (KWVM Photos).  Mr. Gaylord was aware of the public purpose and location of the KWVM during his work on the project. See Gov. Fact ¶ 19; PX 1 [all pages] (Sculptor Selection Brochure); see also Tr. at 160:12-18 (Gaylord).

### C.    Mr. Alli Used Only a Limited Portion of "The Column"

With respect to the third fair use factor – the amount and substantiality of the portion used – the evidence demonstrates that the amount copied was limited by necessity, thus supporting a finding of fair use.  Certain uses, by their nature, require more copying than other uses.  See Campbell, 510 U.S. at 586-87 ("[W]e recognize that the extent of permissible copying varies with the purpose and character of the use.").  In addition, "this factor calls for thought not only about the quantity of the materials used, but about their quality and importance, too."  Id.

First, the Stamp and the Alli Photo are two-dimensional pictorial works, as opposed to a three-dimensional sculpture.  See Gov. Fact ¶ 20; DX 24 (Alli Photo), DX 37 (Stamp), compare with DX 42 (KWVM Photos).  With a three-dimensional sculpture, there are literally an infinite number of viewing perspectives.  Some perspectives, by their nature, would capture a greater portion of "The Column" than that depicted in the Alli Photo or the Stamp.  See Gov. Fact ¶ 21.  The Alli Photo

depicts, at most, portions of 16 of the 19 soldier statues; and the Stamp depicts 14 of the 19 soldier statues.  See Gov. Fact ¶ 22; DX 24 (Alli Photo); DX 37 at 2 (Stamp); DX 43 at Request No. 2 (RFAs).  Most of the statues that are depicted are significantly obscured.  In both the Alli Photo and the Stamp, Soldier No. 1 stands prominently in front; the next four soldiers fall behind Soldier No. 1 and become partially obscured; and the remaining soldier statues fade into the background.  See Gov. Fact ¶ 23.  Other than the front-perspective, no other perspective is visible of any statue, including side- or back-perspectives.  When asked to identify the statues that were visible in the Alli Photo at trial, Mr. Gaylord could only identify six of the statues.  See Tr. at 188:21-89:15 (Gaylord).  Notably, two of the soldier statues he identified, Soldier Nos. 15 and 16, were cropped out of the frame by the Postal Service when it created the Stamp.  See DX 24 (Alli Photo), compare with DX 37 at 2 (Stamp).

The reason Mr. Gaylord could only identify a limited number of the statues is because most of the soldier statues depicted in the Alli Photo and the Stamp are significantly obscured by the perspective and by other graphical elements.  See Gov. Fact ¶ 23.  Simply through the use of perspective, a majority of the statues are at least partially obscured by other statues, and many become irregular dark shapes against a lighter background.  Mr. Gaylord acknowledged this when he testified that, other than Soldier Nos. 1-3, 5, and 15-16, the statues "are masking each other and it's hard to tell what numbers go with them."  Tr. at 189:13-15 (Gaylord).  Other graphical elements also obscure the statues.  See Gov. Fact ¶ 24.  For example, Mr. Alli used the snow covering the statues as a tool to obscure the statues and heighten the surrealistic effect.  See Tr. at 377:18-20 (Alli) ("There's snow, and you can't tell really if the people are people or statues."); DX 24 (Alli Photo), DX 37 (Stamp), compare with DX 42 (KWVM Photos).  In addition, Mr. Alli sharply

- 23 -

reduced the color of the statues in the Alli Photo through controlled lighting.  <u>See generally</u> Tr. at 374:10-15, 375:23-25, 377:1-6 (Alli).  The Postal Service reduced the color even further, resulting in a nearly monochromatic image on the Stamp.  <u>See</u> Tr. at 583:7-24 (McCaffrey).  As a result of these graphical elements, many substantive details of the statues vanish:  the faces of the statues become unrecognizable, the legs disappear into snowdrifts, and the equipment and weaponry merge together with the statues.

> **D.**  **The Postal Service's Use of "The Column" Had No Effect upon the Value of "The Column" or Mr. Gaylord's Potential Market**

With respect to the fourth fair use factor – the effect on the market value of the original work – the evidence unambiguously proves that the Postal Service's use of the Alli Photo for its Stamp did not harm any of Mr. Gaylord's actual or potential business prospects.  <u>See</u> Gov. Fact ¶¶ 39-40.  As a result, this factor supports a finding of fair use.

This factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original."  <u>Campbell</u>, 510 U.S. at 590 (citations omitted).  Courts should account for any harm to the value of the original work, as well as harm to the market for derivative works.  <u>See</u> <u>id.</u>  When the accused work is transformative, market harm cannot be presumed.  <u>See</u> <u>id.</u> at 591; <u>Perfect 10, Inc. v. Amazon.com, Inc.</u>, 487 F.3d 701, 724 (9th Cir. 2007).

The "market effect" factor weighs heavily in favor of fair use.  During the relevant time period, Mr. Gaylord did not commercialize or attempt to commercialize his asserted copyright in any fashion.  Indeed, Mr. Gaylord never commercialized or attempted to commercialize his copyright by offering photographs for sale during **any** time period.  The relevant time period begins

on July 27, 2003, when the Stamp was first issued, and ends on March 31, 2005, when the Stamp was retired.  <u>See</u> Stip. Fact ¶¶ 14-15.  Mr. Gaylord never sold photographs of "The Column."  <u>See</u> Gov. Fact ¶ 25; Tr. at 208:21-23 (Gaylord).  The only products sold by or on behalf of Mr. Gaylord were miniature statues and T-shirts, and no products have been sold since at least August 22, 2000. <u>See</u> Gov. Fact ¶¶ 26, 32.  Approximately five years ago, Mr. Gaylord permitted the foundry to destroy the molds used to make the miniatures.  <u>See</u> Gov. Fact ¶ 32; Tr. at 199:18-200:2 (Gaylord). After he finished his last commercial project in 2002, he sold his studio and completely retired from commercial sculpting.  <u>See</u> Gov. Fact ¶ 35; DX 46 at G2609 (Accounting Ledger); Tr. at 207:3-23 (Gaylord); 320:20-21:2 (Triano); 337:3-7 (Triano).

In fact, Mr. Gaylord acknowledged in response to a request for admission that the Postal Service's use of the Stamp caused no harm to his business.  <u>See</u> DX 43 (Response to Request for Admission No. 18).  The value of "The Column" could not have been harmed by the Postal Service, because, as argued by Mr. Gaylord, the Postal Service's use of the Alli Photo had actually *increased* the value of "The Column."  <u>See</u> DX 43 (Response to Request for Admission No. 20).  Mr. Gaylord's testimony at trial supports the conclusion that the Postal Service's activities could not have harmed him financially:

Q   Have you ever sold any photographs of ["T]he [C]olumn["]?

A   No.

Q   How about any posters?

A   No.

Q   Any postcards?

A   No.

Q   Magnets?

A   No.

Q   Keychains?

A   No.

Q   Has the Postal Service's use of the picture on the stamp affected any of your actual business deals?

A   None that I can think of.

Q   Has the Postal Service's use affected any of your potential business deals?

A   No, I don't think so.

Q   And have you attempted to market any products related to ["T]he [C]olumn["] in the past 10 years?

A   No.  [Plaintiff's objection overruled]

Tr. at 208:21-09:16 (Gaylord); see also Gov. Fact ¶¶ 39-40.  Finally, in two separate letters, Mr. Gaylord and Mr. Triano expressed the belief that there was no market for their products.  See DX 25 at FG 618 (Letter) ("At this point in time, the veterans have very little interest in the Memorial's products."); DX 28 at FG 702 (Letter) ("The Franklin Mint, the Danbury Mint, Bradford Exchange, and several other sources of marketing . . . they simply are not interested.").

