IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| FRANK GAYLORD, | |
| Plaintiff, | No.: 06-539C |
| v. | |
| THE UNITED STATES OF AMERICA; | Judge Thomas C. Wheeler |
| Defendant. | |

**<u>PLAINTIFF'S OPENING BRIEF AFTER TRIAL</u>**

Heidi E. Harvey
FISH & RICHARDSON P.C.
225 Franklin Street
Boston, MA 02110
(617) 542-5070
(617) 542-8906

Attorney for Plaintiff

Dated:  August 20, 2008

## TABLE OF CONTENTS

PAGE

I.   Summary of Argument ........................................................................................1

II.  Issues Presented ..............................................................................................2

III. Argument ..........................................................................................................3

     A.   The Prima Facie Case of Copyright Infringement ...............................3

     B.   The Reasonable Royalty ........................................................................7

IV.  Proposed Findings of Fact with record citation ............................................9

     A.   Background of the Parties and the Work at Issue ................................9

     B.   Gaylord's Selection as Sculptor .........................................................11

     C.   Gaylord's Early Work on "The Column" ...........................................17

     D.   The Copyright Issue and the Stop Work Order ..................................20

     E.   The January 1993 Agreement ..............................................................22

     F.   The Resolution of the Copyright Issue and the Completion of
          the Project ...........................................................................................25

     G.   The Alli Image .....................................................................................31

     H.   The Korean War Stamp ........................................................................33

     I.   The Postal Services Revenues and Profits from The Stamp ..............36

In accordance with the Court's Order dated July 21, 2008, Plaintiff Frank Gaylord respectfully submits his Opening Brief after Trial.

## I.   SUMMARY OF ARGUMENT

This is a straightforward case of copyright infringement brought by a modest man who seeks reasonable compensation.

The modest man, Frank Gaylord, is a West Virginia boy who served his country as a paratrooper at the Battle of the Bulge.

Because he survived that battle and the war, Frank Gaylord had the opportunity his fallen comrades were denied to pursue his talent and passion.  He took it and developed his talent into a career as a sculptor.

Then, improbably, because it was already late in life for an artist, he was chosen to commemorate those who served and died in military conflict for their country in what became his *magnum opus* : "The Column," 19 individual figures of 7' 6" in height in full military detail, modeled by his own hands in clay, cast in stainless steel and installed on the National Mall and commemorating the Korean War, the forgotten war.

The infringement is straightforward because the Postal Service used an image of "The Column" on 89 million first class postage stamps without Frank Gaylord's permission.  No less damaging, but more hurtful, they unveiled the stamp in connection with a celebration of the 50th anniversary of the armistice of the Korea War, without informing him, inviting him, or acknowledging him as sculptor. Gaylord was the forgotten sculptor.

Nevertheless, Frank Gaylord does not cast aspersions or act vindictively.  He simply seeks acknowledgement of what is his, the work of his mind and his hands, which he has

1

protected and which the laws of the United States reserve to his exclusive ownership and reasonable compensation for its use.  He, in fact, seeks the same compensation he and others have sought and obtained for this very work, a 10% royalty based on the Postal Services revenues from the use of the work.

If the copyright laws of the United States do not give him a right to recover in this case, or they can be defeated by uncorroborated and undocumented assertions of biased third parties, then there is little of true value that those laws actually protect.

## II.    ISSUES PRESENTED

The plaintiff's *prima facie* is clear so the dispute is subsumed by three primary questions that the Postal Service – by way of avoidance – have made central:

Whether Frank Gaylord is the sole author of the work "The Column" so that he is the sole owner of the copyright in the work?

Whether Gaylord properly retained his exclusive right to authorize third party use of the work?

What damages constitute "reasonable compensation' to Gaylord for the Postal Services unauthorized use of the work on 89 million First Class postage stamps offered for sale and sold from approximately June 2003 to March 2005?

Gaylord does not intend to anticipate those arguments, which are for the Postal Service to make, but believes the evidence at trial conclusively demonstrated that he is the sole author of the work "The Column" and that, remarkably for a lay person, he carefully and adequately preserved his copyright rights.

The Postal Service, which affirmatively seeks out attractive stamp images and encourage consumers to buy and retain stamps, realized substantial incremental profits on the Korean War stamp and should pay a reasonable royalty for their infringement.

## III.   ARGUMENT

### A.       The Prima Facie Case of Copyright Infringement

This Court has jurisdiction of the subject matter of this copyright action pursuant to 28 U.S.C. Section 1498(b).   Complaint filed July 25, 2006, para. 3.    See also 39 U.S.C. Section 409 (general waiver of sovereign immunity of the United States Postal Service).

Under the copyright laws of the United States, the work at issue, " The Column" is a sculptural work and therefore constitutes copyrightable subject matter pursuant to 17 U.S.C. Section 102(5).   The work "The Column," as a sculptural work, also constitutes a work of " visual art" within the meaning of the Visual Artists Right Act, 17 U.S.C. Section 106A.

Frank C. Gaylord is the sole author and owner of the copyrightable subject matter consisting of the 19 sculptural figures known as " The Column."   *Community for Creative Non-Violence v. Reid,* 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989).   There is no genuine dispute that Mr. Gaylord was selected and paid to sculpt "The Column" over a period of about 5 years from 1990 to 1995.  The only dispute raised by the United States Postal Service is whether anyone else contributed copyrightable subject matter to "The Column" sufficient to make them a joint author or owner.

Gaylord will not anticipate arguments that the Postal Service may make in its opening brief by way of defense of "joint authorship" except to note that the Proposed Findings of Fact, below, make amply clear that Mr. Gaylord alone is the author of "The Column."

3

Frank C. Gaylord duly registered his copyrights in various versions of the work " The Column," from small clay sketches to the final sculpture as installed on the National Mall, which registrations are valid and subsisting and in full force and effect.  17 U.S.C. Section 410. Certified copies of those registrations were submitted in evidence, Plaintiff's Exhibits 9, 11, 15, and 19.   These are the copyrights alleged to be infringed in this suit.

Under 17 U.S.C. Section 410(c):

> In any judicial proceedings the certificates of registration made before or within five years after the first publication of the work shall constitute prima face evidence of the validity of the copyright and of the facts stated in the certificate.

Mr. Gaylord's copyrights-in-suit  were all registered prior to (or, in the case of the last registration, Plaintiff's Exhibit 19, within months of)  the installation of "The Column" on the National Mall in April 1995, and therefore they are entitled to prima presumption of validity set forth in Section 410(c).

Mr. Gaylord carefully retained and preserved his exclusive rights in the copyrights, including across the rocky shoals of some very serious attempts at financial extortion by Mr. Lecky to give them up.   Whatever the Postal Service's position was before trial, after trial it is beyond peradventure that neither the government by any direct or indirect grant from Mr. Gaylord nor any third party, by virtue of alleged "authorship" or conveyance, had the authority to authorize the Postal Service's use of "The Column."

The copies of " The Column" that appear on the Postal Service Stamps and related merchandise are substantially similar in appearance to Frank C. Gaylord' s copyrighted work. 17 U.S.C. Section 501(a).   Compare Plaintiff's Exhibit 22, a photograph taken by Mr. Gaylord, and Plaintiff's Exhibit 26 and 27A-C.

4

Copyright infringement requires proof of "copying," which can be inferred from access and substantial similarity, and "substantial similarity." *Amini Innovation Corp. v. Anthony California, Inc.  439 F.3d 1365, 1368 (Fed. Cir. 2006)* ("Copying requires evidence that a defendant literally copied the designs or, alternatively, that a defendant had access to the protected designs before creating the accused designs with an additional showing of "substantial similarity not only of the general ideas but of the expression of those ideas as well.").

Here there is no question of copying since the infringing image is a photograph of the work "The Column" itself.

