IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FRANK GAYLORD,                    )
                                  )
          Plaintiff,              )
                                  )
     v.                           )          No. 06-539C
                                  )
THE UNITED STATES,                )          Judge Thomas C. Wheeler
                                  )
          Defendant.              )

## DEFENDANT'S RESPONSE TO PLAINTIFF'S POST-TRIAL BRIEF

                         GREGORY G. KATSAS
                         Assistant Attorney General

                         JOHN J. FARGO
                         Director

                         SCOTT BOLDEN
OF COUNSEL:              Senior Trial Counsel
ERIC F. MULCH            Commercial Litigation Branch
United States Postal Service    Civil Division
                         Department of Justice
                         Washington, DC  20530
                         Telephone:    (202) 307-0262
September 22, 2008       Facsimile:    (202) 307-0345

                         Attorneys for Defendant the United States

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.     MR. GAYLORD FAILS TO DIRECTLY ADDRESS THE ISSUES RELEVANT
       TO DETERMINING INFRINGEMENT IN THIS CASE  . . . . . . . . . . . . . . . . . . . . . . . 1

II.    MR. GAYLORD IS NOT THE SOLE AUTHOR OF THE SOLDIER STATUES
       OR "THE COLUMN" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

       A.     Mr. Gaylord's Assertion That He Was the Only Sculptor Is Factually Untrue
              and Legally Irrelevant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       B.     Selection of Subject Matter, Arrangement, and Composition are
              Copyrightable Expression . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

       C.     The Evidence of Joint Authorship Overwhelmingly Rebuts the
              Presumption of Validity in the Copyright Registrations . . . . . . . . . . . . . . . . . . . 6

       D.     Plaintiff's Exhibit No. 6 Provides Evidence of the Only Work Solely
              Authored by Mr. Gaylord . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

       E.     Plaintiff Unfairly Attacks Mr. Lecky . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III.   PLAINTIFF'S PROPOSED FACTS SUPPORT A FINDING OF FAIR USE . . . . . . . . 11

IV.    MR. GAYLORD'S REQUEST FOR COMPENSATION IS SPECULATIVE
       AND IMPROPER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

       A.     Pure Speculation Cannot Substitute for Actual Damages . . . . . . . . . . . . . . . . . 13

       B.     Mr. Gaylord Has Not Established a Reasonable Royalty Rate . . . . . . . . . . . . . 15

       C.     Assuming Liability and Entitlement to Actual Damages,
              Mr. Gaylord's Compensation is Limited to $1500 . . . . . . . . . . . . . . . . . . . . . . 16

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

# TABLE OF AUTHORITIES

**Cases**

Burrow-Giles Lithographic Co. v. Sarony,
    111 U.S. 53 (1884) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

Cadence Industries Corp. v. Ringer,
    450 F. Supp. 59 (S.D.N.Y. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Carol Barnhart Inc. v. Economy Cover Corp.,
    773 F.2d 411 (2d Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Childress v. Taylor,
    798 F. Supp. 981 (S.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-15

Compaq Computer Corp. v. Ergonome Inc.,
    387 F.3d 403 (5th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11-12

Data General Corp. v. Grumman Systems Support Corp.,
    36 F.3d 1147 (1st Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Donald v. Uarco Business Forms,
    478 F.2d 764 (8th Cir. 1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Durham Industries, Inc. v. Tomy Corp.,
    630 F.2d 905 (2d Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Ets-Hokin v. Skyy Spirits, Inc.,
    225 F.3d 1068 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Feist Publications, Inc. v. Rural Telephone Service Co.,
    499 U.S. 340 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

Fred Riley Home Bldg. Corp. v. Cosgrove,
    883 F. Supp. 1478 (D.Kan. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6-7

Medforms, Inc. v. Healthcare Management Solutions, Inc.,
    290 F.3d 98 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Shapiro, Bernstein & Co. v. Jerry Vogel Music Co.,
    161 F.2d 406 (2d Cir. 1947) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

**Statutes**

17 U.S.C. § 101 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

17 U.S.C. § 410 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

**Other Authorities**

H.R. Rep. No. 94-1476 (<u>reprinted in</u> 1976 U.S.C.C.A.N 5659) . . . . . . . . . . . . . . . . . . . . . . . . . 6

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FRANK GAYLORD,                          )
                                        )
            Plaintiff,                   )
                                        )
      v.                                )        No. 06-539C
                                        )
THE UNITED STATES,                      )        Judge Thomas C. Wheeler
                                        )
            Defendant.                   )

### DEFENDANT'S RESPONSE TO PLAINTIFF'S POST-TRIAL BRIEF

Pursuant to the Court's Order of July 23, 2008, Defendant, the United States ("the government"), hereby respectfully submits its Response to Plaintiff's Opening Brief After Trial.

