IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FRANK GAYLORD,

                Plaintiff,

      v.

THE UNITED STATES OF AMERICA;

                Defendant.

No.: 06-539C

Judge Thomas C. Wheeler

## PLAINTIFF'S  RESPONDING BRIEF AFTER TRIAL

Heidi E. Harvey
FISH & RICHARDSON P.C.
225 Franklin Street
Boston, MA 02110
(617) 542-5070
(617) 542-8906

Attorney for Plaintiff

Dated:  September 22, 2008

## <u>TABLE OF CONTENTS</u>

<u>PAGE</u>

I.    Summary of Argument ................................................................................1

II.   Issues Presented .........................................................................................3

      A.    Frank Gaylord is the Sole Author and Owner of the Copyright
            in "The Column"...............................................................................3

      B.    Fair Use is Not Applicable to The Postal Service's Printing and
            Sale of Stamps..................................................................................3

      C.    Gaylord Concedes that the Visual Artists Rights Act Does Not
            Apply to Postal Service's Conduct ...................................................3

      D.    Gaylord is Entitled to Reasonable Royalty Damages As
            Reasonable Compensation for the Postal Service's Violation of
            His Exclusive Rights and Has Established a 10% Royalty Rate ...........3

III.  Argument .....................................................................................................4

      A.    Frank Gaylord is the Sole Author and Owner of the Copyright
            in "The Column"...............................................................................4

            1.    There is No Evidence of Authorship Contributions
                  Other Than Mr. Gaylord's ......................................................4

            2.    The Written Agreement between Mr. Lecky and Mr.
                  Gaylord Acknowledges Mr. Gaylord's Sole Authorship
                  and Ownership and Rebuts Any Argument of Alleged
                  Intent  that the Work be Considered "Joint".............................13

      B.    Fair Use is Not Applicable to The Postal Service's Printing and
            Sale of Stamps................................................................................16

            1.    "The Column" is Not a Building .............................................16

            2.    The Postal Services Use of a Photograph of "The
                  Column" was substantial, commercial and not necessary
                  to further the purpose of commemorating the Korean
                  War and therefore is not a fair use.........................................20

                  a.    "Transformative" ........................................................22

                  b.    "Purpose".....................................................................25

                  c.    "Commercial" ..............................................................28

i

        d.     "Substantial" ............................................................................28

        e.     Inequitable.................................................................................28

   C.     Gaylord Concedes that the Visual Artists Rights Act Does Not Apply to Postal Service's Conduct ...............................................29

   D.     Gaylord is Entitled to Reasonable Royalty Damages ...........................30

Iv.   Response To Government's Proposed Findings Of Fact And Additional Proposed Findings.........................................................................39

   A.     Proposed Facts Relating to Background Issues ...............................39

   B.     Proposed Facts Relating to Fair Use and Damages ............................40

   C.     Proposed Facts Relating to the Architectural Work Exception ..........................43

   D.     Proposed  Facts Relating to Ownership.................................................43

# TABLE OF AUTHORITIES

## Cases

*Aalmuhammed v. Lee,*
    202 F.3d 1227 (9th Cir. 2000) ........................................................................... 6

*Acuff-Rose Music, Inc. v. Campbell,*
    25 F.3d 297, (6th Cir. 1994) ............................................................................ 25

*American Seating Co. v. USSC Group, Inc.,* 514 F.3d 1262 (Fed. Cir. 2008) ............................ 32

*Atari Games Corp. v. Nintendo of American, Inc.*
    975 F.2d 832 (Fed. Cir. 1992) .......................................................................... 25

*Brooktree Corp. v. Advanced Micro Devices, Inc.,*
    977 F.2d 1555 (Fed. Cir. 1992) ........................................................................ 31

*Brunswick Corp. v. United States,*
    36 Fed. Cl. 204 (1996) .................................................................................... 35

*Campbell v. Acuff-Rose,*
    510 U.S. 569 (1994) ........................................................................................ 25

*Childress v. Taylor,*
    945 F.2d 500, 507 (2d Cir. 1991) ................................................................. 6, 38

*Community for Creative Non-Violence v. Reid,*
    490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989) ........................... 4, 7, 23

*Compare Moser Pilon Nelson Architects, LLC v. HNTB Corp.,*
    2006 WL 2331013, *5-*7 (D.Conn. 2006) ....................................................... 19

*Crystal Semiconductor Corp. v. TriTech Microelectronics Intern., Inc.,*
    246 F.3d 1336 (Fed. Cir. 2001) ....................................................................... 33

*Dastar Corp. v. Twentieth Century Fox Film Corp.,*
    539 U.S. 23 (2003) .......................................................................................... 29

*Data General Corp. v. Grumman Systems Support Corp.,*
    36 F.3d 1147 (1st Cir. 1994) ........................................................................... 33

*Davis v. The Gap, Inc.,*
    246 F.3d 152 (2nd Cir. 2001) .......................................................................... 34

*Dowagiac Mfg. Co. v. Minnesota Moline Plow Co.,*
    235 U.S. 641 (1915) ........................................................................................ 32

*Erickson v. Trinity Theatre, Inc.*, **13 F.3d (7th Cir. 1994)** ........................................................ 6

*Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.*
    772 F.2d 505 (9th Cir. 1985) ..................................................................... 37

*General Motors Corp. v. Devex Corp.*,
    461 U.S. 648, 76 L. Ed. 2d 211, 103 S. Ct. 2058 (1983) ................................ 39

*Georgia-Pacific Corp. v. United State Plywood Corp.*,
    318 F.Supp. 1116 (S.D.N.Y. 1970), modified 446 F.2d. 295 (2d Cir.
    1971) ......................................................................................... 30, 32

*Gilliam v. American Broadcasting Companies, Inc.*,
    538 F.2d 14 (2d Cir. 1976) ........................................................................ 15

*Grain Processing Corp. v. American Maize-Products Co.*,
    185 F.3d 1341 (Fed. Cir. 1999) .................................................................. 33

*Hart v. Sampley*,
    1992 WL 100135 (D.D.C. 1992)(not reported in Federal Reporter) .............. 21

*Hart v. Sampley*,
    1992 WL 336496, (D.D.C. 1992)(not reported in Federal Reporter) ............. 22

*Leesona Corp. v. United States*,
    599 F.2d. 958 (Ct. Cl. 1979) ..................................................................... 30

*Leicester v. Warner Bros.*,
    232 F.3d. 1212 (9th Cir. 2000) ............................................................. 17, 18

*M.G.B. Homes v. Amerron Homes, Inc.*,
    903 F.2d 1486 (11th Cir. 1990) ................................................................... 8

*Mackie v. Rieser*,
    296 F.3d 909, (9th Cir. 2002) .................................................................... 31

*Nickson Industries, Inc. v. Rol. Mfg. Co. Ltd.*, 847 F.2d 795 (Fed. Cir. 1988) ............ 32

*PAR Microsystems v. Pinnacle Development Corp.*,
    995 F.Supp. 658  (N.D.Tex. 1998) ............................................................. 34

*Patriot Homes, Inc. v. Forest River Housing, Inc.*,
    2008 WL 544772 (N.D.Ind. 2008) ............................................................. 19

*PODS, Inc. v. Porta Stor, Inc.*,
    484 F.3d 1359 (Fed. Cir. 2007) ................................................................... 8

*Polar Bear Productions, Inc. v. Timex Corp.*, 384 F.3d 700 (9th Cir. 2004) .......... 33, 37

*Schnapper v. Foley*,
    215 U.S.App.D.C. 59, 667 F.2d 102 (1981) ............................................... 22

*Tektronix, Inc. v. United States,*
     213 Ct.Cl. 257, F.2d 343, 193 USPQ 385 (1977) ........................................................ 37

*Vlad Corp. v. Stak Design, Inc.,*
     2005 WL 894853, *3 (E.D.Tex., 2005) ....................................................................... 17

*Waite v. United States,*
     282 U.S. 508, 75 L. Ed. 494, 51 S. Ct. 227 (1931) .................................................... 39

*Warner Bros. Entertainment Inc. v. RDR Books,*
     2008 WL 4126736, 1 (S.D.N.Y.,2008)(not yet published in Federal
     Report) ........................................................................................................................ 17, 35

*Wechsberg v. U.S.,*
     54 Fed. Cl. 158 (2002) ............................................................................................... 35, 36

*Yankee Candle Co. v. New England Candle Co.,* 14 F.Supp.2d 154  (D. Mass.
     1998)(vacated pursuant to settlement), 29 F.Supp.2d 44 (D.
     Mass.1998).................................................................................................................... 18

## Statutes

17 U.S.C.  Section 101 ............................................................................................................ 4

17 U.S.C. Section 103 ............................................................................................................. 24

17 U.S.C. Section 106 (2) ............................................................................................. 1, 26, 41

17 U.S.C. Section 107 ...................................................................................................... 20, 31

17 U.S.C. Section 120 ....................................................................................................... 2, 16

17 U.S.C. Section 201(c) ...................................................................................................... 14

17 U.S.C. Section 504(a)(1).......................................................................................... 30, 34, 36

28 U.S.C. Section 1498(b) ..................................................................................................... 30

37 C.F.R. Section 202.11(b)(2)............................................................................................. 16

In accordance with the Court's Order dated July 23, 2008, Plaintiff Frank Gaylord respectfully submits Plaintiff's Responding Brief after Trial.

## I.        SUMMARY OF ARGUMENT

The Postal Service does mount any real dispute regarding the *prima facie* case of copyright infringement:  it is essentially undisputed that Mr. Gaylord is the author of 'The Column," a work of visual art eligible for copyright protection,  that he has obtained copyright registrations for "The Column," that the Postal Service made unauthorized copies of the work "The Column" on 89 million first class postage stamps and related merchandise by reproducing a photograph of "The Column" which included none of the other elements of the Korean War Veterans' Memorial.

