# In the United States Court of Federal Claims

No. 06-539C

(Filed: December 16, 2008)

| | |
|---|---|
| FRANK GAYLORD,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | Suit for Copyright Infringement; Korean War Veterans Memorial; Postal Service Commemorative Stamp; Ownership of Copyright; Fair Use Doctrine, 17 U.S.C. § 107; Architectural Works Copyright Protection Act. |

*Heidi E. Harvey*, with whom was *Danni Tang*, Fish & Richardson P.C., Boston, Massachusetts, for Plaintiff.

*Scott Bolden*, with whom were *Gregory G. Katsas*, Assistant Attorney General, *John J. Fargo*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., and *Eric F. Mulch*, United States Postal Service, Of Counsel, for Defendant.

## OPINION AND ORDER

WHEELER, Judge.

This case arises from the decision of the United States Postal Service ("Postal Service") to issue a 37-cent postage stamp commemorating the 50th anniversary of the armistice of the Korean War. This commemorative stamp ("the Stamp") features a

photograph of many of the 19 stainless steel soldier sculptures that are part of the Korean War Veterans Memorial ("KWVM") located on the national mall in Washington, D.C. Plaintiff, Frank C. Gaylord II, an artist and World War II veteran, sculpted these 19 soldiers in formation, known as "The Column." Mr. Gaylord filed suit in this Court on July 25, 2006, alleging that the Postal Service, by issuing a stamp that contains an image of "The Column," infringed his exclusive copyright in the sculpture. Compl. ¶¶ 14-15. As damages, Mr. Gaylord seeks a royalty of ten percent on the Postal Service's net sales of the commemorative stamp and related merchandise. Pl.'s Post-Tr. Br. at 9.

For the reasons stated below, the Court rules in favor of Defendant, finding that, while Mr. Gaylord is the sole copyright owner of "The Column," the Postal Service fairly used the sculpture in the Stamp. See 17 U.S.C. § 107. Accordingly, the Postal Service did not infringe Mr. Gaylord's copyright.

## Factual Background[1]

### A. The KVWM and "The Column"

On October 28, 1986, Congress enacted legislation to erect a memorial in Washington, D.C. to honor veterans of the Korean War. See Pub. L. No. 99-572 (1986). Section 1 of this legislation authorized the American Battle Monuments Commission ("ABMC"), an independent commission, to establish the KWVM. Id. Section 2 created the Korean War Veterans Memorial Advisory Board ("VAB"), an organization responsible for recommending the site for the KWVM, selecting the design for the memorial, promoting the establishment of the memorial, and obtaining private funds for its construction and upkeep. Id. The ABMC sought the assistance of the U.S. Army Corps of Engineers in the design and construction of the memorial. Lecky, Tr. at 467-68.[2]

A team of four architects from Pennsylvania State University, Veronica Burns Lucas, Don Leon, John Lucas, and Eliza Pennypacker Oberholtzer, won a contest sponsored by the ABMC to design the KWVM. PX 1 at 2 (The KWVM Sculptor Selection Procedure). The

---

[1] This statement of the facts constitutes the Court's principal findings of fact under Rule 52(a) of the Court. Other findings of fact and rulings on mixed questions of fact and law are set forth in the later analysis.

[2] In this opinion, the Court will refer to the trial transcript by witness and page as "Name, Tr. __," and to trial exhibits as "PX __" for Plaintiff's exhibits, and "DX__" for Defendant's exhibits. The parties' pretrial stipulations of fact, filed on May 16, 2008, are referred to as "Stip. __." For lengthy exhibits, page citations also are included.

architects' design included 38 larger-than-life granite soldiers. Lecky, Tr. at 465-66; PX 1. The Corps of Engineers selected Cooper-Lecky Architects, P.C. ("CLA") as the prime contractor for the creation, construction and installation of the KWVM. Stip. 3. The Corps of Engineers and CLA entered into Contract No. DACA31-90-C-0057 on April 11, 1990, detailing CLA's services for the KWVM project. DX 2. CLA then sponsored an open competition to select the figural sculptor for the sculptural component to be included in the KWVM. Stip. 4; PX 1.

Mr. Gaylord, a veteran of the U.S. Army who served as a paratrooper during World War II, is a professional sculptor who resides in Barre, Vermont. Stip.1; Gaylord, Tr. at 43-57. In 1990, Mr. Gaylord participated in and won CLA's open competition to select the figural sculptor for the sculptural component of the KWVM.[3] Stip. 4. At that time, Mr. Gaylord was a nationally recognized sculptor with a number of public works throughout the United States, including several larger than life size sculptures in granite and cast metal. PX 35, 35A. From 1990 to 1995 when he worked on "The Column," Mr. Gaylord was self-employed. See Triano, Tr. at 320. Mr. Gaylord's son-in-law, John Triano, assisted him by performing some of the labor and handling the business, accounting, and paperwork for Mr. Gaylord's studio. Stip. 6.

