IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| FRANK GAYLORD,<br><br>        Plaintiff,<br><br>    v.<br><br>THE UNITED STATES,<br><br>        Defendant. | No. 06-539 C<br><br>Judge Thomas C. Wheeler |

### **DEFENDANT'S STATEMENT OF THE CONTESTED FACT ISSUES ON REMAND**

Pursuant to the Court's Order of November 14, 2012, Defendant, the United States ("the government"), hereby respectfully submits its Statement of the Contested Fact Issues on Remand.

All issues in the case, including the determination of the proper amount of compensation, were previously before the Court during the 2008 trial. Accordingly, the government hereby incorporates by reference its post-trial proposed facts relating to fair use and damages to the extent that those previously proposed facts remain contested. See Defendant's Post-Trial Brief at 6-10 ¶¶ 12-40 (Docket No. 58). In addition, the Court has made a number of findings of fact that were upheld on appeal and are directly relevant to the present issue before the Court. The government has attempted to identify those established findings of fact in Section I of this Statement. Finally, the government has identified additional contested fact issues on remand in Section II of this Statement.

**I.      RELEVANT ESTABLISHED FACT ISSUES**

1. The 2003 Korean War Veterans Memorial stamp ("the Stamp") caused no harm either to the value of "The Column" or to the market for derivative works. See 85 Fed. Cl. at 70; 595 F.3d at 1375.

2. The Postal Service's use of "The Column" in the Stamp increased the value of "The Column." See 85 Fed. Cl. at 70; 595 F.3d at 1375.

3. Plaintiff Frank Gaylord ("Gaylord") has never sold photographs, postcards, magnets, or keychains of "The Column." See 85 Fed. Cl. at 70.

4. Although Gaylord sold several ten- to twelve-inch miniatures of the soldiers within two or three years after the completion of "The Column," there was limited interest in these miniatures because their price was too high. See 85 Fed. Cl. at 70.

5. Gaylord permitted the foundry to destroy the molds used to make miniatures approximately five years before trial. See 85 Fed. Cl. at 70-71.

6. The Stamp is not an adequate commercial substitute for any products sold by Gaylord. See 85 Fed. Cl. at 71; 595 F.3d at 1375.

**II.     CONTESTED FACT ISSUES RELATING TO COMPENSATION**

    **A.      Issues Relating to Gaylord's Licensing Activity**

1. On February 8, 1995, Gaylord entered into an exclusive license agreement with CLA, Louis Nelson, and KWVM Productions, Inc. See PX 17. Pursuant to this agreement, the parties agreed to split any revenues received from licensing the KWVM. The amount of revenues depended on the work(s) subject to the license. No royalties were ever paid under this

license agreement. On September 3, 1995, Gaylord sent a letter terminating the license agreement effective October 4, 1995. See PX 24.

2. Gaylord's license agreement with KWVM Productions, Inc. is not comparable to a license to use "The Column" on a Postal Service commemorative stamp.

3. On March 13, 1995, Gaylord entered into an exclusive license agreement with the Korean War Veterans Memorial Dedication Foundation, Inc. (KWVMDF or World Travel). See PX 18. Pursuant to this agreement, Gaylord licensed "The Column" for use on commercial memorabilia and merchandise in return for 10% of KWVMDF's revenues on commercial merchandise featuring "The Column." See id. at 2-4. Gaylord agreed to remit back to KWVMDF "a portion of the net proceeds (not less than twenty per cent (20%) thereof)." Id. at 4. Gaylord received a signing bonus of $16,666.66, and received a total of $2,446.93 in royalties from KWVMDF for commercial merchandise featuring "The Column." On December 31, 1996, the license agreement between Gaylord and KWVMDF expired.

4. The only products sold by KWVMDF pursuant to this license agreement were T-shirts and miniature statues. See DX 27 at FG 691 (World Travel Report). These products depicted one or more of the individual solider statutes, and did not depict the soldier(s) as installed in the KWVM. See Tr. at 327:19-28:19 (Triano).

5. Gaylord's last royalty payment from KWVMDF was for $18.36, received on April 28, 1997. See DX 46 at G2605 (Accounting Ledger); Tr. at 339:23-40:14 (Triano).

6. Gaylord's exclusive license agreement with KWVMDF is not comparable to a license to use "The Column" on a Postal Service commemorative stamp.

7. On September 2, 2002, Gaylord entered into a non-exclusive letter agreement with F.J. Designs. See PX 25. Gaylord and F.J. Designs negotiated the agreement after Gaylord

threatened litigation.  See, e.g., FG 785.  Pursuant to this agreement, Gaylord agreed "to release F.J. Designs, Inc. from any present or future liability for" the copyrights related to "The Column" in return for a payment of $650.00.  The payment was calculated by assessing a 10% royalty against the wholesale sales for "the wooden replica of the Korean War Veterans Memorial, item #279."  PX 25.

8. Gaylord's non-exclusive letter agreement with F.J. Designs is not comparable to a license to use "The Column" on a Postal Service commemorative stamp.

9. Since August 22, 2000, the only income that Gaylord has received related to "The Column" is a check for $650 from F.J. Designs in 2002.  See DX 40 (Financial Summary); PX 25 (Letter).

10. Gaylord's last commercial project was completed in 2002.  See DX 46 at G2609 (Accounting Ledger).  After completing that project, Gaylord closed his studio and retired from commercial sculpting.  See Tr. at 207:3-23 (Gaylord); Tr. at 320:20-21:2, 337:3-7 (Triano).

