IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| FRANK GAYLORD,<br><br>        Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>        Defendant. | No.: 06-539C<br><br>Judge Thomas C. Wheeler |

**PLAINTIFF'S SUPPLEMENTAL STATEMENT OF THE CONTESTED FACT ISSUES RELEVANT TO FURTHER DAMAGES PROCEEDINGS**

Pursuant to the Court's Order dated November 14, 2012, Plaintiff Frank Gaylord ("Gaylord") hereby respectfully submits it Supplemental Statement of the Contested Fact Issues Relevant to Further Damages Proceedings and, in particular, to a hypothetical license negotiation.

For ease of understanding the chronology and narrative, selected stipulated facts are included in bold with citation.

1. In 1990 and at the time the Postal Service's infringement began, Frank C. Gaylord II ("Frank Gaylord") was a sculptor of recognized stature with a record of significant public works, including larger than life size sculpture in granite and cast metal, including being the sculptor of the work –in-suit.

2. **The work-in-suit is a sculpture that features 19 statues representing a platoon of soldiers in formation. It is entitled "The Column" and it is part of the Korean War Veteran's Memorial ("KWVM") on the National Mall in Washington, D.C. (Stipulated Fact 5).**

3. **"The Column" was completed and installed as part of the KWVM in 1995. (Stipulated Fact 6).**

4. **Generally speaking, the KWVM consists of three primary components**: **"The Column" sculpture; the mural wall; and the reflecting pool. (Stipulated Fact 8).**

5. Frank Gaylord was self-employed during the entire period of his work on the sculptural figures which extended from approximately mid-1990 (selection) to mid-1995 (installation).

6. **Mr. Gaylord was assisted by his son-in-law, John Triano. Mr. Triano helped Mr. Gaylord with some of the labor of creating "The Column," and was responsible for handling the business, the accounting, and the paperwork for Mr. Gaylord's studio. (Stipulated Fact 10).**

7. After selection as sculptor and after Mr. Gaylord had begun to work on the sculpture, CLA asserted the right to obtain ownership of the copyrights in the Work on behalf of the government and attempted to force Mr. Gaylord to assign his copyrights by withholding substantial contract payments due to Mr. Gaylord.

8. In March 1992, Mr. Gaylord was owed $10,644.00 for work that had been invoiced and for which he had not been paid. Plaintiff's Trial Exhibit 40 in evidence.

9. In June 1992, Mr. Gaylord had not been paid the amounts due as of the March 1992 invoice and had been asked to undertake substantial additional work, including reworking the ponchos on the figures. Plaintiff's Trial Exhibit 40 in evidence; Defendant's Trial Exhibit 4 in evidence.

10. In September 1992, CLA asserted that the Corps of Engineers was 'adamant' about "the copyright issue," i.e., that Frank Gaylord would be required to assign his copyrights to the government and Mr. Gaylord was told to "stop work." Plaintiff's Trial Exhibit 39 in

evidence.

11. In October 1992, Mr. Gaylord still had not been paid for his March 1992 invoices and also had not been paid for the work requested and done in June 1992. He was owed a total of $83,400.00. Mr. Gaylord pointed out that his need for payment was "genuine and sincere."

12. Mr. Gaylord wrote an essay entitled "Mine" in November 1992, subtitled, "On Being Oppressed to Give Up My Copyrights to My Sculpture Figure Composition of Sixteen or Nineteen men, Give Up My Copyrights to a Powerful Agency Who Would Take The Credit and Proceeds for My Work on The Korean War Veterans Memorial."

13. Mr. Gaylord refused to give up his copyright rights in "The Column" despite being owed more than $80,000 and having substantial need for it in late 1992.

14. The total commission price paid to Mr. Gaylord for "The Column" was $775,971 and that price did not include any copyright rights.

15. In the agreement between Mr. Gaylord and the CLA, as prime contractor for the Government, the Government agreed to attribute any depiction of "The Column" to Mr. Gaylord. Plaintiff's Trial Exhibit 8 in evidence (p. 5, paragraph VI., C).

