IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FRANK GAYLORD,

        Plaintiff,

    v.

THE UNITED STATES,

        Defendant.

No. 06-539 C

Judge Thomas C. Wheeler

---

## DEFENDANT'S POST-TRIAL BRIEF ON REMAND

---

STUART F. DELERY
Acting Assistant Attorney General

JOHN J. FARGO
Director

Of Counsel:
MICHAEL F. KIELY
United States Postal Service

SCOTT BOLDEN
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, DC  20530
Email: Scott.Bolden@USDOJ.gov
Telephone:     (202) 307-0262
Facsimile:      (202) 307-0345

July 19, 2013

REDACTED VERSION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................... iv

ISSUES PRESENTED...................................................................................1

SUMMARY OF ARGUMENT ......................................................................2

PROPOSED FINDINGS OF FACT .............................................................3

    I.    RELEVANT ESTABLISHED FACT ISSUES..................................4

    II.   PROPOSED FINDINGS OF FACT RELATING TO COMPENSATION.........................5

ARGUMENT ...............................................................................................15

    I.    GAYLORD FAILED TO MEET HIS BURDEN OF PROOF WITH RESPECT TO COMPENSATION FOR THE FIRST TWO CATEGORIES OF INFRINGING GOODS ................................17

        A.   Gaylord's Agreements are Not Comparable to a Hypothetical Stamp Licensing Agreement........................................................................18

            1.    The Gaylord-Productions Agreement Constituted a Royalty-Splitting Agreement.........................................................20

            2.    The Gaylord-KWVMDF Agreement Involved only Retail Merchandise, Such as Miniature Statues and T-Shirts.......................................................20

            3.    The Gaylord-F.J. Designs Settlement Agreement Involved only Retail Merchandise.........................................................21

            4.    The Gaylord-Alli Settlement Agreement was Litigation-Inspired and Unenforced.........................................................23

            5.    The Productions-Alli Agreement Involved Non-Parties and Retail Merchandise.........................................................24

B.    Gaylord Improperly Uses the Entire Market Value of the KWVM Stamp as his Royalty Base ..........................................................................................................25

C.    Gaylord's Expert Offered No Opinion in Support of Gaylord's Theory of Damages......................................................................................................................26

II.    Pursuant to a Hypothetical Negotiation, Gaylord and the Postal Service Would have Agreed to a Lump-Sum Payment of no more than $10,000 for use of "The Column" on the KWVM Stamp ...................................................................28

A.    The Parties' Licensing Practices Support a Lump-Sum Payment of no More Than $10,000 for Use of "The Column" on the KWVM Stamp ....................................29

B.    A Lump-Sum Royalty is Far More Appropriate than a Running Royalty.....................35

C.    The Single Lump-Sum Payment Would Have Covered Both Used and Retained KWVM Stamps.........................................................................................................37

D.    The Three-Month Retention of the KWVM Stamp Significantly Overestimates the Long-Term Retention of the KWVM Stamp ...................................................40

E.    Expert Valuation Supports a Lump-Sum Payment of No More Than $10,000 for Use of "The Column" on the KWVM Stamp .......................................................43

1.    Pursuant to the Market Approach, The Fair Market Value of a License to Use "The Column" is Minimal ....................................................................................43

2.    Pursuant to the Income Approach, Gaylord's Demand Far Overestimates the Value of "The Column" on the KWVM Stamp................................................44

3.    Pursuant to the Cost Approach, The Postal Service Would Have Paid $5,000 or Less to Use a Different Commemorative Stamp Image ................................45

4.    The Applicable Georgia-Pacific Factors Support the Government ........................46

REDACTED VERSION

III.   Pursuant to a Hypothetical Negotiation, Gaylord and the Postal Service would have agreed to $26,474 from a running royalty on Philatelic and Commercial Merchandise featuring an image of the KWVM Stamp ............................48

IV.   Gaylord is entitled to a delay compensation factor of 19.5% up through July 17, 2013 ..................................................................................................................50

CONCLUSION ........................................................................................................................51

# TABLE OF AUTHORITIES

**Cases**

Bouchat v. Baltimore Ravens Football Club, Inc.,
  346 F.3d 514 (4th Cir. 2003) ................................................... 39

Bruce v. Weekly World News, Inc.,
  310 F.3d 25 (1st Cir. 2002)................................................... 35

Cohen v. United States,
  100 Fed. Cl. 461 (2011) ................................................... 15

de Graffenried v. United States,
  25 Cl. Ct. 209 (1992) ................................................... 37

Dow Chemical Co. v. United States,
  226 F.3d 1334 (Fed. Cir. 2000)................................................... 37

Energy Transp. Group, Inc. v. William Demant Holding A/S,
  697 F.3d 1342 (Fed. Cir. 2012)................................................... 46

Gaylord v. United States,
  595 F.3d 1364 (Fed. Cir. 2010)........................................... 4, 33

Gaylord v. United States,
  678 F.3d 1339 (Fed. Cir. 2012)........................................... *passim*

Gaylord v. United States,
  85 Fed. Cl. 59 (2008) ........................................... 4, 33, 48

Gaylord v. United States,
  98 Fed. Cl. 389 (2011) ........................................... 16, 29

Georgia-Pacific Corp. v. U.S. Plywood Corp.,
  318 F. Supp. 1116 (S.D.N.Y. 1970)........................................... *passim*

Hanson v. Alpine Valley Ski Area, Inc.,
  718 F.2d 1075 (Fed. Cir. 1983)........................................... 22, 24

i4i Ltd. Partnership v. Microsoft Corp.,
  598 F.3d 831 (Fed. Cir. 2010)........................................... 46

**REDACTED VERSION**

LaserDynamics, Inc. v. Quanta Computer, Inc.,
   694 F.3d 51 (Fed. Cir. 2012) ................................................ 18, 22, 25, 47

Leesona Corp. v. United States,
   599 F.2d 958 (Ct. Cl. 1979) .................................................................. 15

Lucent Techs., Inc. v. Gateway, Inc.,
   580 F.3d 1301 (Fed. Cir. 2009) ............................................ 15, 16, 18, 25

McRoberts Software, Inc. v. Media 100, Inc.,
   329 F.3d 557 (7th Cir. 2003) ................................................................ 16

On Davis v. The Gap, Inc.,
   246 F.3d 152 (2d Cir. 2001) ............................................................ 16, 35

Panduit Corp. v. Stahlin Bros. Fibre Works,
   575 F.2d 1152 (6th Cir. 1978) .............................................................. 22

ResQNet.com, Inc. v. Lansa,
   594 F.3d 860 (Fed. Cir. 2010) .............................................................. 18

Rude v. Westcott,
   130 U.S. 152 (1889) ....................................................................... 22, 24

SmithKline Diagnostics, Inc. v. Helena Labs. Corp.,
   926 F.2d 1161 (Fed. Cir. 1991) ............................................................ 16

Stickle v. Heublein, Inc.,
   716 F.2d 1550 (Fed. Cir. 1983) ....................................................... 16, 37

Uniloc USA, Inc. v. Microsoft Corp.,
   632 F.3d 1292 (Fed. Cir. 2011) ....................................................... 18, 46

University of Colorado Foundation, Inc. v. American Cyanamid Co.,
   196 F.3d 1366 (Fed. Cir. 1999) ............................................................ 40

Waite v. United States,
   282 U.S. 508 (1931) ............................................................................ 50

Wall Data Inc. v. Los Angeles County Sheriff's Dept.,
   447 F.3d 769 (9th Cir. 2006) ................................................................ 16

Wechsberg v. United States,
   54 Fed. Cl. 158 (2002) ......................................................................... 15

Wordtech Systems, Inc. v. Integrated Networks Solutions, Inc.,
    609 F.3d 1308 (Fed. Cir. 2010)................................................................................................. 18


## Statutes

17 U.S.C. § 504......................................................................................................................15, 16

28 U.S.C. § 1498....................................................................................................... *passim*

**REDACTED VERSION**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FRANK GAYLORD,

        Plaintiff,

     v.

THE UNITED STATES,

        Defendant.

No. 06-539 C

Judge Thomas C. Wheeler

## DEFENDANT'S POST-TRIAL BRIEF ON REMAND

Pursuant to the Court's Order of June 18, 2013, Defendant, the United States ("the government"), hereby respectfully submits its Post-Trial Brief on Remand.[1]

## ISSUES PRESENTED

Section 1498(b) of Title 28 provides that where the government has infringed a copyright, it shall pay "reasonable . . . compensation" to the copyright owner. Reasonable compensation pursuant to Section 1498(b) is akin to just compensation under the Fifth Amendment. See Gaylord v. United States, 678 F.3d 1339, 1343 (Fed. Cir. 2012). Reasonable compensation is measured by the objective market value of a license in the copyrighted work lost due to the infringement, rather than by subjective and speculative assertions as to what the government has gained. Here, the following issues are presented:

1.      Whether Gaylord failed to meet his burden of proving that a reasonable royalty for the use of an image of "The Column" on the KWVM Stamp was a 10% running royalty assessed against the face value of the stamp.

---

[1] This Brief is being filed under seal because it includes information that the government has designated as Protected Information under the Protective Order in this case, including, *inter alia*, stamp retention data. See Protective Order [Dkt. No. 30].

2.      Whether Gaylord and the Postal Service would have agreed to a lump-sum royalty of $10,000 or less for use of "The Column" on the used and retained KWVM Stamps.

3.      Whether Gaylord and the Postal Service would also have agreed to an 8% running royalty on philatelic and commercial merchandise featuring an image of the KWVM Stamp.

## SUMMARY OF ARGUMENT

First, the Court should conclude that Plaintiff, Frank Gaylord ("Gaylord"), failed to prove that a reasonable royalty for the use of "The Column" on the KWVM Stamp was a 10% running royalty assessed against the face value of the used and retained stamps.  Gaylord improperly relies on financially unsuccessful settlement and license agreements that are not comparable to the infringement; and his claim that the agreements support an established royalty rate is unfounded.  Gaylord's theory of damages incorrectly assumes the entire market value of the KWVM Stamp as a royalty base, ignoring that:  (1) the retail price of a postage stamp has nothing to do with the stamp's image, and (2) "The Column" generated little to no demand for the KWVM Stamp.  And Gaylord errs by relying on the exceptionally limited testimony of his damages expert, whose opinions failed to address any of the significant issues in dispute in this case.

Second, the Court should conclude that Gaylord and the Postal Service would have agreed to a lump-sum royalty of $10,000 or less for use of "The Column" on used and retained KWVM Stamps.  To the extent that Gaylord's agreements have any relevance, the agreements demonstrate that he was willing to license "The Column" for very modest amounts of money – even for free.  At the same time, the Postal Service's agreements show that artists, photographers, and other rights-holders eagerly negotiated a lump-sum royalty of $5,000 or less in return for the honor and prestige of having their works featured on commemorative stamps.  In

situations where a rights-holder refused to negotiate and demanded a running royalty based on stamp revenues, the Postal Service sought out and used alternative art for a stamp issue. Furthermore, reasonable parties to the hypothetical negotiation would have preferred the use of a lump-sum royalty, and Gaylord offered no evidence that anyone in the postal industry would have ever negotiated a stamp image license using a running royalty.  And with respect to the retained stamps, a running royalty is especially unsuitable in this case because Gaylord failed to show a causal link between the use of "The Column" and the retention revenues.  The evidence actually contradicts any alleged link, because the KWVM Stamp underperformed the average of other stamps.  Finally, as demonstrated by the government's damages expert, a lump-sum royalty of $10,000 or less is supported by a series of industry-accepted quantitative and qualitative measures, including:  (1) the market approach; (2) the income approach; (3) the cost approach; and (4) analysis of the applicable <u>Georgia-Pacific</u> factors.

Third, the Court should conclude that Gaylord and the Postal Service would also have agreed to an 8% running royalty on philatelic and commercial merchandise featuring an image of the KWVM Stamp.  The only dispute is whether an 8% or 10% royalty should apply, and the commercial merchandise licenses and agreements in the record strongly suggest that an 8% royalty is more appropriate.  With an 8% royalty, Gaylord's compensation for the philatelic and commercial merchandise is $26,474.

Finally, the parties stipulated to a delay compensation factor through July 17, 2013, and agreed to negotiate any adjustment to the factor for a judgment entered thereafter.