The Ninth Circuit's decisions in Kelly and Perfect 10 support the conclusion that the Postal Service's activities could not have harmed Mr. Gaylord's actual or potential business prospects.  See Kelly v. Arriba Soft Corp., 336 F.3d 811 (9th Cir. 2003); Perfect 10, 487 F.3d at 724-25.  In both cases, the court held that thumbnail images used by internet search engines could not be a market substitute for full-sized images by photographers, and therefore weighed in favor of the defendants for the fourth fair use factor.  See Kelly, 336 F.3d at 821-22; Perfect 10, 487 F.3d at 724-25.  The

Ninth Circuit's analysis is directly applicable to the facts in this case.  The accused infringing Stamp is approximately one inch tall by one-and-a-half inches wide.  See Tr. at 584:9-10 (McCaffrey); PX 26 (Stamp Sheet).  Even if Mr. Gaylord had sold full-size photographs of the soldier statues, the limited physical size of the Stamp could not have affected his actual or potential business prospects.

Thus, each of the four factors weigh strongly in favor of fair use.  Mr. Alli and the Postal Service made a transformative, limited use of a sculpture incorporated into a national monument, and the Postal Service's use of that photograph did not harm the market for "The Column."  As a result, the Court should conclude that the Postal Service's use of "The Column" was fair.

## II.   THE POSTAL SERVICE'S USE OF A PHOTOGRAPH OF THE KWVM WAS NONINFRINGING UNDER THE ARCHITECTURAL WORKS COPYRIGHT PROTECTION ACT

In 1990, Congress extended copyright protection to architectural works.  See Architectural Works Copyright Protection Act (AWCPA), Pub. L. No. 101-650, 104 Stat. 5133 (1990).  Congress, however, afforded architectural works only partial copyright protection.  Citing "the important public purpose" of architecture, Congress explicitly allowed the public to make, distribute, and display pictures and photographs of the work, free from claims of copyright infringement. H.R. Rep. No. 101-735 (reprinted in 1990 U.S.C.C.A.N. 6935, 6953).  Congress codified the exemption in Section 120 of Title 17:

> (a) Pictorial representations permitted. – The copyright in an architectural work that has been constructed does not include the right to prevent the making, distributing, or public display of pictures, paintings, photographs, or other pictorial representations of the work, if the building in which the work is embodied is located in or ordinarily visible from a public place.

17 U.S.C. § 120.  Indeed, the legislative history reveals that Congress considered photographs and

other pictorial representations of architectural works to be presumptive fair uses of the works.  As

such, Congress explicitly provided the exemption as a bright-line alternative to the fair use inquiry:

> **Architecture is a public art form and is enjoyed as such.  Millions of people visit our cities every year and take back home photographs**, posters, and other pictorial representations of prominent works of architecture as a memory of their trip.  Additionally, numerous scholarly books on architecture are based on the ability to use photographs of architectural works.
>
> These uses do not interfere with the normal exploitation of architectural works.  **Given the important public purpose served by these uses and the lack of harm to the copyright owner's market**, the Committee chose to provide **an exemption, rather than rely on the doctrine of fair use**, which requires *ad hoc* determinations.

H.R. Rep. No. 101-735 (reprinted in 1990 U.S.C.C.A.N. 6935, 6953) (emphasis added).

In this case, Section 120 operates as an affirmative defense to Mr. Gaylord's claim of

copyright infringement.  First, Mr. Gaylord cannot dispute that the Postal Service is accused of

making and distributing pictorial representations of the work.  See Complaint.  Second, Mr. Gaylord

cannot dispute that "The Column" is part of and embodied in the KWVM.  See Gov. Fact ¶ 41; DX

43 (Response to Request for Admission No. 6) ("Plaintiff admits that the work-in-suit is understood

in a common sense way to be part of the overall KWVM.")  Third, Mr. Gaylord does not dispute that

the KWVM is located in a public place.  See DX 43 (Response to Request for Admission No. 7).

Thus, the remaining issue for the Court is whether the KWVM is a "building" within the meaning

of the statute.

The KWVM is a "building" within the context of Section 120.  Congress did not define the

word "building" in the Copyright Act.  "Building," as defined by the Copyright Office, means:

> humanly habitable structures that are intended to be both permanent and stationary, such as houses and office buildings, and other permanent and stationary structures

designed for human occupancy, including but not limited to churches, museums, gazebos, and garden pavilions.

37 C.F.R. § 202.11(b)(2).   Under this definition, the KWVM should be considered a building because it is a permanent and stationary structure that was designed to be occupied and viewed by the public in the same manner as a "museum," "gazebo," or "garden pavilion."

Note, however, that the Copyright Office's use of the word "occupancy" should not be misinterpreted to mean "residency."  The Copyright Office's recited examples – churches, museums, gazebos, and garden pavilions – are not commonly designed for human residency.  The Office's definition appears to be inspired by the legislative history to the AWCPA, which demonstrates that Congress did not intend to restrict the definition to "habitable structures" designed for residency:

> Obviously, ["building"] encompassed habitable structures such as houses and office buildings. **It also covers structures that are used, but not inhabited, by human beings**, such as churches, pergolas, gazebos, and garden pavilions.

H.R. Rep. No. 101-735 (reprinted in 1990 U.S.C.C.A.N. 6935, 6951) (emphasis added); see also Yankee Candle Co. v. New England Candle Co., 14 F. Supp. 2d 154, 159 (D.Mass. 1998) (stating that a narrow definition of "building" "might leave a structure like Fenway Park, one of the greatest architectural works ever designed, undeserving of copyright protection"), vacated pursuant to settlement, 29 F. Supp. 2d 44 (D.Mass. 1998).

Mr. Gaylord previously admitted that the KWVM is permanent, stationary, and accessible to the public:

> Plaintiff . . . admits that [the KWVM] is intended to be "permanent" within the lives of those persons now living and foreseeable future generations.  Admitted that the KWVM is stationary and accessible to the public.

DX 43 (Response to Request for Admission No. 8); see also Gov. Fact ¶ 42.  In addition to being a permanent and stationary structure, the KWVM was clearly designed for human occupancy.  See

- 29 -

Gov. Fact ¶ 43.  Visitors enter the memorial through specific entry-points, and walk along pathways.

<u>See</u> Tr. at 496:8-21 (Lecky); DX 42 (KWVM Photos).  The memorial includes a plaza and benches

for people "who lost somebody in the war and want to be in a more contemplative setting."  Tr. at

495:12-16 (Lecky); <u>see also</u> DX 42 at G2484 (KWVM Photos).  CLA took matters of public safety

into account when designing the memorial by limiting "[d]angerous conditions where one could

twist an ankle or fall" and by making the walkways handicap-accessible.  Tr. at 543:23-44:7

(Lecky).

     The facts of the present case are similar to the facts recited and discussed in <u>Leicester v.</u>

<u>Warner Bros.</u>, 232 F.3d 1212 (9th Cir. 2000).  In <u>Leicester</u>, a sculptor created a work of public art

in a building courtyard.  <u>Id.</u> at 1214.  The work of art included a fountain, a garden, benches for the

public, and a series of towers and gates.  <u>Id.</u>  The sculptor later sued Warner Brothers after the

building was used as a set piece in the movie *Batman Forever*.  <u>Id.</u> at 1213.  The Ninth Circuit

affirmed the trial court's fact findings that the plaintiff's sculpture was part of the overall

architectural work, and that the affirmative defense in Section 120 applied.  <u>Id.</u> at 1219-20.

Accordingly, the Postal Service's use of the Alli Photo cannot be infringing, given Section 120 of

Title 17, the architectural nature of the KWVM, and the important public purpose of allowing

photographs of a national memorial free from claims of copyright infringement.

III.     **A JOINT OWNER OF THE SOLDIER STATUES AND "THE COLUMN" GRANTED THE GOVERNMENT AN UNLIMITED, PAID-UP LICENSE**

The government possesses an unlimited, fully paid-up license in both the individual soldier statues and the final compositional sculpture, by virtue of CLA's authorship of both works.  In addition, the government possesses the exclusive rights of a joint owner for both works by virtue of the contributions of the VAB and the CFA.