The determination of copyright infringement is based upon a standard of substantial similarity and expert testimony is not needed for the finder of fact to make a judgment of substantial similarity. *Segrets, Inc. v. Gillman Knitwear Co., Inc.  207 F.3d 56, 66, n11 (1st. Cir. 2000)* ("[W]e reiterate our rule that expert testimony on the topic of "substantial similarity" is not permissible. While expert testimony may be used to establish that there was copying (from evidence of substantial similarity), where factual copying has been established, as here, there should be no expert testimony to establish whether or not there was substantial similarity. *See Concrete Machinery,* 843 F.2d at 608. That is because the test is an "ordinary observer test."); *Trek Leasing, Inc. v. U.S.  66 Fed.Cl. 8, 18 (Fed.Cl.,2005)* ("Since the ordinary observer test is an objective one, expert testimony may not be used to determine substantial similarity.").

The addition of other elements to a work, such as the lighting and composition of a photograph, does not relieve the accused infringer from the obligation to obtain permission of the owner of the underlying copyright in the work before making copies.  *See* 17 U.S.C. Section 7 (1976 ed.) ("Compilations or abridgments, adaptations, arrangements, dramatizations,

translations, or other versions of works in the public domain or of copyrighted works when produced with the consent of the proprietor of the copyright in such works, or works republished with new matter, shall be regarded as new works subject to copyright under the provisions of this title; but the publication of any such new works shall not affect the force or validity of any subsisting copyright upon the matter employed or any part thereof, or be construed to imply an exclusive right to such use of the original works, or to secure or extend copyright in such original works.").

Here there is no genuine issue that the Postal Stamp image is substantially similar to the work "The Column," and, indeed, the Postal Service has not genuinely contested "substantial similarity." Each stamp and every item of merchandise is a direct infringement because they reproduce unauthorized copies of the plaintiff's work 'The Column." No other portion of the Korean War Veterans' Memorial that may or may not also constitute copyrightable subject matter is shown in the image reproduced on stamps and merchandise. See Plaintiff's Exhibit 26.

Therefore, the Postal Service' s use of the work " The Column" constituted copyright infringement for which Mr. Gaylord is entitled to compensation.

The Postal Service also failed to attribute the copies it made of the work " The Column" to Frank Gaylord, denying him the credit and honor that was due to him as the sculptor of the work and damaging his financial interests in a way that is evident though difficult to prove.

Pursuant to 28 U.S.C. Section 1498(b) and the case law thereunder, Gaylord is entitled to a reasonably royalty on the revenue generated by sales of the infringing goods. See also 17 U.S.C. Section 504(a)(1) ; *Leesona Corp. v. United States*, 599 F.2d. 958, 969 (Ct. Cl. 1979);*Georgia-Pacific Corp. v. United State Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y.

1970), modified 446 F.2d. 295 (2d Cir. 1971).   What the appropriate royalty base is and how the royalty should be calculated here are discussed in Section B, below.

Mr. Gaylord is not entitled to an injunction against the Postal Service and Mr. Gaylord does not allege that the government's infringement was willful.  However, if Mr. Gaylord recovers damages, he is entitled to pre-judgment interest from July 27, 2003, to the date of judgment in an amount and based upon a rate to be determined by the Court. *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655-56, 76 L. Ed. 2d 211, 103 S. Ct. 2058 (1983)( Prejudgment interest compensates the injured party for the loss of the use of money he would otherwise have had." ); *Waite v. United States*, 282 U.S. 508, 509, 75 L. Ed. 494, 51 S. Ct. 227 (1931)(Section 1498(b)'s requirement of " reasonably and entire compensation" includes pre-judgment interest on monies plaintiff would have had the use of but for the infringement).

### B.       The Reasonable Royalty

Gaylord believes that the evidence at trial amply established 10% of net sales as a reasonable royalty rate and that this is a fair rate.

An "established" royalty rate is the "best measure" of a reasonably royalty.  *Nickson Industries, Inc. v. Rol Mfg. Co., Ltd.*, 847 F.2d 795, 798 (Fed. Cir. 1988).  Where "the license rate was used widely and offered freely to everyone", and "there were many 'takers' at that price", "we must assume, in the absence of contrary evidence, that it represented full and fair market value, *i. e.* the going price." *Calhoun v. U. S.*, 453 F.2d 1385, 1394 (Ct.Cl. 1972).

In the absence of established royalties and/or alternatively, the decision in *Georgia Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120-21 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir. 1971), has been widely adopted as the touchstone of

7

the reasonable royalty analysis, including by the Court of Federal Claims in intellectual property claims against the government under Section 1498. *See, e.g., Paymaster Technologies, Inc. v. U.S.*, 61 Fed. Cl. 593, (2004).

Here, the 10% established rate was adopted in virtually all transactions involving "The Column", and is a reasonable measure of the going rate. See PPF 121 to 127. Mr. Gaylord has traditionally used a royalty rate of 10% of the gross sales of merchandise as a reasonably royalty rate. PPF 122. Specifically, Mr. Gaylord has licensed the work "The Column" in various arms length transactions at a rate of 10% of direct sales of merchandise. In the February 1995 Agreement, Mr. Lecky agreed to pay Mr. Gaylord at least 15% for exclusive rights. Plaintiff's Exhibit 17. F.J Designs, the manufacturer of unauthorized plaques depicting "The Column," agreed to a 10% royalty rate. Plaintiff's Exhibit 25; see also Defendant's Exhibit 27. Mr. Alli also agreed to a 10% rate of direct sales of merchandise in his settlement with Mr. Gaylord. Defendant's Exhibit 41, paragraph 11(c)(iii).

Moreover, where the "The Column" is the subject, other individuals have independently used 10% as a royalty figure. On the belief that Mr. Lecky was the outright copyright owner to the "The Column" and years prior to this litigation, Mr. Alli negotiated to pay Mr. Lecky a 10% of the total sales in order to market his photographs of "The Column". Plaintiff's Exhibit 42.

The information adduced at trial also demonstrated that both the stamp itself and the merchandise was profitable for the Postal Service.

Contrary to the Postal Service's anticipated arguments, Gaylord does not suggest or purport to seek the Postal Service's profits in this action; however, the analysis of profitability can also inform the issue of whether the Postal Service, in a hypothetical negotiation, would be

capable of paying some portion of its "profits" as a license fee and, if so, what level of profit the entity enjoys.

Based on the evidence at trial, a 10% royalty is established and fair and Mr. Gaylord should be awarded 10% of Postal Service's net sales of stamps and merchandise.

## IV.   PROPOSED FINDINGS OF FACT WITH RECORD CITATION

### A.   Background of the Parties and the Work at Issue

PPF 1.          The Plaintiff, Frank C. Gaylord II, resides in Barre, VT. Stipulated Fact 1.

PPF 2.          The United States Postal Service ("Postal Service") is an "independent establishment of the executive branch of the Government of the United States." 39 U.S.C. Section 201. The Postal Service has offices and branches throughout the United States. Stipulated Fact 2.

PPF3.          The work-in-suit is sculpture  that features 19 statues representing a platoon of soldiers in formation. It is entitled "The Column" and it is part of the Korean War Veterans Memorial ("KWVM") on the National Mall in Washington, D.C.   Stipulated Fact 5.

PPF4.          Generally speaking, the KWVM consists of three primary components: "The Column" sculpture; the mural wall; and the reflecting pool. Stipulated Fact 8.

PPF 5.          Cooper-Lecky Architects ("CLA") was the prime contractor under the Department of the Army contract for the creation, construction and installation of the Korean War Veterans Memorial ("KWVM").  Stipulated Fact 3.

PPF6.          CLA selected an artist named Louis Nelson as the muralist for the mural wall. CLA was responsible for designing the reflecting pool. Stipulated Fact 9.

PPF7.        During 1990, CLA sponsored an open competition to select the figural sculptor for the sculptural component to be included in the KWVM. Mr. Gaylord participated in the competition and was selected as sculptor. Stipulated Fact 4.

PPF8.        "The Column" was completed and installed as part of the KWVM in 1995. Stipulated Fact 6.