### ARGUMENT

### I.  MR. GAYLORD FAILS TO DIRECTLY ADDRESS THE ISSUES RELEVANT TO DETERMINING INFRINGEMENT IN THIS CASE

Plaintiff's Brief did not address many of the primary disputed issues in this case. Instead, Mr. Gaylord primarily focuses on an issue that is not disputed – that the Stamp is substantially similar to "The Column." See Pl. Brief at 4-6. Mr. Gaylord's argument is uncontested. See, e.g., Tr. at 21:14-17 (Bolden) (noting that the legal issue of substantial similarity was not at issue). The Alli Photo is similar in appearance to "The Column" because it is a photograph portraying a unique, obscured, single-perspective, two-dimensional view of a portion of "The Column," as installed in the Korean War Veterans Memorial ("KWVM"). See Gov. Fact ¶ 17. The Postal Service used a unique, modified version of the Alli Photo to create the Stamp. See Gov. Fact ¶ 17; Tr. at 583:19-24, 585:9-13 (McCaffrey).

- 1 -

The parties' dispute regarding copyright infringement has never involved a contest over the existence of similarity between the Stamp and "The Column." The dispute between the parties has focused on three primary issues for the purposes of determining infringement and liability: (1) whether the Postal Service's use of the KWVM as depicted in the Stamp is a fair use; (2) whether the Postal Service's use of a photograph of the KWVM was noninfringing under the Architectural Works Copyright Protection Act; and (3) whether a joint owner of the soldier statues or "The Column" granted the government an unlimited, paid-up license. See generally Answer; Joint Preliminary Status Report; Defendant's Statement of the Proposed Conclusions of Law. Mr. Gaylord largely did not confront these issues in his post-trial Brief. See generally Pl. Brief at 3 ("Gaylord will not anticipate arguments that the Postal Service may make in its opening brief by way of defense . . . ."). As discussed previously in the government's Brief and currently in the following sections of this Response, the evidence overwhelmingly supports the conclusion that the Stamp is noninfringing, and that the Stamp is either a fair use or an authorized use.

## II.    MR. GAYLORD IS NOT THE SOLE AUTHOR OF THE SOLDIER STATUES OR "THE COLUMN"

The evidence presented at trial demonstrates that a joint owner of the soldier statues and "The Column" granted the government an unlimited, paid-up license in both of the works. Mr. Gaylord, Cooper-Lecky Architects ("CLA"), the Veterans Advisory Board ("VAB"), and the Commission of Fine Arts ("CFA") jointly collaborated to create both of the works by contributing copyrightable expression. Mr. Gaylord responds to the evidence with several poorly supported legal arguments, and by generally attacking Mr. Lecky's character. For the reasons described below, Mr. Gaylord's arguments must fail.

A.     **Mr. Gaylord's Assertion That He Was the Only Sculptor Is Factually Untrue and Legally Irrelevant**

Mr. Gaylord's repeated assertion that no one else modeled the statues[1] is: (1) untrue as a matter of fact; and (2) irrelevant as a matter of law. First, Mr. Gaylord, Mr. Triano, and Mr. Lecky each "laid hands on clay." Tr. at 15:7-8 (Harvey), compare with Tr. at 123:10-17 (Gaylord) (testifying that Mr. Triano sculpted rifle- and helmet-straps), Tr. at 486:1-87:2 (Lecky) (testifying that he reworked each of the soldier statues for three days to reduce the wind movement in the ponchos). Second, even assuming, for the sake of argument, that Mr. Gaylord was the only individual who sculpted the soldier statues, that assumed fact would not change the conclusion that the soldier statues were jointly authored. The creation of a joint work merely requires the intention that multiple "contributions be merged into inseparable or interdependent parts of a unitary whole," and does not require that the authors share equally in every aspect of creating a work. 17 U.S.C. § 101; see Shapiro, Bernstein & Co. v. Jerry Vogel Music Co., 161 F.2d 406, 409-10 (2d Cir. 1947) ("The words and music of a song constitute a 'musical composition' in which the two contributions merge into a single work to be performed as a unit for the pleasure of the hearers; they are not a 'composite' work, like the articles in an encyclopedia, but are as little separable for purposes of the copyright as are the individual musical notes which constitute the melody."). As demonstrated by his application materials and his testimony, Mr. Gaylord was aware that the soldier statues and "The Column" were being designed in a collaborative process, and that the sculpture would be merged into the KWVM. See PX 5 at 2-3 (Application Statement) (advocating his experience in collaborating with committees); see also PX 2 (Resume) (stating that he has "[w]orked equally well