The Government's lead argument in its brief is the fair use affirmative defense to infringement liability.  The evidence leads only to the conclusion that the Stamp is indeed a copyrightable  "derivative work' of "The Column"  due to the artistic additions of Mr. Alli and the Postal Service's engraver, but that means that it is therefore an infringement.  The right to create "derivative works" is one of the exclusive rights of copyright reserved to the author, 17 U.S.C. Section 106 (2).   However, unlike news reporting, scholarship, and research type of uses that can constitute a fair use, there was no necessity whatsoever for the Postal Service to use "The Column" to commemorate the Korean War.  None of the privileges and policies rooted in the First Amendment which underlie the fair use doctrine are served, and there is no justification for the Postal Service's  commercial, near total appropriation of the work without attribution to Mr. Gaylord.

1

The Government's reliance on the Architectural Works Act of 17 U.S.C. Section 120 is based on a tortured attempt to argue that the "The Column" is "building" within that exception. "The Column," an outdoor, open-air sculpture which is shown covered in snow in the infringing copies, is not a building, the Government introduced no affirmative evidence that it was, and the only architect who testified at trial (Mr. Lecky) acknowledged that it was not a building.

The Postal Service contests only the element of "ownership" of a valid copyright  and only on the grounds that a one or more entities are somehow "joint authors," even though there is no credible evidence of record of a contribution by anyone, including Mr. Lecky, of anything other than uncopyrightable comments, criticisms, suggestions, and ideas typical of a commission which must be reviewed and approved by a committee.

The Government's "joint authorship" argument ultimately fails because the touchstone of "joint" work is the "intent" of the parties to create a joint work, and the conduct, statements, and written agreements of the parties dispositively rebut that there ever was any such intent.  After an open and hostile and prolonged dispute over copyright ownership with Mr. Gaylord, Mr. Lecky communicated to Mr. Gaylord that the Government had given up any claim to copyright and entered into a written agreement with Mr. Gaylord that acknowledged that Gaylord was the "sole author of the Soldier Sculptures to become part of the overall Memorial, the Soldier Sculptures constituting a contribution to the collective work embodied by the Memorial as a whole." Plaintiff's Proposed Finding of Fact 67.

Finally, the Government sets up and then knocks down a standard for damages invented out of whole cloth – "the market value for the work" – that has no basis in applicable legal precedent.  This straw man on lost profits, a claim plaintiff has not made, is a way of trying to

2

argue that because Frank Gaylord was quietly sitting in Vermont (at the age of 78) not doing much with his copyright that the Postal Service is privileged to take it and sell it for commercial gain without compensating him.

## II.    ISSUES PRESENTED

**A.    Frank Gaylord is the Sole Author and Owner of the Copyright in "The Column"**

1.  There is No Evidence of Any Original Contribution by Anyone Other Than Mr. Gaylord

2.  The Written Agreement between Mr. Lecky and Mr. Gaylord Acknowledges Mr. Gaylord's Sole Authorship and Ownership and Rebuts Any Argument of Alleged Intent that the Work be Considered "Joint"

**B.    Fair Use is Not Applicable to The Postal Service's Printing and Sale of Stamps**

1.  "The Column" is Not a Building

2.   The Postal Services Use of a Photograph of "The Column" was substantial, commercial and not necessary to further the purpose of commemorating the Korean War and therefore is not a fair use

**C.    Gaylord Concedes that the Visual Artists Rights Act Does Not Apply to Postal Service's Conduct**

**D.    Gaylord is Entitled to Reasonable Royalty Damages As Reasonable Compensation for the Postal Service's Violation of His Exclusive Rights and Has Established a 10% Royalty Rate**

3

III.     ARGUMENT

A.     Frank Gaylord is the Sole Author and Owner of the Copyright in "The Column"

Because Mr. Gaylord has the burden of proof and the Government has contested one aspect of plaintiff's *prima facie* case – ownership – Mr. Gaylord starts with this argument even though it appears in the Government's post-trial brief ("Government's Brief") at pages 31-46 following "fair use," an affirmative defense.

The *prima facie* elements of plaintiff's copyright claim are summarized in Plaintiff's Opening Brief After Trial ("Plaintiff's Brief") at pages 3 to 7.

1.     There is No Evidence of Authorship Contributions Other Than Mr. Gaylord's

Frank Gaylord is the sole author and owner of the copyrightable subject matter consisting of the 19 sculptural figures known as " The Column." *Community for Creative Non-Violence v. Reid,* 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989).   There is no genuine dispute that Mr. Gaylord was selected, PPFF 12,-13, 25-30,  and paid to sculpt "The Column" over a period of about 5 years from 1990 to 1995 without any mention of copyright.  PPFF28-29, 32, 36, 43.

The Government argues, however, that others made authorship contributions and that "The Column" should be considered a "joint work."

The definition of a "joint work" requires a finding of intent on the part of the authors to merge their contributions into an integrated whole, 17 U.S.C.  Section 101:

A "joint work" is a work prepared by two or more authors with the intention that their contributions be merged into inseparable or interdependent parts of a unitary whole.

The open and hostile dispute between Mr. Gaylord and Government regarding copyright ownership is dispositive that there was no such intent.   That dispute and the later agreements between Mr. Gaylord and Mr. Lecky acknowledging Mr. Gaylord's sole authorship of copyright are dispositive on "intent" and are discussed in Section A., 2, below.

Here, even had there never been a later agreement, however, the evidence of authorship contribution that the Government relies upon does not make anyone other than Gaylord an author.

The Government's authorship/ownership argument is that the specification of certain required elements in the sculpture gives rise to authorship, that committee members and/or Mr. Lecky made actual authorship contributions, and that the final approval held by the Government somehow constituted authorship.

The Government's proposed findings in their fact paragraphs 44-52 taken together amount to instructions – mere words since there is not a single piece of evidence of any photo, sketch, model, or other demonstrable physical indication of what was wanted - to sculpt 19 soldiers in formation having specified ethnicities carrying certain specified equipment that is depicted with military authenticity, the soldiers to be wearing ponchos that are "not too windy." These are ideas that not one person in 10,000 could carry out  in three dimensional clay sketches to achieve soldiers recognizable as individuals of distinct body types, features, and expressions and who would all relate to each other in pleasing composition.

5

There is a divided view among Courts and commentators about the level of contribution needed to be considered a co-author: *"de minimus* plus" v. "independently copyrightable" contributions. The plaintiff will in the paragraphs immediately following review the status of the various views for the Court's assistance, plaintiff submits that this debate is a red herring. There is no disagreement among Courts or commentators that a person claiming co-authorship must show some "original" contribution beyond mere suggestions, comments, criticisms, and approval. Because suggestion, comment, and criticism is all that the Government can point to here, this Court need not reach the issue of which standard applies.

Nimmer's treatise advocates the "*de minimus* plus" contribution that does not need to be independently copyrightable, *see* 1 *Nimmer on Copyright* § 6.01 (1991), while Goldstein, agreeing with Latman's treatise, advocates that a co-author must make a contribution that is independently copyrightable, *see* 1 Paul Goldstein, *Copyright: Principles, Law and Practice*, § 4.2.1.2 (1989). Of the circuits that have considered this issue, the 2d, 7th and 9th Circuit Courts of Appeals have required independently copyrightable contributions [1] noting specifically that this prevents frivolous claims of authorship (*Childress v. Taylor*, 945 F.2d 500, 507 (2d Cir. 1991)):

> [A]n inquiry so limited [to merely intent] would extend joint author status to many persons who are not likely to have been within the contemplation of Congress. For example, a writer frequently works with an editor who makes numerous useful revisions to the first draft, some of which will consist of additions of copyrightable expression. Both intend their contributions to be merged into inseparable parts of a unitary whole, yet very few editors and even fewer writers would expect the editor to be accorded the status of joint author, enjoying an undivided half interest in the copyright in the published work.

---

[1] *Childress v. Taylor*, 945 F.2d 500 (2d Cir. 1991); *Erickson v. Trinity Theatre, Inc*., 13 F.3d 1061, 1069-1071 (7th Cir.1994); *Aalmuhammed v. Lee,* 202 F.3d 1227, 1231 -1235 (9th Cir. 2000).

The Court of Appeal for the District of Columbia stated a preference for the lower standard, *Community for Creative Non-Violence v. Reid*, 846 F.2d 1485, 1496, 270 U.S.App.D.C. 26, 37 (C.A.D.C 1988), *aff'd without consideration on this point, ,* 490 U.S. 730, 109 S.Ct. 2166, 104 L.Ed.2d 811 (1989).    However, on the actual facts of *Reid,* it is clear that the actual contribution of the claiming co-author was more than just help, commentary and suggestion.    In *Reid*, the alleged co-author created the steam grate pedestal, which generated simulated steam rising, over which the  sculpted figures of the homeless family warmed themselves (shown below):



The pedestal and grate in *Reid*, generating simulated steam to evoke a streetside steam grate, *id* at 1487, clearly serve an identifiable, expressive function that rises to the level of an  "original"

contribution, regardless of whether  or not the pedestal and grate would qualify for independent copyright protection.

The Court of Appeals for the Federal Circuit has held, in denying judgment as a matter of law, that  "participation in, contributions to, and review of the work of an independent contractor by PODS employees would not necessarily create a joint work.  *See M.G.B. Homes v. Amerron Homes, Inc.*, 903 F.2d 1486, 1492-93 (11th Cir. 1990)[finding no co-ownership where home builder reviewed architect's drawings, made suggestions and corrections, and had final approval authority)."  *PODS, Inc. v. Porta Stor, Inc*., 484 F.3d 1359, 1370 (Fed. Cir. 2007) .

The Government's evidence of various committee members input in their proposed findings 58-61 is no more than suggestion and criticism that occurs in every project subject to committee approvals.   In this respect, the Government's Post-Trial, Fig. 1 at page 40 proves too much:  while the figures underwent dramatic change, the evidence is that Frank Gaylord is the one that made all those changes.