Although Mr. Gaylord was chosen as the sole sculptor for the KWVM, his subcontract required him to coordinate and comply with the directions of CLA throughout the project. PX 8 at 2. "The Column" did undergo changes from its inception to its dedication. Although the original design for "The Column" called for 38 soldiers, the final design featured 19 stainless steel statues representing a platoon of foot soldiers in formation. Stip. 5; Gaylord, Tr. at 104-106. In some instances, CLA, acting as supervisor of the project, instructed Mr. Gaylord to institute changes to the appearance of the soldiers. Gaylord, Tr. at 125-26, 173-74. Mr. Gaylord complied with these instructions. Id. "The Column" was completed and installed as part of the KWVM in 1995. Stip. 7. The KWVM was dedicated on July 27, 1995, the 42nd anniversary of the armistice of the Korean War. Stip. 8.

B. Copyright of "The Column"

The January 19, 1993 subcontract between Mr. Gaylord and CLA incorporated some of the provisions from the prime contract between the Corps of Engineers and CLA, but did

---

[3] Generally speaking, the KWVM consists of three primary components: (1) "The Column;" (2) the mural wall; and (3) the reflecting pool. Stip. 9. While Mr. Gaylord designed "The Column," CLA selected artist Louis Nelson as the muralist for the mural wall, and CLA was responsible for designing the reflecting pool. Stip. 10.

not include the copyright provisions. Compare PX 8 at 3 with DX 2. Instead, the subcontract stated that "copyright ownership of the work of art shall be covered in a separate agreement," and that Mr. Gaylord would "have the right to a credit line on the completed design or any visual representation embodying such designs . . . ." PX 8 at 5. Mr. Gaylord and CLA amended their agreement on January 25, 1994, adding that "[t]he copyright for this work will be held by [Mr. Gaylord]." PX 13 at 2. In May 1994, the ABMC withdrew all claims for copyright ownership and/or royalties in the "The Column." PX 14. On February 8, 1995, Mr. Gaylord and CLA entered into an agreement which permitted CLA to license "The Column" subject to prior approval by Mr. Gaylord and an agreed royalty schedule. PX 17. This same agreement acknowledged that Mr. Gaylord was the sole owner of the copyright in "The Column." Id. However, Mr. Gaylord terminated both of these agreements in October 1995, claiming that CLA had breached the agreements by distributing a book which included depictions of "The Column" without his permission and without compensation. PX 24.

On at least five occasions between 1993 and 1995, Mr. Gaylord submitted copyright applications for his work on "The Column." Stip. 11. Mr. Gaylord received the following copyright registrations relating to his work on "The Column:" (1) No. VAu 187 93, registered July 26, 1990; (2) No. VAu 280 954, registered November 15, 1993; (3) No. VAu 280 955, issued November 18, 1993; (4) No. VAu 306 934, registered August 12, 1994; and (5) No. VAu 342 493, registered May 1, 1995. PX 6, 9, 11, 15, 19.

C. Mr. Alli's Photograph

In January 1996, John Alli, a retired United States Marine Corps pilot and earnest amateur photographer, visited the KWVM during a snowstorm and took a photograph, entitled "Real Life." Stip. 12; Alli, Tr. at 371; DX 24. Mr. Alli intended the picture to be a retirement gift for his father, who served in the Marine Corps in Korea. Alli, Tr. 370-71, 373-74, 376. The photograph also won first place in a Naval Institute Press photo contest. Id. at 382. After being told by a national mall vendor that the KWVM was copyrighted, Mr. Alli sought permission to sell his photograph. Id. at 389-90. Through a series of referrals, Mr. Alli located Mr. Lecky. Id. at 388-90. Mr. Lecky wrongly told Mr. Alli that he owned the copyright to the KWVM "outright" and offered to authorize Mr. Alli to sell prints and reproductions of the photo in return for a ten percent royalty. Id. at 390-91. Messrs. Alli and Lecky entered into an agreement regarding the photograph on April 20, 1998, which provided that the licensing entity established by Mr. Lecky at the time of the dedication, KWVM Productions, Inc., would receive ten percent of the net sales of any prints, posters or framed artwork of the photograph sold by Mr. Alli. PX 42. Mr. Alli accounted for his sales which included receipt of $1,000 for the U.S. Army's one-time use of the image in a poster for the 50th Anniversary of the Korean War. DX 42, 47.