11. On April 25, 2007, Gaylord entered into a non-exclusive settlement agreement with John Alli ("Alli").  See DX 41.  Gaylord and Alli negotiated the agreement after Gaylord initiated litigation against Alli.  Pursuant to this agreement, Gaylord agreed to "waive[] all claims for [past] damages against Alli personally"; agreed to non-exclusively license Alli to use "The Column" by assessing a 10% royalty against future net retail sales revenues for Alli's photograph and by assessing a 25% royalty against compensation received from third parties.  Id. at 4-5.  Alli has never paid Gaylord any royalties under this settlement agreement.  See Plaintiff's Response to Interrogatory No. 14.

12. Gaylord's non-exclusive settlement agreement with Alli is not comparable to a license to use "The Column" on a Postal Service commemorative stamp.

13. The Postal Service's use of "The Column" did not harm any of Gaylord's actual business prospects.  See Tr. at 209:7-10 (Gaylord).

14. The Postal Service's use of "The Column" did not harm any of Gaylord's potential business prospects.  See Tr. at 209:11-13 (Gaylord).

15. Since August 22, 2000, Gaylord has not attempted to commercialize "The Column."  See Tr. at 194:12-13, 196:4-11, 208:10-14, 209:14-16 (Gaylord); Tr. at 331:15-18 (Triano); DX 40 (Financial Summary); DX 46 at G2607-09 (Accounting Ledger).

16. Third-parties have had little interest in licensing "The Column."

17. Gaylord's motivations in licensing "The Column" have not always involved monetary compensation.

18. Gaylord's agreements acknowledge that the value of copyrights held by others must be considered when quantifying the royalties he should receive.

19. Gaylord used a lump-sum royalty more often and more successfully in his license agreements.

**B.    Issues Relating to the Postal Service, the Stamp, and Retention**

20. The Postal Service sells stamps primarily as a means to pay for mail services.

21. The Postal Service produces four different types of stamps:  forever, definitive, semipostal, and commemorative.

22. The Stamp's value is primarily attributable to its ability to send mail.

23. The Stamp's value is not attributable to its image.

24. The Stamp in this case consists of expressive elements from at least three sources: Gaylord, Alli, and the Postal Service.

25. Collectible stamps have a level of demand unrelated to the image on the stamp.

26. The Postal Service negotiates with artists to acquire the right to place an artist's work on a stamp.

27. The Postal Service's payment to acquire the right to use an image on a stamp is always in the form of a one-time lump-sum payment. In return for the one-time lump-sum payment, the Postal Service always receives at least the exclusive right to use the image on a stamp and related philatelic products.

28. As of 2008, the highest amount ever negotiated by the Postal Service to acquire the right to use an image for a stamp was $5,000.

29. Having one's work depicted on a commemorative stamp is generally considered a great honor.

30. In addition to the one-time lump-sum payment, an artist whose work is featured on a stamp receives other tangible and intangible benefits. See, e.g., Tr. at 384:1-16; DX 43.

31. The recordkeeping required for a running royalty for tens of millions of 37¢ stamps that were sold for less than two years would have been onerous for Gaylord and the Postal Service.

32. A postage stamp is essentially a pre-paid voucher for the Postal Service's worldwide delivery services. See, e.g., Tr. at 625:15-19, 649:2-8.

33. People retain stamps for any number of reasons. See, e.g., Gaylord, 678 F.3d at 1345.

34. Every stamp issued by the Postal Service is retained by collectors.

35. The Stamp achieved less than the average or average retention with respect to commemorative military stamps.

36. The Stamp achieved less than average retention with respect to 2003 commemorative stamps.

37. The Stamp achieved less than average retention with respect to commemorative stamps as a whole.

38. Between 2003-2012, the Postal Service contracted with a company named Synovate to track the retention of commemorative stamps. Synovate tracked retention of commemorative stamps by conducting surveys.

39. Synovate's reports to the Postal Service reported the number of each commemorative stamp retained within the first three months after release.

40. In 2011 and 2012, Synovate conducted a study to determine how retention changed over a twelve month period, as opposed to the three month period used in the past.

41. Synovate and the Postal Service concluded that the retention of a stamp over twelve months is approximately only 54% of the retention of that same stamp over three months.

42. The three-month retention figure for the Stamp significantly overestimates the Stamp's long-term retention rate.

C. **Issues Related to Valuation**

43. Three broad approaches are used to value intellectual property: the market approach, the income approach, and the cost approach.

44. Pursuant to the market approach, the value of "The Column," as it relates to the Stamp, is far less than 10% of the revenue of the Stamp, and minimal at best.

45. Pursuant to the income approach, the incremental revenue of the Stamp as compared to a mail use stamp was $1,559,605, at most. The incremental revenue does not represent the income attributable to any demand generated by "The Column."

46. Pursuant to the cost approach, the Postal Service would have paid less than $5,000 for the rights to use a different image on the Stamp.

47. The fifteen <u>Georgia-Pacific</u> factors support the government's theory of compensation, and do not support Gaylord's theory of compensation.

48. A hypothetical negotiation between Gaylord and the Postal Service for the use of "The Column" on the Stamp would have resulted in a lump-sum royalty of no more than $10,000.

49. The licenses and agreements in the record support an 8% royalty for commercial merchandise.

50. A hypothetical negotiation between Gaylord and the Postal Service for the use of "The Column" on commercial merchandise featuring an image of the Stamp would have resulted in a running royalty of no more than $26,474.

Respectfully submitted,

STUART F. DELERY
Acting Assistant Attorney General

JOHN J. FARGO
Director


|  |  |
|---|---|
| Of Counsel:<br>MICHAEL F. KIELY<br>United States Postal Service<br><br>April 12, 2013 | _s/ Scott Bolden_<br>SCOTT BOLDEN<br>Assistant Director<br>Commercial Litigation Branch<br>Civil Division<br>Department of Justice<br>Washington, DC  20530<br>Telephone:   (202) 307-0262<br>Facsimile:    (202) 307-0345 |