16. Mr. Gaylord has entered into arm's length comparable licenses for the work "The Column" prior to the date of the hypothetical negotiation. These licenses licensed the work "The Column" both exclusively and non-exclusively on a broad range of merchandise, including replicas, at a royalty rate of 10%. Plaintiff's Trial Exhibits 17, 18, 24, and 42 in evidence. Defendant's Trial Exhibits 40 and 41 in evidence.

17. Mr. Gaylord received an advance royalty payment of $16,666.66 for the rights granted in

the Master License Agreement.  Defendant's Exhibit 40 in evidence.

18. Gaylord terminated the Copyright Licensing Program Agreement and CLA's licensing authority for breach in October 1995. Plaintiff's Trial Exhibit 43 in evidence.

19. **In January 1996, a photographer named John Alli visited the KWVM during a snowstorm and took a photograph (the "Alli Photo"). (Stipulated Fact 12).**

20. In 2002, the United States Postal Service ("Postal Service") decided to issue a 37-cent postage stamp on the fiftieth anniversary of the armistice of the Korean War. The Postal Service decided to incorporate the Alli Photo into the stamp image. The Postal Service had considered several other images before selecting the Alli Photo.

21. **On July 27, 2003, the Postal Service issued the stamp (the "Stamp"). (Stipulated Fact 14).**

22. The Stamp is entitled "Korean War Veterans Memorial" and "The Column" is the entire subject matter of the Stamp, which depicts several of the figures, including the lead figure, in the snow. The mural wall and the reflecting pool components of the KWVM are not shown in the Stamp.

23. John Alli advised the Postal Service, through Sidney Brown of the rights management agency, PhotoAssist, Inc., that the Postal Service would need, in addition to his permission to use the Alli Photo, the permission of William Lecky, Defendant's Trial Exhibit 41 in evidence (Settlement Agreement, para. 10(f)), as Mr. Alli had been misled by Mr. Lecky into believing Mr. Lecky was the owner of the copyright in "The Column."

24. The Postal Service did not seek or obtain Mr. Gaylord's permission to use "The Column" and did not identify Mr. Gaylord as the sculptor of "The Column" on any materials

related to the Stamp or merchandise bearing an image of the Stamp.

25. **The date of the hypothetical negotiation between Mr. Gaylord and the Postal Service is July 27, 2003 (Stipulated Fact 21).**

26. At the time of the hypothetical negotiation, the Postal Service negotiated many terms of licenses relating to the use of pre-existing, copyrighted works on stamps, including the form of the license, the attribution to the author of the pre-existing work, the items upon which stamp images containing pre-existing, copyrighted works could be reproduced, the total quantity of stamps that could be produced, and the royalty rate that would apply to merchandise that bore the Stamp image.

27. The Postal Service has no written policy prohibiting payment of royalties on stamp sales.

28. The Postal Service has no written policy setting any upper limit on the amount that can be paid to the owner of pre-existing, copyrighted work for the use of the work on a stamp or related merchandise.

29. **The Postal Service produced approximately 86.6 million Stamps before the Stamp was retired on March 31, 2005, as well as a variety of other retail goods featuring the image of the Stamp. (Stipulated Fact 15).**

30. At the time of the hypothetical negotiation, the Postal Service produced 50-60 million stamps for an average commemorative stamp production.

31. The Postal Service predicted that the KWVM stamp would sell more than the average commemorative stamp because it printed 86 million KWVM stamps.

32. The Postal Service has asserted that it retired 6.86% of the Stamps printed. The difference represents 80,845,520 stamps with a total sales revenue potential of

$29,912.842.50.

33. **The Postal Service admits to receiving $17,726,917.19 from the sale of 47,910,587 stamps, excluding those stamps that were included in other philatelic merchandise (Stipulated Fact 18).**

34. The Postal Service has averred that it cannot account for the disposition of the stamps representing the difference between 80,845,520 stamps that were "not retired" and the 47,910,587 stamps that were admittedly sold.

35. The Postal Service's business records show that 93.14% of the total KWVM Stamps printed were distributed to the field before the stamp was retired. Defendant's Exhibit 51 in evidence.