## PROPOSED FINDINGS OF FACT

All issues in the case, including the determination of the proper amount of compensation, were previously before the Court during a previous trial in 2008.  <u>See generally</u> <u>Gaylord v.</u>

United States, 85 Fed. Cl. 59, 64-65 (2008).  In prior proceedings, the Court made a number of findings of fact that were upheld on appeal, see generally Gaylord v. United States, 595 F.3d 1364 (Fed. Cir. 2010), and are directly relevant to the present issues before the Court.  The government has attempted to identify those established findings of fact below.  The government's proposed findings of fact follow the established findings of fact.  The parties have also agreed to a number of potentially relevant stipulations.  See Stip. Facts [Dkt. No. 31]; Stipulation [Dkt. No. 97]; Stip. Facts [Dkt. No. 98].

## I.     RELEVANT ESTABLISHED FACT ISSUES

1.     The 2003 Korean War Veterans Memorial stamp ("the KWVM Stamp"), see Stip. Facts ¶¶ 13-14, caused no harm either to the value of "The Column" or to the market for derivative works.  See 85 Fed. Cl. at 70; 595 F.3d at 1375.

2.     The Postal Service's use of "The Column" in the KWVM Stamp increased the value of "The Column."  See 85 Fed. Cl. at 70; 595 F.3d at 1375.

3.     Plaintiff Frank Gaylord ("Gaylord") has never sold photographs, postcards, magnets, or keychains of "The Column."  See 85 Fed. Cl. at 70.

4.     Although Gaylord sold several ten- to twelve-inch miniatures of the soldiers within two or three years after the completion of "The Column," there was limited interest in these miniatures because their price was too high.  See 85 Fed. Cl. at 70.

5.     Gaylord permitted the foundry to destroy the molds used to make miniatures approximately five years before trial in 2008.  See 85 Fed. Cl. at 70-71.

6.     The KWVM Stamp is not an adequate commercial substitute for any products sold by Gaylord.  See 85 Fed. Cl. at 71; 595 F.3d at 1375.

## II.      PROPOSED FINDINGS OF FACT RELATING TO COMPENSATION

### Gaylord's Licensing Activity

1.      <u>KWVM Productions Agreement (PX 17).</u>  On February 8, 1995, Gaylord entered into an exclusive license agreement with Cooper-Lecky Architects, P.C. ("CLA"), Louis Nelson ("Nelson"), and KWVM Productions, Inc.  <u>See</u> PX 17.  Pursuant to this agreement, the parties agreed to split any revenues received from licensing the KWVM.  <u>See id.</u> at 4-6; Tr. II at 48:17-25 (Triano).[2]  The amount of the split depended on the work(s) subject to the license.  <u>See id.</u>  On September 3, 1995, Gaylord sent a letter terminating the license agreement effective October 4, 1995.  <u>See</u> PX 24; Tr. II at 58:8-11 (Triano).

2.      On March 9, 1995, Gaylord received one-third of a lump-sum payment of $50,000 that was sent from the Korean War Veterans Memorial Dedication Foundation, Inc. ("KWVMDF" or "World Travel") to KWVM Productions, Inc.   <u>See</u> DX 46 at G2602.  KWVMDF provided this lump-sum payment pursuant to a separate agreement with KWVM Productions, Inc. that is not in the record.  <u>See</u> Tr. II at 52:5-53:4, 66:4-47:15 (Triano) (receiving $16,666.66 after the payment was split between CLA, Nelson, and Gaylord).

3.      <u>KWVMDF Agreement (PX 18).</u>  On March 13, 1995, Gaylord entered into an exclusive license agreement with KWVMDF.  <u>See</u> PX 18.  Pursuant to this agreement, Gaylord licensed "The Column" for use on commercial memorabilia and merchandise in return for 10% of KWVMDF's revenues on commercial merchandise featuring "The Column."  <u>See id.</u> at 2-4.  Gaylord contractually agreed to remit back to KWVMDF "a portion of the net proceeds (not less than twenty per cent (20%) thereof)."  <u>Id.</u> at 4.  Gaylord received a total of $2,446.93 in royalties

---

[2] Citations to the transcript are in the form of "Tr. [I/II] at xxx:yy (zzzzz)", where "xxx" represents the page number, "yy" represents the line number, and "zzzzz" represents the name of the witness or other speaker.  "Tr. I" refers to the transcript from the trial held on June 16-20, 2008; "Tr. II" refers to the transcript from the trial on remand held on May 13-14, 2013.

from KWVMDF for commercial merchandise featuring "The Column."  See DX 46 at G2602-05; Tr. II at 65:22-25 (Triano).  On December 31, 1996, the license agreement between Gaylord and KWVMDF expired.  See PX 18 at 2; DX 46 at G2605; Tr. I at 340:6-14 (Triano); Tr. II at 65:18-21 (Triano).

4.      The only products sold by KWVMDF pursuant to this license agreement were T-shirts and miniature statues.  See DX 27 at FG 691; DX 101 at FG 562-63; DX 102 at FG 605-08; DX 103 at FG 624-25; Tr. II at 68:4-7 (Triano).  These products depicted one or more of the individual solider statutes, and did not depict the soldier(s) as installed in the KWVM.  See Tr. I at 327:19-28:19 (Triano); Tr. II at 47:11-13 (Triano).

5.      F.J. Designs Agreement (PX 25).  On September 2, 2002, Gaylord entered into a non-exclusive letter agreement with F.J. Designs.  See PX 25.  Gaylord and F.J. Designs negotiated the agreement after Gaylord threatened litigation.  See DX 117; Tr. II at 72:6-19 (Triano).  Pursuant to this agreement, Gaylord agreed "to release F.J. Designs, Inc. from any present or future liability for" the copyrights related to "The Column" in return for a payment of $650.00.  PX 25.  The payment was calculated by assessing a 10% royalty against the wholesale sales for "the wooden replica of the Korean War Veterans Memorial, item #279."  Id.

6.      From August 22, 2000 through at least May 13, 2013, the $650 payment from F.J. Designs was the only income that Gaylord received related to "The Column."  See DX 40; DX 43 (RFA 13); DX 139; DX 146; Tr. II at 77:11-25 (Triano).

7.      Gaylord's last commercial project was completed in 2002.  See DX 46 at G2609. After completing that project, Gaylord closed his studio and retired from commercial sculpting. See Tr. I at 207:3-23 (Gaylord); Tr. I at 320:20-21:2, 337:3-7 (Triano).

8.      Gaylord – Alli Agreement (DX 41).  On April 25, 2007, Gaylord entered into a non-exclusive settlement agreement with John Alli ("Alli").  See DX 41.  Gaylord and Alli negotiated the agreement after Gaylord initiated litigation against Alli.  See id. at 1 ¶ 4.  Pursuant to this agreement, Gaylord agreed to "waive[] all claims for [past] damages against Alli personally"; agreed to non-exclusively license Alli to use "The Column" by assessing a 10% royalty against future net retail sales revenues for Alli's photograph (titled "Real Life") and by assessing a 25% royalty against compensation received from third parties.  Id. at 4-5.

9.      Despite the terms of the agreement between Gaylord and Alli, Alli has never paid Gaylord any royalties under the 2007 settlement agreement.  See DX 146; Tr. II at 79:2-12 (Triano).  Alli testified that he had sold two copies of "Real Life" in 2008.  See Tr. I at 386:7-19 (Alli).

10.      The Postal Service's use of "The Column" did not harm any of Gaylord's actual business prospects.  See DX 43 (RFA 18); Tr. I at 209:7-10 (Gaylord).

11.      The Postal Service's use of "The Column" did not harm any of Gaylord's potential business prospects.  See Tr. I at 209:11-13 (Gaylord).

12.      Since August 22, 2000, Gaylord has not attempted to commercialize "The Column."  See Tr. I at 194:12-13, 196:4-11, 208:10-14, 209:14-16 (Gaylord); Tr. I at 331:15-18 (Triano); DX 40; DX 46 at G2607-09.

13.      Third-parties had little interest in licensing "The Column" from Gaylord, despite Gaylord's efforts.  See DX 25; DX 28 at 2; Tr. II at 68:24-70:4 (Triano).

14.      Gaylord has agreed to license the use of "The Column" for no compensation.  See Tr. I at 301:3-302:9 (Triano); DX 41; DX 146; Tr. II at 79:2-12 (Triano); see generally Tr. I at 304:22-24 (Triano).

**The Postal Service and its Negotiations to Acquire Stamp Images**

15.     A postage stamp is essentially a pre-paid voucher for the Postal Service's worldwide delivery services.  <u>See</u> Tr. II at 162:15-22, 223:13-24 (Owens); Tr. II at 283:4-19 (Kearney); <u>see also</u> Tr. I at 625:15-19, 649:2-8 (Failor).

16.     A postage stamp's retail price is primarily attributable to its ability to send mail. <u>See</u> Tr. II at 162:23-163:6 (Owens); <u>see also</u> Tr. II at 261:22-262:15 (Kearney).

17.     The postage stamp's retail price is not attributable to its image.  <u>See</u> Tr. II at 163:7-9 (Owens); Tr. II at 309:3-6 (Kearney).

18.     The Postal Service negotiates with artists to acquire the right to use an artist's work on a stamp.  <u>See</u> Tr. I at 587:1-25 (McCaffrey); Tr. II at 123:4-126:17, 128:14-21, 160:9-18 (Owens).

19.     In situations where the Postal Service and an artist have negotiated payment for the right to use a particular image on a stamp, the Postal Service's payment has always been in the form of a one-time lump-sum royalty payment.  <u>See</u> Tr. I at 383:11-25 (Alli); Tr. I at 587:11-588:3 (McCaffrey); Tr. II at 161:9-162:17 (Owens).  While the amount of the lump-sum royalty is negotiable, the Postal Service has never agreed to pay a running royalty to the artist based on the face value of the postage.  <u>See</u> Tr. I at 587:11-588:3 (McCaffrey); Tr. II at 192:21-193:21 (Owens).

20.     In return for the one-time lump-sum royalty payment, the Postal Service always receives at least the exclusive right to use the image on a stamp and related philatelic products. <u>See</u> Tr. I at 383:21-25 (Alli); Tr. II at 123:5-124:14, 125:6-15 (Owens).  In each of the ten Postal Service agreements in the record, the Postal Service received the right to use a licensed image on a stamp and related philatelic products, and the Postal Service usually received the right to use

the image on other commercial products as well.  See <em>infra</em> Table 3 (summarizing DX 105-106, DX 109-110, DX 113, DX 118-121, DX 123).

21.     As of 2008, the highest one-time lump-sum royalty payment ever negotiated by the Postal Service to acquire the right to use an image for a stamp was $5,000.  See Tr. I at 587:11-588:3 (McCaffrey); Tr. II at 162:10-14 (Owens); see also Tr. II at 161:9-162:9 (Owens).

22.     Having one's work depicted on a commemorative stamp is generally considered a great honor that increases the value of the work.  See DX 43 (RFA 20); Tr. I at 384:1-16 (Alli); Tr. II at 192:7-14, 193:11-21, 194:3-17 (Owens).

23.     In situations where the Postal Service is unable to acquire the rights to use a particular image for a stamp issue, the Postal Service uses alternative subjects and/or images for the stamp issue.  See Tr. II at 191:17-23, 192:15-20, 221:16-22 (Owens).

**Postal Service Stamp Retention**

24.     Every stamp issued by the Postal Service is retained by collectors.  See Tr. II at 239:11-240:2 (Kearney).

25.     Collectors retain stamps for any number of reasons, including interest in all stamps generally, interest in a particular subject, or interest in certain types of stamps.  See Tr. II at 236:12-24, 239:23-240:2 (Kearney); see also Gaylord, 678 F.3d at 1345 ("Collectors may retain stamps for any number of reasons, including a preference for the image itself or a desire to obtain a particular stamp to compete a collection.") (citing PX 29 at 6, 51-52).

26.     Between 1999-2012, the Postal Service contracted with a company named Synovate[3] to track the retention of commemorative stamps.  See Tr. I at 448:21-450:4 (Delaney); Tr. I at 601:11-603:3 (McCaffrey); Tr. I at 621:13-622:5, 623:4-7 (Failor); Tr. II at 152:10-16,

---

[3] In 2011, Synovate was merged into another market research firm named Ipsos.

195:8-196:7 (Owens); Tr. II at 231:10-20 (Kearney).    Synovate tracked retention of commemorative stamps by conducting a one-time quarterly survey for the commemorative stamps issued during the previous quarter.  See id.  Synovate provided its estimated short-term retention results to the Postal Service in a series of quarterly and annual reports.  See PX 29 (Q4 2003 Report); DX 125 (2003 Annual Report); DX 131 (2004 Annual Report); DX 135 (2005 Annual Report); DX 136 (2006 Annual Report); DX 138 (2007 Quarterly Reports); DX 140 (2008 Quarterly Reports); DX 141 (2009 Quarterly Reports); DX 142 (2010 Quarterly Reports); DX 144 (2011 Quarterly Reports); DX 147 (2012 Quarterly Reports).