This case involves two distinct, copyrightable works.  The individual soldier statues constitute the first copyrightable work.  As described below in Section III.A., these statues were jointly authored by Mr. Gaylord, CLA, the VAB, and the CFA in a collaborative environment.  These statues reached their final, full-size form in August 1994, shortly before being cast at the foundry.  See PX 15 (Registration); see also PX 13 (Letter Agreement Amendment) (discussing the pending enlargement and casting of the statues in January 1994).  Mr. Gaylord's assertions of copyright ownership are based on the individual soldier statues, as opposed to the specific compositional sculpture installed in the KWVM.  See PX 15 (Registration); PX 19 (Registration) (claiming to be a derivative work of PX 15 based on the addition of stainless steel to the 19 soldier statues); PX 6, 9-12 (Registrations).  Mr. Gaylord's limited attempts to offer products for sale were also based on the individual soldier statues, as opposed to the compositional sculpture installed in the KWVM.  See Tr. at 327:19-28:19 (Triano); Tr. at 199:2-25 (Gaylord).

"The Column," as installed in the KWVM, is the second copyrightable work.  "The Column" consists of the 19 soldier statues, as positioned and composed in the setting of the KWVM.  See Stip. Fact ¶ 5.  As described below in Section III.B., "The Column" was jointly authored by CLA, the VAB, and the CFA in a collaborative environment.  "The Column" came into existence in April 1995, when the statues were installed as part of the KWVM.  See Tr. at 137:11-16 (Gaylord); see

also PX 19 (Registration) (containing photographs from the installation, with an effective date of registration of May 1, 1995).

The parties dispute the ownership of both of the works.  Section 201 of Title 17 recognizes that a single copyright may jointly vest in several authors.  See 17 U.S.C. § 201(a) ("The authors of a joint work are co-owners of copyright in the work"); see also Herbert v. United States, 36 Fed. Cl. 299, 308-11 (1996).  "Joint authors co-owning copyright in a work are deemed to be tenants in common, with each having an independent right to use or license the copyright, subject only to a duty to account to the other co-owner for any profits earned thereby."  Community for Creative Non-Violence v. Reid, 846 F.2d 1485, 1498 (D.C. Cir. 1988) (hereinafter "CCNV").  The Copyright Act defines a "joint work" as:

> a work prepared by two or more authors with the intention that their contributions
> be merged into inseparable or interdependent parts of a unitary whole.

17 U.S.C. § 101.  "The touchstone of joint authorship is the intent of the authors at the time of creation, *i.e.*, did they intend their work to be merged into a united whole, and did they intend that they be listed equally as co-authors."  Herbert, 36 Fed. Cl. at 309 (citing Childress v. Taylor, 945 F.2d 500, 505 (2d Cir. 1991); Erickson v. Trinity Theatre, Inc., 13 F.3d 1061, 1068 (7th Cir. 1994)); see also Edward B. Marks Music Corp. v. Jerry Vogel Music Co., 140 F.2d 266, 267 (2d Cir. 1944) ("a joint laboring in furtherance of a common design").  It is not necessary, however, that the authors work together or that the authors know each other.  See id.  A joint work will be found where the authors intend their contributions "be complementary in the sense that they are to be embodied in a single work."  Id.

The intention to merge the contributions must exist at the moment of creation, not some later date.  See Herbert, 36 Fed. Cl. at 309; Thomson v. Larson, 147 F.3d 195, 199 (2d Cir. 1998); see

also H.R. Rep. No. 94-1476 (reprinted in 1976 U.S.C.C.A.N 5659, 5736) ("The touchstone here is the intention, at the time the [work] is [created], that the parts be absorbed or combined . . . ."). In the absence of a **pre-existing** agreement of copyright ownership, courts determine joint ownership based upon circumstantial evidence of intent. This circumstantial evidence can take many forms, but one of the most important is that of decision-making authority. See Thomson, 147 F.3d at 202-03; see also Herbert, 36 Fed. Cl. at 309 ("[T]he Committee as a whole, not the individual authors, had complete control over the manuscript.").

### A.   Mr. Gaylord, CLA, the VAB, and the CFA Jointly Own the Copyright in the Soldier Statues

The testimony of the witnesses at trial overwhelmingly demonstrates that Mr. Gaylord jointly labored to create the soldier statues with members of CLA, members of the VAB, and members of the CFA. Each of these individuals and groups supplied independently copyrightable expression to the soldier statues, and each intended that their contributions be incorporated into the final version of the statues. The direct and circumstantial evidence proves that the parties worked together in a collaborative process, with CLA and the CFA holding final decision-making authority.

Even though Mr. Gaylord and Mr. Lecky entered into a contractual agreement that purported to resolve the issue of copyright ownership, the agreement is nonbinding with respect to the soldier statues because it was signed approximately six months **after** the soldier statues had reached final form.[4]   See PX 17 (License Agreement). Copyright protection begins from the moment the work is "fixed in any tangible medium," so the relevant date for purposes of determining ownership is the date that the statues were enlarged to their full-size form. See 17 U.S.C. § 102(a); Thomson, 147

---

[4] As discussed below in Section III.B., however, the license agreement is fairly interpreted as vesting ownership rights for "The Column" as installed in the KWVM in CLA.

F.3d at 199.  Thus, this post-creation license agreement cannot rebut the circumstantial evidence that

the parties intended to merge their efforts into the soldier statues.  In addition, the document was not

signed by any representative of the government, including the VAB and the CFA, and cannot affect

any ownership rights of the government commissions.

### 1.    The joint collaboration spanned the entire scope of the project

When Mr. Gaylord applied to become the sculptor for the KWVM project during the spring

of 1990, he was aware that the sculpture would be created in a collaborative process, and welcomed

the opportunity.  CLA highlighted the collaborative process in the sculptor competition brochure that

Mr. Gaylord received:

> Sculptors who are interested in being considered for this commission should submit
> the following materials to Cooper-Lecky Architects:
> . . .
> a **statement** that should be no more than three pages . . . .  It should also include, but
> is not limited to: an expression of preferred medium . . . preliminary ideas about cost
> and time factors . . . preliminary thoughts about procedure for fabrication . . . .  These
> preliminary ideas will not be considered binding in any way; **it is assumed that final
> decisions will be made in the collaborative process**.

PX 1 at 3 (Sculptor Selection Brochure) (emphasis added).  This discussion in the brochure appears

to have resonated with Mr. Gaylord, because he touted his ability to create a sculpture in a

collaborative environment in his application statement:

> I have worked with all kinds of committees and can truthfully state that we were on
> good terms at the end of the projects.  Some have been happy and rewarding
> experiences in collaboration.  Some resulted in compromise and others merely used
> me to do their will . . . .  If someone comes up with a better idea than mine, I can
> recognize and accept it.

PX 5 at 2-3 (Application Statement); see also PX 2 (Resume) (advocating to the sculpture selection

committee that he has "[w]orked equally well on independent projects and team projects").  Mr.

Gaylord also emphasized his ability to work with CLA during his presentation to the sculptor

selection committee by presenting a number of sketch models "to show that I could do what they wanted me to do." Tr. at 165:23-25 (Gaylord).

During the first year or two after Mr. Gaylord was selected as the sculptor, he collaborated in an open and friendly manner with the members of CLA, the VAB, and the CFA. For example, Mr. Gaylord testified that the decision to sculpt the soldier statues with ponchos was jointly made with both CLA and Louis Nelson, the muralist, in order to secure approval from the CFA:

> Q      The original proposal was -- well, your original proposal was without ponchos?
>
> A      Well, Louis Nelson mentioned why don't we do them all with ponchos on, see how that goes over.  Well, apparently I'd already shown [CLA] many with ponchos, so I put ponchos on all of them.  And we made a presentation like that.
>
> And Carter Brown went into the room, to the meeting room.  And he started to sit down.  And he saw the two models on his table, and he stopped right in the middle of sitting down and looked at them.  They had ponchos on.  It was something new he wasn't expecting.
>
> I noticed the reaction.  And I think that's what did it.