PPF9.        A photograph taken by Frank Gaylord shows "The Column" as installed.  Plaintiff's Exhibit 22.



PPF10.        The KWVM was dedicated on July 27, 1995, the forty-second anniversary of the armistice of the Korean War.  Stipulated Fact 7.

PPF11.        Gaylord makes no claim to authorship or ownership of the mural wall or the reflecting pool, and those components of the KWVM are not at issue in this case.

**B.**     **Gaylord's Selection as Sculptor**

PPF12.          Plaintiff's Exhibit 1, 'The Korean War Veterans Memorial

Sculptor Selection Procedure," set forth the criteria for selection of the sculptor to which Mr.

Gaylord responded.

Gaylord, Tr. 92, lines 12-25 and Tr. 93, 12-25.

John Triano likewise testified that the criteria for selection were set forth in Plaintiff's

Exhibit 1.

Triano, Tr. 225, lines 10-17, and Tr.225, line 25 – Tr.226, line 8.

PPF13.          The KWVM Sculptor Section Procedure was prepared and

published by Cooper-Lecky Architects.  See Plaintiff's Exhibit 1, page one ("On behalf of the

Army Corps of Engineers, Cooper-Lecky Architects is seeking a figural sculptor with experience

in public to collaborate with the designers of the proposed Korean War Veterans Memorial.")

See also Lecky, Tr. 472, lines 18-22 and Lecky, Tr. 481, lines 3-9.

PPF13.          The KWVM Sculptor Selection Procedure, Plaintiff's Exhibit 1,

sets forth the following criteria for the sculptor, who at the time was going to be requested to

sculpt a total of 38 figures:

"The sculptor selected for this commission must meet the following criteria:

-  have demonstrated outstanding artistic abilities

-  have extensive experience in public art and in collaboration with other design

professionals

-  be able to work in larger than life size (approximately 8 feet in height) in a

realistic style with attention to fine detail appropriate to the commemorative function

11

- be able to demonstrate a familiarity with a wide variety of media (granite is specified in the original design, but bronze, stainless steel and other media are under consideration).

- be familiar with methods, schedules, and able to work within budget and the specified time.

- be a citizen of the United States of America."

Plaintiff's Exhibit 1, page 3, "Criteria for Selection."

PPF14.       In 1990, Frank C. Gaylord II ("Frank Gaylord") was a sculptor of recognized stature with a record of significant public works, including larger than life size sculpture in granite, marble, resin, and bronze and military sculpture with realistic detail.

Mr. Gaylord testified regarding numerous public works of art that he had created prior to his selection as sculptor.

His resume, Plaintiff's Exhibit 2, which was prepared and submitted as part of the selection process, Gaylord, Tr. 94, line 18-19; Tr. 95, line 8-14, details his work as of the time of the submission.

Plaintiff's Exhibit 35 is a compact disk containing "jpg" formatted images of Mr. Gaylord's work and 35A is a color print out with thumb-nail sized prints of the same files.

Plaintiff's Exhibit 3, which are black and white photos of some of the same works mentioned above and additional works and views of Mr. Gaylord's studio.

In particular, his works meeting the selection criteria that he had created prior to the Korean War commission included:

An over life size figure of William Penn in granite for Penn Treaty Park in Philadephia; Plaintiff's Exhibit 35 and 35A, files 99-106.jpg; Gaylord, Tr. 78, lines 16-22;  also see pages 1-18 of Plaintiff's Exhibit 3;

An  over life size figure of Governor Ella Grasso in Italian marble installed on the Connecticut State House; Plaintiff's Exhibit 35 and 25A, files 88-94.jpg; Gaylord Tr. 81, line 22-83, line 22; Plaintiff's Exhibit 3, page 46;

A 9 foot 4 inch tall Madonna in granite; Plaintiff's Exhibit 35 and 35A, files 13.jpg and 55.jpg; Plaintiff's Exhibit 3, page 47;

A sailor in granite for the American Legion in Harrisburg, PA); Plaintiff's Exhibit 35 and 35A, file 32.jpg; Gaylord, Tr. 84, lines 12-13); also see Plaintiff's Exhibit 3, page 15-16.

An over life size two figure composition called "Military Pieta" installed as a memorial to the Korean War at the Courthouse in Taunton, MA; Plaintiff's Exhibit 35 and 35A, file 109.jpg; Gaylord, Tr. 85, lines 2-7; also see pages 28-29 of Plaintiff's Exhibit 3.

PPF 14.    Mr. Gaylord was interested in art from a young age.  He was born in West Virginia in 1925. He was fascinated with animals of all kinds and sketched them and initially he hoped to become a taxidermist.

Gaylord, Tr. 36, line 8 – Tr. 37, line 12.

PPF15.    Mr. Gaylord was drafted into the Army in 1943, but allowed to finish high school before starting his basic training at Fort Hayes, Ohio.

Gaylord, Tr. 42, line 19 – Tr. 43, line 3.

PPF16.        Mr. Gaylord trained as a paratrooper at Fort Benning, Fort Bragg, and Camp McCall, Camp Forest before being deployed from the United States to England aboard the USS Wakefield in August, 1944.

Plaintiff's Exhibit 35/35A, file 202.jpg shows a photograph of an 18 year old paratrooper named Frank Gaylord in his full military gear.   The photo is juxtaposed with Mr. Gaylord at the age of 70 with one of his completed, over life size clay models for "The Column."

Gaylord, Tr. 44, line 6 – Tr. 45, line 8, and Tr. 48, lines 5-24.

PPF17.        From England, after more training and maneuvers in anticipated support of Operation Market Garden, he was deployed to "the Bulge" in Belgium in late 1944, where he fought in the Battle of the Bulge.

Gaylord, Tr. 50, lines 2 – 5.

PPF18.        During the Battle of the Bulge, during which Mr. Gaylord's company was reduced from 178 to 50 as a result of soldiers killed, captured or wounded, and Mr. Gaylord lost several close friends from his training days.  Mr Gaylord later memorialized several of his comrades in the faces of the soldier sculptures of the KWVM.

Gaylord, Tr. 51, line 20 – Tr. 52, line16, Tr. 130, line 23 – Tr. 131, line 15, Tr. 132, line 11 – Tr. 133, line 11.

PPF19.        After sick leave in England for surgery for a hernia he had developed, he eventually rejoined his company in southern France in August 1945,  where they shipped out from Marseille for Okinawa to support the planned invasion of Japan.  Somewhere in the mid-Atlantic, the announcement came that meant the war was over:

"Now hear this, the destination of this ship is hereby changed to……Hampton Roads!"

14

Gaylord, Tr. 55, line 11 – Tr. 57, line 4, and Tr. 58, line 18 – Tr. 59, line 12.

PPF 20.      Throughout his service, Mr. Gaylord continued his interest in art, creating sketches in his "Army Sketchbook" during the many hours of "hurry up and wait" time that characterizes so much of military service.    His Army Sketchbook is reproduced at pages 67-70 of Plaintiff's Exhibit 3 and shows fine detail in respect to human anatomy, military gear, and the diversity of ethnicity and emotion on the faces of young soldiers.

Gaylord Tr. 47, line 24 – Tr. 48, line 4.

PPF21.      After completing his tour of duty in the United States, Mr. Gaylord was discharged from the Army.

Gaylord, Tr. 59, line 13 – Tr. 60, line 3.

PPF22.      Mr. Gaylord entered Carnegie Tech (now Carnegie Mellon) on the GI bill.  He eventually transferred to Temple University's Tyler School of Fine Arts.  He received a Fine Arts degree from the Tyler School in 1950.

Gaylord, Tr. 60, lines 4 – 23, Tr. 63, line 1 – 25; Plaintiff's Exhibit 2, page 1.

PPF23.      During college, Mr. Gaylord fell in love with the sculpture of Rodin and turned his attention to studying and working as a sculptor.  Following graduation and now married, Mr. Gaylord took the job he was offered, a stone carver's job at E.F. Batchelder Co. in Barre, VT, the granite capital of the United States.