---

[1] See, e.g., Pl. Brief at 1 ("modeled by his own hands"); Tr. at 15:7-8 (Harvey) ("no one but Frank Gaylord laid hands on clay"); see generally PPF 73.

on independent projects and team projects"); Tr. at 165:23-25 (Gaylord) (using his models "to show that I could do what they wanted me to do").

Mr. Gaylord's argument that he is the sole copyright owner because he was the sole laborer veers into the discredited "sweat of the brow" theory of copyright creation and ownership. See Tr. at 12:20-21 (Harvey) ("[the soldier statues are] the product of his mind, his hands, and his sweat"); Tr. at 15:6-7 (Harvey) ("no one on those committees ever broke a sweat"), compare with Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340, 359-60 (1991) ("originality, not 'sweat of the brow,' is the touchstone of copyright protection").

### B. Selection of Subject Matter, Arrangement, and Composition are Copyrightable Expression

By arguing that no one else "laid hands on clay," Mr. Gaylord implicitly argues that the contributions of CLA, the VAB, and the CFA were not independently worthy of copyright protection. Mr. Gaylord's argument contradicts the vast weight of authority.

The Supreme Court has rejected similar arguments in at least two different cases. In Feist, the Court acknowledged that the threshold for copyrightable expression is very low:

> The *sine qua non* of copyright is originality. To qualify for copyright protection, a work must be original to the author. Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity. To be sure, the requisite level of creativity is extremely low; even a slight amount will suffice. The vast majority of works make the grade quite easily, as they possess some creative spark, "no matter how crude, humble or obvious" it might be.

Feist, 499 U.S. at 345 (1991) (citations omitted). In a much earlier case, the Supreme Court confronted the issue of whether a photograph was capable of copyright protection. See Burrow-Giles Lithographic Co. v. Sarony, 111 U.S. 53 (1884). The Court concluded that photographs were copyrightable, because the selection, arrangement, composition, and depiction of

the subject matter were all creative and expressive acts.  See id. at 55, 60-61.  Many other courts have echoed the Supreme Court's conclusions with respect to the threshold for copyrightable expression in works of art.  See, e.g., Ets-Hokin v. Skyy Spirits, Inc., 225 F.3d 1068, 1077 (9th Cir. 2000) ("[C]ourts have recognized repeatedly that the creative decisions involved in producing a photograph may render it sufficiently original to be copyrightable and have carefully delineated selection of subject, posture, background, lighting, and perhaps even perspective alone as protectable elements of a photographer's work.").

CLA, the CFA, and the VAB were each involved in the selection, arrangement, composition, and depiction of the soldier statues in "The Column."  The principals of CLA were intimately involved in, *inter alia*, determining the number of statues; positioning the statues; making decisions with respect to the appearance of the statues; and creating the environment of "The Column."  See Gov. Fact ¶¶ 44-45, 49-54.  The CFA was responsible for determining the number of statues; and making decisions with respect to the appearance of the statues.  See Gov. Fact ¶¶ 44, 50, 52-53.  The VAB contributed the historical background to each of the soldier statues; made several important decisions with respect to the appearance of individual soldier statues; and helped arrange and position the soldier statues in the final work.  See Gov. Fact ¶¶ 46-48; Tr. at 132:1-10, 200:3-13 (Gaylord) (changing a soldier statue to appear Hispanic); Tr. at 185:7-14 (Gaylord) (changing the appearance of facial hair and helmet straps); Tr. at 121:8-13, 189:25-90:9 (Gaylord) (arranging and positioning the soldier statues).  Pursuant to the Supreme Court's logic in Feist and Burrows-Giles, CLA, the CFA, and the VAB each contributed copyrightable expression to "The Column."