Frank Gaylord's first, personal and dramatic conception of the soldier figures in early sketches, shown on the left side of Figure 1 of the Government's Post-Trial Brief were part of the original submission in 1990 that persuaded all these committees that he was the right man for the job.  Plaintiff's Exhibit 6 and Gaylord, Tr. 100, lines 1 to 18.  Those figures meet many of same verbal instructions and requirements regarding ethnicity and weaponry as the final figures, but they looking nothing alike, even at the level of the facial features.  They look nothing alike because, by the exercise of his artistic talent, Mr. Gaylord was able to eventually translate the competing and conflicting ideas, comments, and suggestions of multiple committee members into a new set of figures that have a totally different feeling and that satisfied everyone.

Here is the fallacy of the Government's argument:  by their logic, the more people there are on a committee, the more likely it is that someone (or everyone) is a "joint author" of the work.  Logic and law counsel otherwise:  the more people there are on the committee the more likely it is that the artist leaves the committee meeting with a headache and an **idea** of what will pass consensus muster that he must now translate into physical reality.

With respect to Mr. Lecky's specific statements about his own contributions, Plaintiff submits that Mr. Lecky was not a credible witness and that his testimony should be given no weight.

For example, with respect to alleged changes made at the foundry just before casting, Mr. Lecky has clearly either forgotten the events or conflated them with one another.

In the testimony described in the Government's proposed fact finding 46, Mr. Lecky was clearly referring to the time in the project when the figures were being cast at the foundry.  See Lecky,  Tr. 490, lines 16-24 ("What happened is, after the small-scale composition was approved in model form, we then retained several granite fabrication companies and several foundries. And in our contract agreement with those two companies, we stipulated that they had to, in effect, recreate the hill that was going to be in the final composition, and place in the one case the wall, put the wall together.  And Minnesota is where the fabrication was done.  And to place the soldiers when they were case on a hill at the foundry in New York .")

He allowed, albeit somewhat grudgingly, that, as to making the faces look younger by adding some wax to the creases that "Frank was the sculptor.  I, Kent and I were the, sort of critics.  I don't remember who exactly took the wax and filled in, probably Frank. I may have done a little bit." Lecky, Tr. 491, lines 20-23.

He then went on, however, to suggest that he was directly responsible for major revisions to the figures occurred at the foundry (Lecky, Tr. 491, line 25 to Tr. 492, line 18)(emphasis supplied):

> And then the biggest, the biggest trauma that we had, Frank wanted the lead soldier to be somehow different from the rest of the soldiers,. In his view, his **idea** – I don't mean to put words in his mouth, but we had multiple conversations about this – was that the guy at the top of the hill, the lead soldier, Frank initially wanted him to be throwing down his arms and sort of celebrating that he had made it. And we didn't think that was a very good **idea**. So we agreed to not do that, and Frank ultimately agreed not to do that. But he had the figure sort of squatting a little bit, with his knees like bent, like you might be if you saw a snake on the ground or a hand grenade or something in front of you. And Carter Brown, when he was up there, objected violently to this positioning. And so we basically had to cut the legs off that figure and rework it so he was standing up.

There was no lead figure bending his knees or throwing down his weapon at the time the figures were being cast at the foundry. If there was, we have certainly never seen a photograph of any such 7'-6" figure that looked that way just prior to casting. There is no documentation of anything like this happening, even though Mr. Lecky is the "architect of record" which is understood to mean that he is responsible to document anything of importance that occurs on the project.

There is no documentation of anything like this happening, even though Mr. Lecky is the "architect of record" which is understood to mean that he is responsible to document anything of importance that occurs on the project.

There was, long before the casting step, a clay sketch model of a soldier throwing down his rifle with knees bent in Mr. Gaylord's pre-selection submission in 1990. Plaintiff's Exhibit 6, page 4. And that same pre-selection submission contained a "celebratory" figure throwing his arms up, as shown on the left hand side of Figure 1 of the Government's Brief.

10

But by November 1993, more than a year before the figures were cast as the foundry, the lead figure was not kneeling or bending. Plaintiff's Exhibit 11, page 5 (lower right hand corner, 1'-0" figures) Gaylord, Tr. 120, lines 4 to 5, which is no different in posture than the final lead figure approved for casting, see Plaintiff's Exhibit 15, page 4.

So the alleged episode of Mr. Lecky directly and substantially altering, at the foundry, the "celebratory" figure that was kneeling or throwing down his weapon never happened, and the Government's reliance upon it in their proposed fact findings 46, 55, and 57, is misplaced. Mr. Lecky has conflated two different early sketches that Mr. Gaylord did before he had been selected and Mr. Lecky has forgotten that those figures were long superseded by the time everyone got to the foundry. That his confusion of these issues just happens to embellish the allegation that he made substantial changes in the lead figure "shortly before the statues were cast," Government's proposed finding 57, is a further reason why the Court should not rely upon his testimony.

The Government also overstates the testimony of Mr. Gaylord regarding the overall composition. In his testimony cited in their proposed fact finding 46, Mr. Gaylord actually states that the composition was his and that he had composed the figures before the review committee members arrived at his studio. The contribution of Col. Weber that he acknowledged was simply the Colonel's comment that three soldiers were in a line and that they should be staggered.

Finally, we come to the infamous "windy" ponchos and the Government's reliance on Mr. Lecky's assertion that he spent "three days re-working" them. Government's Proposed Finding 51.

11

As Plaintiff has detailed in its Proposed Findings of Fact 74 to 77, Mr. Lecky's assertion that he fixed the ponchos is clearly not true.  He claimed he did the work at his office in D.C., Lecky, Tr. 545, line 21-546, line 6,  but the shipment of the figures to D.C. occurred before ponchos had been added.  Plaintiff's Exhibit 40, page 2 (the model shipment to Washington is shown as Change Order # 6 and the "poncho" sketch soldiers are shown as Change Order #8). The January 1993 agreement that Mr. Lecky entered into with Mr. Gaylord as agent for the Client (the Army Corp of Engineers) and which resolved the "stop work" impasse further rebuts any argument that anyone other than Frank had contributed authorship up to that point in time. Plaintiff's Exhibit 8, dated January 14, 1993, page five in the agreement, FG 153, paragraph IV, G ("The Artist represents and warrants that:  1.  The Work is solely the result of the artistic effort of the Artist…..").

This was not the only place in the trial where Mr. Lecky's testimony ran into trouble when someone else had a recollection of the event or there was a document.  Mr. Lecky claimed, e.g., that the Army poster contract for John Alli's photograph "never happened."  Lecky, Tr. 566, line 17 to Tr. 567, line 9.  Mr. Lecky was unaware, thanks to Fed.R.Evid. 615 and this Court's trial procedure rulings, that Mr. Alli, a retired Marine Corps pilot with no reason to prevaricate, had testified the day before that he had entered into the contract with the Army and received the one-time payment.  Alli, Tr. 387, lines 11 to 24 and Tr. 392, lines 3 to 21.

 In addition, after initially asserting definitively and without qualification that Frank had had notice and had given oral permission for the "Forgotten No More" book that Mr. Lecky had printed and sold at the dedication, Lecky, Tr. 564, lines 5 to 18,  when confronted with Mr. Gaylord's cease and desist letter a week after the dedication complaining of the very book and

the lack of notice or prior authorization which was required under the contract that they had

entered into, Mr. Lecky changed his story on the spot.  Instead of prior permission, as he had just

testified too, he admitted that Frank was "pretty upset," but that he had a lawyer look at the book

and conclude nothing in it was Frank's copyright.  Lecky, Tr. 571, line 17 to Tr. 573, lines 19.

     The Government's assertion of authorship contributions of others are vague and diffuse

and uncorroborated by any contemporaneous documents or credible testimony, and are

inconsistent with the documentation and the evidence does not support a conclusion that anyone

but Frank Gaylord is an author of "The Column."


          **2.**      **The Written Agreement between Mr. Lecky and Mr. Gaylord
Acknowledges Mr. Gaylord's Sole Authorship and Ownership and
Rebuts Any Argument of Alleged Intent   that the Work be
Considered "Joint"**


     The Government's "joint work" argument founders on the dispute over copyright

ownership between Mr. Gaylord, on one hand, and the Government and Mr. Lecky, on the other

and it outcome.  As noted above, whatever the level of contribution required to rise to the level

of joint authorship, the statute requires proof of the  "intent:"

     A "joint work" is a work prepared by two or more authors with the intention that
     their contributions be merged into inseparable or interdependent parts of a unitary
     whole.

17 U.S.C. Section 101.

     Mr. Gaylord could not have made his intent more clear that he was the sole author and

owner of the copyright in "The Column."

In September 1992,  Cooper-Lecky Architects demanded for the first time, on behalf of his "client," the Army Corps of Engineers, that Frank Gaylord assign his copyright ownership. PPFF45.  Mr. Gaylord refused, PP51, and held steadfast despite suffering through an impasse of nine months without payment and no other possibility of work, a situation of financial leverage that was known to Mr. Lecky.  PPFF46-50.

The impasse was partially resolved in January 1993 when the parties entered into an agreement that allowed work and payment to resume, even while it deferred the ultimate issue of copyright ownership.  Plaintiff's Exhibit 8 (page "five" in the agreement, FG 153, paragraph 1: "Copyright ownership of the work of art shall be covered in a separate agreement.")

In May 1994, Mr. Lecky, again as agent for the government, communicated in writing to Mr. Gaylord that "the ABMC has suddenly withdrawn their claim for copyright ownership and/or royalties received from same.  Our lawyers are currently  drawing up a revised agreement for signature by all parties."  Plaintiff's Exhibit 14, page one.

In that revised agreement – signed in December 1994, Plaintiff's Exhibit 17 -- Mr. Lecky acknowledged that Gaylord was the "sole author of the Soldier Sculptures to become part of the overall Memorial, the Soldier Sculptures constituting a contribution to the collective work embodied by the Memorial as a whole." Plaintiff's  Exhibit 17, page two, paragraph 1.  See also Proposed Finding of Fact 67.

Under 17 U.S.C. Section 201(c), the author of a contribution to a "collective work" retains his copyright in his individual contribution:

> **(c) Contributions to Collective Works.—** Copyright in each separate
> contribution to a collective work is distinct from copyright in the collective work
> as a whole, and vests initially in the author of the contribution. In the absence of
> an express transfer of the copyright or of any rights under it, the owner of

14

> copyright in the collective work is presumed to have acquired only the privilege
> of reproducing and distributing the contribution as part of that particular
> collective work, any revision of that collective work, and any later collective work
> in the same series.