D. The Stamp

In 2002, the Postal Service decided to issue a 37-cent postage stamp commemorating the 50th anniversary of the armistice of the Korean War. Stip. 13. The Postal Service elected to incorporate "Real Life" into the stamp image, id, and paid Mr. Alli $1,500 for use of his photograph. Alli, Tr. at 383. Mr. Alli did not seek Mr. Gaylord's permission to put "Real Life" on the Stamp. See Gaylord, Tr. at 153. Mr. Alli, however, advised the Postal Service that they would need, in addition to his permission, the permission of the owner of the copyright in the sculpture and he referred Defendant to Mr. Lecky. DX 41; PX 32 at 3.

The Postal Service issued the Stamp on July 27, 2003. Stip. 14. From this date until the Stamp was retired on March 31, 2005, the Postal Service produced approximately 86.8 million Stamps as well as a variety of other retail goods featuring images of the Stamp. Stip. 15. The Postal Service did not seek Mr. Gaylord's permission to depict "The Column" on the Stamp or on any retail goods, and Mr. Gaylord did not give his permission for the Postal Service to use an image of "The Column" on the Stamp. Stip. 16. Further, neither the Stamp nor the related retail goods identified Mr. Gaylord as the sculptor of "The Column." Stip. 17. An image of the Stamp is set forth below:




E. Resulting Litigation

Mr. Gaylord filed two lawsuits alleging copyright infringement of "The Column." On July 25, 2006, Mr. Gaylord filed suit in this Court alleging that the Postal Service infringed his copyright in the sculpture. Comp. ¶¶ 14-15. The Court conducted a trial in Washington,

D.C., on June 16-20, 2008. The witnesses in order of appearance were: Mr. Gaylord; Mr. Triano; Terry McCaffrey, manger of the Postal Service's Stamp Development department; Eric F. Mulch, an attorney for the Postal Service; William Lecky, principal member of CLA during construction of the KWVM; Mr. Alli; Charles Delaney, manager of the Postal Service's Stamp Acquisition and Distribution Department; and David E. Failor, executive director of the Postal Service's Stamp Services. The parties filed post-trial briefs on August 20, 2008, and reply briefs on September 22, 2008. The Court heard closing arguments on November 5, 2008.

A day after filing suit against the United States in this Court, Mr. Gaylord filed a complaint against Mr. Alli in the U.S. District Court for the District of Maryland, claiming that "Real Life" infringed Mr. Gaylord's copyright in "The Column." DX 39 (District of Maryland Compl. ¶ 18). Mr. Alli and Mr. Gaylord settled that case on April 25, 2007. DX 41.

## Discussion

### A. Jurisdiction

The United States waived sovereign immunity regarding copyright infringement in 28 U.S.C. § 1498(d), permitting plaintiffs to bring actions in this Court:

> Hereafter, whenever the copyright in any work protected under the copyright laws of the United States shall be infringed by the United States, by a corporation owned or controlled by the United States, or by a contractor, subcontractor, or any person, firm, or corporation acting for the Government and with the authorization of consent of the Government, the exclusive action which may be brought for such infringement shall be an action by the copyright owner against the United States in the Court of Federal Claims for the recovery of his reasonable and entire compensation as damages for such infringement, including the minimum statutory damages as set forth in section 504(c) of title 17, United States Code[.]

28 U.S.C. § 1498(b).

### B. Standard for Decision

Article I, Section 8, clause 8 of the United States Constitution empowers Congress to "Promote the Progress of Science and useful Arts, by securing for limited Times to Authors

and Inventors the exclusive right to their respective Writings and Discoveries[.]" Congress thus enacted the Copyright Act of 1976, Pub. L. No. 94-553, 90 Stat. 2541, to provide copyright protection for "original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." 17 U.S.C. § 102(a).

In order to establish copyright infringement, a plaintiff must show that he owns a valid copyright and that the alleged infringer copied the work. Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., 499 U.S. 340, 361 (1991). Under the Copyright Act, "certificate of registration made before or within five years after first publication of a work shall constitute prima facie evidence of the validity of the copyright and of the facts stated in the certificate." 17 U.S.C. § 410(c).

Proof of copying can be inferred from access and substantial similarity. Amini Innovation Corp. v. Anthony California, Inc., 439 F.3d 1365, 1368 (Fed. Cir. 2006) ("Copying requires evidence that a defendant literally copied the designs or, alternatively, that a defendant had access to the protected designs before creating the accused designs with an additional showing of 'substantial similarity not only of the general idea but of the expression of those ideas as well.'") (citing Shaw v. Lindheim, 919 F.2d 1353, 1356 (9th Cir. 1990)). Expert testimony is not needed for the finder of fact to make a judgment of substantial similarity, and courts will use an "ordinary observer test" to evaluate whether there is substantial similarity. See Trek Leasing, Inc. v. United States, 66 Fed. Cl. 8, 18 (2005).