36. The field was still calling for the stamp to be distributed right before it was taken off the market and therefore permits the presumption that the stamps already distributed to the field were sold. Defendant's Exhibit 51 in evidence. Further, Mr. Delaney testified, in response to the Court's question, that the KWVM Stamp did better than the average commemorative stamp.

37. The Postal Service was in a strong financial position at the time of the hypothetical negotiation and had positive retained earnings in Fiscal 2004, which represented 12 of the 20 months that the KWVM Stamp was being sold.

38. First class mail, including first class stamps used for postage, contributed a marginal profit of 54% during Fiscal 2004, 54.3% during Fiscal 2003, and 52.4% during Fiscal 2005.

39. Stamps which are retained and not exchanged for postal services represent pure profit for

the Postal Service.

40. At the time of the hypothetical negotiation, the Postal Service had conducted a quarterly stamp retention survey through a firm called Synovate since 1999. The Postal Service has recently described the Synovate survey as a "statistically valid national survey."

41. The Synovate survey for the quarter that the Stamp was issued showed that at least 14,500,000 of the Korean War Veterans Memorial Stamps sold were going to be retained by households that did not intend to exchange them for postal services, representing $5,400,000 in retained revenue.

42. The Synovate surveys show that, among 37 cent stamps for which the Postal Service produced data, the average retention revenue per image was $3,700,000, while the retention revenue for the KWVM stamp was $5,400,000.

43. The Synovate surveys show that, among 37 cent stamps for which the Postal Service produced data, the KWVM stamp ranked 20th in retained revenue among 82 stamps, or in the top 25%.

44. Stamps which the Postal Service's own studies show are retained should be treated, for purposes of royalty calculations, as "merchandise" and not pre-paid postage.

45. David Failor, the Manager of Stamp Services at the time of the issuance of the Stamp at issue here, described Postal Service profits of $100-200MM per year as a result of "retained" stamps in an interview with USA Today in May 2005.

46. **The Postal Service received $330,919.49 in revenue from the sales of retail goods that featured the Stamp.  (Stipulated Fact 22).**

47. The retail goods realized an overall gross profit of 80%.

48. **The Postal Service licensed third parties at a royalty of 8% of net sales for the non-exclusive right to use the image of Stamp on retail goods. The Postal Service received $17,831.93 in revenue from these licenses. (Stipulated Fact 19).**

49. Frank Gaylord has licensed the work "The Column" in arms length transactions at a rate of 10% of direct sales of merchandise.

50. Frank Gaylord has historically used a royalty rate of 10% of merchandise sales as a reasonable royalty rate.

51. Frank Gaylord has negotiated the right to receive 15-25% of the revenue from sublicensing rights in the work "The Column."

52. Frank Gaylord is entitled to a royalty of at least 10% on merchandise and sales of the Stamp that were retained by collectors.

53. David Failor, the Manager of Stamp Services at the time of the issuance of the Stamp at issue here, stated in a 2005 USA Today article that Postal Service customers want attractive stamps for their letters.

54. The Postal Service spends considerable time and resources to license or obtain attractive stamp images.

55.  The number of stamps sold and the number of stamps retained by customers varies greatly with different images. Plaintiff's Exhibit 29 in evidence.

56. Frank Gaylord is also entitled to reasonable compensation on the sales of stamps that were sold and not retained.

57.  In a hypothetical negotiation, the Postal Service and Frank Gaylord would have negotiated a running royalty on stamp sales and merchandise as that would allow the

Postal Service to pay for the use of "The Column" on the KWVM Stamp only to the extent that the stamp generated revenue for the Postal Service.

Dated: April 12, 2013                     /s/ Heidi E. Harvey
                                          Heidi E. Harvey
                                          FISH & RICHARDSON P.C.
                                          One Marina Park Drive
                                          Boston, MA 02210
                                          (617) 542-5070
                                          (617) 542-8906

                                          Attorney for Plaintiff Frank Gaylord

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on this 12th day of April, 2013.

                                          /s/ Heidi E. Harvey

21940331.doc