27.    The Postal Service's Stamp Services group used the estimated short-term retention results from the Synovate reports to analyze the relative popularity of various commemorative stamp issues.  See Tr. I at 623:4-16 (Failor).

28.    The estimated short-term retention of a particular stamp issue is not equivalent to – and is actually far greater than – the long-term retention of the stamp issue.  See Tr. I at 624:25-625:19 (Failor); Tr. II at 201:14-202:20 (Owens); Tr. II at 234:13-236:3 (Kearney).  Prior to 2011, the Postal Service did not have a way to derive estimated long-term retention from the estimated short-term retention survey results.  See Tr. I at 627:15-628:12, 633:20-634:13 (Failor); see also Tr. I at 601:20-603:3 (McCaffrey).

29.    The estimated short-term retention of a particular stamp issue is far greater than the long-term retention of the stamp issue because some purchasers who initially retain a stamp lose interest after the first three months.  Over the course of a year, some initially-retained stamps are used for postage, given to others as gifts, or lost.  See Tr. I at 625:6-19 (Failor); Tr. II at 202:5-20 (Owens); Tr. II at 235:14-236:3 (Kearney).

30.     In 2011 and 2012, the Postal Service retained Synovate to conduct additional surveys to determine how retention changed over a twelve-month period, as opposed to the three-month period used in the past.  See DX 145 at 6-10; Tr. II at 235:2-13 (Kearney).

31.     As a result of the additional surveys, Synovate and the Postal Service concluded that the long-term retention rate of a stamp is approximately 54% of the short-term retention rate of that same stamp.  See DX 145 at 9; Tr. II at 237:12-20 (Kearney).

**The KWVM Stamp**

32.     The KWVM Stamp in this case consists of expressive elements from at least three sources:  Gaylord, Alli, and the Postal Service.  See DX 37; Tr. I at 583:7-585:21 (McCaffrey).

33.     The KWVM Stamp was below average with respect to its retention in comparison with the retention of other commemorative stamps surveyed in the same fiscal quarter of 2003. See Tr. I at 659:13-660:2 (Failor); PX 29 at 5:



34.     The KWVM Stamp was at or below average with respect to its retention in comparison with the retention of other commemorative military stamps.  See DX 151 at 17-18; DX 151 Exhibit 8 (identifying sources); Tr. II at 383:21-385:19 (Bokhart); DX 135 at G100452:



The average three-month retention rate for other commemorative military stamps was ▮▮%. The KWVM Stamp's three-month retention rate was significantly lower – 18.1%.  See DX 151 Exhibit 8.

35.    The KWVM Stamp was below average with respect to its retention in comparison with the retention of other 2003 commemorative stamps.  See DX 151 at 17-18; DX 151 Exhibit 9 (identifying sources); Tr. II at 383:21-385:19 (Bokhart).  The average three-month retention rate for the other 2003 commemorative stamps was ▮▮%.  The KWVM Stamp's three-month retention rate was lower – 18.1%.  See DX 151 Exhibit 9.

36.    The KWVM Stamp was below average with respect to its retention in comparison with respect to commemorative stamps as a whole.  See DX 151 at 17-18; DX 151 Exhibit 10 (identifying sources); Tr. II at 383:21-385:19 (Bokhart).  The average three-month retention rate for the other commemorative stamps in the Synovate surveys of record was ▮▮%.  The KWVM Stamp's three-month retention rate was lower – 18.1%.  See DX 151 Exhibit 10.

**Valuation of a Hypothetical License Agreement**

37.    Pursuant to the market approach, the value of a copyright license for "The Column," as it relates to the KWVM Stamp, is far less than 10% of the revenue of the KWVM Stamp, and minimal at best.  See DX 151 ¶¶ 74-89; Tr. II at 363:22-373:25 (Bokhart).

38.     Pursuant to the income approach, the incremental revenue of the KWVM Stamp as compared to a mail use stamp was $███████, at most.  The incremental revenue does not represent the income attributable to any demand generated by "The Column."  See DX 151 ¶¶ 90-93; Tr. II at 374:1-390:6 (Bokhart).

39.     Pursuant to the cost approach, the Postal Service would have paid less than $5,000 for the rights to use a different image on the KWVM Stamp.  See DX 151 ¶¶ 94-99; Tr. II at 374:1-390:6 (Bokhart).

40.     The applicable <u>Georgia-Pacific</u> factors support the government's theory of compensation, and do not support Gaylord's theory of compensation.  See DX 151 ¶¶ 100-117; Tr. II at 390:7-395:23 (Bokhart).

**Structure of a Hypothetical License**

41.     In a hypothetical negotiation, the Postal Service would have been in a stronger negotiating position than Gaylord.  See Tr. II at 392:22-395:5 (Bokhart).  None of Gaylord's license agreements were financially successful.  See Gov. Facts ¶¶ 1-9.  None of Gaylord's other marketing and licensing efforts were successful.  See Gov. Facts ¶¶ 12-13.  The Postal Service had an established licensing program for a product that provided many tangible and intangible benefits to the rights-holders.  See Gov. Facts ¶¶ 15-23.

42.     The lump-sum licenses that the Postal Service negotiated with rights-holders are more indicative of the outcome of a hypothetical negotiation than Gaylord's unsuccessful running royalty licenses for commercial merchandise.  See Tr. II at 373:6-25, 390:18-391:16, 393:8-394:8 (Bokhart).  For example, Horst Hamann Photography agreed to license a "vertical photograph of Atlas statue" to the Postal Service for use on a stamp, philatelic products, and other products in return for a lump-sum payment of $500.  See DX 109.  The Art Institute of

Chicago agreed to license "Young Mother, 1888, by Mary Cassatt" to the Postal Service for use on a stamp, philatelic products, and other products in return for a lump-sum payment of $1,000. See DX 110.  John Alli agreed to license "Real Life" to the Postal Service for use on a stamp and philatelic products in return for a lump-sum payment of $1,500.  See DX 118.  Nicolas Ekstrom agreed to license "Black Sun" to the Postal Service for use on a stamp, philatelic products, and other products in return for a lump-sum payment of $2,500.  See DX 119.  The Isamu Noguchi Garden Museum / Foundation agreed to license "Akari 25N" to the Postal Service for use on a stamp and philatelic products in return for a lump-sum payment of $2,500.  See DX 120.  VAGA agreed to license "Mother and Child, 1944-45" to the Postal Service for use on a stamp and philatelic products in return for a lump-sum payment of $5,000.  See DX 121.  Todd Eberle agreed to license "Walt Disney Concert Hall (Disney 2A)" to the Postal Service for use on a stamp and philatelic products in return for a lump-sum payment of $5,000.  See DX 123.  Walt Disney Company agreed to license use of some of its works on commemorative stamps without any payment.  See Tr. II at 194:3-17 (Owens); see also Tr. II at 193:11-21 (Owens).

43.     Between 2003 and 2005, the Postal Service largely did not track specific sales of the KWVM Stamp.  See PX 32, 34; Tr. II at 311:24-312:5 (Delaney).

44.     The recordkeeping required for a running royalty for tens of millions of 37¢ stamps that were sold for less than two years would have been onerous for Gaylord and the Postal Service.  See Tr. I at 321:3-14 (Triano); Tr. II at 311-24-312:5, 324:21-325:3 (Delaney); see also DX 151 ¶ 125; see generally Stip. Facts ¶¶ 13-15, 18.

45.     In a hypothetical negotiation, Gaylord and the Postal Service would have agreed to use a lump-sum royalty, rather than a running royalty applied to the face value of each KWVM Stamp.  See Tr. II at 395:24-398:10 (Bokhart); see also DX 151 ¶¶ 124-125.

REDACTED VERSION

46.     A hypothetical negotiation between Gaylord and the Postal Service for the use of "The Column" on used and retained KWVM Stamps would have resulted in a lump-sum royalty of no more than $10,000.  See Tr. II at 395:16-399:13 (Bokhart).

47.     Gaylord and the Postal Service would also have also agreed to separately negotiate a royalty for the commercial merchandise featuring the KWVM Stamp.  See, e.g., PX 205; Tr. II at 128:14-21 (Owens); Tr. I at 384:11-13 (Alli).  The parties would have agreed to an 8% running royalty of the revenues the Postal Service's philatelic and commercial merchandise.  See PX 18 at 3-4; Tr. I at 323:16-23 (Triano); Stip. Facts ¶ 19.  An 8% running royalty of the revenues of the Postal Service's philatelic and commercial merchandise would have yielded $26,474.  See Stip. Facts ¶¶ 20, 22.

## ARGUMENT

Section 1498(b) of Title 28 provides that where the government has infringed a copyright, it shall pay "reasonable . . . compensation" to the copyright owner.  Reasonable compensation pursuant to Section 1498(b) is akin to just compensation under the Fifth Amendment.  See Gaylord, 678 F.3d at 1343 (citing Leesona Corp. v. United States, 599 F.2d 958, 968-69 (Ct. Cl. 1979)).  The methods of determining "actual damages" pursuant to Section 504(b) of Title 17 can be used to determine reasonable compensation for the taking of "what is essentially a compulsory, non-exclusive [copyright] license."  Id.

Plaintiff, Frank Gaylord ("Gaylord"), bears the burden of proof with respect to the quantum of reasonable compensation.  See Cohen v. United States, 100 Fed. Cl. 461, 478-79 (2011); Wechsberg v. United States, 54 Fed. Cl. 158, 166 (2002) ("A recovery of 'reasonable and entire compensation' [under 28 U.S.C. § 1498(b)] suggests that the burden of proof lies with Plaintiff."); see also Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1324 (Fed. Cir. 2009)

REDACTED VERSION

(with respect to a hypothetical negotiation in the context of patent infringement, "[t]he burden of proving damages falls on the patentee"); SmithKline Diagnostics, Inc. v. Helena Labs. Corp., 926 F.2d 1161, 1164 (Fed. Cir. 1991) ("the amount of a prevailing party's damages is a finding of fact on which the plaintiff bears the burden of proof by a preponderance of the evidence").

A lost license fee is recoverable as actual damages pursuant to Section 504(b) of Title 17, but the lost license fee cannot be "based on undue speculation."  On Davis v. The Gap, Inc., 246 F.3d 152, 166 (2d Cir. 2001); Wall Data Inc. v. Los Angeles County Sheriff's Dept., 447 F.3d 769, 786 (9th Cir. 2006); McRoberts Software, Inc. v. Media 100, Inc., 329 F.3d 557, 566 (7th Cir. 2003).  Similarly, the Federal Circuit has repeatedly held that hypothetical royalty awards for patent infringement must be supported by substantial evidence.  See Lucent, 580 F.3d at 1335 (vacating a jury's damage award as "based mainly on speculation or guesswork," rather than "supported by substantial evidence").  Furthermore, any license emerging from a hypothetical negotiation must be one that would be considered reasonable by the relevant industry.  See Stickle v. Heublein, Inc., 716 F.2d 1550, 1561-62 (Fed. Cir. 1983).  In this case, this Court and the Federal Circuit have each concluded that Gaylord can recover the fair market value of a license based on a hypothetical, arms-length negotiation between the parties.  See Gaylord v. United States, 98 Fed. Cl. 389, 392 (2011); Gaylord, 678 F.3d at 1343 ("When, as in this case, the plaintiff cannot show lost sales, lost opportunities to license, or diminution in the value of the copyright, many circuits award actual damages based on the fair market value of a license covering the defendant's use.") (citations omitted).  The Federal Circuit suggested that the Court consider whether different license fees are appropriate for "three categories of infringing goods":

> (1) stamps used to send mail; (2) unused stamps purchased by collectors; and (3) commercial merchandise featuring an image of the stamp.

Gaylord, 678 F.3d at 1344-45.

In this case, Gaylord asserts that he is entitled to a running royalty of 10% assessed against the retail sales of each of the three categories of infringing goods.[4]  Gaylord has not met his burden of proof with respect to proving entitlement to a 10% running royalty for the three categories of infringing goods.  Instead, the record shows that Gaylord is entitled to a lump-sum royalty of no more than $10,000 for the first two categories of infringing goods.  The government stipulates that Gaylord is entitled to a running royalty of 8% for the commercial merchandise featuring an image of the KWVM Stamp.  Finally, the parties have stipulated to a delay compensation factor of 19.5% from July 27, 2003 through July 17, 2013, and have agreed to negotiate in good faith any adjustment to the factor for a judgment entered after July 17, 2013.  See Stipulation [Dkt. No. 97].