Tr. at 110:18-11:7 (Gaylord).  The extent of the collaboration during this time period went far beyond strictly defined roles of architect and sculptor.  At some point after the CFA and CLA had decided to use ponchos on the soldier statues, a new issue arose regarding Mr. Gaylord's modeling of the ponchos.  When CLA decided that the statues depicted too much wind movement in the ponchos, Mr. Lecky – rather than Mr. Gaylord – personally reworked each statue:

> Q      Who did [the wind movement] seem too forceful to?
>
> A      Mostly Kent and myself.  I can't remember whether Carter Brown came in and commented on that.  But in the initial series of images that Frank sent down, it was a gale-force wind, and we were not comfortable with that.  And I am a sculptor, as well as an architect, and asked Frank to come down and take some of the wind out of the sails.

And he was not happy with that, and said you know, you're a sculptor; you want to take some of the cloth out of those ponchos, you know, you go ahead and do it.  And so I put on my jeans and sweatclothes, and brought in my tools, and reworked the sculpture for three days.

Q      Do you remember which soldier sculptures you worked on?

A      All of them.

Q      And do you remember at what stage of completion were the soldiers at the time that you worked on them?

A      Well, again, completion, it depends on your definition.  We were still working with the one-foot-high clay figures at that point.  I mean, we hadn't gotten into full-scale replication and casting and all that sort of thing.

In fact, we were still dealing with 38 figures, as I recall, at that point.

Tr. at 486:1-87:2 (Lecky); see also Tr. at 167:7-9 (Gaylord) (stating that Mr. Brown thought that Mr. Gaylord's models were "sending the wrong message with the wind . . . [s]o we took a lot of the wind out of the ponchos then").

As indicated by the testimony quoted above, Mr. Gaylord's working relationship with CLA had begun to sour by 1992.  Mr. Gaylord continued to collaborate with CLA to create the soldier statues, even though he disagreed with CLA's creative direction.  In a letter to CLA dated June 2, 1992, Mr. Gaylord opened the letter by stating that he and Mr. Triano "believed that [Mr. Cooper and Mr. Lecky] were too busy to see us."  DX 4 at 1 (Letter).  The remainder of the letter discusses a number of substantive design changes requested by Mr. Cooper.  Mr. Gaylord responded by stating that he will comply with the design changes, and by offering several design suggestions for CLA and the representatives of the VAB and the CFA.  See id.  As the project continued, the working relationship between Mr. Gaylord and CLA continued to deteriorate.  Yet Mr. Gaylord continued

to comply with CLA's design decisions despite his disagreements about the creative direction of the project:

> Q      But what kind of input would [CLA] give you about what these figures were supposed to look like?
>
> A      I had my ideas, and the architects had their ideas.   The architects are not sculptors.   And it soon became obvious to me that they knew nothing about sculpture.   But they were the supervisors.   And as supervisors, if I didn't do what they told me to do, I didn't get paid.
>
> Q      What did they tell you to do with the sculptures?
>
> A      They would, they would want -- well, one of them would want something changed; say that doesn't look right.   Well, what's wrong with it?   Oh, I don't know, it just doesn't look right.
>
> So I'd change it in 20 minutes.   Well, that wouldn't do, because he's being paid a lot of money to supervise, and 20 minutes is not going to do it.   So he's got to change the whole front of a figure.   That took all day.   So that's more like it.
>
> He changed the front of no. 3, which actually I improved upon by changing it.
>
> Q      Well, you said "he" changed.   Who are you talking about?
>
> A      Kent Cooper.
>
> Q      When you say he changed it, did he model the front?
>
> A      No, he didn't touch it.
>
> Q      Did he tell you how to make the change?
>
> A      He would point and say that doesn't look right.

Tr. at 125:8-26:12 (Gaylord); Tr. at 174:6-7 ("[Kent Cooper of CLA] knew he was the paymaster, and I did what I was told to do, or I didn't get paid.").   Notably, as demonstrated by the testimony above, Mr. Gaylord admitted that CLA's modifications actually resulted in a substantial improvement to Soldier No. 3.   See also Tr. at 173:21-74:20 (Gaylord) (stating that Mr. Cooper's

- 37 -

insistence on Mr. Gaylord's rework of the entire front of Soldier No. 3 resulted in a new statue that "was a lot nicer than the original no. 3").

> ### 2. CLA, the CFA, and the VAB each contributed copyrightable expression to the soldier statues

Throughout the project, CLA, the CFA, and the VAB were deeply involved in nearly every substantive decision relating to the final appearance of the soldier statues.  Before Mr. Gaylord became the sculptor for the project, CLA, the CFA, and the VAB had already made several key decisions regarding the appearance of the statues and the sculpture.  For example, CLA, the CFA, and the VAB were working from a design initially proposed by the Penn State team, including a group of soldier statues equipped for battle, moving towards an American flag.  See PX 1 at 1-2, 4 (Sculptor Selection Brochure); Tr. at 474:4-7 (Lecky).  The VAB contributed a "story" to each of the soldier statues throughout the project, consisting of an ethnic background, a military service, a task, and equipment that were representative of the soldiers of the Korean War.  See Gov. Fact ¶¶ 46-48.

After Mr. Gaylord was retained as the sculptor, CLA, the CFA, and the VAB continued to modify the substantive details of the appearance of the soldier statues.  As discussed in the previous Section, CLA, Mr. Gaylord, and Mr. Nelson jointly decided that the individual soldier statues should wear ponchos, and the decision was approved by the CFA.  See Gov. Fact ¶ 49; Tr. at 110:18-11:14, 184:4-12 (Gaylord); Tr. at 484:10-17 (Lecky).  After that decision, CLA and the CFA decided that the ponchos proposed by Mr. Gaylord depicted too much wind, and so Mr. Lecky reworked the statues to reduce the wind.  See Gov. Fact ¶¶ 50-51; Tr. at 486:9-17 (Lecky).

The reviewing agencies and CLA changed many other details of the individual soldier statues.  The VAB instructed Mr. Gaylord to change the appearance of one soldier from Italian to

Hispanic.  See Tr. at 132:1-10, 200:3-13 (Gaylord).  Mr. Gaylord complied with the VAB's instructions, and he changed the face of the statue to depict a thinner nose and higher cheeks.  See id.  The VAB also instructed Mr. Gaylord to depict certain soldiers as clean-shaven, and some with buckled chin-straps.  See Tr. at 185:7-14 (Gaylord).  CLA worked with Mr. Gaylord to change the age of the soldiers by removing wrinkles from the faces of the statues.  See Tr. at 491:16-25 (Lecky).

The modifications to Soldier No. 1 are particularly noteworthy, because this statue is the centerpiece of the sculpture, and the statue in the foreground of the Alli Photo and the Stamp.  See Tr. at 174:25-75:5 (Gaylord); DX 24 (Alli Photo); DX 37 (Stamp).  Mr. Gaylord initially modeled the lead soldier statue, Soldier No. 1, in a "celebratory" pose, with his arms raised over his head.  See PX 35A at 135-38.jpg (Retrospective).  CLA rejected Mr. Gaylord's proposal, and decided that Soldier No. 1 should be depicted in a non-celebratory pose.  See Gov. Fact ¶ 55; Tr. at 106:19-07:4 (Gaylord); Tr. at 492:1-11 (Lecky); see also DX 2 at G138 (Contract).  Mr. Gaylord later modeled Soldier No. 1 with a substantial amount of wind movement in the soldier's poncho.  CLA instructed Mr. Gaylord to reduce the amount of wind movement depicted in the solider's poncho, contrary to Mr. Gaylord's preference.  See Gov. Fact ¶ 56; Tr. at 174:21-77:12, 179:9-25 (Gaylord).  Mr. Gaylord then modeled Soldier No. 1 in a squatting position.  Shortly before the statues were cast, the CFA rejected Mr. Gaylord's design, and CLA reworked the statue into a standing position.  See Gov. Fact ¶ 57; Tr. at 492:10-25 (Lecky).  As depicted below in Figure 1, the final version of Soldier No. 1 appears markedly different from the initial version modeled by Mr. Gaylord.