Gaylord, Tr. 61, line 19 – Tr. 62, line 25, and Tr. 68, line 12 – Tr. 70, line 4.

PPF 24.      Mr. Gaylord apprenticed with the E.F. Batchelder company learning to simply cut smaller segments of granite from larger ones and prepare them for the

carver.   At an early stage, he was allowed to begin to carve the granite and he was a granite sculptor from that time on.

Gaylord, Tr. 70, lines 5 – 14, Tr. 71, line 20 – Tr. 72, line 24.

PPF25.      In his "Requested Statement," Plaintiff's Exhibit 5, submitted as part of the sculptor selection process for the KWVM, Mr. Gaylord described his current studio, equipment, and other resources available to him to undertake the 38 over life size figures being requested.

PPF26.      In addition to his existing works, Mr. Gaylord created numerous sketches and models as part of the selection process to show, among other things, his ability to model fine detail, his ability to model ethnic features (as ethnic diversity of the military was to be represented in the final figures), and his ability to model realistic military detail.

Gaylord, Tr. 98, line16 – Tr. 99, line 8, and Tr. 101, line 10 – Tr. 103, line 14.

PPF27.      The sketches that Mr. Gaylord created to demonstrate his abilities and submitted in support of his application to be selected as sculptor are shown in Plaintiff's Exhibit 6, United States Copyright Registration VAu 187-193, a copyright registration certificate obtained by Mr. Gaylord for his sketches in July of 1990.

Gaylord, Tr. 100, lines 2-9.

PPF28.      The  Sculpture Selection Procedure, Plaintiff's Exhibit 1 states that finalists "will receive a fee of three thousand dollars for developing a design approach," but is silent on the subject of copyrights.  The sculpture selection criteria contains no other language that suggest or implies any conveyance of rights would be required from the sculptor.  Plaintiff's Exhibit 1.

16

PPF29.     The government introduced no evidence of any required conveyance of copyright prior to Mr. Gaylord' selection as sculptor.  Both Mr. Gaylord and Mr. Triano  testified that there was no mention of copyrights in the selection brochure or at the beginning of work after Mr. Gaylord was selected.

Gaylord, Tr. 144, lines 2-10, and Triano, Tr. 235, lines 5-7.

PPF30.     Mr. Gaylord was selected as the sculptor for the KWVM in about mid-1990.

Gaylord, Tr. 104, lines 3-5, and Triano, Tr. 235, line 24 – Tr. 235, line 5.

**C.     Gaylord's Early Work on "The Column"**

PPF31. Frank Gaylord was self-employed during the entire period of his work on the sculptural figures which extended from approximately mid-1990 (selection) to mid-1995 (installation).   Mr. Gaylord owned and operated his own sculpture studio until he retired five or six years ago.

Gaylord, Tr. 207, lines 3-11 (Frank talks about selling his studio 5-6 years ago); I'm not finding any direct quotes on that Frank was self-employed; Triano, Tr. 320, line 20 to Tr. 321, line 2.

PPF32.     There is no evidence of record that Mr. Gaylord was an "employee" of the United States government at any time during the KWVM project.

PPF33.     Mr. Gaylord was assisted by his son-in-law, John Triano. Mr. Triano helped Mr. Gaylord with some of the labor of creating " The Column," and was responsible for handling the business, the accounting, and the paperwork for Mr. Gaylord's studio.  Stipulated Fact 10.

PPF34.        The anticipated project after selection consisted of three broad phases: 5 sketches and maquettes for preliminary design approval, production of 33 additional sketches and maquettes as requested for final design approval, and fabrication and installation of the final sculptures.  Plaintiff's Exhibit 1, "Korean War Veterans Memorial Sculptor Selection Procedure," page 3, "Selection Procedure."

PPF35.        "Sketch" is a term that refers to a small clay scale model.  A "maquette" is a somewhat larger clay scale model with greater detail .  For example, in Plaintiff's Exhibit 11, one of Mr. Gaylord's copyright registrations in suit, he refers to the work being registered as "2-0 Clay Maquettes.

Triano, Tr. 247, lines 17-21 .

PPF36.        After selection, Mr. Gaylord began working on sketches for the then- planned 38 figures.  Mr. Triano testified that this work was done without a written contract.  Mr. Lecky told him that CLA preferred not to attempt to negotiate a formal contract for the entire commission price until the designs were approved.

Triano, Tr. 236, line 6 – Tr. 237, line 24; Lecky, Tr. 509, line 9 – Tr. 510, line 3.

PPF37.        Mr. Triano described the process of this initial design phase: Mr. Gaylord worked on clay model sketches in his studio in Vermont.  A number of photographs would be taken which would be sent to Washington, D.C. for review and comment.  At that point, Mr. Gaylord would invoice CLA for his time and materials.

Triano, Tr. 237, lines 12 to 18.

PPF38.        Plaintiff's Exhibit 40 is a letter dated June 30, 1992, from John Triano to William Lecky, summarizing the work  invoiced and payment status as of the date

and reflecting the "change order" process that Mr. Triano described as well as requesting

payment of past invoices through March 23, 1992.   This exhibit shows that the "change

order" approach had been in place for nearly two years of the commission work.

PPF39.        Plaintiff's Exhibit 40 also shows that the project scope had

undergone significant changes during the first two years of the project, the number of figures

being referred to as "19 Sketch Soldiers #5,"  see page 2, column 1, as opposed to the

originally planned 38.

PPF40.        After the "19 Sketch Soldiers #5" entry, there is an entry on

Plaintiff's Exhibit 40 that indicates that the figures were  "shipped to Washington D.C."   As

Mr. Gaylord testified, the clay models were sent in a refrigerated truck.  Plaintiff's Exhibit

40 shows that Gaylord invoiced CLA $9325.00 for the shipment by truck.

Gaylord, Tr. 120, lines 15 to 18.

PPF41.        After the shipment to Washington, Plaintiff's Exhibit 40

indicates that Mr. Gaylord was requested to do a "15 Poncho Sketch Soldiers#8," Plaintiff's

Exhibit 40, page 2, col. 1 for which he invoiced Cooper Lecky Architects $33,180.00.

Gaylord, Tr. 110, line 11 to Tr. 11, line 7; Triano, Tr. 247, lines 8-25.

This entry reflects the request of the review committee that all the soldiers be

"resculpted" to wear ponchos.  See Defendant's Exhibit 2, p. 147 (Prime Contract between

Army Corps of Engineers and Cooper Lecky Architects)(change order request dated October

9, 1991).

PPF42.        No shipment of soldier figures in ponchos is reflected on

Plaintiff's Exhibit 40.  However, the next entry indicates that Mr. Gaylord was requested to

19

do a "Poncho Sketch Soldiers Rework#9," for which he invoiced Cooper Lecky Architects

$20,644.00.

PPF43.    At the point of Plaintiff's Exhibit 40, nearly two years into the

project, there was still no written contract between Mr. Gaylord and Cooper Lecky

Architects.

PPF44.    In Plaintiff's Exhibit 40, p. 2  in June of 1992, Mr. Triano

states, in reference to invoices dated through March 1992, "I still don't understand the long

waiting period between payments."

### D.    The Copyright Issue and the Stop Work Order

PPF45.    In 1992, for the first time in the project, CLA asserted the right

to obtain ownership of the copyright in the solider sculptures on behalf of the government.

In a letter dated September 3, 1992, which is Plaintiff's Exhibit 39, Mr. Lecky stated

(emphasis supplied):

"I have just spoken with William Taylor at the COE.  The client remains adamant
about the copyright issue.  As you know this has been discussed for months, and their
position remains unchanged."

The letter goes on to tell Mr. Gaylord to "stop work on this project immediately."

PPF46.    Mr. Gaylord had, at this time, been working in response to

change requests with his invoices unpaid since March of 1992.  See Plaintiff's Exhibit 40.