**C.** **The Evidence of Joint Authorship Overwhelmingly Rebuts the Presumption of Validity in the Copyright Registrations**

Mr. Gaylord incorrectly asserts that the *prima facie* evidence of the validity of the copyright registrations resolves the issue of ownership. See Pl. Brief at 4 ("[T]herefore, [Mr. Gaylord's copyrights] are entitled to prima presumption [*sic*] of validity set forth in Section 410(c)."). As discussed in the legislative notes accompanying the statute, the presumption of validity is rebuttable and "does not deprive the defendant in an infringement suit of any rights; it merely orders the burdens of proof." 17 U.S.C. § 410 Statutory Notes (quoting H.R. Rep. No. 94-1476 (reprinted in 1976 U.S.C.C.A.N 5659, 5772-73)). If a defendant presents evidence that the statements in the registration are incorrect, validity[2] will not be assumed. See Durham Industries, Inc. v. Tomy Corp., 630 F.2d 905, 908 (2d Cir. 1980); see also Medforms, Inc. v. Healthcare Management Solutions, Inc., 290 F.3d 98, 114 (2d Cir. 2002) ("the presumption of validity afforded a copyright registration may be rebutted by proof of deliberate misrepresentation"). Ultimately, if a defendant effectively challenges the presumption of validity, the burden of proof of validity shifts back to the plaintiff. See Carol Barnhart Inc. v. Economy Cover Corp., 773 F.2d 411, 414 (2d Cir. 1985) (quoting H.R. Rep. No. 94-1476 (reprinted in 1976 U.S.C.C.A.N 5659, 5773)); see also Fred Riley Home Bldg.

---

[2] "[U]nlike a patent claim, a claim to copyright is not examined for basic validity before a certificate is issued [by the Copyright Office]." 17 U.S.C. § 410 Statutory Notes; see also Donald v. Uarco Business Forms, 478 F.2d 764, 765 n.1 (8th Cir. 1973). Thus, the *prima facie* evidence presumption in Section 410 is a rebuttable statutory presumption, rather than a presumption based upon deference to the Copyright Office. Indeed, the Copyright Office is required to register a copyright if the deposit is copyrightable and if "the other legal and formal requirements of" Title 17 are met. 17 U.S.C. § 410(a); see also Cadence Industries Corp. v. Ringer, 450 F. Supp. 59, 65-66 (S.D.N.Y. 1978) ("[T]he Copyright Office has neither the facilities nor the authority to rule upon the factual basis of applications for registration . . . where an application is fair upon its face, the Office cannot refuse . . . to perform the ministerial duty of registration imposed upon it by the law.") (citation omitted).

- 6 -

Corp. v. Cosgrove, 883 F. Supp. 1478, 1482 (D.Kan. 1995) (holding that defendant rebutted the presumption of validity, shifting the burden of establishing ownership to the plaintiff).

As discussed at length in the government's Brief, the evidence that the soldier statues and "The Column" were both jointly authored by Mr. Gaylord, CLA, the VAB, and the CFA is overwhelming. See Gov. Brief at 31-42. This evidence rebuts the presumption of validity, and Mr. Gaylord bears the burden of establishing ownership to the soldier statues and "The Column."

### D. Plaintiff's Exhibit No. 6 Provides Evidence of the Only Work Solely Authored by Mr. Gaylord

Mr. Gaylord did independently create and copyright sketch models for the KWVM project, but those sketch models bear almost no resemblance to the soldier statues and "The Column." Mr. Gaylord created these sketch models as part of his application to be selected as the sculptor for the project. See Tr. at 100:2-03:24, 162:21-65:25 (Gaylord). Mr. Gaylord later filed a registration certificate for the copyright on the sketch models. See PX 6 (Copyright Registration). Indeed, the Court should compare Mr. Gaylord's sketch models with the soldier statues and "The Column" because the significant differences between the works demonstrates the extent of the contributions by CLA, the VAB, and the CFA.

Several of the Mr. Gaylord's sketch models depict a group of soldiers in physical contact with each other. See PX 6 at Photograph 1, 8 (Registration). Several depict wounded soldiers. See PX 6 at Photograph 1, 2 (Registration); see also Tr. at 484:6-9 (Lecky). The faces of the soldiers generally appear to be realistically sculpted. See PX 6 at Photograph 2-7 (Registration). Significantly, none of the sketch models created by Mr. Gaylord was selected for incorporation into the final work. See Tr. at 100:2-03:24, 162:21-65:25 (Gaylord).