House Report No. 94-1476, commenting on the two terms "joint work" and "collective

work" in Section 201 in connection with the 1976 Revision of the Copyright Act stated:

> The definition of "joint work" is to be contrasted with the definition of "collective work,"
> also in section 101,  in which the elements of merger and unity are lacking; there the key
> elements are assemblage or gathering of "separate and independent works into a
> collective whole."

The dispute over copyright ownership and the resolution by written agreement that

Gaylord was the sole author of the  soldier sculptures is dispositive on the issue of Gaylord's

"intent."[2]  He never intended that his contributions be merged into any joint work with anyone

else and survived the better part of a fall and winter in Vermont without being paid rather than be

coerced into any other position.  Mr. Lecky's agreement that Gaylord's soldiers sculptures were

a contribution to a "collective work" (the overall KWVM) is dispositive, as a matter of law, of

any argument that "The Column" was intended to be, or is, a "joint work."  *Gilliam v. American*

*Broadcasting Companies, Inc.*, 538 F.2d 14, 22 (2d Cir. 1976)(where screen writers explicitly

reserved all rights not granted by contract to broadcasting company, such reservation is

inconsistent with joint authorship.)

---

[2] It is also dispositive on the issue of whether anything Mr. Lecky allegedly contributed gave him
status as a co-author.  He signed an agreement drafted by his own lawyers in resolution of a
dispute on the very issue that says only Gaylord was the sole author.

**B.**    **Fair Use is Not Applicable to The Postal Service's Printing and Sale of Stamps**

**1.**    **"The Column" is Not a Building**

The Government argues that the Postal Service's use of a photograph of "The Column" is not  infringing under the Architectural Works Copyright Protection Act ("AWCPA").  In particular, the AWCPA specifically excludes from copyright protection pictorial representations of public buildings.  17 U.S.C. Section 120.  The Government argues that  the KWVM is a building within the context of Section 120 and that the "The Column" as part of the KWVM is therefore subject to Section 120.

The Government is simply wrong that "The Column," or even the Korean War Veterans' Memorial, of which it is a part, is a building.  The Government asserts that the KWVM meets the definition of "building" because it is permanent, stationary, and designed for human occupancy. *See* 37 C.F.R. Section 202.11(b)(2)(the definition of "building" includes "other permanent and stationary structures designed for human occupancy, including but not limited to churches, museums, gazebos, and garden pavilions.")  Although the KWVM is permanent and stationary, to say that KWVM was designed for human occupancy would greatly distort the idea of human occupancy in the context of a building.  Moreover, common-sense dictates that the KWVM is not a building.

The Government argues that the KWVM is designed for human occupancy because it has specific entry-points for visitors, pathways, a plaza and benches, and issues of public safety had to be considered during its construction.  Government's Post-Trial  Brief,  pages 29-30.  If these

characteristics alone were enough to making something public and stationary into a building ,

then any number of parks and gardens would similarly qualify as buildings.

In addition, these assertions do not answer the question of how "The Column," which is

the copyrighted work at issue here, an open-air, outdoor sculpture could be considered a

building.  It does not have any plazas, pathways, or benches, and indeed, in photos it is shown

with a chain around it so that no can "enter" it.

Human occupancy in the context of a building means more than that just that people can

visit a particular structure or use it.  The Court in *Vlad Corp. v. Stak Design, Inc.,* 2005 WL

894853, *3 (E.D.Tex.,2005), rejected a claim that kiosks, as those seen in malls, are buildings

protectable as architectural works.  The Court held that kiosks, despite being used by humans

and sharing characteristics with pergolas, gazebos and garden pavilions, are not buildings

protected as architectural works because unlike pergolas, gazebos and garden pavilions, kiosks

are not capable of being occupied as forms of shelter by humans. *Id.*  Similarly, despite that

people may visit the KWVM and use the benches, the KWVM is also not capable of being

occupied as a form of shelter by humans.

The Government's reliance on *Leicester v. Warner Bros.*, 232 F.3d. 1212 (9th Cir. 2000),

is misplaced.  In *Leicester*, the issue was  whether sculptural towers that were **attached to a**

**building** as a part of the building's street wall were subject to the exemption under Section 120.

*Id.* at 1220-1221.  Significantly, there was no dispute that the 801 Tower is itself a building

subject to Section 120. *See id.*  Here, Plaintiff disputes that any aspect of the KWVM is a

building.

17

There also was no contention in *Leicseter* that sculptural towers, had they been stand-alone structures, would meet the definition of Section 120. *See id*. The focus of the Court's analysis in *Leicester* was solely on whether the towers, as part of a building, should also be considered a "building" or not. *See id*. Because the sculptural towers formed a street wall that surrounded the lower level of the 801 Tower., the Court found that the street wall was a part of the 801 Tower, "designed to extend the building visually" by giving the impression that the building continues to the property line, 232 F.3d at 1217-1219, and therefore with the exception to copyright protection under Section 120. *Id*.

The holding of *Leicester* is inapplicable in this case – "The Column" is a stand-alone monument and is not connected to or a part of any structure that can be reasonably called a building.

The Government argues that the definition of a building should not be "too narrow," but one does not need to adopt a definition of a building that is anyway "narrow" to resolve this matter. Courts have rejected definition that are too broad and which would contort the meaning of the term out of reason.

In *Yankee Candle Co. v. New England Candle Co.*, the Court cautioned against a too rigid elemental approach to determining what is a building because works such as the Fenway Park might be left "undeserving of copyright protection" if walls and a roof were always required. *Yankee Candle Co. v. New England Candle Co.*, 14 F.Supp.2d 154, 159 (D. Mass. 1998)(vacated pursuant to settlement), 29 F.Supp.2d 44 (D. Mass.1998). Rather, the Court adopted a more common sense approach that would exclude structures that might meet certain elemental definitions as building. *See id*, 159-160. The Court found that a candle store in a mall,

18

despite having walls and a roof and was designed for human occupancy, was not a building

under Section 120 because it was merely a room in a building and not an independent structure.

*Id.*

The Court has difficulty concluding that constructing an empty room in a large shopping

mall into a candle shop with a colonial motif transforms that room into a "building" within the

meaning of the Copyright Act. The entire mall itself, with its interior walled off and divided into

separate spaces for stores, easily qualifies as a building, but an individual store does not."

Yankee did not design or construct the walls and ceiling in its store; it built within an existing

structure. Had Yankee designed a church to fit into that mall space, certainly it would not

become a "building" just because the AWCPA's legislative history lists a "church" as an

example of a "building." Holding that the mall store constitutes a "building" would distort the

plain meaning of the term. *Id*.

Taking a "plain meaning" common sense approach, "The Column" is clearly not a

building: it lacks the traditional elements of walls and a roof, it does not enclose a space that can

be considered "inside", it is not subject to codes regulating buildings for human occupancy, and

does not provide any shelter or any other form of human occupancy characteristic of buildings.

See *Patriot Homes, Inc. v. Forest River Housing, Inc.*, 2008 WL 544772 (N.D.Ind.

2008)(holding modular homes are "buildings" because unlike mobile homes, they are

constructed pursuit to state building codes).  *Compare Moser Pilon Nelson Architects, LLC v.

HNTB Corp.*, 2006 WL 2331013, *5-*7 (D.Conn. 2006)(holding that a parking garage is a

"building" because "[i]t is a permanent structure with a roof, and it *encloses a space* that is

designed for a wide variety of human activities, including storage and *shelter*."(emphases added)).

Mr. Lecky, the only trial witness qualified as an architect, acknowledged that the KWVM is not a building. When asked about his familiarity with constructions codes necessary for a project such as the KWVM, Mr. Lecky commented that "[the KWVM is] a unique project, *unlike a building.*" Lecky, Tr. 543, lines 18 to 22, (emphasis added). Finally, the Stamp image used by the Postal Service is itself the clearest evidence that "The Column" is not a building or attached to a building. The Stamp image, as shown below, depicts The Column, with living trees in the background under heavy snow fall. Defendant's Exhibit 37, below.



**2.      The Postal Services Use of a Photograph of "The Column" was substantial, commercial and not necessary to further the purpose of commemorating the Korean War and therefore is not a fair use**

The fair use provision, 17 U.S.C. Section 107, authorizes limited uses of copyrighted works where the purpose of the use is necessary to advance goals and activities rooted in the

First Amendment privilege (emphasis supplied)(the Government has never quoted or referred to

the preamble of Section 107 in any submission to this Court)**:**

> Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, **for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research**, is not an infringement of copyright.
>
> In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—
>
> **(1)** the purpose and character of the use, including whether such use is of a **commercial nature** or is for nonprofit educational purposes;
> **(2)** the nature of the copyrighted work;
> **(3)** the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> **(4)** the effect of the use upon the potential market for or value of the copyrighted work.
>
> The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

The argument that the Postal Service's commercial conduct here is a "fair use" is frankly

absurd and recalls a similar case that is instructive:  a defendant accused of copyright

infringement for selling images of a sculpture which stood on the National Mall made a kitchen

sink of arguments in avoidance, including fair use, which were properly and promptly rejected

by the Court.  *Hart v. Sampley*, 1992 WL 100135 (D.D.C. 1992)(not reported in Federal

Reporter) (copy attached):

> Second, defendants argue that they are not infringing because of the "fair use" exception. Fair use is not infringement of a copyright where it is for purposes such as criticism, comment, news reporting, teaching, scholarship or research. *See* 17 U.S.C. § 107. Defendants contend that their use of the statue is for criticism and comment.  However, defendants give little attention to the fact that they are selling these images.

The Court granted a preliminary injunction against the alleged "fair use" and later also granted summary judgment of copyright infringement.[3] *Hart v. Sampley*, 1992 WL 336496, (D.D.C. 1992)(not reported in Federal Reporter) (copy attached.)