C. Plaintiff's Case of Copyright Infringement

1. Mr. Gaylord is the Sole Copyright Owner of "The Column."

Mr. Gaylord owns a valid copyright in "The Column." Mr. Gaylord registered his copyrights in "The Column" from small clay sketches to the final sculpture as installed in the KWVM. PX 6, 9, 11, 15, 19. As four of these registrations were made prior to installation of "The Column"and the fifth within months of the installation, Mr. Gaylord is entitled to a prima facie presumption of copyright validity in "The Column." 17 U.S.C. § 410(c).

Defendant, however, contends that "The Column" was jointly authored by the Government, which would grant it an unlimited, fully paid license in the sculpture. Section 201 of Title 17 recognizes that a single copyright may jointly vest in several authors. 17 U.S.C. § 201(a). The Copyright Act defines a "joint work" as "a work prepared by two or more authors with the intention that their contributions be merged into inseparable or

interdependent parts of a unitary whole." 17 U.S.C. § 101. The touchstone of joint authorship is "a joint laboring in furtherance of a common design." See Edward B. Marks Music Corp. v. Jerry Vogel Music Co., 140 F.2d 266, 267 (2d Cir. 1944) (citation omitted). A joint work will be found where the authors intend their contributions to "be complementary in the sense that they are to be embodied in a single work." Id. "Joint authors co-owning copyright in a work are deemed to be tenants in common, with each having an independent right to use or license the copyright, subject only to a duty to account to the other co-owner for any profits earned thereby." Cmty. for Creative Non-Violence v. Reid, 846 F.2d 1485, 1498 (D.C. Cir. 1988) (citation omitted). However, mere participation in, contributions to, and review of work does not necessarily create a joint work. See PODS, Inc. v. Porta Stor, Inc., 484 F.3d 1359, 1370 (Fed. Cir. 2007).

Defendant argues that The Column was jointly authored by CLA, VAB, and the Commission on Fine Arts ("CFA"), indicating that the Government has an unlimited, fully paid license in the sculpture. Def.'s Post-Tr. Br. at 31. To this end, Defendant states that CLA, the CFA, and the VAB each contributed copyrightable expressions to the soldier statues. Id. at 38. For example, Defendant explains that the VAB contributed a background story for each of the soldier statues, such as ethnicity, military service, task, and equipment suggestions that were representative of the soldiers of the Korean War. Id. Defendant adds that CLA, Mr. Gaylord and Mr. Nelson decided that the soldier statues should wear ponchos with ultimate approval by CFA. Id. Regarding this change, Defendant contends that Mr. Lecky reworked the ponchos after they appeared to depict too much wind. Id. The VAB also provided instructions to Mr. Gaylord, telling him to change the appearance of one soldier from Italian to Hispanic, as well as to depict certain soldiers as clean-shaven and others with buckled chin-straps. Id. at 38-39. Defendant also notes that CLA worked with Mr. Gaylord to change the age of soldiers by removing wrinkles from the faces of the statues with wax. Id. at 39. Defendant states that CLA reworked a squatting Soldier No. 1 into a standing position prior to casting. Id.; Lecky, Tr. at 492. Lastly, Defendant argues that CLA, the VAB, and the CFA each collaborated to modify the entire compositional structure and setting of "The Column." Def.'s Post-Tr. Br. at 41.

The evidence, however, is not as Defendant suggests. For the reasons addressed below, the Court finds that Mr. Gaylord performed virtually all of the artistic work on the sculptures, and that the contributions of the various committees and CLA were more in the nature of suggestions and constructive criticisms.

First, Defendant overstates the physical contributions of Mr. Lecky. The record does not establish that Mr. Lecky reworked the ponchos as Defendant claims. Specifically, while Defendant alleges that Mr. Lecky performed this work in his Washington, D.C. office, see Lecky, Tr. at 545-46, the shipment of the models pre-dates the addition of the ponchos, see

PX 40 at 2 (Change Order #6 shows the model shipment to Washington, D.C. and Change Order #8 shows the poncho sketch soldiers). Regarding the use of wax to modify the ages of the soldiers, the evidence does not establish that this work was performed by Mr. Lecky. See Lecky, Tr. at 491 ("Well, Frank was the sculptor, I, Kent and I were the, sort of critics. I don't remember who exactly took the wax and filled in, probably Frank. I may have done a little bit."). Further, as for the transformation of Soldier No. 1, the evidence does not suggest that Mr. Lecky performed the work to make the soldier "stand up." In fact, there is no evidence in the record that a squatting version of the soldier existed immediately before the casting.