## I.  GAYLORD FAILED TO MEET HIS BURDEN OF PROOF WITH RESPECT TO COMPENSATION FOR THE FIRST TWO CATEGORIES OF INFRINGING GOODS

Gaylord failed to meet his burden of proving entitlement to a 10% running royalty assessed against the face value of the KWVM Stamp.  In a misplaced attempt to prove his case, Gaylord improperly relies upon:  (1) agreements that are not comparable to the hypothetical negotiation in this case; (2) the entire market value rule; and (3) exceptionally limited expert testimony.  Accordingly, the Court should reject his demand for $3,024,376.20[5] as unduly

---

[4] In his pretrial brief, Gaylord asserts that he is entitled to "at least a 10% royalty on infringing merchandise and infringing stamps retained by collectors," as well as "at least a 10% royalty on infringing stamps used for mail to the extent by which the sales of the KWVM Stamp for mail use exceeded the sales for mail use of the average 37 cent commemorative stamp."  Gaylord Pre-Trial Brief at 6 [Dkt. No. 107].  Gaylord, however, did not present any evidence or argument during the remanded trial regarding the extent sales of used KWVM Stamps exceeded the average, and did not present any argument regarding the precise amount of compensation sought.
[5] See Gaylord Supplemental Brief on Damages at 10 [Dkt. No. 77].

speculative because it far exceeds the evidence of what reasonable parties would have agreed to in a hypothetical negotiation.[6]

A.     **Gaylord's Agreements are Not Comparable to a Hypothetical Stamp Licensing Agreement**

First, Gaylord's assertion of entitlement to a 10% running royalty is built upon a shaky foundation of largely incomparable agreements. The Federal Circuit has repeatedly held that a plaintiff cannot support its claim of a reasonable royalty by relying on license agreements that are "radically different from the hypothetical agreement under consideration." Lucent, 580 F.3d at 1327; see also Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1316-17 (Fed. Cir. 2011); ResQNet.com, Inc. v. Lansa, 594 F.3d 860, 870-72 (Fed. Cir. 2010); Wordtech Systems, Inc. v. Integrated Networks Solutions, Inc., 609 F.3d 1308, 1319-21 (Fed. Cir. 2010). The hypothetical agreement under consideration in this case would consist of the Postal Service's payment of a reasonable license fee to Gaylord for the use of "The Column" on the three categories of infringing goods. Gaylord, 678 F.3d at 1343-44. Between 1995 and the present, Gaylord authorized the use of "The Column" in a total of four different written agreements. See *infra* Table 1. While Gaylord's 1995 agreement with KWVMDF is arguably relevant to a hypothetical license for the use of "The Column" on commercial merchandise, **none** of Gaylord's four agreements is comparable to a license for the use of "The Column" **on used stamps and retained stamps**. See Uniloc, 632 F.3d at 1317 ("The meaning of [Lucent, ResQNet, and Wordtech] is clear: there must be a basis in fact to associate the royalty rates used in prior licenses to the particular hypothetical negotiation at issue in the case."). Gaylord's four

---

[6] The parties have agreed that the date of the hypothetical negotiation is July 27, 2003, the date the Postal Service issued the KWVM Stamp. See Stip. Facts ¶¶ 14, 21; see generally LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51, 75 (Fed. Cir. 2012).

license agreements are summarized in the following Table, and described in detail in the following subsections of this Brief:

| Begin Date and Term | Licensor / Licensee | Licensed Work / Goods Produced Subject to Royalty | Agreement Type Summary of Terms / Total Royalties Paid | Record |
|---|---|---|---|---|
| 2/8/1995 to 10/4/1995 | **Gaylord**, CLA, and Nelson<br><br>KWVM Productions, Inc. | Copyright: "The Column", CLA copyrights, and Nelson copyrights.<br><br>N/A | License Agreement<br><br>85% Licensing Revenue to Gaylord on a license limited to the Gaylord Work;<br><br>42.5% Licensing Revenue to Gaylord and to CLA or Nelson for a dual-authored work;<br><br>28.33% Licensing Revenue to each for a Combined Authorship License.<br><br>**Total Royalties Paid:  Not applicable, the agreement was a royalty-splitting agreement** | PX 17, PX 24 |
| 3/13/1995 to 12/31/1996 | **Gaylord**<br><br>KWVMDF (aka World Travel) | Copyright: "The Column"<br><br>Miniature statues and T-shirts | License Agreement<br><br>10% of Product Revenue<br><br>15% of all Sublicensed Product Revenue<br><br>Gaylord agreed to pay not less than 20% of his net royalty proceeds back to KWVMDF<br><br>**Total Royalties Paid:  $2,446.93** | PX 18 |
| 9/2/2002 | **Gaylord**<br><br>F.J. Designs | Copyright: "The Column"<br><br>Wooden replica of the Korean War Veterans Memorial, item #279 | Settlement Agreement<br><br>One-time lump-sum payment of 10% of wholesale sales ($650); full release for any present or future liability<br><br>**Total Royalties Paid:  $650** | PX 25 |
| 4/25/2007 to present | **Gaylord**<br><br>Alli | Copyright: "The Column"<br><br>None | Settlement Agreement, General Release, and Copyright Non-Exclusive License<br><br>All claims for past damages waived<br><br>10% of the net retail sales revenue for "Real Life"<br><br>25% of the compensation received by Alli from sublicensing third parties<br><br>**Total Royalties Paid:  $0** | DX 41 |

**Table 1.  A summary of Gaylord's license agreements involving "The Column."**

### 1.   *The Gaylord-Productions Agreement Constituted a Royalty-Splitting Agreement*

The 1995 agreement between Gaylord, Louis Nelson ("Nelson"), Cooper-Lecky Architects ("CLA"), and KWVM Productions, Inc. was a short-lived royalty-splitting arrangement, and is thus not comparable to the hypothetical agreement.  Pursuant to this agreement, the parties agreed to split any revenues received from licensing the KWVM.  See PX 17 at 4-6; Tr. II at 48:17-25 (Triano).  The amount of the split depended on the work(s) subject to the license.  See id.  Gaylord unilaterally terminated the license agreement eight months after its effective date.  See PX 24; Tr. II at 58:8-11 (Triano).  The agreement provides no evidence of a commercially valid royalty rate applied against particular goods in the marketplace.  Nevertheless, the royalty-splitting arrangement demonstrates that Gaylord was willing to split royalties amongst each of the parties who contributed to a licensed work.  See *infra* Section II.E.2.

### 2.   *The Gaylord-KWVMDF Agreement Involved only Retail Merchandise, Such as Miniature Statues and T-Shirts*

The 1995-1996 agreement between Gaylord and KWVMDF is not comparable to the hypothetical agreement for used and retained stamps because the 1995 agreement applied to commercial merchandise.  Pursuant to the Gaylord-KWVMDF agreement,[7] Gaylord licensed "The Column" for use on commercial memorabilia and merchandise in return for 10% of KWVMDF's revenues on commercial merchandise featuring "The Column."  See PX 18 at 2-4. The effective royalty rate of the license, however, was 8% because Gaylord contractually agreed to remit back to KWVMDF "a portion of the net proceeds (not less than twenty per cent (20%) thereof)."  Id. at 4.

---

[7] Prior to his agreement with KWVMDF, Gaylord received one-third of a lump-sum payment, but KWVMDF provided this lump-sum payment pursuant to a separate agreement between KWVM Productions and KWVMDF that is not in the record.  See Gov. Facts ¶ 2.

T-shirts and miniature statues were the only commercial merchandise products sold by KMVMDF pursuant to the license agreement with Gaylord.  See DX 27 at FG 691; DX 101 at FG 562-63; DX 102 at FG 605-08; DX 103 at FG 624-25; Tr. II at 68:4-7 (Triano).  These products depicted one or more of the individual solider statutes, and did not depict the soldier(s) as installed in the KWVM.  See Tr. I at 327:19-28:19 (Triano); Tr. II at 47:11-13 (Triano).

The agreement was not financially successful for KWVMDF and Gaylord.  In a letter dated February 8, 1996, Triano acknowledged that the agreement was unsuccessful.  See DX 25 ("At this point in time, the veterans have very little interest in the Memorial's products.").  Gaylord received a total of $2,446.93 in royalties from KWVMDF for commercial merchandise featuring "The Column" up through the expiration of the license agreement.  See DX 46 at G2602-05; Tr. II at 65:22-25 (Triano).

Accordingly, the 1995 Gaylord-KWVMDF agreement for licensed commercial merchandise is not comparable to a 2003 hypothetical agreement between Gaylord and the Postal Service for licensed commemorative stamps (whether used or retained).  The agreement, however, is arguably relevant to the parties' hypothetical negotiation for the use of "The Column" on commercial merchandise.  See infra Section III.

### 3.  The Gaylord-F.J. Designs Settlement Agreement Involved only Retail Merchandise

The 2002 settlement agreement between Gaylord and F.J. Designs is not comparable to the hypothetical agreement for used and retained stamps because the settlement agreement applied to commercial merchandise.  See PX 25 ("for the wooden replica of the Korean War Veterans Memorial, item #279").  F.J. Designs entered into the settlement agreement after Gaylord threatened litigation.  See DX 117; Tr. II at 72:6-19 (Triano).  Pursuant to this settlement agreement, Gaylord agreed "to release F.J. Designs, Inc. from any present or future liability for" the copyrights related to "The Column" in return for a lump-sum payment of

$650.00, calculated by assessing a 10% royalty against the wholesale sales of the commercial merchandise.  PX 25.

As a result, the 2002 Gaylord-F.J. Designs settlement agreement for a wooden replica of the Korean War Veterans Memorial is not comparable to a 2003 hypothetical agreement between Gaylord and the Postal Service for licensed commemorative stamps (whether used or retained) and licensed merchandise.  In addition, this settlement agreement cannot constitute evidence of an established royalty because the parties entered into the agreement after Gaylord threatened to sue.  See Rude v. Westcott, 130 U.S. 152, 164 (1889) ("It is clear that a payment of any sum in settlement of a claim for an alleged infringement cannot . . . determin[e] the damages sustained by the owners of the patent in other cases of infringement."); LaserDynamics, 694 F.3d at 77 (noting the court's "longstanding disapproval of relying on settlement agreements to establish reasonable royalty damages"); Hanson v. Alpine Valley Ski Area, Inc., 718 F.2d 1075, 1078-79 (Fed. Cir. 1983) ("[S]ince the offers were made after the infringement had begun and litigation was threatened or probable, their terms should not be considered evidence of an established royalty.") (citation omitted).  Settlement agreements are not reliable evidence of an established royalty rate because "license fees negotiated in the threat of high litigation costs may be strongly influenced by a desire to avoid full litigation." Hanson, 718 F.2d at 1078-79 (quoting Panduit Corp. v. Stahlin Bros. Fibre Works, 575 F.2d 1152, 1164 n.11 (6th Cir. 1978)); see also Rude, 130 U.S. at 164 (holding that settlement agreements are not evidence of an established royalty because "[t]he avoidance of the risk and expense of litigation will always be a potential motive for a settlement"); LaserDynamics, 694 F.3d at 77 (holding that settlement agreement are generally unreliable because such "license fees . . . are tainted by the coercive environment of patent litigation").  Here, Triano testified that the potential for high litigation costs actually did

motivate the settlement.  <u>See</u> Tr. II at 71:25-72:17 (Triano) (identifying a mutual desire to avoid $10,000 in legal fees for each side).

### *4. The Gaylord-Alli Settlement Agreement was Litigation-Inspired and Unenforced*

The 2007 settlement agreement between Gaylord and Alli appears to have been constructed by Gaylord for the sole purpose of supporting his claim against the government, and is thus not objective nor comparable to the hypothetical agreement.  Gaylord and Alli entered into the settlement agreement shortly after Gaylord had initiated litigation against Alli.  <u>See</u> DX 41 at 1 ¶ 4 ("The parties currently are engaged in Civil Action No. 06-cv-01921-WMN, filed . . . in the United States District Court for the District of Maryland.").  Pursuant to the settlement agreement, Gaylord agreed:   (1) to "waive[] all claims for [past] damages against Alli personally"; (2) to non-exclusively license Alli to use "The Column" by assessing a 10% royalty against future net retail sales revenues for Alli's photograph; and (3) to allow Alli to sub-license "The Column" by assessing a 25% royalty against compensation received from third parties.  DX 41 at 4-5.