Initial proposal for Soldier No. 1. See PX 35 V at 135.jpg; Tr. at 176:7-23 (Gaylord).

Soldier No. 1 modified to include a poncho. See PX 35 V at 138.jpg.

Soldier No. 1 undergoes further substantive revisions prior to November 1993. See PX 11 at 5; see also Tr. 179:7-25 (Gaylord).

Final form as installed in April 1995. See DX 42 at G2487; see also PX 19; PX 22.

**Fig. 1.  Design Changes to Soldier No. 1**

Overall, the decision-making authority relating to the appearance of the soldier statues rested with CLA, the VAB, and the CFA, rather than with Mr. Gaylord. The initial contract signed between Mr. Gaylord and CLA clearly states that Mr. Gaylord's responsibilities included the creation of models "to gain approvals from CLA," and "compliance with directions given by" CLA. See PX 8 at FG 149-50 (Letter Agreement) (Section I:  Task 4, Task 9; Section II). Mr. Gaylord's work was subject to numerous reviews by representatives of CLA and the reviewing agencies during every step of the project. See Gov. Fact ¶ 60; Tr. at 178:23-79:3, 180:1-12 (Gaylord). As part of the reviewing and approval process, Mr. Gaylord created over 200 different sculptures to show to CLA. See Gov. Fact ¶ 59; Tr. at 107:13-16, 166:8-14 (Gaylord). At times, Mr. Gaylord's suggestions regarding the appearance of the soldier statues were rejected by CLA. See Gov. Fact ¶ 58; Tr. at 172:19-73:3 (Gaylord). When Mr. Gaylord sought registrations for his asserted

copyright, he acknowledged that his work was "fully approved by all federal commissions" on the registration certificate.  See PX 9-12 (Copyright Registrations); Tr. at 178:23-79:3 (Gaylord).

The evidence and the testimony at trial proves that Mr. Gaylord, CLA, the VAB, and the CFA each supplied independently copyrightable expression to the soldier statues, and each intended that their contributions be incorporated into the final version of the statues.  Thus, the soldier statues are jointly owned.

**B.**     **CLA, the VAB, and the CFA Jointly Own the Copyright for "The Column" as Installed in the KWVM**

Even assuming, *arguendo*, that Mr. Gaylord is the sole owner of the soldier statues, the soldier statues were incorporated into "The Column" – a joint work between CLA, the VAB, and the CFA.  CLA, the VAB, and the CFA each collaborated to modify the entire compositional structure and setting of "The Column."  CLA, Mr. Gaylord, and the VAB positioned the individual soldier statues within "The Column."  See Gov. Fact ¶ 45; Tr. at 121:8-13, 189:25-90:9 (Gaylord) (stating that the VAB and Mr. Gaylord were responsible); Tr. at 490:2-91:9 (Lecky) (stating that CLA was responsible, with some input from Mr. Gaylord).  CLA was responsible for positioning trees and rocks in the KWVM.  See Gov. Fact ¶ 54; Tr. at 489:21-90:1 (Lecky).  CLA and the CFA then changed the number of individual soldier statues in "The Column" from 38 statues to 19 statues.  See Gov. Fact ¶ 44; Tr. at 105:18-24 (Gaylord); Tr. at 479:23-80:2, 488:5-13 (Lecky); see also DX 2 at G142 (Contract).  CLA and the CFA determined the height and size of the individual soldier statues in "The Column."  See Gov. Fact ¶ 52; Tr. at 487:8-25 (Lecky).  Even during the final installation, CLA continued to change the compositional structure of the entire sculpture in the setting of the KWVM:

> And in fact, when the figures came out and were placed, we relocated, we changed some of the positions of the figures, and rotated a couple of heads to be sure that they were, in fact, in eye-line vision with their partner.

Tr. at 491:5-9 (Lecky).

While the license agreement between Mr. Gaylord and Mr. Lecky is nonbinding with respect to the issue of who owned the copyright in the soldier statues, the license agreement binds Mr. Gaylord with respect to CLA's ownership of the KWVM, including the statues as installed. The relevant sections of the agreement are: Paragraph 1, where CLA acknowledges Mr. Gaylord's sole authorship in the "Soldier Sculptures"; Paragraph 5, where Mr. Gaylord acknowledges CLA's authorship of the memorial, including the soldier sculptures; and Paragraph 11, where both parties acknowledge the respective ownership rights upon termination of the Agreement. See PX 17 at FG 344-45, 49 (License Agreement). The key language in the agreement is that the "Gaylord Work" is always defined as the individual soldier statues, rather than "The Column" sculptural composition as a whole. See PX 17 at ¶ 1 ("Soldier Sculptures"), ¶ 5 (CLA "is the sole author of the collective work embodied by the overall Memorial . . . includ[ing], among others, the individual soldier sculptures") (emphasis added). Accordingly, the license agreement signifies Mr. Gaylord's assent that CLA owned the copyright for "The Column" as installed in KWVM.

The evidence and the testimony proves that CLA, the VAB, and the CFA each supplied independently copyrightable expression to "The Column," and each intended that their contributions be incorporated into the final version of the statues. Mr. Gaylord acknowledged CLA's ownership of the KWVM, including "The Column," in the license agreement. Thus, "The Column," as installed in the setting of the KWVM, is jointly owned.

C.      The Analysis Used in <u>CCNV v. Reid</u> Is Highly Relevant

The facts in the D.C. Circuit's <u>CCNV v. Reid</u> case are strikingly similar to the facts in the present case.  846 F.2d 1485 (D.C. Cir. 1988).  In that case, the Community for Creative Non-Violence entered into an oral agreement with a sculptor to produce a statue for display at a Christmas pageant.  <u>See</u> <u>id.</u> at 1487.  The sculptor created the statue in his studio, but his efforts were directed and reviewed by CCNV.  <u>See</u> <u>id.</u> at 1487-88; <u>see also</u> <u>id.</u> at 1497.  CCNV also was responsible for creating the sculpture's base, in the form of a steam grating.  <u>See</u> <u>id.</u> at 1488.  The parties filed competing copyright registration certificates and proceeded to court to determine copyright ownership.

The primary issue in the <u>CCNV</u> case was whether the statue was a "work made for hire" within the definition of Section 101 of Title 17.  That issue was appealed to the Supreme Court, <u>see</u> <u>CCNV v. Reid</u>, 490 U.S. 730 (1989), but is not present in this case.  The significance of <u>CCNV</u> to the present case is the suggestion by the Court of Appeals that <u>CCNV</u> "might qualify as a *textbook example* of a jointly-authored work in which the joint authors co-own the copyright." <u>CCNV</u>, 846 F.2d at 1497 (emphasis added).

In addressing joint authorship, the court noted that:  CCNV had created the sculpture's base; the parties labored to create the sculpture as a unitary whole; CCNV motivated the creation of the sculpture; CCNV directed the effort to produce what it wanted, rather than the sculptor; and CCNV monitored the sculptor's work to guide the sculptor's expression and coordinate his effort with CCNV's contributions.  <u>See</u> <u>id.</u> at 1495-98.  These facts are nearly identical to the facts in this case.  Since the <u>CCNV</u> district court never considered the issue of joint ownership, the case was remanded to the district court after the Supreme Court's decision.  <u>See</u> <u>CCNV</u>, 490 U.S. at 753 n.32 (noting

that neither party sought review of the joint ownership issue or the remand order, and therefore, the

Court would not "pass judgment" as to that order).  The case ultimately settled without a decision

on the merits with respect to joint ownership.  See CCNV v. Reid, 1991 WL 415523 (D.D.C. Jan.