As Mr. Triano testified, Triano, Tr. 240, lines 9 – 241 line 15, as a two-man shop and given

the scope of the project, Mr. Gaylord had no other work that he could turn to while the

parties attempted to resolve this dispute.    The impasse on payment was not resolved until an

agreement, Plaintiff's Exhibit 8, was signed in January 1993, at which point Mr. Gaylord had

gone for months without payment by CLA and without other income sources.

PPF47.      It provides significant insight into Mr. Lecky's character that he allowed Mr. Gaylord to work without payment from March 1992 to September 1992 even though, as Mr. Lecky asserts, he was aware of a "copyright issue' which had been discussed "for months" which was serious enough to require a "stop work" order. That is, Mr. Lecky only informed Mr. Gaylord that he should stop work after he had incurred six months worth of unpaid invoices.

PPF48.      It provides additional insight into Mr. Lecky's character that he refused to take responsibility, as the prime contractor and the architect of record, for the decision to issue the "stop work" order and attempt to deflect blame for the situation onto others. In a response letter dated November 6, 1992, Plaintiff's Exhibit 41, Mr. Lecky stated that the "'stop work letter' was primarily meant for Louis Nelson who is under contract and working on the mural." However, the "stop work" letter, Plaintiff's Exhibit 39, was addressed to Mr. Gaylord and Mr. Nelson is not even copied on the letter.   Mr. Lecky also states, implying that he would otherwise authorize payment to Mr. Gaylord, that didn't "have an approved change order from the Corps; which means I can't get paid from them."

PPF49.      In the meantime, however, Mr. Lecky had submitted and received authorization from the Army for a change order increasing the payment CLA was owed by $839,800.00.

Defendant's Exhibit 2, page G 156-57, amendment dated August 1992.

This increase was more than total amount Mr. Gaylord was paid for the entire project. By the end of the project, CLA had been paid $5,442.000.00 for its management of

the overall project while Mr. Gaylord was paid a total of approximately $775,000.00.

Lecky, Tr. 552, line 18-553, line 7, and Defendant's Exhibit 2, page G192; see Defendant's Exhibit 40 (Triano Summary of Revenues and Costs).

PPF50.     The non-payment of Mr. Gaylord's invoices, despite approved increases in CLA's own contract, combined with the timing of the "stop work" order clearly show that Mr. Lecky was attempting to exert extreme financial leverage on Mr. Gaylord to get him to sign over this copyright in the work 'The Column."

Triano, Tr. 240, line 4 to Tr. 241, line 15; Gaylord, Tr. 145, line 23 to Tr. 146, line 7.

PPF 51.     Mr. Gaylord never gave in to Mr. Lecky's extortion and refused to give up his copyright rights in "The Column."

**E.     The January 1993 Agreement**

PPF 52.     The impasse, but not the dispute, was resolved in an agreement signed in January 1993 between Frank Gaylord and CLA, Plaintiff's Exhibit 8, which provided a basis for Mr. Gaylord to be paid and work to resume, but deferred the copyright issue for a later agreement.

PPF53.     The January 1993 agreement, Plaintiff's Exhibit 8:

(a)     refers to Army Corps of Engineers and the Battle Monument Commission as "the Client" and Frank Gaylord as "the Artist," Plaintiff's Exhibit 8, page one, first and second paragraphs;

(b)     states that the Artist is "an independent sub-contractor for this part of the project and, as such, is responsible for the methods and means used in performing its services," Plaintiff's Exhibit 8, page two, para. I, Task 9 (third sub-para.);

22

(b)      prohibits any direct communication between Mr. Gaylord and the Army Corps of Engineers, Plaintiff's Exhibit 8, page two, last paragraph;

(c)      identifies the provisions of the prime contract between the Army Corp of Engineers and CLA that are included in the contract with Mr. Gaylord; Plaintiff's Exhibit 8, page three, para. III;

(d)      states that "copyright ownership of the work of art shall be covered in a separate agreement," Plaintiff's Exhibit 8, page five, para. VI, A;

(e)      promises that the Artist would have the right to a credit line on the completed design and any visual representation embodying such designs as drawings, models, or photographs and this same credit and notice shall be included in any publication of the design by the Architect,"  Plaintiff's Exhibit 8, page five, para. VI, C;

(f)      permits CLA to keep, at its own expense, "documents, drawings, models, sketches, and maquettes, provided however that none of the documents or objects to retained or copies may be sold, reproduced or otherwise used for any purpose other than the creation of archives for historical purposes of public exhibition," Plaintiff's Exhibit 8, page five, para. VI, F;

(g)      requires Mr. Gaylord to represent that "1. The Work is solely the result of the artistic effort of the Artist, Plaintiff's Exhibit 8, page five, para. VI, G, 1.

PPF54.      The January 1993 Agreement between Gaylord and CLA, affirmatively makes the contract subject to specifically incorporated provisions of the Army prime contract with CLA, Defendant's Exhibit 2, including "paragraphs I 11, 15, 16, 18, 22, 23, 24, 26, 27, and 30."

PPF55.      In the prime contract between CLA and the Army Corps of

Engineers, the provisions that relate to ownership of copyrights and designs, models, and sketches are paragraphs I 28 and 1 29**,** Defendant's Exhibit 2, page G71**,** which are not .  Those provisions are not incorporated into the January 1993 contract between Frank Gaylord and CLA.

PPF56.      Mr. Gaylord resumed work on the project and registered "19 sketch models" in ponchos on November 15, 1993, Copyright Registration No. VAu 280 954, Plaintiff's Exhibit 9, and "19 2-0 maquettes" "fully approved" in ponchos on November 18, 1993, Copyright Registration No. VAu 280 955, Plaintiff's Exhibit 11.

PPF57.      In January 1994, Gaylord and CLA entered into an Amendment of the January 1993 Agreement providing for Mr. Gaylord's services "required to assist the Foundry in the enlargement, casting, finishing and placement of the final sculptures on the Mall in Washington, D.C.," Plaintiff's Exhibit 13, page one, "Scope of Work," first paragraph.

PPF58.      One of the tasks required to be performed by Gaylord in this phase of the work was the "sculpting of the faces…."  Plaintiff's Exhibit 13, page 1, "Scope of Work," para. 1.

PPF59.      The January 1994 Amendment states, page two, "Other Contractual Matters:"

> The Copyright for this work will be held by the Artist, but it suse and compensation for that use will be managed by the Architect.  All agreements for the use of that copyright, however, will be jointly approved by the Artist and the Architect.  The terms of that agreement are articulated under a separate contract.  This Agreement is dependent on acceptance of the copyright agreement by all parties.

**F.    The Resolution of the Copyright Issue and the Completion of the Project**

PPF60.    CLA never, in the course of commission, provided Gaylord with a copy of the prime contract, Defendant's Exhibit 2.

See Triano, Tr. 239, line 20 to Tr. 240, line 2.

PPF61.    In May 1994, CLA reported to Frank Gaylord that the government, through the Army Battle Monuments Commission, had withdrawn all claim for copyright ownership and/or royalties in the sculpture.   Plaintiff's Exhibit 14, page 1, para. 1.

PPF62.    John Triano testified that the Army's withdrawal of its claim for copyright cleared the way for the "separate" copyright agreement referred to in both the January 1993 Agreement and the January 1994 Amendment to be concluded.

Triano Tr. 285, line 23 to Tr. 286, line 11.

PPF63.    In August 1994, Frank Gaylord registered the copyright in "19 7'-6" tall clay soldiers to be cast in steel for the National Korean War Veteran's Memorial on the Mall in Washington D.C.",  United States Copyright Registration VAu 306-934, Plaintiff's Exhibit 15.  Mr. Gaylord is shown standing next to one of the figures in the photographs which are included in the registration, Figure No. 5, the ammunition bearer for the BAR gunner, Plaintiff's Exhibit 15, page 8, top photo.