- 7 -

Mr. Gaylord's preliminary sketch models from 1990 differ significantly with the one-foot sketch models and the two-foot maquettes that Mr. Gaylord sought to register in 1993.  See PX 9 (Registration); PX 11 (Registration).  These sketch models and maquettes resulted from the collaborative efforts of Mr. Gaylord, CLA, the VAB, and the CFA throughout this time period.  These newer sketch models and maquettes encompass a number of individual soldier statues, as opposed to a group of soldiers combined into one statue.  See PX9 (all photos) (Registration), PX 11 (all photos) (Registration), compare with PX 6 at Photograph 1, 8 (Registration).  None of the newer models depicts a wounded soldier.  See PX9 (all photos) (Registration), PX 11 (all photos) (Registration), compare with PX 6 at Photograph 1,2 (Registration); see also Tr. at 484:6-9 (Lecky); DX 2 at G138 (Contract) (requiring revisions to eliminate "casualty or jubilant portrayals" of the statues during the spring of 1991).  Each of the newer models contains a poncho.  See PX9 (all photos) (Registration), PX 11 (all photos) (Registration).  The faces of the newer models are de-emphasized and impressionistic, as opposed to realistic.  See PX9 (all photos) (Registration), PX 11 (all photos) (Registration), compare with PX 6 at Photograph 2-7 (Registration).

Mr. Gaylord, CLA, the VAB, and the CFA continued to modify the sketch models and maquettes up through the enlargement and casting of the final soldier statues.  See PX 15 (all photos) (Registration); PX 19 (all photos) (Registration).  The committee-created final soldier statues from 1994 and "The Column" as installed in 1995 bear little resemblance with the independently-created sketch models from 1990.  The differences in appearance are directly attributable to the copyrightable contributions of CLA, the VAB, and the CFA.

E.     **Plaintiff Unfairly Attacks Mr. Lecky**

Plaintiff's Brief ultimately devolves into a number of unwarranted personal attacks on Mr. Lecky.  These attacks are unsupported by the record and are completely inappropriate.  First, Plaintiff argues that Mr. Lecky did not pay Mr. Gaylord for work between March and September of 1992 to "extort" Mr. Gaylord's copyrights.  See Pl. Brief at 4 ("Mr. Gaylord carefully retained [his copyrights] across the rocky shoals of some very serious attempts at financial extortion by Mr. Lecky."); PPF 50 ("Mr. Lecky was attempting to exert extreme financial leverage on Mr. Gaylord . . . ."); PPF 51 ("Mr. Gaylord never gave in to Mr. Lecky's extortion."); see also PPF 47-48.  This assertion is false.  None of the witnesses, including Mr. Gaylord and Mr. Triano, supported Plaintiff's contention that Mr. Lecky issued the "stop-work" order to force Mr. Gaylord to relinquish his copyrights.  And Mr. Triano testified that the amount of temporarily unpaid work ranged from 30 to 60 days, contrary to the "six months worth of unpaid invoices" alleged by Plaintiff.  See Tr. at 240:18-19 (Triano), compare with PPF 47.  Mr. Triano's accounting summary indicates that Mr. Gaylord received a total of $153,466.00 from CLA for work on the KWVM project during 1992.  See DX 40 (Accounting Summary).  Mr. Triano's ledger book shows that Mr. Gaylord received $10,000.00 from CLA for work on the KWVM project on May 5, 1992, and that Mr. Gaylord received an additional $10,644.00 from CLA on July 3, 1992.  See DX 46 at G2591 (Accounting Ledger); PX 40 at FG 0065 (Letter).  Thus, Plaintiff's allegations of extortion are baseless.

Second, Plaintiff argues, without merit, that Mr. Lecky's testimony regarding his modeling of the soldier statues is "uncorroborated and undocumented."  Pl. Brief at 2; see also PPF 77.  As discussed in the government's Brief, Mr. Lecky's testimony is consistent with the high degree of collaboration between the parties to the KWVM project during the early stages of construction.  See

- 9 -

Gov. Brief at 34-36.  At trial, counsel for Plaintiff did not attempt to rebut or disprove Mr. Lecky's

testimony in any way.  Indeed, Plaintiff's counsel verified Mr. Lecky's testimony during cross-

examination:

> Q   In your testimony before lunch, you said that there was a change in which the
> idea of ponchos was introduced, correct?
>
> A   Correct.
>
> Q   And then you said Mr. Gaylord provided some clay sketch models that showed
> the ponchos quite windy.
>
> A   Correct.
>
> Q   And then you put on your jeans and went to work.
>
> A   Correct.
>
> Q   Okay.  Those were shipped down to you in a refrigerated truck from Barre,
> Vermont, to keep from melting and deforming?
>
> A   Correct.
>
> Q   Right.  Were we at the 38-figure stage?
>
> A   Probably.  I don't honestly remember exactly, but I imagine so.
>
> Q   All right.  And --
>
> A    And when I put on my jeans and went to work, that was at Mr. Gaylord's
> suggestion, because he didn't want to come down and deal with it.