While the fair use doctrine is admittedly fascinating and consists of a richly woven tapestry of case by case decisions, each of which could be held up for comparison to the facts of this case, it is enough here to point out that the Postal Service's image was "additive," i.e., a derivative work, not "transformative," that there was no necessity whatsoever for the Postal Service to use the image of "The Column" for their stated "purpose" of commemorating the Korean War, and the Postal Service's use was commercial and was an appropriation of the entire work and it was inequitable in that no attribution to Mr. Gaylord was given.

### a.    "Transformative"

The Government's evidence amounts to no more than an argument that, having added artistically to "The Column" by virtue of Mr. Alli's photographic skills and the Postal Service's engraver's skills they have "transformed" the Work and should therefore be privileged, apparently, to use as much of "The Column" as it wants for as much commercial gain as it wants without attribution or other liability to Gaylord.

The adaptation of "Harry Potter and The Sorcerer's Stone" from a book into a movie effected a dramatic "transformation" of the work from literary to motion picture, from words on

---

[3] The Court also rejected other familiar sounding arguments, such as that the Government was a co-author or co-owner of the work. 1992 WL100135 at *3. ("Plaintiffs contend that statue was not commissioned by Public Law 96-297 and even if it were this Circuit has found that commissioned works are copyrightable.) *See Schnapper v. Foley,* 215 U.S.App.D.C. 59, 667 F.2d 102, 108 (1981).

page to moving images and sounds and music.  Such an adaptation is  more "transformative"
than the changes the Government attempts to rely upon here:  the change of a three-dimensional
sculpture to a two-dimensional picture.  But that is not what "transformative" means in the
context of "fair use," and that is why no one could argue that anyone other than the author of a
book has the right, *ab initio,* to  "transform" the book into a movie.

The term "transformative" was introduced into the doctrine in an article by Judge Pierre
Leval  entitled "Toward a Fair Use Standard," 103 Harv. L. Rev. 1111 (1990):[4]

> The use must be productive and must employ the quoted matter in a
> different manner or for a different purpose from the original. A quotation of
> copyrighted material that merely repackages or republishes the original is unlikely
> to pass the test; in Justice Story's words, it would merely "supersede the objects"
> of the original. If, on the other hand, the secondary use adds value to the original -
> - if the quoted matter is used as raw material, transformed in the creation of new
> information, new aesthetics, new insights and understandings -- this is the very
> type of activity that the fair use doctrine intends to protect for the enrichment of
> society. Transformative uses may include criticizing the quoted work, exposing
> the character of the original author, proving a fact, or summarizing an idea argued
> in the original in order to defend or rebut it. They also may include parody,
> symbolism, aesthetic declarations, and innumerable other uses.

Thus, the Government erroneously equates "transformative" to "changed" or "different'
and thereby confuses the fair use doctrine with the "derivative works' principle.  That this

---

[4] The reproduction of the sculpture in *Reid* to illustrate the holding of the case is a fair use, as is
the short quotation from the above law review article.  Plaintiff could not, however, print
images of the sculpture on t-shirts, postcards, magnets, pins, or other two-dimensional media
to sell them by claiming a "transformative" use.  Likewise, plaintiff has quoted no more than
the original law review  article than is necessary to provide historical context and explanation
for the term "transformative" as it relates to this case.  Plaintiff  could not, however, extend
that use to republication of most or all of the article simply because the law review published
the article knowing and likely expecting that exactly such quotation and reference  as is set
forth above would occur.  Note also that in both cases, the source of the material is attributed.

muddying of the concepts is going on is apparent in the opening pages of the Government's brief where the government states:

> The doctrine of fair use recognizes that people create new works from pre-existing materials , and attempts to strike a balance between individual property interests and the societal interest in fostering creativity.

> Defendant's Post Trial Brief, p. 1.

The balance that the government refers to is actually struck in the "derivative works" provision, 17 U.S.C. Section 103, which makes it clear that the addition of new authorship to pre-existing works is independent of pre-existing copyrighted material and does not give the new author any rights in such pre-existing works:

> **(a)** The subject matter of copyright as specified by section 102 includes compilations and derivative works, but protection for a work employing preexisting material in which copyright subsists does not extend to any part of the work in which such material has been used unlawfully.

> **(b)** The copyright in a compilation or derivative work extends only to the material contributed by the author of such work, as distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material. The copyright in such work is independent of, and does not affect or enlarge the scope, duration, ownership, or subsistence of, any copyright protection in the preexisting material.

17 U.S.C. Section 103.

John Alli's contributions and the Postal Services' contributions are "additive," not transformative, and the Government's transformative argument is a "derivative works" argument in disguise:  while Mr. Alli's and the engraver's contributions are independently copyrightable, Section 103 makes it absolutely clear that the Postal Service was required to have Gaylord's permission before it could make, distribute, and sell copies.

24

The Government cites *Campbell v. Acuff-Rose*, 510 U.S. 569 (1994), *remanded Acuff-Rose Music, Inc. v. Campbell*, 25 F.3d 297, (6th Cir. 1994), and *Atari Games Corp. v. Nintendo of American, Inc.* 975 F.2d 832 (Fed. Cir. 1992) for the proposition that copyright laws should not be applied to "stifle … creativity", 510 U.S. at 577, but to promote "progress in arts and sciences."  The reasoning of neither case is applicable here.  In *Campbell*, the Supreme Court held that the parody of a song *may* be fair use despite being commercial.  In holding so, the Court found "the more transformative a work is, the less important the other fair use factors." 510 U.S. at 579.  Without deciding whether the particular parody was fair use, the Court noted parody's "obvious claim to transformative value" as a "humorous form of criticism." *Id* at 579. Mr. Alli's photograph, however beautiful and artistic in its own right, does not "alter[] the first with new expression, meaning, or message." *Id* at 579.  In *Atari*, the Court found that intermediary copying of computer object code *necessary* for the purpose of reverse engineering to learn the code's uncopyrightable ideas and processes was fair use. 975 F.2d at 842-844.  The government's use of the Column does not further the learning of unprotected ideas, but a strict use of the protected expression.

### b.    "Purpose"

Frank Gaylord's **subjective purpose** in creating the work, "The Column" is legally irrelevant.   Section 107 refers to the nature and purpose of the accused infringer's use.  It should also be apparent based on logic alone that  no sane copyright system would allow an infringer to escape liability based on a *post hoc* characterization of what an author's subjective purpose was at the time of creation of the work.  The current term of copyright is life of the author plus 70 years.,  17 U.S.C. Section 302, which means that some works of authorship could have been

created 100 or more years ago.  Whether Irving Berlin (who lived to the age of 101)  intended to

honor America or make money, or both, when he wrote "God Bless America," (1918) in 1938) is

irrelevant: these subjective issues are subsumed by the copyright laws into a **grant** to the author

of objective, exclusive rights under the statute (17 U.S.C. Section 106):

> Subject to sections 107 through 122, the owner of copyright under this title has
> the exclusive rights to do and to authorize any of the following:
>
> **(1)** to reproduce the copyrighted work in copies or phonorecords;
> **(2)** to prepare derivative works based upon the copyrighted work;
> **(3)** to distribute copies or phonorecords of the copyrighted work to the public by
> sale or other transfer of ownership, or by rental, lease, or lending;
> **(4)** in the case of literary, musical, dramatic, and choreographic works,
> pantomimes, and motion pictures and other audiovisual works, to perform the
> copyrighted work publicly;
> **(5)** in the case of literary, musical, dramatic, and choreographic works,
> pantomimes, and pictorial, graphic, or sculptural works, including the individual
> images of a motion picture or other audiovisual work, to display the copyrighted
> work publicly; and
> **(6)** in the case of sound recordings, to perform the copyrighted work publicly by
> means of a digital audio transmission.

One of the exclusive rights is the right to create derivative works.  Putting aside that Mr.

Gaylord's intent is irrelevant, as a factual matter, Mr. Gaylord testified that it was the proposed

material – granite – which was what first caught his attention about the project.   Gaylord, Tr. 96,

lines 3 to 18.  It is also at least implicit that Mr. Gaylord sought the commission as gainful work,

since he was in the business of carving and sculpting.  Even though he may not have said that *per

se*, it is fairly clear from later letters pointing out the need for payment that Mr. Gaylord did not

undertake this project as a "gift" to the United States of America and therefore it is equally

plausible to infer that the opportunity to get paid was likewise a motivation.  See Plaintiff's

Exhibit 40 (summarizing unpaid invoices).  The foregoing demonstrates well why reliance on

one stated reason for undertaking a commission is too narrow a view and why the copyright laws sensibly do not make anything relating to the extent of the artist's exclusive rights dependent on subjective intent, except for "joint authorship."

As to the Postal Service's alleged purpose to commemorate the Korean War, there is no credible evidence of record that they had any necessity whatsoever to use the image of "The Column" to fulfill this purpose. Thus, in contrast to fair use cases relating to written works, where news reporting, commentary and criticism of the works may necessitate some quotation of authorship to achieve the purpose, there is no such necessity here.

Mr. McCaffrey, an experienced stamp designer employed by the Postal Service, testified to the selection process. He noted that myriad images and ideas were considered, including presumably Army owned, contemporaneous photographs taken during the War. "The Column" was selected from among the issues not because the Postal Service needed to use the image to commemorate the war, but because of all the available images, they wanted to use "The Column." McCaffrey, Tr. 586, lines 4 to 9.

The desire of the Postal Service to use certain images which may be protected by copyright and trademark laws is precisely why they have in-house attorneys and employees who attend to the issue, in advance, of obtaining clearance and permission to use such materials. Failor, Tr. 620, lines 6 to 12, and 644, lines 15 to 23; Plaintiff's Exhibit 30. Indeed, here the Postal Service sought Mr. Alli's permission, a step that is inconsistent with any contemporaneous belief that what they were doing was privileged.