Second, Defendant's proffered contributions of the various committees to "The Column" are not evidence of joint ownership, but rather of suggestion and criticism. While "The Column" underwent dramatic changes during its creation, the evidence shows that Mr. Gaylord made the committees' requested changes. Mr. Gaylord reworked the statues himself, under the supervision of CLA or based upon ideas offered by the committee members. Gaylord, Tr. at 125-26, 132, 174, 184-85; Lecky, Tr. at 491. The CFA did approve of the use of ponchos, but the poncho concept was based upon models produced by Mr. Gaylord. Gaylord, Tr. at 110, 183-84. Mr. Gaylord also created the composition of the "The Column," using Colonel Bill Weber's suggestion to stagger the statues. Id. at 121. Colonel Weber is a veteran of Korea and served as a VAB member. Id. While the final version of "The Column" evidences stark differences in the statues from the original sketches submitted by Mr. Gaylord in 1990, the transformation was the result of Mr. Gaylord's labor, with the critique and suggestions of the committees. Mr. Gaylord was able to translate the competing and conflicting ideas, comments, and suggestions of multiple committee members into a new set of figures. Mere participation in, contributions to, and review of work does not necessarily create a joint work. See PODS, 484 F.3d at 1370. Rather, it was Mr. Gaylord's artistic skill that created "The Column," indicating that he is the sole author. See Steve Altman Photography v. United States, 18 Cl. Ct. 267, 281-82 (1989) (finding that the photographer was the sole author because his artistic skill created the photograph).

Further, the evidence shows that the parties never intended to create a joint work. In fact, it appears that from the moment copyright ownership was discussed between the parties, disputes arose regarding ownership. In 1992, CLA asserted the right to obtain copyright ownership of "The Column" on behalf of the Government. In a September 3, 1992 letter, CLA stated that the Government "remain[ed] adamant about the copyright issue" and instructed Mr. Gaylord to "stop work on th[e] project immediately . . . ." PX 39. The impasse was partially resolved in January 1993 when the parties entered into an agreement that allowed work and payment to resume, but it deferred the ultimate issue of copyright ownership. PX 8 at 5. Months later, CLA contacted Mr. Gaylord to inform him that "the ABMC ha[d] suddenly withdrawn their claim for copyright ownership and/or royalties

received from same." PX 14. Later that year, Mr. Gaylord and CLA entered into a revised agreement which acknowledged that Mr. Gaylord was the "sole author of the Soldier Sculptures to become part of the overall Memorial, the Soldier Sculptures constituting a contribution to the collective work embodied by the memorial as a whole." PX 17. The history of "The Column" project thus shows an open and contentious dispute regarding copyright ownership, ultimately with CLA's concession that Mr. Gaylord was the sole owner of the copyright.

Thus, as there was no intention to create a joint work and Mr. Gaylord created "The Column" with only criticisms and suggestions of the various committees, Plaintiff is the sole owner of the copyright in "The Column."

2. The Postal Service Copied "The Column."

In addition to the fact that, in its briefings and at trial, Defendant did not contest that the Postal Service copied "The Column" in the Stamp, Plaintiff has established proof of copying. First, there can be no dispute that Mr. Alli had access to "The Column" when photographing it as he was present at the KWVM. Second, to an ordinary observer, the Stamp is substantially similar to "The Column." The Stamp features a photograph of a significant number of the statues and, while the two works do not share exact expressions, they both honor Korean War veterans. As such, this Court infers proof of copying. See Amini Innovation Corp., 439 F.3d at 1368.

D. The Fair Use Doctrine

While Mr. Gaylord has established that he solely owns a valid copyright and that the Postal Service copied his work, his right to reproduce is not absolute. Rather, this right is subject to several exceptions and exemptions, including fair use, 17 U.S.C. § 107, which Defendant claims is applicable to the present case.

The purpose of the Copyright Act is not to reward authors, but to achieve progress in the arts and sciences, which is accomplished when the "Act 'encourages others to build freely upon the ideas and information conveyed by a work.'" Atari Games Corp. v. Nintendo of Am. Inc., 975 F.2d 832, 842 (Fed. Cir. 1992) (citation omitted). Progress is thus encouraged through the fair use doctrine, codified in 17 U.S.C. § 107. "The fair use doctrine thus 'permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which the law is designed to foster.'" Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 577 (1994) (quoting Stewart v. Abend, 495 U.S. 207, 236 (1990)). While Section 107 identifies a number of potential fair uses of copyrighted material that may be exempted from infringement, it provides a four-factor test that courts

are to use to determine whether the alleged infringer is afforded protection from infringement:

> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
>
> (2) the nature of the copyrighted work;
>
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
>
> (4) the effect of the use upon the potential market for or value of the copyrighted work.