Gaylord specifically structured the settlement agreement, however, to support his claim against the government.  Gaylord agreed to pay Alli 10% of any compensation he received from the government after litigation costs were deducted.  <u>See</u> DX 41 at 6 ¶ 15.  Despite the agreement on paper to assess a 10% royalty against future net retail sales, Gaylord has never collected any royalties from Alli.  <u>See</u> Tr. I at 387:1-2 (Alli); DX 146; Tr. II at 79:2-12 (Triano).  After trial in 2008, Gaylord's counsel admitted that this agreement was litigation-inspired:

> John Alli, of course he agreed to pay us 10 percent of future sales in the settlement agreement with us, but I will allow as how **we were directly involved in that and we already foresaw litigation**, that particular royalty could be given less weight because it was not prior to the litigation.

Nov. 5, 2008 Tr. (Harvey) (emphasis added), compare with Rude, 130 U.S. at 164; Hanson, 718 F.2d at 1078-79.

For these reasons, the 2007 Gaylord-Alli settlement agreement is not reliable evidence, and is not comparable to a 2003 hypothetical agreement between Gaylord and the Postal Service for licensed commemorative stamps (whether used or retained) and licensed merchandise. The settlement agreement was litigation-inspired, and Gaylord has not enforced the licensing terms.

### 5. The Productions-Alli Agreement Involved Non-Parties and Retail Merchandise

Gaylord has also relied on an agreement between two non-parties – KWVM Productions, Inc. and Alli – to support his claim. The agreement is summarized below in Table 2:

| Begin Date and Term | Licensor / Licensee | Licensed Work / Goods Produced Subject to Royalty | Agreement Type Summary of Terms / Total Royalties Paid | Record |
|---|---|---|---|---|
| 4/20/1998 to present | KWVM Productions, Inc.<br><br><br><br>Alli | Copyright: Korean War Veteran's Memorial<br><br><br>Posters, signed and numbered prints | Letter Agreement<br><br>One-time lump-sum payment of $250 +<br>10% of retail sales price for future sales<br><br><br>**Total Royalties Paid: $3,276.65 (estimated)** | PX 42 |

**Table 2. A summary of the KWVM Productions-Alli agreement.**

The Productions-Alli agreement is not comparable to the hypothetical agreement because it is irrelevant with respect to the licensing practices of Gaylord and the Postal Service. In addition, the licensed goods – "posters [and] prints" – produced under this agreement are not comparable to commemorative stamps. PX 42. Finally, the estimated maximum amount of royalties that Alli paid to Productions pursuant to this agreement is $3,276.65. See DX 47 (calculated by adding $250 to 10% of every item other than the U.S. Army Poster and the Photo Contest Award).

**B. Gaylord Improperly Uses the Entire Market Value of the KWVM Stamp as his Royalty Base**

Gaylord's running royalty theory is flawed because it assesses compensation based upon the face value of all of the accused stamps as the royalty base.  Gaylord's approach is directly contradicted by the Federal Circuit's entire market value rule, which holds that patentees may not calculate damages based upon sales of a multi-component product unless the patentee shows that the demand for the entire product is attributable to the patented feature.  See LaserDynamics, 694 F.3d at 67-68 ("It is not enough to merely show that the [patented feature] is viewed as valuable, important, or even essential to the [infringing multi-component product].");  see also Lucent, 580 F.3d at 1332-33; Uniloc, 632 F.3d at 1318-19.

The evidence in this case establishes that the copyrightable expression in "The Column" generated little, if any, demand for the KWVM Stamp.  The stamp is akin to a multi-component product because it is a combination of expressive elements contributed by the Postal Service, John Alli ("Alli"), and Gaylord.  A postage stamp is a pre-paid voucher for the Postal Service's worldwide delivery services.  See Tr. II at 162:15-22, 223:13-24 (Owens); Tr. I at 625:15-19, 649:2-8 (Failor).  As such, the retail price of a postage stamp is primarily attributable to its ability to send mail, and has nothing to do with the stamp's image.  See Tr. II at 162:23-163:9 (Owens); Tr. II at 309:3-6 (Kearney).

Even with respect to KWVM Stamps that were specifically retained, as opposed to used for postage, the evidence establishes that "The Column" generated little to no demand for the KWVM Stamp.  Collectors retain all stamps for any number of reasons.  See Gov. Facts ¶ 25. With respect to the KWVM Stamp, collectors retained the stamp less than other comparable stamps.  See Gov. Facts ¶¶ 33-36.

**REDACTED VERSION**

Accordingly, the Court should reject Gaylord's running royalty theory since Gaylord failed to prove that the Postal Service's use of "The Column," as compared to any other image, caused the sales of the KWVM Stamp.

**C.  Gaylord's Expert Offered No Opinion in Support of Gaylord's Theory of Damages**

Finally, Gaylord has not met his burden of proof to the extent that he relies upon irrelevant expert testimony.   Gaylord's expert, Joseph F. Faris ("Faris"), provided almost no opinions applicable to:  (1) Gaylord's running royalty theory; and (2) the Federal Circuit's suggested framework in this case.  In his six-page expert report, Faris ultimately concluded that the profit margin of the KWVM Stamps was somewhere between 52 and 99%.[8]  See PX 229 at 6.  Faris's conclusion is irrelevant to Gaylord's theory of entitlement to a running royalty of 10% assessed against stamp revenues, as opposed to stamp "profits."   Significantly, Faris freely admitted that he had no expert opinions with respect to each of the compensation issues identified by the Federal Circuit:

> Q      And do you have any opinion as to what a willing licensor and a willing licensee would have agreed to in a hypothetical negotiation at the time of infringement?
>
> A      No, sir.
>
> Q      And just to clarify, for purposes of a hypothetical negotiation in this case, Mr. Gaylord would have been the licensor, is that correct?
>
> A      Yes, sir.
>
> Q      Do you have any opinions regarding what he would have agreed to when the stamp was issued in 2003?
>
> A      No, sir.

---

[8] During trial, Faris testified that the profit margin ranged between "a little over 42 percent to up to 99 plus percent," Tr. II at 98:23-99:3 (Faris), but the discrepancy between his testimony and his report was never explained.

**REDACTED VERSION**

Q      Do you have any opinions regarding what the Postal Service would have agreed to when the stamp was issued in 2003?

A      No, sir.

Q      Does your expert report contain any opinion regarding the amount of compensation that Mr. Gaylord is owed in this case?

A      No, sir.

Q      Did you examine any of Mr. Gaylord's license agreements in this case?

A      No, sir.

Q      Did you attempt to compare the retention of the Korean War Veterans Memorial stamp with the retention of any other commemorative stamp?

A      No, sir.

. . .

Q      Do you have any opinion as to whether Mr. Gaylord's compensation should take the form of a lump sum payment or an ongoing royalty?

A      No, sir.

Q      And if an ongoing royalty rate were to be used, do you have any sort of an opinion as to what rate should be applied?

A      No, sir.

Q      Do you have any opinion with respect to the proper amount of compensation owed to Mr. Gaylord for stamps that were actually used by customers to send mail?

A      No, sir.

Q      Do you have any sort of opinion with respect to the proper amount of compensation owed to Mr. Gaylord for stamps that were unused and retained by collectors?

A      No, sir.

Q      And do you have any opinion with respect to the proper amount of compensation owed to Mr. Gaylord for commercial merchandise?

A      No, sir.

. . .

Q       And would you agree that the [concluded profit margin] range between 42 percent and 99 percent is wide?

A       Yes, sir.

Q       Did you make any attempts to increase the precision of your ultimate conclusion?

A       No, sir.

Q       Did you attempt to calculate the profit margin of any other postage stamp?

A       No, sir.

Q       Any other commemorative stamp?

A       No, sir.

Q       So do you have any opinions regarding how the profitability of the Korean War Veterans Memorial stamp compares to any other commemorative stamp?

A       No, sir.

Q       Do you have any opinion about whether the image on a commemorative stamp has any effect on its profitability?

A       No, sir.

Tr. II at 113:9-117:15 (Faris).  Faris's testimony was unequivocal.  Thus, the Court should conclude that Gaylord has not met his burden to the extent he attempts to rely upon irrelevant expert testimony.

II.   PURSUANT TO A HYPOTHETICAL NEGOTIATION, GAYLORD AND THE POSTAL SERVICE WOULD HAVE AGREED TO A LUMP-SUM PAYMENT OF NO MORE THAN $10,000 FOR USE OF "THE COLUMN" ON THE KWVM STAMP

Despite Gaylord's inability to prove entitlement to a running royalty for sales of used and retained KWVM Stamps, the evidence of record provides a basis for determining "reasonable . . . compensation" for the government's use of "The Column."  28 U.S.C. § 1498(b).  Pursuant to a hypothetical negotiation, the evidence and the expert testimony establish that Gaylord and the

Postal Service would have agreed to a lump-sum payment of no more than $10,000 for use of "The Column" on the used and retained KWVM Stamps.

### A. The Parties' Licensing Practices Support a Lump-Sum Payment of no More Than $10,000 for Use of "The Column" on the KWVM Stamp

As described above in Section I.A., Gaylord was party to only four agreements in the record, and none of the agreements is comparable to a license for use on a commemorative stamp. Nevertheless, his agreements demonstrate that he willingly licensed "The Column" for small amounts of money. For example, Gaylord's only license agreement for commercial merchandise negotiated without a threat of litigation resulted in only $2,446.93 in royalty payments. See PX 18; DX 27; DX 46. In several situations, he willingly licensed "The Column" for free. See Gov. Facts ¶¶ 9, 14.

The record is replete with evidence regarding the Postal Service's licensing practices to obtain the rights to use an image from other artists, photographers, and any other applicable rights-holder. Most significantly, the Postal Service negotiated a one-time lump-sum to Alli of $1,500 for the right to use his photograph in a commemorative stamp. See DX 118; see also Gaylord, 98 Fed. Cl. at 392 ("[T]he Postal Service paid Mr. Alli . . . $1,500."); Tr. I at 382:23-384:16 (Alli). Terrence McCaffrey ("McCaffrey"), the Postal Service's former Manager of Stamp Development, testified that the Postal Service and other rights-holders had typically agreed to compensation "around two to three thousand dollars," with $5,000 being the highest negotiated amount for the right to use a preexisting image on a stamp. See Tr. I at 587:1-588:3 (McCaffrey). Layne Owens ("Owens"), a Stamp Development Specialist for the Postal Service since 2003, similarly testified that when the Postal Service and artists negotiated lump-sum payments, the payments ranged between $50 to $5,000 prior to 2008. See Tr. II at 161:9-162:14 (Owens); see also id. at 161:17-23 ("It has to be pretty much an iconic photograph for us to pay

[$5,000]."\).   The Postal Service's stamp licenses all support the testimony of McCaffrey and

Owens:

| Begin Date and Term | Licensor / Licensee | Licensed Work / Goods Produced Subject to Royalty | Agreement Type Summary of Terms / Total Royalties Paid | Record |
|---|---|---|---|---|
| 6/7/1999 | Brown Brothers | Copyright: "USS Holland – first submarine" | Agreement for Photograph Used as Art Reference in Production of Stamp<br><br>Image used as art reference to create a stamp image | DX 105 |
|  | Postal Service | Postage stamp, philatelic products, other products | One-time lump-sum payment of $200<br><br>**Total Royalties Paid:  $200** |  |
| 10/13/1999 | United States Navy | Copyright: "USS S-6" | Agreement for Photograph Used as Art Reference in Production of Stamp<br><br>Image used as art reference to create a stamp image | DX 106 |
|  | **Postal Service** | Postage stamp, philatelic products, other products | One-time lump-sum payment of $1<br><br>**Total Royalties Paid:  $1** |  |
| 2/27/2001 | Horst Hamann Photography | Copyright: "Vertical photograph of Atlas statue" | Agreement for Photograph to be Used as Art Rendering for Stamp Art<br><br>Image used to create a stamp image<br><br>One-time lump-sum payment of $500 | DX 109 |
|  | **Postal Service** | Postage stamp, philatelic products, other products | **Total Royalties Paid:  $500** |  |
| 8/13/2001 | The Art Institute of Chicago | Copyright: "Young Mother, 1888, by Mary Cassatt" | Agreement with Photographer Regarding Photograph to be Used as Stamp Art<br><br>Image used as art reference to create a stamp image | DX 110 |
|  | **Postal Service** | Postage stamp, philatelic products, other products | Image used to create a stamp image<br><br>One-time lump-sum payment of $1,000<br><br>**Total Royalties Paid:  $1,000** |  |
| 1/15/2002 | Nat Steinbook | Copyright: "Hillsboro Inlet Lighthouse, Early 2000" | Agreement for Photograph to be Used as Art Rendering for Stamp Art<br><br>One-time lump-sum payment of $350 | DX 113 |
|  | **Postal Service** | Postage stamp, philatelic products, other products | **Total Royalties Paid:  $350** |  |