7, 1991) (No. Civ. A. 86-1507(TPJ)).

The facts cited in CCNV are directly relevant to the present case.  Accordingly, the Court

should conclude that Gaylord, CLA, the VAB, and the CFA jointly own the copyright in the soldier

statues; and that CLA, the VAB, and the CFA jointly own the copyright in "The Column" as

installed in the KWVM.

### D.    The Government Possesses an Unlimited, Paid-Up License with Respect to CLA's Copyrights

CLA is a joint owner of the individual soldier statues **and** "The Column" as installed.  By

virtue of its contractual agreement with CLA, the government possesses an unlimited license with

respect to the copyrights owned by CLA related to the KWVM project.  CLA's contract with the

government contained at least two separate clauses that provided this license.  First, contract clause

I.28 states that:

> The Government shall have unlimited rights, in all drawings, designs, specifications, notes and other works developed in the performance of this contract . . . .  The Contractor hereby grants to the Government a paid-up license throughout the world to all such works to which he may assert or establish any claim under design patent or copyright laws.

DX 2 at G71 (Contract No. DACA31-90-C-0057, Contract Clause I.28 - DFARS Clause 52.227-

7022).  This automatic grant of a copyright license is reinforced by the subsequent contract clause:

> All designs, drawings, specifications, notes and other works developed in the performance of this contract shall become the sole property of the Government and may be used on any other design or construction without additional compensation to the Contractor.  The Government shall be considered the "person for whom the work was prepared" for the purpose of authorship in any copyrightable work under

- 44 -

17 U.S.C. 201(b).  With respect thereto, the Contractor agrees not to assert or authorize others to assert any rights nor establish any claim under the design patent or copyright laws.

DX 2 at G71 (Contract No. DACA31-90-C-0057, Contract Clause I.29 - DFARS Clause 52.227-7023).

The government's unlimited, paid-up copyright license from CLA was confirmed by a contracting officer's decision on February 23, 2000.  See DX 30 (Contracting Officer's Decision).  In the decision, the contracting officer analyzed the clauses cited above and found that, *inter alia*, the government held "an unlimited license with respect to any copyrights derived of the KWVM." DX 30 (Contracting Officer's Decision at 7).  CLA did not appeal the decision.  As a result, the contracting officer's decision is final, conclusive, and binding on CLA.  See 41 U.S.C. § 605(b).

Accordingly, the Court should conclude that CLA, which is a joint owner of the copyright in the soldier statues, and a joint owner of the copyright in "The Column" as installed, granted an unlimited, paid-up license in these copyrights to the government.

### E.    As a Result of the Contributions of the VAB and the CFA, the Government Has an Independent Right to Use the Soldier Statues and "The Column"

As noted previously, joint authors of a copyrighted work each have the right to exercise any of the exclusive rights in copyrighted works, including copying, distributing, and making derivative works.  See CCNV, 846 F.2d at 1498; H.R. Rep. No. 94-1476 (reprinted in 1976 U.S.C.C.A.N 5659, 5736) ("coowners of a copyright would be treated generally as tenants in common, with each coowner having an independent right to use or license the use of a work"); 17 U.S.C. § 106 (identifying the exclusive rights of each owner).  The VAB and the CFA are both government entities.  See Gov. Fact ¶¶ 1-3.  The employees of the VAB and the CFA, including J. Carter Brown and Col. Bill Weber, were acting within their official duties while critiquing, suggesting,

- 45 -

supervising, and approving the creation of the soldier statues and "The Column," as installed.  These duties are sufficient to create joint authorship in the soldier statues.  For example, a district court upheld a jury verdict of joint authorship in a documentary film where the plaintiff:  discussed the film with the defendant as a joint project; prepared an outline for the film; discussed the outline for the film with others; drafted interview questions that were incorporated into the film; and drafted and supplied a significant amount of information about groups and individuals featured in the film.  See Berman v. Johnson, 518 F. Supp. 2d 791, 796 (E.D.Va. 2007); see also Baker v. Robert I. Lappin Charitable Foundation, 415 F. Supp. 2d 473, 487 (S.D.N.Y. 2006) (finding joint authorship in an educational film where the claimants made suggestions that were incorporated into the script, played a role in writing the script, and exercised final decision-making authority).  Accordingly, the government has the right to exercise any of the exclusive rights in the works, by virtue of the contribution of employees of the VAB and the CFA, free from Mr. Gaylord's claims of infringement.  See, e.g. Quintanilla v. Texas Television Inc., 139 F.3d 494, 498 (5th Cir. 1998) ("A co-owner of a copyright cannot be liable to another co-owner for infringement of the copyright.") (citation omitted).

The law is unsettled, however, with respect to works jointly authored by government employees and non-government authors.  Under one interpretation, this type of jointly authored work would not be protected by copyright, and would be considered to be in the public domain.  Section 105 of Title 17 states that "[c]opyright protection . . . is not available for any work of the United States Government . . . ."  17 U.S.C. § 105.  Section 101 defines "work of the United States Government" as:

> a work prepared by an officer or employee of the United States Government as part of that person's official duties.

17 U.S.C. § 101.  Under this interpretation, since employees of the VAB and the CFA helped

prepare the soldier statues, the statues are not eligible for copyright protection.  Under another

interpretation, Section 105 would apply only to works solely authored by the government, and

copyright protection would still be available for works jointly authored by government employees

and non-government authors.  Under either interpretation, in this case, the government would have

an independent right to use the soldier statues and "The Column," as installed, because the works

are either in the public domain, or because of the contributions of its employees to the jointly-owned

copyrights.  Ultimately, this issue is moot if the Court concludes that CLA is a joint owner of the

copyright in the soldier statues and "The Column," and that CLA granted an unlimited, paid-up

license in these copyrights to the government.


**IV.   THE VISUAL ARTISTS RIGHTS ACT IS NOT APPLICABLE TO THE PRESENT
       CASE**

       In his pretrial Statement of the Proposed Conclusions of Law, Mr. Gaylord incorrectly argues

that the government has infringed Mr. Gaylord's rights under the Visual Artists Rights Act.  See 17

U.S.C. § 106A; Pl. St. of Law ¶¶ 2, 9.  This argument is baseless.  The purpose of Section 106A is

to protect the right of an artist to preserve a single work of art after it has been sold.  See Scott v.

Dixon, 309 F. Supp. 2d 395, 400 (E.D.N.Y. 2004).  The statute has no bearing on later derivative

works, such as the Alli Photo or the Stamp.  See 17 U.S.C. § 106A(c)(3) ("The rights described in

paragraphs (1) and (2) . . . shall not apply to any reproduction, depiction, portrayal, or other use of

a work . . . ."); see also 17 U.S.C. § 106A(e)(2).  Furthermore, the statute is inapplicable where a fair

use has been proven.  See 17 U.S.C. § 106A(a) ("Subject to section 107 . . . ."); 17 U.S.C. § 107

("Notwithstanding . . . sections 106 and 106A . . ."). Finally, if "The Column" is found to be a joint work, "a waiver of [Section 106A] rights . . . by one such author waives such rights for all such authors." 17 U.S.C. § 106A(e)(1).

## V. ASSUMING LIABILITY, MR. GAYLORD IS NOT ENTITLED TO COMPENSATION IN EXCESS OF MINIMUM STATUTORY DAMAGES

Section 1498(b), the sole jurisdictional basis for this lawsuit, invokes the eminent domain principles of the Fifth Amendment by allowing the recovery of "reasonable and entire compensation":

> the exclusive action which may be brought for such infringement shall be an action by the copyright owner against the United States in the Court of Federal Claims for the recovery of his reasonable and entire compensation as damages for such infringement, including the minimum statutory damages as set forth in section 504(c) of title 17.