Gaylord, Tr. 116, lines 1-11; Tr. 117, lines 6-17 (referring to the model at the 1 foot stage); Tr. 128, lines 2-10; Tr. 129, lines 5-10 (referring to the final 7'-6" figures of Plaintiff's Exhibit 15).

PPF64.      In February 1995, Gaylord entered into an agreement with CLA which permitted CLA to license the work "The Column" subject to prior approval by Frank Gaylord and an agreed royalty schedule.   Plaintiff's Exhibit 17.

PPF65.      The February 1995 agreement was drafted by CLA with the advice of its counsel and was negotiated through several drafts.

Triano Tr. 310, lines 14 to Tr. 311, line 7; Lecky, Tr. 543, lines 2-4.

PPF66.      In the February 1995 Agreement, which expressly refers to the Army prime contract between the Army and CLA, Plaintiff's Exhibit 17, page one, para. A, CLA represents that "Client [the Army] has no claim regarding copyrights on the contributions of the parties to the Memorial and therefore Cooper-Lecky, Gaylord and another party which has rendered creative services in connection with the Memorial, i.e., Louis Nelson Associates, Inc. ("Nelson") own the copyrights in their contributions to the Memorial," Plaintiff's Exhibit 17, page one, para. D.

PPF67.      In the February 1995 Agreement, CLA acknowledged, "on its own behalf and on behalf of the Client," that Frank Gaylord was the "sole author of the Soldier Sculptures to become part of the overall Memorial, the Soldier Sculptures constituting a contribution to the collective work embodied by the Memorial as a whole.  As the author such contribution, Gaylord is entitled to retain sole ownership of the copyright for the Solider Sculptures, the Soldier Sculptures sometimes being referred to herein as the "Gaylord Work," which term shall include all versions of such Solider Sculptures, including, but not limited to, the sketches, reproductions, photographs, prints, and all drawings."   Plaintiff's Exhibit 17, page two, para. 1 (emphasis added).

PPF68.        The February 1995 Agreement granted CLA an exclusive rights to license the Gaylord work, Plaintiff's Exhibit 17, page 2, paragraph 2, but required CLA to obtain Gaylord's prior approval for any licensing of the Soldier Sculptures,  Plaintiff's Exhibit 17, page 2, para. 3

PPF69.        The February  1995 Agreement expressly provides the right of termination on  thirty (30) days written notice in the event of, among other things, material breach.  Plaintiff's Exhibit 17, page 6, para. 10.

PPF70.        In April 1995, Mr. Gaylord was present as "The Column" was installed on the National Mall.  Gaylord registered a copyright in the "The Column" as installed on the National Mall, United States Copyright Registration No. VAu 342-49, Plaintiff's Exhibit 19.

Gaylord, Tr. 137, lines 14 – 18, and Tr. 139, lines 9 – 24.

PPF71.        John Triano testified that CLA repeatedly  breached its obligations under the Agreement both prior to and during the KWVM dedication ceremony.

Triano, Tr. 300, line 18 to Tr. 305, line 4.

PPF72.        Gaylord expressly terminated the February 1995 Agreement and CLA' s licensing authority for breach on September 3, 1995.   Plaintiff's Exhibit 24.

PPF73.        Frank Gaylord is the sole contributor of original, copyrightable subject matter to the 19 larger than life size sculptural figures of soldiers in formation which became known as "The Column."

(a)     Frank Gaylord testified that "The Column" was the work "of his mind" and that, while he assigned routine tasks, such as the details of belts and other clothing to John Triano,

Gaylord, Tr. 123, lines 10-17, he was only person who made any artistic contributions to the work,   Gaylord, Tr. 152, line 23 (product of his mind), Tr. 125, line 8 to Tr. 127, line 3 (architect's input), Tr.  120, line 19 – Tr. 121, line 13 (input from committee).

(b)      Mr. Gaylord testified that his instructions were "They were on an undefined mission, going through enemy territory.  That's all they told me.  And they were a 38-figure composition. That meant something, because each would not have to function as a piece of sculpture by itself, because it was part of something larger.  That meant is could be off balance. It could be walking or running forward, off balance.  That made movement in the composition."

Gaylord, Tr. 105, lines 1-10.

(c)      Mr. Gaylord testified that he made 250—270 different sketches in clay overall because the Fine Arts Committee "didn't know what they wanted.  They were not sculptors.  So I'm suggesting to them.  And they incorporate some of them, let's put these together, let's try these together."

Gaylord, Tr. 166, lines 8-14.

(d)      Mr. Gaylord testified that when the committee would come up and visit him at his studio in Vermont, he "would have them all together in arrangement and composition.  They would come up and see the composition."

Gaylord, Tr. 121, lines 5-7.

(e)      Mr. Gaylord testified that he created the composition of the overall sculpture with some input from veterans for military accuracy:

> Q.      All right.  And that composition, the way they relate to one another, who created that?

A.     Essentially, I did.  I had some input from the veterans.  Like Col. Bill Weber would say, you know, if I were to shoot, I could shoot three men with one bullet.  So that I had to stagger the column.

(f)     Mr. Gaylord show, as part of his retrospective of his work, the evolution of Figure Number 11, Plaintiff's Exhibit 35 and 25A, files 203-222.jpg, and described how the figure was built upon from an initial armature of wire and detailed anatomy to the addition of clothing and the fine detail of the weaponry and features.

Gaylord, Tr. 107, line 23-114, line 8.

(g)     Mr. Gaylord was asked why the figure development included a step of detailed anatomy:

Q.     Now, why is it that you show – I mean, when they are going to be covered in uniforms and so forth, why do you show this detailed anatomy?

A.     Everything, every wrinkle in the poncho, every wrinkle in anyone's clothing is caused by something going on underneath it.  That's  one of the first things we learned in art school.  The nude is the basis for almost figure sculptures, just about all figure sculpture.  Unless it's abstract or something like that.  But the nude is the basis for all realistic figure sculpture."

Gaylord, Tr. 109, lines 5-15.

(h)     Mr. Gaylord testified about the individuals and the events that inspired each of the figures for him.  While the service and specialty of each figure was dictated by the Fine Arts Committee, how each of the individual soldiers should look and stand, and how they related to one another in the formation were all created by Mr. Gaylord.

Gaylord, Tr. 128, line 13-134, line 13.

(i)     Mr. Gaylord explained the balance of form and detail that he struck and why that was important to overall work and composition:

29

"Since it is a 19 figure composition, I did not put any detail in any of the figures, because the eye tends to rest on detail.  I wanted the eye to wander over the entire composition, because that's what it is supposed to do.  And so there's supposed to be really nothing on the figures to catch the eye, so the eye keeps moving along the whole composition.  That's the intention…..To make them look more expressive, you exaggerate.  Exaggerate is not the word; stylization is the world.  Stylized.  I put, I deliberately put no blood veins in the hands so they wouldn't attract any attention.  I just put tendons."

Gaylord, Tr.133, line 24- 134, line 6; Tr. 134, lines 9-13.

PPF74.      Mr. Lecky purported to testify that he had re-worked the poncho figures himself by "putting on his jeans and rolling up his sleeves" and going to work on them in the conference room in Washington, D.C.  He said the "ponchos" in the figures that had been delivered to Washington D.C. were too "windy" and purported to assert that he made changes to the figures.

Lecky, Tr. 486, lines 1-14.

PPF75.      The summary of Gaylord invoices, Plaintiff's Exhibit 40, page two, shows that the models shipped to Washington D.C. before the figures were wearing ponchos, that Mr. Gaylord invoiced for adding ponchos, and that Mr. Gaylord invoiced for "poncho rework."

PPF76.      There is no evidence that any actual changes Mr. Lecky claimed to have made were ever shown to Mr. Gaylord in person or in photographs.

30

PPF77.        Mr. Lecky's bare assertion that he made actual contributions to the sculpture figures that were incorporated and survive in the present work is uncorroborated by any other person's testimony or any other document.

PPF78.        Mr. Gaylord submitted copyright applications for the copyright registrations on the work " The Column" and received certificates of registration for the same Stipulated Fact 11.