Tr. at 545:17-46:13 (Lecky).

Finally, Plaintiff asks the Court to make unfounded negative inferences regarding Mr.

Lecky's character in several instances.  See PPF 47-48 ("It provides . . . insight into Mr. Lecky's

character . . ."); PPF 74 ("Mr. Lecky purported to testify . . . and purported to assert . . ."), compare

- 10 -

with Pl. Brief at 1 ("Frank Gaylord does not cast aspersions . . . ."). These inappropriate

characterizations are baseless and must be rejected.


III.    **PLAINTIFF'S PROPOSED FACTS SUPPORT A FINDING OF FAIR USE**

Mr. Gaylord did not address the issue of whether the Postal Service's use of the KWVM as

depicted in the Stamp was a fair use. Several of Plaintiff's Proposed Findings of Fact, however,

support the government's contention that the use was fair. For example, Mr. Gaylord indirectly

recognizes that the Alli Photo is a transformative work of art by lauding Mr. Alli's skills, efforts,

and awards related to the Alli Photo. See PPF 81-83. Mr. Gaylord admits that the Stamp depicts

fewer than all nineteen of the soldier statues. See PPF 94.[3] Finally, Plaintiff's Proposed Fact 31

describes Mr. Gaylord's sale of his sculpture studio due to his retirement. This proposed fact

supports the conclusion that the Postal Service's use of the Alli Photo for the Stamp did not harm

any of Mr. Gaylord's actual or potential business prospects.

With respect to this last factor, the Fifth Circuit upheld a jury verdict of fair use where the

defendant's alleged infringing activity did not harm the plaintiff's actual or potential business

prospects. See Compaq Computer Corp. v. Ergonome Inc., 387 F.3d 403, 410-11 (5th Cir. 2004).

In that case, the authors of an ergonomic handbook sued a computer manufacturer who used several

similar illustrations and phrases in a safety guide distributed with its computers. See id. at 406-07.

The court found that the plaintiff's business prospects could not have been harmed because the

plaintiff ceased actively marketing the ergonomic handbook six months before the defendant began

---

[3] The parties dispute the number of soldier statues depicted on the Stamp. See Gov. Brief
at 23 (fourteen); PPF 94 (fifteen).

distributing its safety guide.  See id. at 410-11.  Furthermore, the plaintiff's decision to stop marketing its handbook had nothing to do with the defendant.  See id.

The facts cited by the Fifth Circuit in Compaq parallel the facts in the present case.  As discussed in detail in the government's Brief, Mr. Gaylord has not attempted to commercialize "The Column" since at least August 22, 2000.  See Gov. Fact 33.  His last commercial project was completed in 2002.  After completing that project, Mr. Gaylord closed his studio and retired from commercial sculpting.  See Gov. Fact 35.  He retired more than a year before the Postal Service issued the Stamp, indicating that the Postal Service's activity had nothing to do with his failure to commercialize "The Column."[4]  Thus, the Postal Service's use of the Alli Photo could not have harmed any of Mr. Gaylord's actual or potential business prospects.  See Gov. Fact 39-40; Tr. at 209:7-13 (Gaylord).

In sum, each of the four statutory factors weighs strongly in favor of fair use.  Mr. Alli and the Postal Service made a transformative, limited use of a sculpture incorporated into a national monument, and the Postal Service's use of the Alli Photo did not harm the market for "The Column."  As a result, the Court should conclude that the Postal Service's use of "The Column" was fair.

---

[4] In addition, the evidence shows that Mr. Gaylord and Mr. Triano believed that potential customers were not interested in their products during the late-1990s.  See DX 25 (Triano - Learst Letter); DX 28 (Gaylord - Weber Letter).