### c.    "Commercial"

The Postal Service printed and sold some $29MM worth of stamps bearing the image of "The Column."  The testimony of Mr. Failor and related documents make it clear that the Postal Service is in the business of choosing attractive and popular subject matter for its stamps to encourage consumers to collect them and never circulate them because collected stamps mean "big business" for the Postal Service.  As flattering as it is to Mr. Gaylord's ego that of all the myriad possible images the Postal Service could have chosen for its stamp commemorating the Korean War they chose an image of his work, the Postal Service's use is primary commercial.

### d.    "Substantial"

The portion of the work used is a photograph of the entire work.  The image contains as much of the work as is possible to get into the frame of a single photo.  Compare Plaintiff's Exhibit 22, a photograph taken by Frank Gaylord, and Plaintiff's Exhibit 26, the stamp Image.  The *Blanch* case which the Postal Service relies upon supports Plaintiff's position.  In *Blanch*, the use of the copyrighted work was a tiny portion of the original work and it was combined in a collage of many other works.  Precisely because of this minimal use which was in turn buried in a visually complex collage, the Court found that the use was not "substantial."

### e.    Inequitable

The nature of the fair use doctrine is a privilege to use such portions of pre-existing materials as are necessary to accomplish a teaching, commentary, criticism, research, or new reporting purpose, often about the work itself, such as a movie or book review.  Inherent in that purpose is the notion that the later user will acknowledge the prior author's authorship and ownership and will not attempt to pass the work off as its own.  There is no acknowledgement of Frank Gaylord's authorship of "The Column" and thus the Postal Service's use is not a "fair use"

of a work in which they acknowledge the copyright of another but a simply appropriation of that work for their own commercial gain.  The Postal Service even credits its own engraver and puts its own copyright notice on the image. Their arguments that their conduct should be considered privileged and protected by fair use concepts are hollow.

C.    **Gaylord Concedes that the Visual Artists Rights Act Does Not Apply to Postal Service's Conduct**

Mr. Gaylord acknowledges that the attribution aspect of the Visual Artist Rights Act ("VARA") appears to apply only the original work and not to copies, reproductions, or derivative works.  In *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23 (2003), the Supreme Court held that the producer of videotapes that largely used the content of a television series in the public domain did not violate the Lanham Act prohibition against the misrepresentation of the "origin" of goods by not attributing to the original series.

In reaching that holding, the Court noted that to interpret "origin" of the Lanham Act to apply to the communicative content rather than just the physical manufacture of the tapes would conflict with copyright law, which specifically provides the right of attribution under VARA.  *Id* at 33-35.  "That express right of attribution is carefully limited and focused:  It attaches only to specified "work[s] of visual art," Section 101, is personal to the artist, Section 106A(b) and (e), and endures only for "the life of the author," Section 106A(d)(1)."  *Id* at 34-35.

Because, as the Government also concedes, the accused stamps are not, themselves, works of visual art, the right of attribution does not apply.

**D.      Gaylord is Entitled to Reasonable Royalty Damages**

Pursuant to 28 U.S.C. Section 1498(b) and the case law thereunder, Gaylord is entitled to a reasonably royalty on the revenue generated by sales of the infringing goods.  *See also* 17 U.S.C. Section 504(a)(1) ; *Leesona Corp. v. United States*, 599 F.2d. 958, 969 (Ct. Cl. 1979); *Georgia-Pacific Corp. v. United State Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970), modified 446 F.2d. 295 (2d Cir. 1971).

The Government argues that, assuming liability, Mr. Gaylord is entitled to only $750 in minimum statutory damages.  To arrive at this conclusion, the Government argues that Mr. Gaylord is not entitled to actual damages because he did not suffer lost market value from the Postal Service's infringement, and that the Postal Service's infringement did not proximately cause injury to the market value of the soldier statues.  Thus, according to the Government, because Mr. Gaylord cannot prove actual damages, Mr. Gaylord is only entitled of $750 as the "minimum statutory damage" of Section 1498(b).

The Government's arguments are flawed for several reasons.  First, the true thrust of the Government's analysis of actual damages is that Mr. Gaylord cannot recover lost profits.  This argument is a straw man because  Mr. Gaylord does not seek recovery of any lost profits, and lost profits is not the appropriate method of determining damages in a Government infringement case.  Second  Mr. Gaylord is not limited to  statutory damages only.  The established royalty rate of The Column is 10% and Mr. Gaylord is entitled to such as his "reasonable and entire compensation."

The Government's first main argument is that Mr. Gaylord has not suffered "lost market value" or "injury to the market value" for the "The Column."

30

The concept of "market value" is not legally significant in the analysis of damages in this case, and plaintiff's counsel has been pointing that out to the government since the discovery phase.

Although the term does appear in passing in cases as part of the Court's explanatory language, it does not independently stand for a separate legal doctrine. *Mackie v. Rieser*, 296 F.3d 909, (9th Cir. 2002), the case the Government cites for the idea of "market value", is illustrative. In *Mackie*, the Court uses the term "market value" in the course of discussing "what [the defendant] would have paid for a *license* to use [the work]." *Id* at 916, (emphasis added). It is clear that the Court's use of "market value" – defined as "what a willing buyer would have been reasonably required to pay to a willing seller for [the owner's] work", *id* a 917, (citations omitted), – is a stand-in for a reasonable royalty analysis consistent with *Georgia Pacific*. In *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 f.2d 1555, 1578-1580, (Fed. Cir. 1992), the Court uses the term "market value" as a factor to determine lost profits. There, the court used the idea of "diminished market value" to illustrate the point that the plaintiff may recover lost profits because infringer's entry into the market with lower-priced infringing products caused plaintiff to lower its prices.

Although the Government did not make these arguments explicitly, Mr. Gaylord is aware that the concept of "market value" is a factor in two related, but ultimately inapplicable, analyses. First, "*market for or value of* the copyrighted work" is the fourth factor in the fair use analysis. 17 U.S.C. Section 107. However, we never need to reach this factor in this case because the Postal Service's use of "The Column," was not necessary to any fair use purpose, and was commercial, substantial, having used the entire work, and unattributed. Second, "the

31

established profitability of the product made under the patent; its commercial success; and its current popularity" is the eighth *Georgia-Pacific* factor in the analysis of a reasonable royalty rate. 318 F.Supp.1116, 1120-1121 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir. 1971). However, as discussed below, we also do not need to reach the full *Georgia-Pacific* analysis because Mr. Gaylord has proven an established royalty. *See Georgia-Pacific*, 318 F.Supp. at 1121, ("[T]he Supreme Court said that, where a patentee could not prove lost profits, infringer's profits or *an established royalty*, the patentee could 'show the value by proving what would have been a reasonable royalty, considering the nature of the invention, its utility and advantages, and the extent of the use involved.'", citing *Dowagiac Mfg. Co. v. Minnesota Moline Plow Co.*, 235 U.S. 641, 648 (1915))(emphasis added), *and Nickson Industries, Inc. v. Rol. Mfg. Co. Ltd.*, 847 F.2d 795, 798 (Fed. Cir. 1988)("Where an established royalty exists, it will usually be the best measure of what is a 'reasonable' royalty.")(citations omitted).

In essence, by reiterating the "market value for the work," the Government is really arguing that Mr. Gaylord may not recover lost profits because he did not suffer lost sales as a result of the Government's infringement. The Government focused on facts such as that Mr. Gaylord had retired and had not recently commercialized "The Column," and that the Government's infringement had not negatively impacted Mr. Gaylord's business prospects. What the Government is really saying, is that Mr. Gaylord was not making a lot of money from "The Column" and the Government's unauthorized use of The Column did not cause Mr. Gaylord to lose any money that he otherwise would have made. Although the Government, for obvious reasons, did not articulate it as such, this is a classic "lost profits" analysis. *See American Seating Co. v. USSC Group, Inc.*, 514 F.3d 1262, 1269 (Fed. Cir. 2008) ("To prove

32

lost profits from lost sales, the patent owner bears the initial burden to show a reasonable probability that "but for" the infringement, he would have made the sales.").

The Government's focus on proximate causation confirms that the Government's analysis is only about lost profits.  Proximate causation is an element of the lost profits analysis because a copyright owner may only recover lost profits that he would have made "but for" the infringement.  *See Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341, 1349 (Fed. Cir. 1999)("To recover lost profits, the patent owner must show "causation in fact," establishing that "but for" the infringement, he would have made additional profits.")

Proximate causation is not an element, however, where recovery is based on reasonable royalty or a license fee.  *See Crystal Semiconductor Corp. v. TriTech Microelectronics Intern., Inc.*, 246 F.3d 1336, 1354 (Fed. Cir. 2001)("Thus, a patentee may obtain lost profit damages for that portion of the infringer's sales for which the patentee can demonstrate "but for" causation and reasonable royalties for any remaining infringing [sic].")(citation omitted).

 Not surprisingly, each of the cases the Government cites regarding proximate causation discusses the role of proximate causation only the context of lost profits.  In *Polar Bear Productions, Inc. v. Timex Corp.*, 384 F.3d 700, 709-713 (9th Cir. 2004), the Court found that the plaintiff film company could not recover business losses because the infringement did not cause the plaintiff's business losses, and could not recover indirect profits from infringing watchmaker because the film company could not show a non-speculative causal link between the infringing activities of trade show promotions and the watchmaker's increased revenue.  In *Data General Corp. v. Grumman Systems Support Corp.*, 36 F.3d 1147, 1172-1173 (1st Cir. 1994), the Court affirmed the jury's finding of actual damages based on lost profits because a reasonable

jury could find that the copyrighted software was the infringer's only attractive feature that took business away from the copyright owner. Finally, in *PAR Microsystems v. Pinnacle Development Corp.*, 995 F.Supp. 658, 661-662 (N.D.Tex. 1998), the Court found that the plaintiff may not recover lost profits because plaintiff could not show actual profits that it would have made selling its own software but for the defendant's infringement, and thus the element of causation was not met.

The "lost profits" analysis is not the appropriate method of determining damages in this case. In general, the Government's implicit assertion that "lost profits" is the only model of determining actual damages in a copyright infringement action under 17 U.S.C. Section 504(b), is incorrect. Reasonable royalty (and particularly a licensing fee) is also an available measure of damages in copyright infringement actions under Section 504(b). *See On Davis v. The Gap, Inc.*, 246 F.3d 152, 163 -165 (2nd Cir. 2001).