17 U.S.C. § 107. These four factors, while mandatory, are not meant to be exclusive. See Harper & Row Publishers, Inc. v. Nation Enters., 471 U.S. 539, 560 (1989). When evaluating a potential fair use under these factors, the Supreme Court has emphasized that the proper approach is a "sensitive balancing of interests." Campbell, 510 U.S. at 584 (citing Sony Corp. Of Am. v. Universal City Studios, Inc., 464 U.S. 417, 455 n.40 (1984)).

In the present case, Defendant alleges that the Postal Service's use of an image of "The Column" on the Stamp is fair use of the sculpture, making it exempt from infringement. Def.'s Post-Tr. Br. at 14. The Court therefore must analyze the Postal Service's use of "The Column" under the four fair use factors. 17 U.S.C. § 107.

1. The Stamp is Transformative in Nature.

When analyzing the first factor of the fair use doctrine, courts inquire whether the new work is transformative. Courts evaluate whether the accused work "merely supersede[s]" the original work, or whether it "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." Campbell, 510 U.S. at 579 (citation omitted). "[T]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use." Id. When conducting this analysis, courts often consider whether the new work "adds value to the original," by incorporating "new information, new aesthetics, new insights and understanding." Blanch v. Koons, 467 F.3d 244, 251-52 (2d Cir. 2006) (quoting Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc., 150 F.3d 132, 142 (2d Cir. 1998)).

Here, while both the Stamp and "The Column" are intended to honor the veterans of the Korean War, the Stamp is transformative, providing a different expressive character than

"The Column." The artistic expression of "The Column" can be summarized as a three-dimensional sculptural snapshot of a group of soldiers on an undefined mission during the Korean War, captured as a single moment in time. See Gaylord, Tr. at 105; PX 1. Mr. Alli, through his photographic talents, transformed this expression and message, creating a surrealistic environment with snow and subdued lighting where the viewer is left unsure whether he is viewing a photograph of statues or actual human beings. Alli, Tr. at 377-78. The viewer experiences a feeling of stepping into the photograph, being in Korea with the soldiers, under the freezing conditions that many veterans experienced. Id. Mr. Alli took hundreds of pictures of "The Column" before he achieved this expression, experimenting with angles, exposures, focal lengths, lighting conditions, as well as the time of year and day. Id. at 373, 377. Mr. Alli also achieved his vision using various photographic effects and equipment. Id. at 375 (using a portrait lens and a tripod), 378 (using slide film), and 379 (choosing glossy prints). Mr. Alli's efforts resulted in a work that has a new and different character than "The Column" and is thus a transformative work. Campbell, 510 U.S. at 579; Blanch, 467 F.3d at 251-52. The Postal Service further altered the expression of Mr. Gaylord's statues by making the color in the "Real Life" photo even grayer, creating a nearly monochromatic image. McCaffrey, Tr. at 583. This adjustment enhanced the surrealistic expression ultimately seen in the Stamp by making it colder. Id.; see also PX 26. Thus, the Postal Service further transformed the character and expression of "The Column" when creating the Stamp.

The Court concludes that the Stamp is a transformative work, having a new and different character and expression than Mr. Gaylord's "The Column." Campbell, 510 U.S. at 579; Blanch, 467 F.3d at 251-52. The first factor of the fair use analysis thus weighs heavily in favor of Defendant.

2. "The Column" is a Creative Work.

Under the second fair use factor, courts are to evaluate the nature of the copyrighted work. 17 U.S.C. § 107(2). This factor "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied." Campbell, 510 U.S. at 586. When evaluating this factor, courts often make two distinctions regarding the nature of the copyrighted work, the first being relevant to the present case: "(1) whether the work is expressive or creative, such as a work of fiction, or more factual, with a greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with the scope for fair use involving unpublished works being considerably narrower." Blanch, 467 F.3d at 256.

However, even when a creative work has been copied, the second factor may be of limited utility to the fair use analysis where the challenged work is transformative. Id. at 257. For instance, in Blanch, the U.S. Court of Appeals for the Second Circuit found that the second fair use factor carried limited weight in its analysis because the defendant used the artist's work in a transformative manner, not to exploit the work's creative virtues, but rather to comment on the work's social and aesthetic meaning. Id.

Similarly, in the present case, the transformative nature of the Stamp causes the second factor to carry little weight in the fair use analysis. While Mr. Gaylord's "The Column" is a creative work of art, the Postal Service did not copy Mr. Gaylord's creation in an effort to exploit its virtues. Rather, as discussed above, the Postal Service, through the efforts of Mr. Alli and its own engravers, changed Mr. Gaylord's sculpture to create a new, surrealistic vision. The Postal Service thus created a transformative work. Although "The Column" is creative, indicating that the second fair use factor weighs in favor of Plaintiff, this Court must give the second factor limited weight in the fair use analysis. Id.