**REDACTED VERSION**

| Begin Date and Term | Licensor / Licensee | Licensed Work / Goods Produced Subject to Royalty | Agreement Type Summary of Terms / Total Royalties Paid | Record |
|---|---|---|---|---|
| 9/17/2002 | **Alli**<br><br>**Postal Service** | Copyright:<br>"Real Life"<br><br>Postage stamp, philatelic products (other products later excluded) | Agreement with Photographer Regarding Photograph to be Used as Stamp Art<br><br>Image used to create a stamp image<br><br>One-time lump-sum payment of $1,500<br><br>**Total Royalties Paid:  $1,500** | DX 118 |
| 6/18/2003 | Nicolas H. Ekstrom<br><br>**Postal Service** | Copyright:<br>"Black Sun"<br><br>Postage stamp, philatelic products, other products | Agreement Regarding Photograph Proposed As Stamp<br><br>Image used to create a stamp image<br><br>One-time lump-sum payment of $2,500<br><br><br>**Total Royalties Paid:  $2,500** | DX 119 |
| 8/13/2003 | The Isamu Noguchi Garden Museum / Foundation<br><br>**Postal Service** | Copyright:<br>"Akari 25N"<br><br><br><br>Postage stamp, philatelic products | Agreement Regarding Photograph Proposed As Stamp<br><br>Image used to create a stamp image<br><br>One-time lump-sum payment of $2,500<br><br>**Total Royalties Paid:  $2,500** | DX 120 |
| 10/23/2003 | VAGA<br><br>**Postal Service** | Copyright:<br>"Mother and Child, 1944-45"<br><br>Postage stamp, philatelic products | Agreement Regarding Photograph Proposed As Stamp<br><br>Image used to create a stamp image<br><br>One-time lump-sum payment of $5,000<br><br><br>**Total Royalties Paid:  $5,000** | DX 121 |
| 11/10/2003 | Todd Eberle<br><br>**Postal Service** | Copyright:<br>"Walt Disney Concert Hall (Disney 2A)"<br><br>Postage stamp, philatelic products | Agreement Regarding Photograph Proposed As Stamp<br><br>Image used to create a stamp image<br><br>One-time lump-sum payment of $5,000<br><br>**Total Royalties Paid:  $5,000** | DX 123 |

**Table 3. A summary of the Postal Service's stamp image license agreements.**

In some situations, the Postal Service and the rights-holders agreed to use various works on commemorative stamps for free.  Notably, the Walt Disney Company, owner of some of the

most well-known copyrighted works, agreed to license use of some of its works on commemorative stamps without payment:

> Q      And what was the negotiated payment to use the Disney properties on stamps?
>
> A      The Postal Service didn't pay any amount to the Disney Company to use their properties on stamps.
>
> Q      And why not?
>
> A      Again, it goes go back to it's an honor to be on a stamp, and what the rights holder gets is the prestige of being on a postage stamp, and it elevates that person's property to a higher level than his or her peers.
>
> Q      Is there any financial advantage to having a work on a stamp?
>
> A      I believe that the visibility and the number of impressions would give it considerable consideration.

Tr. II at 194:3-17 (Owens); see also Tr. II at 193:11-21 (Owens) (discussing another no-fee philatelic agreement).  Owens's testimony regarding the no-fee license agreement with Disney highlights the reality that artists whose works are featured on a commemorative stamp receive tangible and intangible compensation far in excess of the monetary license fee.  Alli similarly testified that the Postal Service's use of "Real Life" in the KWVM Stamp "significantly" affected the value of his work:

> Q      How did the Postal Service's use of your photograph affect the value of your photograph?
>
> A      Significantly.
>
> Q      In what way?
>
> A      Well, I think in a couple ways, tangible and intangible.
>
> I think tangibly, there were several vendors that came to me and wanted to use it for some of their products.  And that helped me financially.
>
> And I would say intangibly, I think it just felt like an honor to have the image as a first-class postage stamp.

Tr. I at 384:1-16 (Alli).  Even Gaylord himself admitted that the Postal Service's KWVM Stamp "increased the value, appeal, market, and notoriety of ['The Column']."  See DX 43 (RFA 20); see also Gaylord, 85 Fed. Cl. at 70 (citing); Gaylord, 595 F.3d at 1375 (citing).

The Postal Service and rights-holders freely negotiate many aspects of the license agreement.  For example, the parties could negotiate the duration of the license agreement.  See Tr. II at 126:12-17 (Owens).  The parties also could negotiate the appearance and placement of copyright notice, the approval of press release images, and the approval of marketing materials. See Tr. II at 166:21-167:7 (Owens).  During the course of the negotiations, the parties could change the language of the standard license agreement.  See Tr. II at 166:8-20 (Owens).

Significantly, the parties could also negotiate the scope of the licensed products.  The Postal Service always sought the right to use an image on three different types of products:  (1) stamps; (2) philatelic products;[9] and (3) "other products" (commercial merchandise).  See DX 110 at 1; DX 119 at 1; Tr. II at 177:11-14 (Owens).  If the Postal Service was unable to negotiate the right to use an image on the commercial merchandise in return for the lump-sum fee, those products were excluded from scope of the license agreement.  See Tr. II at 123:5-124:5 (Owens); see also Tr. II at 124:6-126:11 (Owens).  Alli, in particular, licensed the Postal Service to use "Real Life" on the KWVM Stamps and philatelic products for the lump-sum of $1,500; but he separately negotiated a revision to the license to exclude the commercial merchandise for the KWVM Stamp.  See PX 205; Tr. II at 128:14-21 (Owens); Tr. I at 384:11-13 (Alli); see e.g., DX 47 (showing receipt of a "[o]ne time payment" of $6,142 from the Danbury Mint for a "Gold Plated Stamp").

---

[9] Philatelic products are products that include a physical copy of the stamp, as well as the Postal Service Guide to U.S. Stamps.  See Tr. II at 124:6-125:2 (Owens).

Some aspects of the license agreement, however, were nonnegotiable.  Most obviously, the Postal Service insisted on receiving the rights to use the image on stamps and philatelic products.  See Tr. II at 185:14-186:5 (Owens) ("We either issue the stamp or we don't.").  While the amount of the lump-sum royalty is negotiable, the Postal Service also has never agreed to pay a running royalty to the artist based on the face value of the postage.  See Tr. I at 587:11-588:3 (McCaffrey); Tr. II at 192:21-193:21 (Owens).  Prior to 2008, the Postal Service and artists always agreed to a lump-sum payment of $5,000 or less, see Tr. I at 587:11-588:3 (McCaffrey); Tr. II at 161:9-162:14 (Owens), and that amount has only been exceeded one time since.  See Tr. II at 162:1-6 (Owens) ("[The artist] wanted $10,000 for High Noon.  We agreed to [a lump-sum of $6,000].").

In the situations where the Postal Service cannot obtain the right to use an image from all necessary rights-holders with a mutually-satisfactory license, the Postal Service does not issue the commemorative stamp.  See Tr. II at 130:2-12 (Owens); Tr. II at 155:12-19 (Owens).  In those situations, the Postal Service will seek out a different subject matter or alternative art for a stamp issue.  See Tr. II at 191:17-23 (Owens) (replacing a Spencer Tracy stamp issue with a John Wayne stamp issue); Tr. II at 192:15-20, 221:12-22 (Owens).

Ultimately, the parties' respective licensing practices strongly suggest that Gaylord would have readily agreed to provide the Postal Service with a license to use "The Column" on the KWVM Stamp for a lump-sum payment of $10,000, at most.  Gaylord's commercial merchandise license agreements were financially unsuccessful.  Between 1996 and the date of the hypothetical negotiation in 2003, he had only received a total of $650 related to the copyright for "The Column," and that was after threatening suit against a manufacturer of a wooden replica of the KWVM.  Thus, the facts strongly indicate that Gaylord would have eagerly negotiated a

REDACTED VERSION

lump-sum payment of $10,000 or less in 2003 in return for the honor and prestige of having "The Column" featured on the KWVM Stamp.  As discussed in Section III of this Brief, Gaylord would also have separately negotiated an 8% running royalty for the philatelic and commercial merchandise, and would have received a total of $26,474 for those products.  The license agreements of the Postal Service demonstrate that the Postal Service would have attempted to negotiate a license fee for "The Column" of $5,000 or less in 2003.  Giving Gaylord every benefit of the doubt, it is reasonable to assume that the Postal Service may have been willing to offer up to $10,000 in the hypothetical negotiation in 2003 for use on a commemorative stamp – double the amount the Postal Service had negotiated with any other rights-holder up to that point. See, e.g., Gaylord, 678 F.3d at 1345 ("Indeed, the court may find that a hypothetical negotiation between the parties would result in a higher ongoing royalty than the rate earned by Mr. Gaylord or the Postal Service under past agreements.").  The evidence strongly shows, however, that the Postal Service would have sought out and used an alternative stamp issue rather than pay Gaylord more than $10,000 for use on a commemorative stamp, especially if presented with a demand for 10% of all KWVM Stamp revenues.

### B.   A Lump-Sum Royalty is Far More Appropriate than a Running Royalty

A lump-sum royalty is far more appropriate than a running royalty for at least four important reasons.  First, in connection with the license agreements discussed above, a lump-sum royalty (including, in some situations, $0) was used far more often and successfully by the relevant parties.  See PX 25 ($650 payment to Gaylord); DX 41 (Gaylord waived all past damages, no payments collected); Tr. I at 302:5-9 (Triano) (waiving royalties); DX 110; DX 118-21; DX 123.  Second, previous courts who have considered copyright damages in similar contexts have awarded lump-sum royalties as opposed to running royalties.  See Bruce v. Weekly World News, Inc., 310 F.3d 25, 29-30 (1st Cir. 2002); see also On Davis, 246 F.3d at

161 (rejecting plaintiff's claim for a $2.5 million running royalty, but holding that a jury could reasonably find a fair market value of a $50 lump-sum royalty). Third, the record shows that the parties likely would have preferred a lump-sum royalty over a running royalty. The recordkeeping required for a running royalty would have been onerous for both parties for tens of millions of 37¢ stamps that were sold by the Postal Service for less than two years. See generally Stip. Facts ¶¶ 13-15, 18. Triano's testimony proves that he and Gaylord would not have been capable of tracking the sales of tens of millions of KWVM Stamps:

> Q    In general, what sorts of record-keeping tasks would you do for Mr. Gaylord?
>
> A    Well, I would keep track of the money that came in, the money that came out. Of course, we had a CPA in Montpelier. Just anything that didn't involve the artistic side of the business.
>
> Q    And how did you record that information?
>
> A    Just in an old-fashioned ledger. Like I said, this was before the internet. And if you had the internet down here, we're going to get it 15 years later up in Vermont. So it's just basic, old-fashioned, pencil-to-the-paper recording.

Tr. I at 321:3-14 (Triano). Even the Postal Service lacked the ability to fully track the sales of the KWVM Stamp when it was on the market. See PX 32, 34; Tr. II at 311:24-312:5, 324:21-325:3 (Delaney); see also Tr. II at 15:13-21 (Harvey) ("[T]he Postal Service's own tracking was unable to track every stamp that was sold at that time."). In addition, surveying customers to determine long-term retention of the KWVM Stamp would have been impossible for Gaylord. Finally, and most importantly, the retail value of a stamp has nothing to do with the image on the face of the stamp. A postage stamp is essentially a pre-paid voucher for the Postal Service's worldwide delivery services. See Gov. Facts ¶ 15. As such, the stamp's value is primarily attributable to its ability to send mail. See Gov. Facts ¶ 16. Thus, the retail value of a stamp cannot be used as a royalty base with respect to its image.

Finally, Gaylord has offered no evidence that anyone in the postal industry would have ever negotiated a stamp image license using a running royalty on the face value of the postage. The Federal Circuit has held that the evidence must support the view that the license emerging from a hypothetical negotiation is one that the relevant industry would consider.  See Stickle, 716 F.2d at 1561-62.  In Stickle, the Federal Circuit found that basing a royalty for a taco frying machine on food revenue would be clearly erroneous in the absence of any evidence that anyone in the industry would agree to such a license.  See id.; see also de Graffenried v. United States, 25 Cl. Ct. 209, 217-18 (1992) (rejecting a running royalty based upon throughput partly because of no industry acceptance of that form of license); see generally Dow Chemical Co. v. United States, 226 F.3d 1334, 1348 (Fed. Cir. 2000) (rejecting use of a running royalty of the decline in property values to determine a reasonable royalty because "a more conventional and substantiated measure of damages" existed).  Similarly, the unrebutted evidence shows that numerous artists have agreed to license a wide range of images for use on commemorative stamps in return for a negotiated lump-sum royalty.  See, e.g., Gov. Facts ¶¶ 17, 42.[10]  Thus, there is no basis for departing from the "more conventional and substantiated" lump-sum license by adopting Gaylord's unsupported running royalty on the face value of the KWVM Stamp.  See Dow Chemical, 226 F.3d at 1348.