28 U.S.C. § 1498(b). The legislative history for Section 1498(b) and canons of statutory construction support the conclusion that "reasonable and entire compensation" is the equivalent of just compensation under the Fifth Amendment. See Leesona v. United States, 599 F.2d 958, 968 (Ct. Cl. 1979); see also S. Rep. No. 1877 (reprinted in 1960 U.S.C.C.A.N. 3444, 3446). Under Section 1498, the United States is not an ordinary infringer, but rather a compulsory, nonexclusive licensee. See Motorola, Inc. v. United States, 729 F.2d 765, 768 (Fed. Cir. 1984). The proper focus is "what the owner has lost, not what the taker has gained." Leesona, 599 F.2d at 969.

The analysis of reasonable and entire compensation in Section 1498(b) is somewhat similar to the analysis that the district courts use to assess actual damages for non-government copyright infringements. To prove actual damages under Title 17, a plaintiff must show both loss and causation. Section 504(b) contains two distinct monetary remedies – actual damages and recovery

of the infringer's profits.[5]  See 17 U.S.C. § 504(b).  The plain language of the statute mandates that actual damages must be suffered "as a result of the infringement," and profits must be "attributable to the infringement."  Id.

For actual damages, a plaintiff must first prove a loss in value to the copyrighted work.  See, e.g., Brooktree Corp. v. Advanced Micro Devices, Inc., 977 F.2d 1555, 1579 (Fed. Cir. 1992) (analogizing to copyright law "wherein actual damages may be measured in terms of the diminished market value of the copyrighted work").  A plaintiff must then prove that the defendant proximately caused the loss in value.  See Polar Bear Productions, Inc. v. Timex Corp., 384 F.3d 700, 708 (9th Cir. 2004) ("[I]t is apparent that a causal link between the infringement and the monetary remedy sought is a predicate to recovery of both actual damages and profits . . . a plaintiff in a § 504(b) action must establish this causal connection.").  To put it another way, a plaintiff must prove "that, **but for** the defendant's infringement, the plaintiff would not have suffered the loss."  Data General Corp. v. Grumman Systems Support Corp., 36 F.3d 1147, 1171 (1st Cir. 1994) (emphasis added).

Thus, actual damages cannot be based on "undue speculation."  Abeshouse v. Ultragraphics, Inc., 754 F.2d 467, 470 (2d Cir. 1985); see also Childress v. Taylor, 798 F. Supp. 981, 991-92 (S.D.N.Y.1992) (declining to award actual damages because copyright owner's play was a commercial failure and estimates of damages were unduly speculative).  According to the Ninth Circuit:

---

[5] This remedy is only available in Title 17 copyright actions between private entities.  Under Title 28, the infringer's profits are never recoverable because they do not represent a loss by the copyright owner.  See Leesona, 599 F.2d at 969 (the focus is "what the owner has lost, not what the taker has gained").  Pursuant to the principles of sovereign immunity and eminent domain, "profits" of the government are unavailable as a remedy under Section 1498(b).  Finally, the Postal Service was required by statute to match its total costs of operation to the costs of services provided during this time period.  See 39 U.S.C. § 3621 (2000) (repealed 2006).

> [A] copyright owner is required to do more initially than toss up an undifferentiated gross revenue number; the revenue stream must bear a legally significant relationship to the infringement.  The result is that a plaintiff seeking to recover indirect profits must formulate the initial evidence of gross revenue duly apportioned to relate to the infringement.

Polar Bear, 384 F.3d at 711 (citing 4 Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 14.03[B], 14-39); see also Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc., 772 F.2d 505, 517 (9th Cir. 1985) ("a court may deny recovery of a defendant's profits if they are only remotely or speculatively attributable to the infringement").

In private copyright infringement actions, a copyright owner who cannot prove loss and causation can only recover statutory damages.  Congress has provided for the recovery of statutory damages in the absence of proof of actual damages.  See 17 U.S.C. §§ 504(b), 504(c); H.R. Rep. No. 94-1476 (reprinted in 1976 U.S.C.C.A.N. 5659, 5777) (stating that a copyright infringement plaintiff is "not obligated to submit proof of damages and profits and may choose to rely on the provision for minimum statutory damages").  Congress also explicitly incorporated "minimum statutory damages" as a measure of reasonable compensation in Section 1498(b).  See 28 U.S.C. § 1498(b) ("reasonable and entire compensation . . . including the minimum statutory damages as set forth in section 504(c) of title 17").  This concept was recognized *in dicta* by the Court of Federal Claims.  See Wechsberg v. United States, 54 Fed. Cl. 158, 166 (2002) ("Where a plaintiff lacks proof of actual damages, Section 1498(b)'s reference to minimum statutory damages serves as both a floor and a ceiling on recovery.").[6]

---

[6] As discussed below in Section V.C., the court in Wechsberg went on to incorrectly interpret "including the minimum statutory damages" to permit recovery of the entire range of statutory damages.  28 U.S.C. § 1498(b).

Accordingly, in order for Mr. Gaylord to recover "reasonable and entire compensation" in the form of actual damages, Mr. Gaylord must demonstrate that: (1) the soldier statues lost fair market value; and (2) the government's actions proximately caused the loss in market value. As described below, Mr. Gaylord has produced no evidence of either loss or causation. As a result, Mr. Gaylord's compensation, assuming liability, is limited to minimum statutory damages.

## A.    Actual Damages are Improper Because Gaylord Cannot Prove Any Damages

Mr. Gaylord offered no proof that the soldier statues lost market value or that he has been otherwise damaged. See generally Gov. Brief, Section I.D. A copyright owner can provide relevant, objective evidence of market value in a number of ways. See Mackie v. Rieser, 296 F.3d 909, 917 (9th Cir. 2002) (holding that the proof must be objective, as opposed to plaintiff's personal, subjective evidence of market value). Mr. Gaylord, however, provided no objective evidence of diminished market value. He did not offer, sell, or license any products when the Postal Service began using the image in 2003. See Gov. Fact ¶¶ 27, 29, 32-35. He had no actual or potential business prospects for the soldier statues after August 22, 2000. See Gov. Fact ¶ 32. He never offered, sold, or licensed any photographs of the soldier statues. See Gov. Fact ¶ 25.

In fact, both Mr. Gaylord and Mr. Triano believed that there was no market for the soldier statues. In a letter to the CEO of World Travel, Mr. Triano acknowledged that World Travel had largely failed in its efforts to sell KWVM-related retail goods. Mr. Triano rationalized:

> At this point in time [February 8, 1996], the veterans have very little interest in the Memorial's products.

DX 25 (Triano - Learst Letter). Mr. Gaylord also believed that there was no market for his products. In an undated letter to Colonel Bill Weber, a member of the Veterans Advisory Board, Mr. Gaylord stated that:

> We plan to test market one soldier, no. 5[,] in a quarter page ad[] in the <u>Greybeards</u>
> soon just to see if there is any interest out there.  The Franklin Mint, the Danbury
> Mint, Bradford Exchange and several other sources of marketing[;] they simply are
> not interested.  So, we will proceed with a small scale marketing attempt of our own.

DX 28 (Gaylord - Weber Letter).

Even if the soldier statues are presumed to have market value, they did not lose market value.

Mr. Gaylord admitted "that the Postal Service's use of the Alli Image as part of the Stamp has not

harmed any actual business prospects of Plaintiff."  DX 43 (Response to Request for Admission No.

18).  At trial, Mr. Gaylord verified that the Postal Service's use of the Alli Photo had not harmed any

of his actual or potential business prospects.  <u>See</u> Gov. Fact ¶¶ 39-40; Tr. at 209:7-13 (Gaylord).

### B.      Actual Damages are Improper Because the Postal Service Did Not Proximately Cause Injury to the Market Value of the Soldier Statues

Mr. Gaylord's damages argument is fatally flawed because the Postal Service's activities

have no causal relationship with Mr. Gaylord's failure to obtain revenue from the soldier statues.