PPF79.        As previously referred to above, Gaylord received, among others, the following United States Copyright Registrations for " The Column:" United States Copyright Registration Nos. VAu 280 954, registered November 15, 1993; VAu 280 955, registered November 18, 1993, VAu 306 934, registered August 12, 1994, and Vau 342 493, registered May 1, 1995; and United States Copyright Registration VA 716-095 issued May 1, 1995.

### G.    The Alli Image

PPF80.        In January 1996, a photographer named John Alli visited the KWVM during a  snowstorm and took a photograph (the " Alli Photo" ).   Stipulated Fact 12.

PPF81.        Mr. Alli is a retired Marine Corps.  pilot and serious amateur photographer who wanted a picture of the "The Column" as a retirement gift for his father, a career Naval officer who had served in Korea.

Alli Tr. 370, line 25 to Tr. 371, line 8; Tr. 376, lines 11 to 24; Tr. 373, line 19 to Tr. 374, line 15.

PPF82.        Mr. Alli testified that he visited "The Column" several times in various weather conditions to take pictures and finally, very early in the morning after a heavy

snow, he took the photograph of "The Column" that eventually became the Postal Service stamp at issue.

Alli Tr. 376, line 17 to Tr. 377, line 20.

PPF83.     Mr. Alli took the photo in early 1996.  The photograph was framed and given to his father and was well-received in the military community.  It won first place in the Navy's annual photo contest.

Alli Tr. 372, line 25 t0 Tr. 373, line 5; Tr. 379, lines 7-10; Tr. 382, lines 2 to15.

PPF84.     Later Mr. Alli tried to find out permission he would need to sell reprints of the photograph and approached a souvenir vendor near the Mall.  Through a series of referrals, he eventually was directed to William Lecky, as the architect of record for the KWVM.

PPF85.     Later Mr. Alli contacted a vendor on the National Mall to try to sell reprints of his photograph.  He learned from the vendor that because the Memorial itself is copyrighted, he would need permission in order to market his photograph.

Alli. Tr. 389, lines 3 to 15.

PPF86.     Through a series of referrals, Mr. Alli was eventually directed to William Lecky, as the architect of record of the KWVM.

Alli Tr. 388, line 24 to Tr. 390, line 11.

PPF87.     Mr. Alli brought a framed print of his photograph to Mr. Lecky, who informed him that he (Mr. Lecky) owned  the copyright "outright" and graciously offered to authorize Mr. Alli to sell prints and reproductions of the photo in return for a royalty of 10% of Mr. Alli's sales.

Alli. Tr. 390, line 11 – Tr. 391, line 6.

PPF88.        Mr. Alli and Mr. Lecky entered into an agreement regarding the Alli Image on April 20, 1998.  Plaintiff's Exhibit 42.  The Alli-Lecky Agreement documented a request by the Army to use the Alli Image on a one-time basis on  poster for the 50th Anniversary of the Korean War.

Alli. Tr. 387, line 11 – Tr. 388, line 13.

PPF89.        The Alli-Lecky Agreement also provided that KWVM Productions, Inc. (the licensing entity set up by Lecky at the time of the dedication) would receive 10% of net sales of any prints, posters or framed artwork of the Alli Image that was sold by John Alli.  Plaintiff's Exhibit 42.

PPF90.        Mr. Alli has paid Mr. Lecky a 10% royalty on his net sales since he signed the 1998 Agreement.

Alli, Tr. 393, lines 3 – 8.

PPF91.        Mr. Alli accounted for his sales in a spreadsheet produced to the parties in this dispute, Defendant's Exhibit 47, which shows, among other things, receipt of $1000.00 for the Army's one-time use of the Alli Image in the poster referenced in Plaintiff's Exhibit 42.

### H.    The Korean War Stamp

PPF92.        In 2002, the United States Postal Service (" Postal Service" ) decided to issue a 37-cent postage stamp commemorating the fiftieth anniversary of the armistice of the Korean War. The Postal Service decided to incorporate the Alli Photo into the stamp image.   Stipulated Fact 13.

PPF93.	On July 27, 2003, the Postal Service issue the stamp (the "Stamp"). Stipulated Fact 14.

PPF94.	The Stamp depicted an image of " The Column" showing fifteen of the nineteen soldier figures, including the lead figure, in the snow.   Plaintiff's Exhibit 26; Gaylord, Tr. 150, lines 17-20.

PPF95.	The mural wall and the reflecting pool are not shown in the Stamp. Plaintiff's Exhibit 26; Gaylord, Tr. 150, lines 21-23.

PPF96.	The only portion of the KWVM shown in the stamp is " The Column."   Plaintiff's Exhibit 26.

PPF97.	John Alli did not seek Frank Gaylord' s permission before authorizing the Postal Service to put the Alli Image on the Stamp.

Gaylord, Tr. 153, lines 15-25.

PPF98.	John Alli advised the Postal Service that they would need, in addition to his permission, the permission of the owner of the copyright in the sculpture and believing that person to be William Lecky, referred them to Mr. Lecky.

Defendant's Exhibit 41 (Settlement Agreement between Gaylord and Alli, also PX32, page 3, paragraph 10(f).

PPF99.	The Postal Service did not seek Mr. Gaylord's permission to depict the work "The Column" on the Stamp or any related retail goods.   Stipulated Fact 16.

PPF100.	Frank Gaylord did not give permission, express or otherwise, for the Postal Service to use an image of  "The Column" on the Stamp.  Indeed, Mr. Gaylord was not even aware of the Stamp until after it issued on July 27, 2003.

Gaylord Tr. 151, lines 2-10.

PPF101.    Frank Gaylord sued the United States Postal Service for copyright infringement in the Court of Federal Claims on July 25, 2006, alleging infringement of the four copyright registrations identified in PPF82, above, on the basis of the Postal Service's publication, distribution, and sale of the Stamp and related merchandise, which incorporate unauthorized copies of the copyrighted work "The Column."

Complaint in Civil Action 06-539C (Docket No. 1) filed July 25, 2006.

PPF102.    Frank Gaylord sued John Alli for copyright infringement in the United States District Court for the District of Maryland on July 26, 2006, on the basis of the four copyright registrations identified in PPF82, above, and Mr. Alli's publication, distribution, and sale of the Alli Image and related merchandise, which incorporate unauthorized copies of the copyrighted work  "The Column."

Defendant's Exhibit 41, page one, paragraph 4 (Settlement Agreement referring to Civil Action No. 06-cv-01921-WMN, D.Md.); See Also Joint Preliminary Status Report (Docket No. 9), filed January 16, 2007, p. 1, identifying Maryland action adverse to Mr. Alli and status).

PPF103.    When Mr. Alli became aware of the Gaylord suit and Mr. Gaylord's claim to copyright in "The Column" and asked Mr. Lecky to provide him with a copy of Mr. Lecky's alleged copyright which gave him "outright" ownership of the work.  As Mr. Alli testified, at this point, he had seen his own copyright in his photograph and he had seen Mr. Gaylord's copyright, but he had never seen any copyright owned by Mr. Lecky.

Alli, Tr. 395, lines 2 to 17; Alli, Tr. 393, lines 13 to 21.

PPF104.    Mr. Alli testified that he got no response from Mr. Lecky to his request for a copy of Mr. Lecky's copyright.

Alli, Tr. 395, lines 12 to 17.

PPF105.    Mr. Gaylord and Mr. Alli amicably settled the case in an Agreement dated April 25, 2007, while this present action was pending.

Defendant's Exhibit 41 (Gaylord-Alli Settlement Agreement); Complaint dated July 26, 2006.  The Agreement expressly provides that the claims compromised and settled are those that are personal to Mr. Alli based on his own conduct and are not for the benefit of any third party who may be jointly and severally liable to Mr. Gaylord, including the Postal Service.

Defendant's Exhibit 41, page four, paragraph 11(b), paragraph 18.