IV.    MR. GAYLORD'S REQUEST FOR COMPENSATION IS SPECULATIVE AND IMPROPER

Despite the fact that Mr. Gaylord offered no proof that Postal Service's accused activities caused any financial harm, he claims that he is entitled to reasonable compensation in the amount of $3,024,377.20.  See Pl. Brief at 8-9; PPF 126-27.  To put it another way, since a causal link between the accused activity and the result must exist, Mr. Gaylord argues that, but for the Postal Service's use of the Alli Photo as part of the Stamp, Mr. Gaylord would have received $3,024,277.20.  See generally Data General Corp. v. Grumman Systems Support Corp., 36 F.3d 1147, 1171 (1st Cir. 1994).  Mr. Gaylord's argument must fail because it is based on pure speculation.  Even though he claims that he is merely "seek[ing] the same compensation he and others have sought and obtained for this very work," the evidence proves that he neither sought nor obtained revenue for "The Column" after August 22, 2000, other than receiving $650 as a result of a cease and desist letter.  Pl. Brief at 2; see Gov. Fact ¶¶ 25, 27, 29, 33-34.  Nor has Mr. Gaylord demonstrated the existence of an established royalty rate for "The Column."  As a result, even if Mr. Gaylord proves liability, his recovery is limited to minimum statutory damages – $750.  Ultimately, even if Mr. Gaylord could recover compensation exceeding minimum statutory damages, the proper compensation is the amount of money the Postal Service paid for the right to use the Alli Photo – $1500.

A.    Pure Speculation Cannot Substitute for Actual Damages

Mr. Gaylord suffered no financial harm as a result of the Postal Service's use of the Alli Photo as part of the Stamp.  He freely admitted as much during his trial testimony and in response to a Request for Admission.  See Gov. Fact ¶¶ 39-40; Tr. at 209:7-13 (Gaylord); DX 43 (Response to Request for Admission No. 18).  He did not offer, sell, or license any products during the time

- 13 -

period when the Postal Service sold the Stamp and the related retail products.  See Gov. Fact ¶¶ 27,

29, 32-35.  He had no actual or potential business prospects for the soldier statues after August 22,

2000.  See Gov. Fact ¶ 32.  He never offered, sold, or licensed any photographs of the soldier

statues.  See Gov. Fact ¶ 25.  He did not commercialize the soldier statues in any way during the last

ten years.  See Tr. at 208:21-09:16 (Gaylord).  Mr. Gaylord retired from commercial sculpting after

completing his last commercial project in 2002, for reasons completely unrelated to the Postal

Service.  See Gov. Fact ¶ 35; DX 46 at G2609 (Accounting Ledger); Tr. at 207:3-23 (Gaylord); Tr.

at 320:20-21:2, 337:3-7 (Triano).

As a result, Mr. Gaylord engages in speculation when he indirectly argues that he would have

received $3,024,277.20, but for the Postal Service.  By framing this argument in terms of a

"reasonable royalty," Mr. Gaylord leaps to several invalid assumptions.  He incorrectly assumes that

he and the Postal Service would have agreed to payment of a royalty on the Stamp revenue.  See

Gov. Fact ¶ 38; Tr. at 588:1-3 (McCaffrey) (stating that the Postal Service has not and cannot pay

an artist a royalty).  He incorrectly assumes that the revenues from the Stamp are directly

attributable to the image of "The Column."  See, e.g., Tr. at 660:12-18 (Failor) ("The people that

are passionate about that subject . . . I don't think that the [Stamp] image would make any difference

to them.").  Finally, he incorrectly assumes the existence of an established royalty rate.  See Section

IV.B.

In a similar case, a district court rejected a plaintiff's claim for damages based upon a

royalty.  See Childress v. Taylor, 798 F. Supp. 981 (S.D.N.Y.  1992).  In Childress, a playwright

argued that she was entitled to a 6% royalty of the gross box office sales of a series of plays.  See

id. at 989-90.  Similar to the present case, the playwright's argument incorrectly assumed:  the

- 14 -

ability to obtain a royalty on gross revenue; the existence of profits directly attributable to the playwright's contributions; and an established royalty rate. See id. at 991-92. The district court rejected the playwright's request for a royalty as purely speculative. See id. The Court should reject Mr. Gaylord's request for a royalty for the same reason.

### B.    Mr. Gaylord Has Not Established a Reasonable Royalty Rate

Contrary to Mr. Gaylord's assertion, he has not established that a 10% royalty applied against net sales would have been reasonable.[5] See Pl. Brief at 7-8. In the few instances where he licensed "The Column," Mr. Gaylord often accepted less than a 10% royalty applied against net sales. In addition, he typically agreed to waive the royalty for significant time periods.