In this case, Mr. Gaylord has not sought his lost profits. At the outset of trial, counsel for Mr. Gaylord clarified that reasonable royalty was Mr. Gaylord's theory of recovery, and not lost profits. Harvey,, Tr. 30, line 20 to Tr. 31, line 11. The availability of a reasonable royalty makes sense. Mr. Gaylord was past retirement age when he completed "The Column" and that he chose not to personally pursue making money from commercializing "The Column" does not mean "The Column" no longer enjoys the protection of copyright laws or that the Government may infringe with impunity. Indeed, even if J. K. Rowling never wrote another book or licensed another movie and otherwise became a recluse does not mean anyone can write Harry Potter sequels and commercialize them without her permission or paying her a license fee. *See*

*Warner Bros. Entertainment Inc. v. RDR Books*, 2008 WL 4126736, 1 (S.D.N.Y.,2008)(not yet

published in Federal Report)(copy attached).

Finally, reasonable royalty, and not lost profits, is the appropriate measure of damages in

a case, as this, where there is no exclusivity.  As the Government noted, "the United States is not

an ordinary infringer, but rather a compulsory, nonexclusive licensee."  *Government's Opening*

*Brief*, page 48, citations omitted.  In the context of the Government's patent infringement,

> given the absence of a reasonable expectation of exclusivity, lost profits are a
> fortiori inappropriate. The award of lost profits assumes a right to exclusivity. The
> eminent domain theory of Section 1498(a)-allowing the United States to take a
> license under the patent for use or procurement-is at odds with such a right to
> exclusivity.

*Brunswick Corp. v. United States,* 36 Fed. Cl. 204, 208 (1996).  The Court in *Wechsberg v. U.S.,*

54 Fed. Cl. 158, 166 (2002), commented that although there had been no cases that specifically

discussed the standard of "reasonable and entire compensation" in Section 1498(b) , the phrase

should be interpreted identically as it is interpreted in Section 1498(a)(addressing the

Government's patent infringement) because the identical phrase was used in two clauses of the

same statute.

Moreover, the same logic – that the Government is a "compulsory, non-exclusive

licensee" – also applies in the case of the Government's copyright infringement.  Consequently,

"[a]warding a reasonable royalty has long been recognized as the proper measure of damages for

patent infringement by the Government."  *Id* at 209, *citing Decca Limited v. United States,* 640

F.2d 1156, 1172 (Ct. Cl. 1980).

The Government's second argument is that because Mr. Gaylord has not proven lost

profits, he is only entitled to $750.  The Government argues that because Section 1498(b)

references "*minimum* statutory damages", any such recovery can only be the lowest possible single number.  This  weirdly dichotomous position of the government --- on one hand, if Mr. Gaylord could show "but for" causation the sky would be the limit on the lost profits he could seek, or, alternatively, he can have no more than  $750 – is an indication that the reasoning behind both arguments is not grounded in sound law and logic.

Section 1498(b) states that "entire and reasonable compensation" includes "the minimum statutory damages *as set forth in section 504 (c) of title 17*."  Emphasis added.  17 U.S.C. Section 504(c) does not limit statutory damages to $750 but provides for a range from $750 to $35,000.

Moreover, the Court in *Wechsberg* has already considered and rejected the Government's argument that $750 is the ceiling of damages recoverable under Section 1498(b).  The Court noted that allowing for the entire range of statutory damages under Section 1498(b) "is the only interpretation in harmony with Title 17's **option for a plaintiff to elect statutory damages**", and "it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective."  54 Fed.Cir. at 166, citations omitted.  Moreover, "[a ceiling of $750] makes no sense, as there would then be no logical reason for a plaintiff ever to make such an election.  If such a plaintiff were limited in that event to a ceiling of $750 in damages, he might as well proceed solely under Section 1498(b) to put on his best case for 'reasonable and entire compensation,' with the security of that same statutory minimum as a floor for his recovery."  *Id*.

Finally, statutory damages are not the only recovery available to Mr. Gaylord.  As discussed above, reasonable royalty is the appropriate method of determining actual damages in this case and an established royalty rate is the "best measure" of a reasonable royalty rate.  The established royalty rate is also the "best measure" of Mr. Gaylord's "reasonable and entire

36

compensation." *See Tektronix, Inc. v. United States,* 213 Ct.Cl. 257, 552 F.2d 343, 347, 193 USPQ 385, 390 (1977)("Where an established royalty rate for the patented inventions is shown to exist, the rate will usually be adopted as the best measure of reasonable and entire compensation."), *cert. denied,* 439 U.S. 1048 (1978).

Mr. Gaylord's claim of 10% royalties is based on uncontroverted evidence that 10% is the royalty rate employed in virtually all transactions involving 'The Column," and involves no speculation.

The Government does not argue that Mr. Gaylord's royalty rate is speculative. Indeed, the case law cited by the Government would not support such an argument. *Abeshouse v. Ultragraphics, Inc.*, 754 F.2d 467 (2d Cir. 1985), *Polar Bear*, 384 F.3d 700, and *Frank Music Corp. v. Metro-Goldwyn-Mayer, Inc.* 772 F.2d 505 (9th Cir. 1985) each concerned whether a claim for lost profits was too speculative and are therefore inapplicable to this case. The Court in *Abeshouse* rejected the plaintiff's claims for reputation damage to the copyrighted posters and lost of future sales resulting from the lack of copyright notices because the plaintiff presented no evidence of any actual harm. 754 F.2d at 471. The Court in *Polar Bear* rejected the plaintiff's claim of business losses that allegedly resulted from the defendant's failure to pay a modest license fee, and indirect lost profits that were not causally linked to the infringing activities as too speculative. 384 F.3d at 709-716. The Court in *Frank* found that the owner of a copyright for a musical show could recover indirect profits from the infringing casino's hotel and gaming business because shows serve the promotional purpose of drawing customers to the casino. 772 F.2d at 517.

*Childress v. Taylor*, cited in Section IIIA above, regarding "joint authorship" is the only case discussing a speculative reasonable royalty and is inapposite on this issue here. 798 F.Supp. 981 (S.D.N.Y.,1992).  In *Childress*, the Court rejected a playwright's claim of a royalty rate because it was unsupported by evidence. 798 F.Supp. at 991-992.  The playwright provided no evidence of past licenses for the play and the only evidence of a royalty rate was from the failed negotiations between the author and the defendant.  *See id* at 986.  The Court also rejected as too speculative the playwright's claim of additional actual damages on the theory that the play would have been more financially successful if her name was associated with it, because the play was a commercial failure.  *Id* at 991-992.

In contrast, Mr. Gaylord is not claiming damages in addition to the reasonable royalty, and has provided extensive evidence that 10% is the established royalty rate for "The Column."

Mr. Gaylord has traditionally used, and his licensors has always accepted, 10% of the gross sales of commercial merchandise based on his works as a license fee..  PPF 122.  Mr. Gaylord has licensed the work "The Column" in various arms length transactions at a rate of at least 10% of direct sales of merchandise.  In the February 1995 Agreement, Mr. Lecky agreed to pay Mr. Gaylord at least 15% for exclusive rights.  Plaintiff's Exhibit 17.  F.J Designs, the manufacturer of unauthorized plaques depicting "The Column," agreed to a 10% royalty rate. Plaintiff's Exhibit 25; see also Defendant's Exhibit 27.  Mr. Alli also agreed to a 10% rate of direct sales of merchandise in his settlement with Mr. Gaylord.  Defendant's Exhibit 41, paragraph 11(c)(iii).  Moreover, where the "The Column" is the subject, other individuals have independently used 10% as a royalty figure. On the belief that Mr. Lecky was the outright copyright owner to the "The Column" and years prior to this litigation, Mr. Alli negotiated to pay

Mr. Lecky a 10% of the total sales in order to market his photographs of "The Column".

Plaintiff's Exhibit 42.  Thus, as 10% is the established royalty rate for The Column, 10% is

therefore Mr. Gaylord's "reasonable and entire compensation."

　　　　Finally, Mr. Gaylord is entitled to pre-judgment interest from July 27, 2003, to the date of

judgment in an amount and based upon a rate to be determined by the Court. *General Motors*

*Corp. v. Devex Corp.*, 461 U.S. 648, 655-56, 76 L. Ed. 2d 211, 103 S. Ct. 2058 (1983)

(prejudgment interest compensates the injured party for the loss of the use of money he would

otherwise have had." ); *Waite v. United States*, 282 U.S. 508, 509, 75 L. Ed. 494, 51 S. Ct. 227

(1931)(Section 1498(b)'s requirement of " reasonably and entire compensation" includes pre-

judgment interest on monies plaintiff would have had the use of but for the infringement).

## IV.    RESPONSE TO GOVERNMENT'S PROPOSED FINDINGS OF FACT AND ADDITIONAL PROPOSED FINDINGS

### A.    Proposed Facts Relating to Background Issues

　　　　1-3.    Mr. Gaylord does not contest the recitation of the legislative enactments but

states that they are not facts of record and they are ,irrelevant since nothing in any of the

legislation or enactments relates in any way to copyrights.

　　　　4-5.    Mr. Gaylord does not contest these findings as factual matters but states that they

are likewise irrelevant to the issues in suit.  The Sculptor Selection Brochure, PX 1, indicates

nothing more than the suggest 38 human figures in the proposed layout (at that time) of the

overall Memorial.

　　　　6.    Mr. Gaylord does not contest this proposed finding.

　　　　7.    Mr. Gaylord contests this proposed finding to the extent that it purports to rely

upon published legal decisions to establish record facts.  The facts of the cited cases are not

binding on Mr. Gaylord as a matter of claim or issue preclusion because he was not a party to the cases, although certain matters therein may well be binding on the Government and Mr. Lecky, as the Government's agent.   To the extent that the holdings of the cases may contain persuasive legal authority, they are nevertheless not properly characterized as facts in evidence.