3. The Stamp Features a Substantial Part of "The Column" But Minimizes the Sculpture's Importance.

When evaluating the third factor, the amount and substantiality of the portion used in relation to the copyrighted work as a whole, the Supreme Court has recognized that analysis must be made of not only "the quantity of the materials used, but . . . their quality and importance too." Campbell, 510 U.S. at 587. For instance, in Harper & Row, the Supreme Court found that copying of only 300 to 400 words of President Ford's unpublished autobiography was copyright infringement. The Supreme Court disagreed with the appellate court's characterization of the copied work as using only a "meager . . . infinitesimal amount" of the book because of the "expressive value of the excerpts and their key role in the infringing work[.]" Id. at 566. The Supreme Court explained, "[the infringer] quoted these passages precisely because they qualitatively embodied Ford's distinctive message." Id. at 565. The Supreme Court added, "the fact that a substantial portion of the infringing work was copied verbatim is evidence of the qualitative value of the copied material, both to the originator and to the plagiarist who seeks to profit from marketing someone else's copyrighted expression." Id.

In terms of quantity, the Stamp depicts 14 of the 19 soldier statues in "The Column." DX 37 at 2 (Stamp). While most of these statues are obscured by their fellow soldiers and all are pictured from a frontal perspective, the fact remains that a substantial number of the statues are visible on the Stamp. The Postal Service's use of many of the statues weighs against fair use. This fact is somewhat mitigated, however, by the quality and importance of the statues to the Stamp. Unlike the text in Harper & Row, the statues were not copied

verbatim in the Stamp. Rather, Mr. Alli and the Postal Service used variables to lessen the quality and importance of "The Column"and to alter the expression of the Stamp. Mr. Alli used the snow covering the statues as a tool to obscure the statues and create a heightened surrealistic effect. See Alli, Tr. at 377. He added to this effect by sharply reducing the color of the statues through controlled lighting. See generally, id. at 374-75. The Postal Service reduced the color even further when producing the Stamp, creating a nearly monochromatic image. See McCaffrey, Tr. at 583. The efforts of Mr. Alli and the Postal Service thus changed the qualitative message of "The Column" and mitigated the weight of the third factor. Harper & Row, 471 U.S. at 565.

4. The Stamp Has Little Impact Upon "The Column's" Potential Market.

Regarding the fourth factor, the effect of the use upon the potential market for or value of the copyrighted work, courts are "to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also 'whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market' for the original." Campbell, 510 U.S. at 590 (citation omitted). Courts are to account for both harm to the value of the original work, as well as harm to the market for derivative works. Id. (citing Harper & Row, 471 U.S. at 568). When a court finds that the allegedly infringing work is transformative under the first factor, market harm cannot be presumed. See id. at 591; Perfect 10, Inc. v. Amazon.com, Inc., 508 F.3d 1146, 1168 (9th Cir. 2007).

Here, the evidence shows that Defendant's stamp has little or no impact upon the market or value of "The Column." First, since the Stamp is transformative, market harm cannot be presumed. Campbell, at 591; Perfect 10, Inc., 508 F.3d at 1168. Second, when analyzed, it is apparent that the market factor weighs in favor of fair use because the Stamp caused no harm either to the value of "The Column" or to the market for derivative works. Regarding the value of "The Column" itself, Plaintiff conceded that Defendant's use of "Real Life" actually increased the value of "The Column." DX 43 (Response to Request for Admission No. 20). As for derivative works, the record shows that Mr. Gaylord has made only limited attempts to commercialize his copyright in "The Column." Mr. Gaylord has never sold photographs, postcards, magnets, or keychains of "The Column." Gaylord, Tr. at 208-09. Although Mr. Gaylord sold several ten- to twelve-inch miniatures of the soldiers within two or three years after the completion of "The Column," there was limited interest in these miniatures because their price was too high. Id. at 199. In fact, Mr. Gaylord permitted the foundry to destroy the molds used to make miniatures approximately five years ago. Id. at 199-200. The Stamp thus has not impacted Mr. Gaylord's attempts to market derivative works.