### C. The Single Lump-Sum Payment Would Have Covered Both Used and Retained KWVM Stamps

The lump-sum payment of $10,000, or less, accurately reflects the fair market value of a non-exclusive license covering the Postal Service's use of "The Column" in a commemorative stamp – whether it is used or retained.  See Gaylord, 678 F.3d at 1345 (recognizing "the possibility that a one-time, paid-up license accurately reflects the fair market value of a license

---

[10] Gaylord could have examined the licensing practices of the postal services of other large foreign countries, but chose not to do so.

for both the used and unused stamps").  When people collect stamps, the Postal Service receives revenues from the sale of those stamps without immediately paying the cost of providing corresponding delivery services.  People, however, retain stamps for any number of reasons.  See, e.g., id. at 1345 ("Collectors may retain stamps for any number of reasons, including a preference for the image itself or a desire to obtain a particular stamp to complete a collection.").  Despite counsel for Gaylord's arguments that people collected the KWVM Stamp in greater than average numbers because of its image,[11] there is no evidence that anyone actually retained the stamp because of Gaylord's copyrighted expression.

Gaylord failed to present any evidence – including expert testimony – of a causal link between the use of "The Column" and the Postal Service's retention revenues for the KWVM Stamp.  See, e.g., Tr. II at 114:8-11 (Faris) ("Q  Did you attempt to compare the retention of the Korean War Veterans Memorial stamp with the retention of any other commemorative stamp?  A No, sir.").  In fact, the record directly rebuts the existence of any causal link because the Postal Service's surveys demonstrated that the KWVM Stamp underperformed its peers.  See infra Figure 1; see also Tr. I at 659:13-660:2 (Failor) (stating that the popularity of the KWVM Stamp "would be below average I would say . . . if you're just looking at it statistically the [stamp] would be less than average").  The government's expert fully analyzed the Postal Service's records and surveys and confirmed that collectors retained the KWVM Stamp less than the average commemorative:  (1) military stamp; (2) 2003 stamp; and (3) stamps as a whole.  See Tr. II at 383:21-385:19 (Bokhart); DX 151 at 17-18; DX 151 Exhibits 8-10 (identifying sources).

---

[11] See, e.g., Tr. II at 17:20-19:4 (Harvey); see also Appeal Oral Argument at 3:43-6:29, Gaylord, 678 F.3d 1339, available at http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2011-5097.mp3.

The KWVM Stamp's below average performance strongly suggests that the retention revenue of the stamp is not attributable to Gaylord's copyrighted expression.



**Figure 1.  Synovate's reports demonstrate that the KWVM Stamp underperformed its peers.  See PX 29 at G2425; DX 135 at G100452.**

Given the record evidence of the underperformance of the KWVM Stamp, Gaylord's unsupported attorney arguments amount to pure conjecture.  Other relevant decisions strongly support the conclusion that Gaylord's speculation cannot entitle him to a percentage of the alleged retention profits.  For example, in Bouchat v. Baltimore Ravens Football Club, Inc., 346 F.3d 514, 522-23 (4th Cir. 2003), the Fourth Circuit held that the owner of an infringed copyrighted drawing was not entitled to a portion of revenues from a National Football League team where:

> (1) there exists no conceivable connection between the infringement and those revenues; or (2) despite the existence of a conceivable connection, [plaintiff] offered only speculation as to the existence of a causal link between the infringement and the revenues.

Id.  The appellate court affirmed the trial court's award of summary judgment against the plaintiff because the plaintiff provided only speculation as to the link between the infringement and the defendants' revenues related to the use of the drawing.  See id. at 522-527.  Similarly, the

Federal Circuit affirmed a district court's conclusion that a group of plaintiffs were not entitled to damages for copyright infringement where the plaintiffs failed to establish a connection between claimed revenues and the infringement.  See University of Colorado Foundation, Inc. v. American Cyanamid Co., 196 F.3d 1366, 1375 (Fed. Cir. 1999); see also Gaylord, 678 F.3d at 1345 ("It may be pertinent to examine whether the number of unused stamps is greater for this stamp than for the average stamp issued by the Postal Service.  Collectors may retain stamps for any number of reasons . . . .").

Ultimately, the record did not demonstrate any demand for "The Column" on a retained stamp.  Since Gaylord has offered only speculation as to a causal link between the use of "The Column" and the Postal Service's retention revenues, a lump-sum payment of no more than $10,000 accurately reflects the fair market value of the hypothetical license for both used and retained KWVM Stamps.

### D. The Three-Month Retention of the KWVM Stamp Significantly Overestimates the Long-Term Retention of the KWVM Stamp

The parties dispute the amount of KWVM Stamps that were retained long term.  Ultimately, the parties' dispute boils down to whether long-term retention is equivalent to short-term retention, as Gaylord contends; or whether long-term retention is approximately 54% of short-term retention, as the government contends.[12]

The parties seem to agree on the following basic facts in the record.  The Postal Service contracted with a company named Synovate to track the retention of commemorative stamps between 1999 and 2012.  See Gov. Facts ¶ 26.  Synovate tracked retention of commemorative stamps by conducting a one-time quarterly survey for the commemorative stamps issued during the previous quarter.  See id.  Synovate provided its estimated short-term retention results to the

---

[12] The parties' dispute is completely irrelevant to Gaylord's failure to attribute any of the retention to the use of "The Column."

Postal Service in a series of quarterly and annual reports.  See Gov. Facts ¶ 26; PX 29; DX 125; DX 131; DX 135-136; DX 138; DX 140-142; DX 144; DX 147.  The Postal Service used the estimated short-term retention results from the Synovate reports to analyze the relative popularity of various commemorative stamp issues.  See Tr. I at 623:4-16 (Failor).  Prior to 2011, the Postal Service did not have a way to derive estimated long-term retention from the estimated short-term retention survey results.  See Tr. I at 627:15-628:12, 633:20-634:13 (Failor); see also Tr. I at 601:20-603:3 (McCaffrey).

        Significantly, however, the Postal Service has long recognized that short-term retention of a particular stamp issue is not equivalent to – and far greater than – the long-term retention of the stamp issue.  For example, David Failor ("Failor"), a former manager of Stamp Services for the Postal Service, described the three-month survey as a "one-time snapshot."  Tr. I at 623:4-7 (Failor); see also Tr. I at 624:21-625:1 (Failor) (further questions about the "initial snapshot" of the Elvis stamp).  In the context of the Elvis stamp, Failor described the three-month retention rates a "a very fuzzy number" because stamps can always be used for postage:

> Q      So when you say 124 million, is that based upon the initial sales of the stamp, or is that a number you know with certainty?
>
> A      It's a very fuzzy number.  We don't know any of these numbers for certain mainly because if a customer says to us yes, I love the Elvis stamp and I'm going to hold onto it forever because I'm an Elvis fan and then tomorrow thinks well, I guess I don't really like Elvis that much.  I can use that stamp.
>
>        Stamps always maintain their value and their ability to be used on mail, so a stamp is always considered a liability for the Postal Service.  There's still a service that could be rendered if a customer decides to use that stamp.

Tr. I at 625:6-19 (Failor); see also Gov. Facts ¶ 29 (some initially-retained stamps are used for postage, given to others as gifts, or lost).  Counsel for Gaylord then asked Failor whether the Postal Service had a method – at the time of trial in 2008 – of "translat[ing]" the three-month "snapshot" to long-term retention:

Q      . . .   Do you have a model that takes these numbers that you get in the snapshot and translates it to likely total retention for any purpose?

A      No.  I think we just take this one-time snapshot and that's what gives us what we need is the trends and the popularity.  It's really the tool to help us compare one against another.

Tr. I at 634:7-13 (Failor); see also Tr. II at 201:14-202:20 (Owens); Tr. II at 234:13-236:3 (Kearney).  Because the Postal Service did not have a validated way of deriving long-term retention from short-term retention, the Postal Service's finance group chose not to use the short-term retention to determine long-term retention in its official financial statements prior to 2011.[13]

See Tr. II at 263:8-264:20 (Kearney).  In 2011 and 2012, the Postal Service retained Synovate to conduct additional surveys to determine how retention changed over a full twelve-month period, as opposed to the three-month period.  See DX 145 at 6-10; Tr. II at 235:2-13 (Kearney).  As a result of the additional surveys, Synovate and the Postal Service concluded that the long-term retention rate of a stamp is approximately 54% of the short-term retention rate of that same stamp.  See DX 145 at 9; Tr. II at 237:12-20 (Kearney).  Defendant's Exhibit 145 summarizes the Postal Service's model and describes its financial application.

At the very least, the record establishes that the estimated three-month short-term retention of the KWVM Stamp significantly overestimates the actual long-term retention of the stamp.  Defendant's Exhibit 145 provides a model for deriving an estimate of the long-term retention of the KWVM Stamp.  Gaylord cites no alternate model,[14] and fails to allege any support for his contention that long-term retention of the KWVM Stamp is equivalent to short-term retention.

[13] The long-term retention of a stamp is subsumed within the Postal Service's finance group's calculation of "breakage," which also includes lost and destroyed stamps.  See Tr. II at 275:24-276:16 (Kearney).
[14] Gaylord's expert admitted during rebuttal that short-term retention would have to be reduced to determine long-term retention.  See Tr. II at 440:7-23, 444:9-12 (Faris).

**E.  Expert Valuation Supports a Lump-Sum Payment of No More Than $10,000 for Use of "The Column" on the KWVM Stamp**

Christopher Bokhart ("Bokhart"), the government's damages expert, provided credible analysis and testimony regarding the reasonable compensation owed to Gaylord.  Bokhart is broadly qualified to provide opinions relating to intellectual property licenses, hypothetical negotiations, and the calculation of reasonable royalties.  He is a Certified Public Accountant with over 25 years of experience in intellectual property and business valuation.  See DX 151 Exhibits 1-2.  He has provided expert testimony in numerous cases involving the valuation of copyrights, patents, and trademarks.  See id.  He has provided expert testimony on compensation in several Section 1498 cases before this Court.  See id.  Bokhart has a great deal of experience in determining a reasonable royalty based on a hypothetical negotiation.  See id.[15]

Bokhart ultimately concluded that a hypothetical negotiation between the Postal Service and Gaylord would have resulted in a lump-sum royalty payment of $10,000 or less for the use of "The Column" on used and retained KWVM Stamps.  See DX 151 at 3 ¶ 2; Tr. II at 362:2-14 (Bokhart).  Bokhart based his conclusion upon a detailed analysis of a series of industry-accepted quantitative and qualitative measures, including:  (1) the market approach; (2) the income approach; (3) the cost approach; and (4) analysis of the applicable Georgia-Pacific factors.  See DX 151 at 20 ¶ 67; Tr. II at 362:15-24 (Bokhart).

*1.  Pursuant to the Market Approach, The Fair Market Value of a License to Use "The Column" is Minimal*

Bokhart's analysis of the license agreements in the record pursuant to the market approach demonstrates that the fair market value of a license to use "The Column" is minimal.  The market approach attempts to examine comparable agreements to value the intellectual

---

[15] In contrast, Gaylord's damages expert testified that he had not determined a reasonable royalty in this case, see Tr. II at 113:9-114:4 (Faris), or any other previous case, see Tr. II at 112:25-113:2 (Faris).

property at issue.  See Tr. II at 363:24-364:7 (Bokhart).  Thus, the market approach is consistent

with the analysis in Section I.A. of this Brief, although Bokhart also assumed, for the sake of his

opinion, that Gaylord's commercial merchandise agreements were comparable.  Despite his

assumption of comparability, Bokhart concluded that the Gaylord's commercial merchandise

agreements did not support Gaylord's claim for a 10% running royalty, because the agreements

were "not successful."  Tr. II at 373:3-16 (Bokhart).  Instead, the Postal Service's license

agreements were more "indicative . . . for stamps" and that "the value related to the [Gaylord's]

copyright is very low."  Tr. II at 373:17-25 (Bokhart).  Gaylord's expert testified that he did not

take issue with respect to Bokhart's analysis of the market approach.  See Tr. II at 438:4-6

(Faris).