Mr. Gaylord's failure to obtain revenue from the statues is attributable to:  (1) his retirement two

years before the issuance of the Stamp; (2) his lack of effort to commercialize or license the statues;

and (3) the significant differences between the Postal Service's products and Mr. Gaylord's

products.

First, Mr. Gaylord's retirement from commercial sculpting in 2002 indicates that the Postal

Service's activities in 2003 had nothing to do with Mr. Gaylord's failure to obtain revenue from

licensing the soldier statues.  Mr. Gaylord's last commercial project was completed in 2002, and

following the completion of that project, he sold his studio.  <u>See</u> Gov. Fact ¶ 35; DX 46 at G2609

(Accounting Ledger); Tr. at 207:3-23 (Gaylord); Tr. at 320:20-21:2, 337:3-7 (Triano).

Second, Mr. Gaylord has not made any efforts to commercialize the soldier statues in the last ten years.  <u>See</u> Tr. at 208:21-09:16 (Gaylord).  A exhibit that identifies Mr. Gaylord's KWVM income and expenses indicates that he received no income related to the project in the last five years. <u>See</u> DX 40 (Financial Summary).  Indeed, the document only identifies two sources of royalty income, and the second source – for $650 – was the result of a cease and desist letter, rather than any direct sale of merchandise.  <u>See</u> Gov. Fact ¶ 34; DX 40 (Financial Summary); PX 25 (Letter).

Taken together, Mr. Gaylord's retirement and his failure to commercialize "The Column" demonstrate that there was no causation between the Postal Service's activities and Mr. Gaylord's claim for a royalty.  Similarly, in <u>PAR Microsystems, Inc. v. Pinnacle Development Corp.</u>, a district court entered judgment in favor of the defendants where the plaintiff "had no product to sell and did not lose any sales due to [defendant's] infringement."  995 F. Supp. 658, 662 (N.D.Tex. 1998).  In that case, the former licensee of a computer program accused a later licensee of infringing a copyright.  <u>See id.</u> at 659-61.  The former licensee, however, did not and could not market its own program during the time period of the defendant's infringement.  <u>See id.</u> at 661-62.  The court held that no reasonable jury could have awarded plaintiff actual damages because:

> PAR's inability to sell its copyrighted software was not caused in fact by Pinnacle's infringement.  PAR did not demonstrate a reasonable probability that, but for Pinnacle's infringement, PAR would not have suffered the losses.  Pinnacle's infringement was not the proximate cause of the lost sales that were the subject of PAR's trial evidence.

<u>Id.</u> at 622.  The same logic rules out the existence of proximate cause in the present case.

Finally, the significant differences between the products sold by the Postal Service and the products sold by Mr. Gaylord demonstrate that Postal Service could not have affected Mr. Gaylord's business.  The Postal Service's products were all based on the Stamp which was based on the Alli

Photo.  See, e.g., DX 24 (Alli Photo).  Mr. Gaylord's products consisted of T-shirts and miniature statues produced by World Travel.  See DX 23 (Invoices).  The Postal Service's products all were largely two-dimensional in nature; whereas the soldier statues are three-dimensional.  The image of the KWVM on the Postal Service's products is obscured by snow in an abstract fashion; whereas Mr. Gaylord's products depicted a realistic view of the soldier statues.  The Postal Service's products are minuscule in size in comparison to the soldier statues.[7]  Given these differences, it is impossible to conclude that the Postal Service's sales of its products affected the market for the soldier statues.  See Kelly, 336 F.3d at 821-22 (holding that thumbnail images could not have affected the market for full-sized images).

### C.      Mr. Gaylord's Maximum Recovery is $750

In the absence of actual damages, Mr. Gaylord's maximum recovery is governed by the plain language of Section 1498(b), which allows "minimum statutory damages as set forth in section 504(c)" as a measure for reasonable compensation.  28 U.S.C. § 1498(b).  The only interpretation of this phrase that does justice to the words of the statute is that minimum statutory damages is $750.

The starting point for interpreting "minimum statutory damages" is the language of the statute itself.  See Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc., 447 U.S. 102, 108 (1980).  "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."  Perrin v. United States, 444 U.S. 37, 42 (1979).  "Minimum" is defined as "[t]he least possible degree or quantity" and "[a] lower limit permitted by law or other authority."  American Heritage College Dictionary 868 (3d

---

[7]  For example, the Stamp measures approximately one inch tall by one-and-a-half inches wide.  See Tr. at 584:9-10 (McCaffrey); PX 26 (Stamp Sheet).  Each full-size soldier statue is approximately 7.5 feet tall.

ed. 2000). Therefore, under the current statutory limits, the plain meaning of "minimum" is $750 based on the ordinary, common meaning of the word. See 17 U.S.C. § 504(c)(1) (establishing the range of statutory damages, with the minimum amount set at $750, and the maximum amount set at $30,000).

This conclusion is at odds with the Court of Federal Claims's conclusion in Wechsberg. See Wechsberg, 54 Fed. Cl. at 165-66. The Wechsberg court, in *dicta*, construed "minimum statutory damages" to include the entire range of statutory damages.[8] Id. To support this, the court suggested that the word "including" should be read "but at least." Id. This interpretation, however, reads out the word "minimum" from the plain language of the statute, because anything other than $750 is not "minimum statutory damages." The court's interpretation of the statute renders that portion superfluous, in violation of the principles of statutory interpretation. See Hohn v. United States, 524 U.S. 236, 249 (1998); Kawaauhau v. Geiger, 523 U.S. 57, 62 (1998) (quoting Mackey v. Lanier Collection Agency & Service, Inc., 486 U.S. 825, 837 (1988)). In addition, the court incorrectly substituted its judgment for that of Congress by inferring that plaintiffs would have "no logical reason" to choose minimum statutory damages if they were limited to $750. Wechsberg, 54 Fed. Cl. at 166; compare with H.R. Rep. No. 94-1476 (reprinted in 1976 U.S.C.C.A.N. 5659, 5777) (stating that a copyright infringement plaintiff is "not obligated to submit proof of damages and profits and may choose to rely on the provision for minimum statutory damages"); BMG Music v. Gonzalez, 430 F.3d 888, 892 (7th Cir. 2005) (affirming award of minimum statutory damages, and

---

[8] The parties in Wechsberg never briefed this issue. The court's interpretation of "including the minimum statutory damages" is pure *dicta* because the court did not award any statutory damages whatsoever. See id. at 167. As a result, the government could not appeal the court's conclusions.

defining $750 per work as "the statutory minimum award"); <u>Gnossos Music v. Mitken, Inc.</u>, 653 F.2d 117, 118 (4th Cir. 1981) (noting that the plaintiffs "waived any recovery in excess of the $250.00 minimum statutory damages" and that plaintiffs seeking minimum statutory damages are "relieved of the often difficult burden of proving actual damages or infringer's profits"); <u>Encyclopaedia Britannica Educ. Corp. v. Crooks</u>, 558 F. Supp. 1247, 1252, 1256 (W.D.N.Y. 1983) (awarding minimum statutory damages to plaintiffs seeking the same where plaintiffs contended actual damages were incalculable and where plaintiffs offered no proof of damages).  Because Section 1498(b) is susceptible to a plausible reading under which sovereign immunity is not waived for statutory damages above $750, the statute fails to establish an unambiguous waiver for statutory damages above $750 and sovereign immunity therefore bars statutory damages above $750.  For this reason, this Court should adopt the plain meaning of the statute and decline to follow <u>Wechsberg</u>.

## CONCLUSION

In view of the foregoing, the government did not infringe Mr. Gaylord's copyright.  Plaintiff is not entitled to any damages.

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

JOHN J. FARGO
Director


 s/ Scott Bolden
SCOTT BOLDEN
Senior Trial Counsel
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, DC  20530
Telephone:    (202) 307-0262
Facsimile:    (202) 307-0345

Attorneys for Defendant the United States

OF COUNSEL:
ERIC F. MULCH
United States Postal Service

August 20, 2008