PPF106.    Mr. Gaylord and Mr. Alli agreed that Mr. Alli would pay Mr. Gaylord 10% of net retail sales on revenue he receives from sales of the Alli Image and that Mr. Gaylord would pay Mr. Alli 10 % of any net recovery from enforcement of the Gaylord copyrights, including in this litigation, that remains after Gaylord's litigation costs, including an unreimbursed attorneys' fees, have been deducted.

Defendant's Exhibit 41, page 5, paragraph 11(c)(iii) and page 6, paragraph 15.

## I.    The Postal Services Revenues and Profits  from The Stamp

PPF107.    The Postal Service produced approximately 86.6 million Stamps before the Stamp was retired on March 31, 2005, as well as a variety of other retail goods featuring the image of the Stamp.  Stipulated Fact 15.

The Stamp is shown on Plaintiff's Exhibit 24.  Samples of retail merchandise, namely a postcard, lapel pin, and magnet, bearing the image of the Stamp are Plaintiff's Exhibits 27A, 27B, and 27C, respectively.

PPF108.      The Stamp and the retail goods do not identify Mr. Gaylord as the sculptor of " The Column."  Stipulated Fact 17.

PPF109.      The Postal Service News Release announcing the stamps is dated July 28, 2003, and refers to the release of the stamp the previous day.  It does not identify Mr. Gaylord a the sculptor of "The Column," but it contains a copy of the image of the Stamp. Plaintiff's Exhibit 28, page one.  The Postal Service News Release credits Mr. Alli with the photograph incorporated into the stamp and credits Richard Sheaff as the "stamp designer." Plaintiff's Exhibit 28, page two.

PPF110.       The Postal Service printed 86,800,00 stamps bearing the copyrighted work 'The Column' and has asserted that it retired 6.86% of them. The difference represents 80,845,520 stamps with a total sales revenue potential of $29,912,842.50.

Plaintiff's Exhibit 34 (Defendant's First Supplemental Response to Plaintiff's Interrogatory No. 9), page 2, fifth paragraph.

PPF111.      Defendant's Exhibit 51, explained by Postal Service employee Charles Delaney, shows the monthly usage of the Stamp during each month that it was on sale. The final number of stamps sent to "field" on Exhibit 51 corroborates that at all but 6.86% of the stamps were sent to field.

Defendant's Exhibit 51 also indicates that the field was demanding more stamps to be sent right up to the last month the stamp was offered, March 2005.

37

Delaney, Tr. 423, lines 10 to 22.

PPF112.      The Postal Service's direct costs of printing the Korean War

stamps was $2.09 per 1000 stamps, or $118,412.00.

Plaintiff's Exhibit 33 (Defendant's Response to Interrogatory No. 10), page two of the

exhibit (numbered page 26 of the response).

PPF113.      Mr. Delaney testified that the Postal Service's overhead costs did

not increase as a result of the printing and sale of the Korean War Stamp.

Delaney, Tr. 454, line 25-, 455, line 11.

PPF114.      The Postal Service did a stamp retention survey that showed that at

least $5.4MM in Korean War Veterans Memorial Stamps that were sold in 2003 alone were

retained by households that did not intend to exchange them for postal services.

Defendant's Exhibit 29, page G02410.

PPF115.      Taking the total sales of non-retired stamps ($29,912,842.50) (PFF

112, above) less printing costs of $118,412.00 (PPF 110, above), where the Postal Service

obtained $5.4MM in revenue from stamps purchased to be retained (PPF112) results in an

incremental profit to the Postal Service on stamps of at least 18% on overall stamps sales.

PPF116.      The Postal Service sold $330,919.49 in other retail goods that were

not stamps per se that that were based upon or incorporated principally the Stamp image, such as

Plaintiff's Exhibits 27A, 27B, and 27C  as shown in the Table in PPF 117.

PPF117.        The following revenues and costs are associated with non-stamp

goods that featured the Stamp (all of the rows except that last one are set forth in Stipulated Fact

20; the total revenue for Framed Art is also set forth in Stipulated Fact 20; the costs for Framed

Art were supplied by the USPS shortly prior to trial; Gaylord accepts the USPS' representation

regarding those costs even though they were not supplied in a supplemental interrogatory

response):

| Product | Revenues | Costs |
|---|---|---|
| The American Commemorative Panel | $63,792.25 | $15,990.00 |
| Cancellation Pages | $23,360.00 | $2,250.00 |
| American Commemorative Collection Sheets | $34,703.50 | $1,195.00 |
| First Day of Issuance Ceremony Program | $2,341.35 | $0.00 |
| First Day of Issue Covers | $9,650.25 | $2,580.90 |
| Cancellation Keepsake (pane of 20stamps with First Day of Issue Cover) | $36,153.40 | * |
| Lapel Pin | $25,481.84 | $23,278.00 |
| Postcard | $9,407.68 | $5,591.00 |
| Magnet | $11,571.51 | $12,051.00 |
| Framed Art | $114,457.71 | $68,472.60 |
| Totals | $330,919.49 | $131,408.50 |

*The parties dispute the costs associated with the Cancellation Keepsake.

PPF118.     The overall incremental profit enjoyed by the Postal Service for non-stamp merchandise was over 60% ($330,919.49 in gross revenue less $131,408.50 in costs).

PPF119.     David Faillor was the Postal Service's Manager of Stamp Services in 2003, with responsibility for all aspects of Postal Service's stamp program, including management of intellectual property issues related to stamps with the Postal Service's legal counsel.

Faillor, Tr. 618, lines 10-18; Tr. 620, lines 6-18.

PPF120.     The Postal Service puts its own copyright notice on its merchandise.  See, e.g., Plaintiff's Exhibit 27A (Postcard, front side) which bears a USPS Copyright Notice.   Terrence McCaffrey, a USPS employee and stamp designer, testified that the copyright notice was placed on all Postal Service stamp images "because all images, stamp images since 1978 have been copyrighted."  When asked why, Mr. Caffrey responded, "To protect the rights of the imagery.  And we resell them.  We license the stamp images."

McCaffrey, Tr. 589, lines 10-12.

PPF121.     The Postal Service licensed third parties at a royalty of 8% of net sales for the non-exclusive right to use the image of Stamp on retail goods. The Postal Service received $17,831.93 in revenue from these licenses.  Stipulated Fact 19.

PPF122.     Frank Gaylord has licensed the work " The Column" in arms length transactions at a rate of 10%  on non-exclusive direct sales of merchandise and has historically used a royalty rate of 10% as a reasonably royalty rate.

Gaylord, Tr. 147, lines 10-23; Plaintiff's Exhibit 25.

PPF123.       Mr. Lecky and Mr. Alli used a royalty of rate of 10% for non-exclusive  licensing of prints and copies of Mr. Alli's photograph, which contains the work "The Column."  Plaintiff's Exhibit 42.

PPF124.       The February 1995 Agreement between Frank Gaylord and KWVM Productions (Lecky) included the negotiated the right to receive at least 15% royalty  for the exclusive license to use the Gaylord Work (the "Soldier Sculptures").  Plaintiff's Exhibit 17, page 4, paragraph 8(a)(i).

PPF125.       Frank Gaylord has established that 10% is a reasonable royalty on net sales for the use of the image of the work "The Column" in this case and that the Korean War stamp resulted in incremental profits with respect to both stamps and merchandise, meaning that the USPS is capable of paying.

PPF126.       10% is a reasonable royalty on the Postal Services sales of items being the infringing copies of  "The Column."

PPF127.       10% of the Postal Services net sales of infringing items is $2,991,284.25 (stamps) and $33,092.95 (merchandise).

Respectfully submitted,


Dated:  August 20, 2008                    /s/ Heidi E. Harvey
                                            Heidi E. Harvey
                                            MA 548114
                                            FISH & RICHARDSON P.C.
                                            225 Franklin Street
                                            Boston, MA 02110
                                            (617) 542-5070
                                            (617) 542-8906

                                            Attorneys for Plaintiff

22008666.doc