First, the payment from F.J. Designs does not show that Mr. Gaylord had an established royalty rate. The royalty in the agreement with F.J. Designs was applied against "wholesale sales," rather than "net sales," "gross sales," "direct sales," or "total sales." See PX 25 at ¶ 1 (Letter Agreement). F.J. Designs also agreed to stop manufacturing and selling the alleged infringing wooden replica "at the wholesale level," leaving the agreement ambiguous with respect to retail sales. See PX 25 at ¶ 2 (Letter Agreement). Finally, Mr. Gaylord agreed to release F.J. Designs from any "present or future liability," indicating that the one-time payment included a fully paid-up license. See PX 25 at ¶ 3 (Letter Agreement).

Second, Mr. Gaylord's agreement with World Travel in 1995 and 1996 does not establish the existence of a 10% royalty. Although World Travel was required to pay Mr. Gaylord a "sum equal to the product of (i) all Product Revenue, multiplied by (ii) ten percent (10%)," Mr. Gaylord

---

[5] Mr. Gaylord contradicts himself by arguing that the royalty base comprises, at different times, "net sales," "gross sales," "direct sales," and "total sales." Pl. Brief at 7-8. These differing terms tend to indicate, at least, that there is no established royalty base.

was contractually obligated to refund 20% of his proceeds back to World Travel.  See PX 18 at FG

372-73 (World Travel Agreement).  As a result, Mr. Gaylord's effective royalty was only 8%.  See

Tr. at 323:21-23 (Triano) ("[U]nder our agreement, we would, for every dollar they sent us, we

would kick back, we would give 20 cents back to World Travel.").

Third, the settlement agreement with Mr. Alli does not demonstrate an established royalty.

Conspicuously, the agreed-upon 10% royalty applies **only** to future sales of the Alli Photo.  See DX

41 at ¶ 11(c)(iii) (Alli Settlement).  With respect to all sales of the Alli Photo prior to the settlement

agreement, Mr. Gaylord "waive[d] all claims for damages . . . and does not require Alli to account

for such uses beyond the representations made herein."  DX 41 at ¶ 11(b) (Alli Settlement); see also

Tr. at 387:1-3 (Alli) ("Q    And have you ever paid any money to Frank Gaylord?  A    No.").

Accordingly, Mr. Gaylord has not established the existence of a reasonable royalty.  He

testified that the Postal Service's use of the Stamp had not affected his actual or potential business

prospects.  See Tr. at 208:21-09:16 (Gaylord); see also Gov. Fact ¶¶ 39-40.  As a result, if the Court

finds that Mr. Gaylord is entitled to compensation, Mr. Gaylord's recovery should be limited to

minimum statutory damages.

### C.    Assuming Liability and Entitlement to Actual Damages, Mr. Gaylord's Compensation is Limited to $1500

Assuming, *arguendo*, that Mr. Gaylord establishes liability **and** proves that he is entitled to

compensation in the form of actual damages, his recovery is limited to $1500.  The Postal Service

paid Mr. Alli a one-time fee of $1500 for the right to use the Alli Photo as part of the Stamp.  See

Gov. Fact ¶ 36; DX 47 (Alli Income Summary); Tr. at 383:11-25 (Alli).  The Postal Service has not

and cannot pay an artist a royalty based on overall stamp revenue for the right to use an image.  See

Gov. Fact ¶ 38; Tr. at 588:1-3 (McCaffrey).  In fact, the Postal Service has never paid more than a

one-time fee of $5000 to acquire the right to use an image.  See Gov. Fact ¶ 37; Tr. at 587:11-25

(McCaffrey).  Accordingly, the proper measure of compensation in this hypothetical situation would

be equivalent to the amount that the Postal Service paid to acquire the right to use the Alli Photo.


## CONCLUSION

In view of the foregoing, the government did not infringe Mr. Gaylord's copyright.  Plaintiff

is not entitled to any damages.


Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

JOHN J. FARGO
Director


 s/ Scott Bolden
SCOTT BOLDEN
OF COUNSEL:                    Senior Trial Counsel
ERIC F. MULCH                  Commercial Litigation Branch
United States Postal Service   Civil Division
                               Department of Justice
                               Washington, DC  20530
                               Telephone:     (202) 307-0262
September 22, 2008             Facsimile:     (202) 307-0345

Attorneys for Defendant the United States