8-11.   Mr. Gaylord does not contest these proposed findings.

**B.      Proposed Facts Relating to Fair Use and Damages**

12.      Mr. Gaylord does not contest the proposed finding as a factual matter but does contest that it states Mr. Gaylord's entire intent in seeking and obtaining the commission, which is, in addition, largely irrelevant to the issues in dispute.  See Section IIIB(2)(b), above. On this point, there is no evidence of record of any intent on Mr. Gaylord to create a joint work with anyone and he uniformly and credibly testified that he viewed and understood the work to be his.

13.-14.      For the same reasons stated in connection with the Government's proposed finding number 12, above, Mr. Gaylord contests the relevance of these proposed findings to any issue in dispute and also notes that proposed finding 14 is not an accurate characterizations of Mr. Alli's testimony. Mr. Alli's testimony about the surreal nature of the photo referred to his view of the resulting photo based on the reactions of others and there is no evidence that they formed any part of his intent in creating it.

15.-18.      Mr. Gaylord does not contest these proposed findings of fact, except that in proposed findings 15 and 18, it is wholly improper for the Government to cite the arguments of counsel as record evidence and in proposed finding 17, it is not correct that the photo depicts the KWVM.  The "KWVM" has been stipulated by the parties to consist of "three primary

components: "The Column" sculpture; the mural wall; and the reflecting pool." Stipulated Fact 8. The photo shows only "The Column." Whether the Government is engaged in semantics to avoid affirmatively mischaracterizing the evidence by referring to "one view" of the KWVM, the true fact is that the photo is of "The Column" and nothing else. Presumably photos of the entire KWVM exist and any number of them could have been selected for the subject matter of the Stamp or even taken for that purpose, but the Postal Service chose a photo that showed "The Column" only, even in preference to historical photos of the actual war. McCaffrey, Tr. 586, lines 4 to 9.

In addition, these facts establish nothing more than that Mr. Alli, and possibly the Postal Service, added copyrightable subject matter to the pre-existing work "The Column." As discussed in Section IIIB(2)(a) above, Section 103(b) makes clear that Mr. Alli and therefore the Postal Service obtained no rights in "The Column" itself by virtue thereof.

Furthermore, Mr. Gaylord wishes to note that Mr. Alli was able to create a beautiful photo, in addition, due in no small part to the selection of compelling subject matter.

19-21.        Mr. Gaylord does not contest this proposed fact finding but notes that public display of a work is one of the exclusive rights in copyright reserved to the artist, 17 U.S.C. Section 106, and not a defeat or waiver of those rights.

22.-23.        Mr. Gaylord objects the characterization that the Stamp depicts "a **limited** number of the 19 individual soldier statues" and the characterization that "soldier statues depicted … are completely obscured." The Stamp depicts 15 of the 19 soldiers. *See* PPF94. A statue that is depicted is not obscured. Further, there would be no point in selecting the photo for Postal Service's stated purpose to commemorate the Korean War if the statutes were not clearly

41

identifiable as "The Column."   Because the statues are clearly identifiable as the work "The

Column," Mr. Gaylord submits the portion depicted is substantial and not limited.

24.     Mr. Gaylord  contests the characterization "obscured" to the extent it implies that

the presence of snow somehow makes the subject matter unrecognizable as "The Column."  Mr.

Gaylord also objects to the characterization of "other graphical elements" obscuring the Column.

The Government does not cite any support for elements other than snow.  In addition, to the

extent that this proposed finding it supposed to imply that Mr. Alli intended to use the snow to

obscure the statues, the implication is incorrect.  Mr. Alli, in the testimony cited, is referring to

the reaction of others to the resulting photo and his view that the resulting photo is surreal and

not his intent in creating it.

25 – 37.       Mr. Gaylord does not contest these proposed finding except notes that

royalties were paid by World Travel, *see* e.g., Defendant's Exhibits 27, under the agreement at

rate of 10% which was also the rate of the negotiated settlement referred to in proposed finding

paragraph 34.  Mr. Gaylord also notes that the choice of an artist not to commercialize his own

work of fine art via massive quantities of reproductions sold at very low prices does not give

others permission to do so while he is not looking anymore than one can pick the apples off of

the neighbor's tree while they are on vacation.  The choice of when and how and how often to

reproduce a copyrighted work is reserved exclusively to the author and those that make

unauthorized copies are liable to the author for reasonable compensation for violation of that

right.

38.     Mr. Gaylord contests this proposed finding to the extend it implies the Postal

Service is unable to pay a royalty based on stamp revenue.  Mr. McCaffrey testimony relates

only to the Postal Service's policy regarding paying artists for the rights to stamp art *a priori*, and not the Postal Service's ability or obligation to pay royalties as damages for infringement. *See* McCaffrey, Tr. 587, line 1 to Tr. 588, line 3.

39 – 40.  Mr. Gaylord does not contest these proposed findings.

**C.     Proposed Facts Relating to the Architectural Work Exception**

41 – 43.  Mr. Gaylord does not contest these proposed findings but submits that they are irrelevant to any issues in dispute.

**D.     Proposed  Facts Relating to Ownership**

44 – 61.  Putting aside for the moment the important consideration that no weight should be given to any testimony of Mr. Lecky whatsoever and that the Government mischaracterizes the testimony of Mr. Gaylord, even if every fact is true, these paragraphs do not amount to any authorship contributions.

In proposed finding 57, Mr. Lecky's claim that he cut the legs off a figure at the foundry before casting is clearly not true or confused with other events.  See, Section IIIA, above, pages 10 to 12.  The Government's reliance upon this assertion in proposed findings 46, 55, and 57, is misplaced

The Government also overstates Mr. Gaylord's testimony regarding composition.  In the testimony cited in proposed finding 45.  Mr. Gaylord testified that the composition was his and that the contribution of Col. Weber was to note three soldiers were in a line and that they should be staggered.  Gaylord, Tr. 121, lines 8 to 13.

43

51.     Mr. Gaylord does not contest that Mr. Lecky testified that he worked on the soldier statues, however, Mr. Gaylord strongly contests whether these statements, without corroboration of any other person or document and in contradiction to documentation of record, strongly contests the veracity of these statements.  *See* PPF 74-77 (Lecky claimed he reworked ponchos in D.C., but the contemporaneous documents show the figures shipped to D.C. had no ponchos, that Frank Gaylord was later asked to add ponchos and was thereafter asked to "rework" the ponchos, all of which Gaylord invoiced to Lecky).   See also Section IIIA, above, pages 12 to 14.

52.     Mr. Gaylord does not contest this proposed finding.

53.     Mr. Gaylord objects to the characterization that the input from CLA, VAB and CLA regarding facial features of the soldier statues were "key aspects."  The input from CLA, VAB, and CLA were only ideas, and Mr. Gaylord alone contributed the copyrightable expression of those ideas.  *See* PPF 73.

54 .     Mr. Gaylord does not contest these proposed findings, but notes that trees and rocks are not shown in the Stamp and not claimed by Mr. Gaylord as copyrightable subject matter.

55.     Mr. Gaylord respectfully notes that "celebratory" was the characterization and commentary that Mr. Lecky made about Mr. Gaylord's submission sculptor only **after** Mr. Gaylord had already modeled it from his own mind and without the benefit of any suggestions from anyone on the committee to select the sculptor.  Indeed, "celebratory" is easy to recognize once somehow has already deftly and compellingly modeled it for you in three-dimensions, as Mr. Gaylord had done.  "Non-celebratory" is another matter altogether and pure "idea."

44

62. Mr. Gaylord objects to this proposed finding. Mr. Gaylord contends that DX 30 (Contracting Officer's Decision) was erroneously admitted into evidence. Harvey, Tr. 505, lines 12 to 15. None of the trial witnesses had personal knowledge of this documents and no one testified to its relevance to this case. Mr. Lecky, the person to whom the decision is addressed on its face, had no recollection of it. Lecky, Tr. 504, line 19 to 505, line 3.

In response to this proposed finding, Mr. Gaylord proposes two rebuttal findings of fact and an additional legal conclusion.

PPRF1. There is no evidence that Mr. Gaylord was a party to or even had prior notice of the proceeding before the Contracting Officer prior to the issuance of the decision in DX30.

PPRF2. Mr. Gaylord is not a party to the prime contract between CLA and the Army Corps of Engineers. *See* Defendant's Exhibit 2, page "FG 745".

As a matter of law, the contracting office's decision in Defendant's Exhibit 30 is not binding on the Court or on Mr. Gaylord. First, because "[c]ontract interpretation is a question of law," decisions by the contracting officers and their review boards are not binding on the courts. *United Pacific Ins. Co. v. Roche*, 401 F.3d 1362, 1365 (Fed. Cir. 2005)(citation omitted).

Second, although contracting officer's decision may have some persuasive value, *see id*, the Court should not give any weight to Defendant's Exhibit 30. There is no evidence that Mr. Gaylord had prior notice of the proceeding before the contracting officer which resulted in the decision in DX 30 prior to the issuance of the decision, *see* PPRF1. There is affirmative evidence that Mr. Gaylord was not a party to either the contract, Defendant's Exhibit 2, page "FG 745," or any of the clauses that are the basis for the decision, see Plaintiff's Exhibit 8

(January 1993 Agreement) which excludes the very clauses, I 28 and I 29, PPFF 55, that are the basis for the contracting officer's decision, Defendant's Exhibit 2, page "FG 751."

Clause I.37, which made the prime contract subject to the Contract Dispute Act of the 1978, was also not included in the contract between CLA and Mr. Gaylord. *See* PPF54. Thus, having had no notice of the proceeding, and having never agreed to the prime contract or any of the pertinent terms, the decision cannot and should not affect Mr. Gaylord's interests in the copyrights.

Respectfully submitted,

Dated:  September 22, 2008

/s/ Heidi E. Harvey
Heidi E. Harvey
MA 548114
FISH & RICHARDSON P.C.
225 Franklin Street
Boston, MA 02110
(617) 542-5070
(617) 542-8906

Attorneys for Plaintiff

22031163.doc

46