Furthermore, it is unlikely that the Stamp will impact Mr. Gaylord's future attempts to commercialize his copyright because the Stamp is an inadequate substitute for "The Column." These facts are analogous to those presented in Kelly v. Arriba Soft Corporation, 336 F.3d 811 (9th Cir. 2003) and Perfect 10, 508 F.3d at 1146. In both cases, the Ninth Circuit held that the market factor weighed in favor of fair use because thumbnail images used by internet search engines could not be a market substitute for full-sized images by photographers. See Kelly, 336 F.3d at 821-22; Perfect 10, 508 F.3d at 1168. Similarly, it is unlikely that these one by one-and-a-half inch stamps would be adequate commercial substitutes for future products sold by Mr. Gaylord. Thus, the Stamp has no impact on the potential market for "The Column" and the fourth factor weighs in favor of fair use.

5. Defendant's Use of "The Column" as Depicted in the Stamp is a Fair Use.

"Having explored the statutory factors and weighed them in light of the purposes of a copyright," Blanch, 467 F.3d at 259 (citing Campbell, 510 U.S. at 78), the Court finds that the "promoting the Progress of Science and useful Arts," U.S. Const., art I, § 8, cl. 8, was served by the Postal Service's Stamp. Thus, the Court finds that the Postal Service's use of "The Column" in the Stamp was a fair use and Defendant is not liable for copyright infringement.

E. The Architectural Works Copyright Protection Act

Defendant asserts an additional affirmative defense, arguing that because "The Column" is an architectural work, the public, and thus the Postal Service, may make, distribute, and display pictures and photographs of the sculpture free from claims of copyright infringement. Def.'s Post-Tr. Br. at 27-30.

Congress, through the Architectural Works Copyright Protection Act ("AWCPA"), Pub. L. No. 101-650, 104 Stat. 5133 (1990), extended copyright protection to architectural works. A limitation on such copyright protection was codified in 17 U.S.C. § 120, which states that copyright protection in an architectural work "does not include the right to prevent the making, distributing, or public display of pictures, paintings, photographs, or other pictorial representations of the work, if the building in which the work is embodied is located in or ordinarily visible from a public place." A building, however, is not any man-made structure. Rather, the Copyright Office defines "buildings" as permanent and stationary structures designed for human occupancy:

> humanly habitable structures that are intended to be both permanent and stationary, such as houses and offices, and other permanent and

> stationary structures designed for human occupancy, including but not limited to churches, museums, gazebos, and garden pavilions.

37 C.F.R. § 202.11(b)(2). The Copyright Office excludes from registration under AWCPA structures it does not consider to be buildings, such as walkways and bridges. Id. at § 202.11(d)(1).

Defendant contends that the KWVM is a "building," as defined by the Copyright Office and thus is afforded limited copyright protection. Def.'s Post Tr. Br. at 29. The Government argues that the KWVM was designed for "human occupancy" in a similar manner as museums, gazebos, or garden pavilions and thus fits within the Copyright Office's definition. Id. To support this argument, Defendant cites to a passage of AWPCA's legislative history, which indicates that Congress intended to extend coverage of the AWCPA to structures "'that are used, but not inhabited, by human beings, such as churches, pergolas, gazebos, and garden pavilions.'" Id. (citing H.R. Rep. No. 101-173 (reprinted in 1990 U.S.C.C.A.N. 6935, 6951)) (emphasis removed). Defendant concludes that, because the KWVM includes walkways and benches, it was designed for human occupancy and is covered by the AWPCA.

Defendant's attempt to extend the AWPCA to "The Column," however, is unavailing. "The Column" is not a "building" and thus does not fall under the exemption to copyright infringement afforded architectural works. Beyond not being a building in the ordinary meaning of the word, "The Column" does not fit the Copyright Office's definition of the term. The structures used in the definition of "building" by the Copyright Office are intended to house individuals; either for the sake of providing shelter or for another purpose such as religious services. In contrast, the KWVM was designed as a monument to honor the veterans of the Korean War. See Pub. L. No. 99-572 (1986). It is an artistic expression intended to convey a message rather than to be occupied by individuals. The fact that individuals may traverse through the KWVM does not detract from its intended purpose. Much like a walkway or bridge, the KWVM permits individuals to access through it, but is not intended for occupancy. Defendant's argument that the KWVM is a building explicitly rests upon the fact that the monument contains walkways; a feature which the Copyright Office excludes from its definition of "building."

Furthermore, had Congress intended to extend the AWCPA to monuments and memorials, it presumably would have drafted the AWCPA to reflect such protection. The Act notably is silent regarding such structures. The Copyright Office, in defining a "building," also chose not to list monuments and memorials. Again, had the Office intended to include monuments and memorials in the definition of "building," it presumably would have included them in its list of structures.

## Conclusion

Based upon the foregoing, the Court finds that Defendant's Stamp was a fair use of Mr. Gaylord's copyrighted sculpture. The Clerk is directed to enter judgment for the Defendant. No costs.

IT IS SO ORDERED.

s/Thomas C. Wheeler
THOMAS C. WHEELER
Judge