> **2.   *Pursuant to the Income Approach, Gaylord's Demand Far Overestimates the Value
> of "The Column" on the KWVM Stamp***

Bokhart also determined that Gaylord's assertion of entitlement to a 10% royalty could

not be justified pursuant to the income approach.  The income approach attempts to examine the

income attributable to the accused product – in this case, the KWVM Stamp.  See Tr. II at 374:4-

10 (Bokhart).  Notably, the approach examines the KWVM Stamp as a whole; the approach does

not attempt to determine the income attributable to an individual subcomponent of the stamp,

such as its image.  See id.; see also DX 151 ¶ 93.

To determine the Postal Service's income attributable to the accused product, Bokhart

compared the commemorative KWVM stamp to a hypothetical mail use stamp[16] used by the

public in equivalent amounts.  See DX 151 ¶¶ 90-93; DX 151 Exhibit 5; see generally Tr. II at

376:8-382:21 (Bokhart).  Bokhart calculated that the incremental revenue of the KWVM Stamp

---

[16] Generally speaking, mail use stamps are "intended for use on mail primarily, so they include
subjects like Love stamps and Celebrate stamps and wedding stamps that are obviously more
intended for use than anything else."  Tr. II at 253:19-254:2 (Kearney).

over an equivalently-used mail use stamp was $████.  The incremental revenue, however, does not reflect the value of Gaylord's copyrightable expression because the KWVM Stamp is a collection of contributions from the Postal Service, Alli, and Gaylord.  See Tr. II at 380:8-13 (Bokhart).  Nevertheless, noting that Gaylord's previous agreements included royalty-splitting provisions to account for the contributions of others, Bokhart's use of the income approach demonstrated that Gaylord's demand for a 10% running royalty again far overestimated the value of "The Column" on the KWVM Stamp.  See Tr. II at 380:14-382:3 (Bokhart) (noting that Alli negotiated a royalty of ██% of the incremental revenue split determined using Gaylord's assumptions); DX 151 Exhibit 5.0.

### 3. Pursuant to the Cost Approach, The Postal Service Would Have Paid $5,000 or Less to Use a Different Commemorative Stamp Image

The income approach scenario described above also assumes that the Postal Service could not have used an alternative commemorative stamp.  See Tr. II at 382:18-21 (Bokhart).  Thus, the cost approach attempts to examine the availability of alternatives to the accused product, and how those alternatives affect the overall value of the intellectual property.  See Tr. II at 374:11-20 (Bokhart).  The cost approach considers that a reasonable licensee will not pay more in a royalty than the cost to convert to an alternative.

Bokhart concluded that the Postal Service would have paid $5,000 or less for the rights to use an alternate image.  See DX 151 ¶¶ 94-99.  First, a variety of alternate images were available.  See, e.g., Tr. I at 579:18-580:19 (McCaffrey); Tr. II at 389:8-16 (Bokhart).  Second, an alternate image would likely have performed at least as well as, if not better than, "The Column" on the KWVM Stamp.  See Gov. Facts ¶¶ 33-36.  Third, the Postal Service has actually sought out and used alternative images in the past.  See Gov. Facts ¶ 23.  These factors support

Bokhart's testimony that the Postal Service could have acquired an equally-performing image for $5,000 or less.

### 4. The Applicable *Georgia-Pacific* Factors Support the Government

Finally, the Federal Circuit "has sanctioned the use of the Georgia–Pacific factors to frame the reasonable royalty inquiry." Uniloc, 632 F.3d at 1317 (citing Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116 (S.D.N.Y. 1970)); see also Energy Transp. Group, Inc. v. William Demant Holding A/S, 697 F.3d 1342, 1357 (Fed. Cir. 2012) (endorsing Georgia–Pacific as setting forth "a list of admissible factors," rather than a specific "test for royalty calculations"). The fifteen factors set forth in Georgia-Pacific include:

> (1) royalties the patentee has received for licensing the patent to others; (2) rates paid by the licensee for the use of comparable patents; (3) the nature and scope of the license (exclusive or nonexclusive, restricted or nonrestricted by territory or product type); (4) any established policies or marketing programs by the licensor to maintain its patent monopoly by not licensing others to use the invention or granting licenses under special conditions to maintain the monopoly; (5) the commercial relationship between the licensor and licensee, such as whether they are competitors; (6) the effect of selling the patented specialty in promoting sales of other products of the licensee; (7) the duration of the patent and license term; (8) the established profitability of the product made under the patent, including its commercial success and current popularity; (9) the utility and advantages of the patent property over old modes or devices; (10) the nature of the patented invention and the benefits to those who have used the invention; (11) the extent to which the infringer has used the invention and the value of that use; (12) the portion of profit or of the selling price that may be customary in that particular business to allow for use of the invention or analogous inventions; (13) the portion of the realizable profit that should be credited to the invention as opposed to its non-patented elements; (14) the opinion testimony of qualified experts; and (15) the results of a hypothetical negotiation between the licensor and licensee.

i4i Ltd. Partnership v. Microsoft Corp., 598 F.3d 831, 853 n.3 (Fed. Cir. 2010) (citing Georgia-Pacific, 318 F. Supp. at 1120).

Bokhart considered the fifteen Georgia-Pacific factors, and, to the extent the factors were applicable, he concluded that they supported the government's theory of damages. See Tr. II at

390:7-392:21 (Bokhart); see also Tr. II at 392:22-395:15 (Bokhart); DX 151 ¶¶ 100-117.   In

particular, Bokhart highlighted the following factors during his testimony:

- Factor No. 1 – Bokhart concluded that even though Gaylord offered agreements with a face value royalty of 10%, the agreements:  were not successful, did not result in meaningful royalty payments, and were not indicative of the value of the copyright.  See Tr. II at 390:18-391:5 (Bokhart); see also LaserDynamics, 694 F.3d at 77 (this factor "assumes a voluntary agreement," rather than a settlement agreement).

- Factor No. 2 – Bokhart noted that the Postal Service negotiated lump-sum royalties of $5,000 or less with numerous rights-holders.  See Tr. II at 391:6-16 (Bokhart).

- Factor No. 4 – Bokhart correctly noted that Gaylord has made almost "no meaningful effort to commercialize his technology or identify that it has significant value . . . . This indicates again a lack of significant value of the copyright."  Tr. II at 391:17-25 (Bokhart).

- Factor Nos. 8-9 – Bokhart acknowledged that a large number of KWVM Stamps were sold, but that fact was undercut by the stamp's underperformance with respect to its peers.  See Tr. II at 392:1-6 (Bokhart).

- Factor No. 13 – Bokhart testified that the KWVM Stamp is a collection of contributions; and that the Postal Service, rather than Gaylord, bore any financial risk with respect to the KWVM Stamp's popularity.  See Tr. II at 392:7-21 (Bokhart) ("giving a license . . . actually puts [Gaylord] in a better position").

Bokhart's report also reviews the applicability of other Georgia-Pacific factors.  For example, with respect to the fifth Georgia-Pacific factor, Bokhart concluded that the parties "are not direct competitors . . . [t]heir relationship is closer to inventor and promoter."  See, e.g., DX 151 ¶ 107.

Bokhart's conclusion is well-supported by the record because:  (1) Gaylord received more than $500,000 from the government through CLA to create the copyrighted work-in-suit between 1992-1995, <u>see, e.g.</u>, DX 40; (2) by 2003, Gaylord's efforts to promote his work had failed, and he had ceased any efforts to commercialize "The Column," <u>see</u> <u>Gaylord</u>, 85 Fed. Cl. at 70-71, Gov. Facts ¶¶ 7, 12-13; and (3) the Postal Service's use of "The Column" increased its value to Gaylord, <u>see</u> <u>Gaylord</u>, 85 Fed. Cl. at 70.

In contrast to Bokhart's extensive analysis of these factors, Gaylord's expert made only a passing reference to a single <u>Georgia-Pacific</u> factor during his redirect testimony on the profitability of the KWVM Stamp.  <u>See</u> Tr. II at 117:23-118:9 (Faris).  Gaylord's expert also made no effort to put his analysis in proper context, such as how the profitability of the KWVM Stamp compared with other stamps, <u>see</u> Tr. II at 114:8-11, 117:3-11 (Faris), and whether the stamp image has any effect on overall profitability, <u>see</u> Tr. II at 117:12-15 (Faris).

Thus, the Court should consider Bokhart's extensive analysis of the applicability of each of the factors and reject Faris's cursory analysis of a single factor out of context.  Accordingly, the applicable <u>Georgia-Pacific</u> factors support the government's theory of damages in this case.

## III.  PURSUANT TO A HYPOTHETICAL NEGOTIATION, GAYLORD AND THE POSTAL SERVICE WOULD HAVE AGREED TO $26,474 FROM A RUNNING ROYALTY ON PHILATELIC AND COMMERCIAL MERCHANDISE FEATURING AN IMAGE OF THE KWVM STAMP

Even though the parties would have agreed to a lump-sum royalty of no more than $10,000 for use of "The Column" on used and retained KWVM Stamps, the evidence demonstrates that Gaylord and the Postal Service would have been willing to agree to a running royalty for the philatelic and commercial merchandise featuring the KWVM Stamp.  The Federal Circuit strongly suggested that "an ongoing royalty appears to be appropriate" with respect to the commercial merchandise featuring an image of the KWVM Stamp.  <u>Gaylord</u>, 678 F.3d at 1345. In addition, the parties have stipulated to the royalty base – the Postal Service received $330,919

in revenues from the sale of philatelic and commercial merchandise that featured the KWVM Stamp.  See Stip. Facts ¶¶ 20, 22.  The only dispute is whether an 8% royalty should apply against the merchandise revenues, as the government contends; or whether a 10% royalty should apply against the same, as Gaylord contends.[17]   Neither party offered expert testimony with respect to this issue.

The commercial merchandise licenses and agreements in the record strongly suggest that an 8% royalty is more appropriate than a 10% royalty.  Indeed, both Gaylord and the Postal Service agreed to license their works to third parties on commercial merchandise for an 8% running royalty.  Gaylord had only one license agreement relating to use of "The Column" on commercial merchandise outside of the context of threatened litigation.  See PX 18.  The license agreement was structured so that he effectively received an 8% royalty[18] of the T-shirt and statue revenues featuring "The Column."   See id.  The Postal Service's commercial merchandise agreements with third-parties also used an 8% royalty.  See Stip. Facts ¶ 19.  The other agreements that Gaylord is likely to cite in support of a 10% royalty cannot be considered evidence of an established royalty.  See supra Sections I.A.3-4.

Accordingly, the Court should conclude that Gaylord is entitled to an 8% royalty assessed against the philatelic and commercial merchandise revenues.  Since the parties have stipulated

---

[17] The ultimate amount in dispute with respect to this issue is minimal.  Given the agreement as to the royalty base, the government contends that Gaylord is entitled to a total of $26,474 for this category of goods; whereas Gaylord contends that he is entitled to $33,092.  See Stip. Facts ¶ 22; Plaintiff's Memo of Law at 6.  Nevertheless, the parties were not able to resolve this issue by stipulation.

[18] While Gaylord's agreement with KWVMDF nominally used a 10% royalty, see PX 18 at 3-4, the effective royalty of the agreement was 8%.   See id. at 4; Tr. I at 323:16-23 (Triano) ("[U]nder our agreement, we would, for every dollar they sent us, we would kick back, we would give 20 cents back to World Travel.")

the amount of commercial merchandise revenues, Gaylord's compensation for this category is $26,474.

**IV. GAYLORD IS ENTITLED TO A DELAY COMPENSATION FACTOR OF 19.5% UP THROUGH JULY 17, 2013**

Delay compensation is awardable as part of "reasonable and entire compensation" under Section 1498(b).  See Gaylord, 678 F.3d at 1345; see also Waite v. United States, 282 U.S. 508, 508-09 (1931).  The parties have jointly stipulated that the delay compensation factor for sales of the KWVM Stamp and related merchandise is 19.5% through July 17, 2013, and have agreed to negotiate in good faith any adjustment to the factor for a judgment entered after July 17, 2013. See Stipulation [Dkt. No. 97].

## CONCLUSION

For the foregoing reasons, the government respectfully requests that Court award reasonable compensation in accordance with the government's proposed findings of fact and conclusions of law.

Respectfully submitted,

STUART F. DELERY
Acting Assistant Attorney General

JOHN J. FARGO
Director


  s/Scott Bolden

| | |
|---|---|
| Of Counsel: | SCOTT BOLDEN |
| MICHAEL F. KIELY | Assistant Director |
| United States Postal Service | Commercial Litigation Branch |
| | Civil Division |
| | Department of Justice |
| | Washington, DC  20530 |
| July 19, 2013 | Email: Scott.Bolden@USDOJ.gov |
| | Telephone:     (202) 307-0262 |
| | Facsimile:     (202) 307-0345 |