IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FRANK GAYLORD,

        Plaintiff,

    v.

THE UNITED STATES,

        Defendant.

No. 06-539 C

Judge Thomas C. Wheeler

---

## DEFENDANT'S RESPONSE TO
## PLAINTIFF'S POST-TRIAL BRIEF ON REMAND

---

STUART F. DELERY
Acting Assistant Attorney General

JOHN J. FARGO
Director

Of Counsel:
MICHAEL F. KIELY
United States Postal Service

SCOTT BOLDEN
Assistant Director
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, DC  20530
Email: Scott.Bolden@USDOJ.gov
Telephone:    (202) 307-0262
Facsimile:    (202) 307-0345

August 1, 2013

**REDACTED VERSION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................................................................... ii

ARGUMENT ............................................................................................................. 1

I.   GAYLORD CONCEDES THAT HE HAS NOT MET HIS BURDEN WITH RESPECT TO USED KWVM STAMPS ............................................................................................... 3

II.  THE EVIDENCE SUPPORTS A HYPOTHETICALLY NEGOTIATED LICENSE TO USE "THE COLUMN" ON USED AND RETAINED KWVM STAMPS FOR NO MORE THAN $10,000 ................... 6

   A.   The $83,400 Allegedly Owed to Gaylord by CLA in 1992 is not Objective Evidence of the Fair Market Value of a Nonexclusive License to Use "The Column" on a Commemorative Stamp ..................................................................................... 9

   B.   Retained Stamps are not the Same as Commercial Merchandise ................................. 10

   C.   Defendant's Exhibit 145 Supports the Conclusion that the Three-Month Retention of the KWVM Stamp Significantly Overestimates the Long-Term Retention of the KWVM Stamp .......................................................................................... 11

   D.   Gaylord's Alternative Approaches are Flawed ........................................................ 14

      1.   Pursuant to the Cost Approach, the Postal Service would have Paid $5,000 or Less to Use a Different Commemorative Stamp Image ...................................... 14

      2.   Pursuant to the Income Approach, Gaylord Overestimates the Value of "The Column" on the KWVM Stamp ....................................................................... 15

III. THE EVIDENCE SUPPORTS A HYPOTHETICALLY NEGOTIATED LICENSE TO USE "THE COLUMN" ON KWVM STAMP PHILATELIC AND COMMERCIAL MERCHANDISE AT AN 8% ROYALTY RATE ........................................................................................... 17

IV.  PLAINTIFF'S PROPOSED FINDINGS OF FACT ARE GENERALLY FLAWED ............................ 18

CONCLUSION ........................................................................................................ 22

**REDACTED VERSION**

## TABLE OF AUTHORITIES

**Cases**

Bouchat v. Baltimore Ravens Football Club, Inc.,
  346 F.3d 514 (4th Cir. 2003) ................................................................ 7

Cohen v. United States,
  100 Fed. Cl. 461 (2011) ...................................................................... 1

de Graffenried v. United States,
  25 Cl. Ct. 209 (1992) ......................................................................... 7

Dow Chemical Co. v. United States,
  226 F.3d 1334 (Fed. Cir. 2000) ............................................................ 7

Energy Transp. Group, Inc. v. William Demant Holding A/S,
  697 F.3d 1342 (Fed. Cir. 2012) ............................................................ 7

Fromson v. Western Litho Plate and Supply Co.,
  853 F.2d 1568 (Fed. Cir. 1998) ........................................................... 13

Gaylord v. United States,
  595 F.3d 1364 (Fed. Cir. 2010) .......................................................... 10

Gaylord v. United States,
  678 F.3d 1339 (Fed. Cir. 2012) ..................................................... passim

Gaylord v. United States,
  85 Fed. Cl. 59 (2008) ....................................................................... 10

Georgia-Pacific Corp. v. U.S. Plywood Corp.,
  318 F. Supp. 1116 (S.D.N.Y. 1970) ................................................... 7, 8

i4i Ltd. Partnership v. Microsoft Corp.,
  598 F.3d 831 (Fed. Cir. 2010) .............................................................. 8

LaserDynamics, Inc. v. Quanta Computer, Inc.,
  694 F.3d 51 (Fed. Cir. 2012) .............................................................. 18

Lucent Techs., Inc. v. Gateway, Inc.,
  580 F.3d 1301 (Fed. Cir. 2009) ....................................................... 1, 13

Rude v. Westcott,
  130 U.S. 152 (1889) ......................................................................... 18

Sinclair Refining Co. v. Jenkins Petroleum Process Co.,
   289 U.S. 689 (1933) .................................................................................................. 13

Stickle v. Heublein, Inc.,
   716 F.2d 1550 (Fed. Cir. 1983) ................................................................................. 7

Uniloc USA, Inc. v. Microsoft Corp.,
   632 F.3d 1292 (Fed. Cir. 2011) ................................................................................. 8

University of Colorado Foundation, Inc. v. American Cyanamid Co.,
   196 F.3d 1366 (Fed. Cir. 1999) ................................................................................. 7

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FRANK GAYLORD,

        Plaintiff,

    v.

THE UNITED STATES,

        Defendant.

No. 06-539 C

Judge Thomas C. Wheeler

## DEFENDANT'S RESPONSE TO
## PLAINTIFF'S POST-TRIAL BRIEF ON REMAND

Pursuant to the Court's Order of June 18, 2013, Defendant, the United States ("the government"), hereby respectfully submits its Response to Plaintiff's Post-Trial Brief on Remand.[1]  For the purposes of this Response, "Plaintiff's Post-Trial Brief" includes Plaintiff's Post-Trial Memorandum in Support of Judgment [Dkt. Nos. 126, 131] and Plaintiff's Proposed Findings of Fact with Record Citation and Conclusions of Law on Damages [Dkt. Nos. 128, 132].

## ARGUMENT

Plaintiff, Frank Gaylord ("Gaylord"), failed to meet his burden of proof with respect to his claim that a 10% running royalty is a reasonable royalty for the use of "The Column" on the 2003 Korean War Veterans Memorial commemorative stamp ("KWVM Stamp") and the related merchandise.  See Cohen v. United States, 100 Fed. Cl. 461, 478-79 (2011) ("The plaintiff bears the burden of proving that the infringement was the cause of its loss of revenue."); see also Lucent Techs., Inc. v. Gateway, Inc., 580 F.3d 1301, 1324 (Fed. Cir. 2009) (with respect to a

---

[1] This Response is being filed under seal because it includes information that the government has designated as Protected Information under the Protective Order in this case, including, *inter alia*, stamp retention data.  See Protective Order [Dkt. No. 30].

hypothetical negotiation in the context of patent infringement, "[t]he burden of proving damages falls on the patentee").   In this case, the Federal Circuit suggested that the Court consider whether different hypothetically-negotiated royalties are appropriate for "three categories of infringing goods":

> (1) stamps used to send mail; (2) unused stamps purchased by collectors; and (3) commercial merchandise featuring an image of the stamp.

Gaylord v. United States, 678 F.3d 1339, 1344-45 (Fed. Cir. 2012).  In Gaylord's opening post-trial brief ("Gaylord Br."), Gaylord conceded, for the first time, that he had not met his burden of proof with respect to the KWVM Stamps used to send mail.  See Gaylord Br. at 11 ("Plaintiff does not seek a separate damages award for KWVM Stamps used as postage.").

In the government's opening post-trial brief ("Gov. Br."), the government argued that Gaylord had not met his burden of proving entitlement to a 10% running royalty for any of the three categories of infringing goods.  See Gov. Br. at 17-28.  In particular, Gaylord did not meet his burden because he erroneously relied upon:  (1) financially unsuccessful agreements that were incomparable to the infringement; (2) a misapplication of the entire market value rule; and (3) expert testimony that failed to reach any significant issues in dispute.  See id.

Nevertheless, the government argued that the Court could conclude that the parties would have agreed to a lump-sum royalty of $10,000 or less for use of "The Column" on the first two categories of infringing goods – used and retained KWVM Stamps.  See Gov. Br. at 28-48. Similarly, the government argued that the Court could conclude that the parties would have further agreed to an 8% running royalty on the third category of infringing goods – philatelic and commercial merchandise featuring an image of the KWVM Stamp.  See Gov. Br. at 48-50. These conclusions were well-supported by the record.  At the time of the hypothetical negotiation, Gaylord was objectively willing to license "The Column" for very modest amounts

of money, and he had given up any effort to commercialize his work.  <u>See</u> Gov. Facts ¶¶ 1-14.

At the same time, other rights-holders eagerly negotiated with the Postal Service for a lump-sum

royalty of $5,000 or less in return for the honor and prestige of having their works featured on

commemorative stamps.  <u>See</u> Gov. Facts ¶¶ 18-23, 42.  A running royalty is especially unsuitable

for the retained KWVM Stamps because the evidence shows that the stamp's performance had

nothing to do with its image.  <u>See</u> Gov. Facts ¶¶ 15-17, 24-25, 32-36.  Finally, the government's

damages expert provided credible testimony that a lump-sum royalty of $10,000 or less was

supported by a series of industry-accepted quantitative and qualitative measures.  <u>See</u> Gov. Facts

¶¶ 37-47.

Gaylord offered little in support of his claim for compensation.  Having jettisoned his

claim for compensation for KWVM Stamps used as postage, Gaylord argues that he met his

burden with respect to obtaining a 10% royalty for the KWVM Stamps retained by collectors.

As described below, Gaylord's arguments lack legal and factual support.

## I.   GAYLORD CONCEDES THAT HE HAS NOT MET HIS BURDEN WITH RESPECT TO USED KWVM STAMPS

Gaylord now states that he "does not seek a separate damages award for KWVM Stamps

used as postage," because there are allegedly "no comparable licenses for [such] stamps."

Gaylord Br. at 11.   Gaylord's choice to not seek compensation for used KWVM Stamps

constitutes an implicit concession that he failed to meet his burden of proof with respect to used

KWVM Stamps.  <u>See e.g.</u>, Gaylord Br. at 3 ("Without any comparable licenses . . . the royalty

method breaks down . . . .").

While Gaylord is entitled to forego seeking compensation for this category of infringing

goods, Gaylord is clearly mistaken with respect to his contention that "there are no comparable

licenses for stamps used as postage."  Gaylord Br. at 11.  The government introduced numerous

license agreements between the Postal Service and other rights-holders whereby the Postal Service negotiated a lump-sum royalty of $5,000 or less for the right to use copyrighted works for postage, whether used or retained.  See DX 105-106; DX 109-110; DX 113; DX 118-121; DX 123; Gov. Facts ¶¶ 19-21, 42.  The Postal Service always sought the right to use an image on three different types of products:  (1) stamps; (2) philatelic products; and (3) "other products" (commercial merchandise).[2]  See DX 110 at 1; DX 119 at 1; Tr. II at 177:11-14 (Owens).  Most significantly, the Postal Service negotiated a one-time lump-sum to John Alli ("Alli") of $1,500 for the right to use his photograph in a commemorative stamp.  See DX 118 at 1; see also Gaylord, 98 Fed. Cl. at 392 ("[T]he Postal Service paid Mr. Alli . . . $1,500."); Tr. I at 382:23-384:16 (Alli).

Gaylord's efforts to ignore these directly comparable license agreements are not credible. In particular, Gaylord argues that copyrighted photographs are incomparable and inferior works of art in comparison with his copyrighted sculpture.  See Tr. II at 221:9-10 (Harvey) ("Do you think that [the KWVM] is comparable to a photograph of a submarine **as a work of art**?") (emphasis added); see also Gaylord Proposed Findings at II.B.(1).  Gaylord's self-serving argument as to the elevated artistic worth of "The Column" vis-à-vis the works of other artists has no basis in the facts of this case.  For example, Gaylord's subjective view of the artistic worth of "The Column" is contradicted by the objective evidence of his financially unsuccessful attempts to license and market the work.  See Gov. Facts ¶¶ 1-14, 37, 41.  In addition, the Postal Service often negotiated licenses for photographs of copyrightable sculptures and works of art:

---

[2] The first two categories of infringing goods identified by the Federal Circuit would fall within the first type of products licensed by the Postal Service; the third category of infringing goods would encompass both the second and third types of products licensed by the Postal Service.



**Figure 1.  The Postal Service licensed images of sculptures and architecture for commemorative stamps for a lump-sum royalty.  Clockwise from the top left:  "Black Sun" (DX 119); "Akari 25N" (DX 120); "Mother and Child, 1944-45" (DX 121); "Walt Disney Concert Hall (Disney 2A)" (DX 123).**

The Postal Service's licensing practices with respect to these works were exactly the same as with any other image.  See generally DX 119; DX 120; DX 121; DX 123.  With respect to the Postal Service's commemorative stamps featuring the work of Isamu Noguchi, the photographers negotiated lump-sum payments of $2,500, and the rights-holders of the photographed sculptures negotiated no-fee agreements.  See DX 119; DX 120; Tr. II at 182:2-183:2 (Owens).  The Walt Disney Company, the owner of other famous pre-existing copyrighted works, similarly agreed to a no-fee philatelic agreement with the Postal Service.  See Tr. II at 194:3-17 (Owens).  These license agreements are merely a subset of all of the license agreements between the Postal Service and rights-holders to use copyrighted works on stamps – both used and retained.

Accordingly, while Gaylord correctly conceded that he failed to meet his burden of proof with respect to used KWVM Stamps, his claim that the record lacks comparable license agreements is contradicted by the Postal Service's negotiations for the use of copyrighted works on stamps.  The Postal Service's license agreements are directly comparable to the hypothetical negotiation at issue in this case, and the agreements demonstrate that the Postal Service would have attempted to negotiate a license fee for "The Column" of $5,000 or less in 2003.

## II.   THE EVIDENCE SUPPORTS A HYPOTHETICALLY NEGOTIATED LICENSE TO USE "THE COLUMN" ON USED AND RETAINED KWVM STAMPS FOR NO MORE THAN $10,000

An objective view of the licensing practices of Gaylord and the Postal Service demonstrates that a hypothetical negotiation would have resulted in a lump-sum payment of $10,000 or less in return for the honor and prestige of having "The Column" featured on the KWVM Stamp.  Gaylord's agreements demonstrate that he was willing to license "The Column" for very modest amounts of money – even for free.  See Gov. Facts ¶ 3 (receiving $2,446.93 in royalties); id. ¶ 5 ($650 received); id. ¶ 9 ($0 received); id. ¶ 14 ($0 received).  The Postal Service's agreements show that other rights-holders eagerly negotiated a lump-sum royalty of

REDACTED VERSION

$5,000 or less in return for the honor and prestige of having their works featured on commemorative stamps. <u>See</u> Gov. Facts ¶¶ 19-21, 42. If a rights-holder refused to negotiate and demanded a running royalty based on stamp revenues, the Postal Service sought out and used alternative art. <u>See</u> Gov. Facts ¶ 23. In addition, Gaylord offered no evidence that anyone in the postal industry would have ever negotiated a stamp image license using a running royalty. <u>See</u> <u>Stickle v. Heublein, Inc.</u>, 716 F.2d 1550, 1561-62 (Fed. Cir. 1983); <u>de Graffenried v. United States</u>, 25 Cl. Ct. 209, 217-18 (1992); <u>see also</u> <u>Dow Chemical Co. v. United States</u>, 226 F.3d 1334, 1348 (Fed. Cir. 2000). Furthermore, Gaylord failed to show a causal link between the use of "The Column" and the retention revenues. <u>See</u> Gov. Facts ¶¶ 24-26, 32-36; <u>Gaylord</u>, 678 F.3d at 1345; <u>Bouchat v. Baltimore Ravens Football Club, Inc.</u>, 346 F.3d 514, 522-23 (4th Cir. 2003); <u>University of Colorado Foundation, Inc. v. American Cyanamid Co.</u>, 196 F.3d 1366, 1375 (Fed. Cir. 1999). Finally, a lump-sum royalty of $10,000 or less is supported by a series of industry-accepted quantitative and qualitative measures, including: (1) the market approach; (2) the income approach; (3) the cost approach; and (4) analysis of the applicable <u>Georgia-Pacific</u> factors. <u>See</u> Gov. Facts ¶¶ 37-40; <u>see also</u> <u>Energy Transp. Group, Inc. v. William Demant Holding A/S</u>, 697 F.3d 1342, 1357 (Fed. Cir. 2012) (endorsing <u>Georgia-Pacific Corp. v. U.S. Plywood Corp.</u>, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), as setting forth "a list of admissible factors," rather than a specific "test for royalty calculations").

Critically, Gaylord's post-trial brief ignores the most fundamental fact issues identified by the Federal Circuit. The Federal Circuit remanded the case to this Court to "consider *all* evidence relevant to a hypothetical negotiation rather than limiting its analysis to the Postal Service's past licenses." <u>Gaylord</u>, 678 F.3d at 1344. The government presented a detailed analysis of each of Gaylord's agreements in its post-trial brief, and explained why Gaylord's

agreements could not support his claims.  See Gov. Br. at 18-24; Gov. Facts ¶¶ 1-9.  Gaylord,

however, presented only a fleeting and shallow analysis of his agreements, without considering

the terms, scope, and context of the agreements.  See Gaylord Br. at 1; PPF 17, 19.  With respect

to retained KWVM Stamps, the Federal Circuit suggested that "[i]t may be pertinent to examine

whether the number of unused stamps is greater for this stamp than for the average stamp" to

determine "the value attributable" to "The Column."   Gaylord, 678 F.3d at 1345.   The

government introduced evidence that the KWVM Stamp performed at or below average by every

metric in comparison with the stamp's peers.  See Gov. Br. at 38-40; Gov. Facts ¶¶ 33-36.

Gaylord, however, introduced no evidence during trial on this issue.[3]  Finally, the Federal Circuit

"has sanctioned the use of the Georgia–Pacific factors to frame the reasonable royalty inquiry."

Uniloc USA, Inc. v. Microsoft Corp., 632 F.3d 1292, 1317 (Fed. Cir. 2011) (citing Georgia-

Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116 (S.D.N.Y. 1970)).  Gaylord, however,

devoted only two sentences in his post-trial brief to a discussion of the factors.  See Gaylord Br.

at 5-6; see also Gaylord Proposed Findings at 20-21 (proposing conclusions of law without

factual support); compare with Gov. Br. at 46-48.[4]

Gaylord's post-trial brief attempts to side-step the fundamental issues cited by the Federal

Circuit by arguing that:  (1) a $10,000 lump-sum royalty is too low because of a stop work order

---

[3] Gaylord introduced no evidence in support of his argument, despite his counsel's clear awareness of the importance of this factor.  See, e.g., Tr. II at 17:20-19:4 (Harvey); see also Appeal Oral Argument at 3:43-6:29, Gaylord, 678 F.3d 1339, available at http://oralarguments.cafc.uscourts.gov/default.aspx?fl=2011-5097.mp3.

[4] Gaylord improperly omits context from the identified factors to support his view of the case.  For example, Gaylord identifies "factors 10 and 11" as simply "nature and extent of use," but the Federal Circuit identifies the factors as "(10) the nature of the patented invention **and the benefits to those who have used the invention**; (11) the extent to which the infringer has used the invention **and the value of that use**."  Gaylord Br. at 6; compare with i4i Ltd. Partnership v. Microsoft Corp., 598 F.3d 831, 853 n.3 (Fed. Cir. 2010) (citing Georgia-Pacific, 318 F. Supp. at 1120).

billing dispute in 1992, prior to the creation of "The Column"; (2) retained stamps are economically identical to commercial merchandise; (3) the Court improperly admitted a Postal Service accounting position paper relating to the proper valuation of stamps retained long-term; and (4) two accounting approaches used by the government's damages expert corroborate Gaylord's request for a 10% running royalty on retained KWVM Stamps.  As described below, each of these arguments lacks merit.

### A.   The $83,400 Allegedly Owed to Gaylord by CLA in 1992 is not Objective Evidence of the Fair Market Value of a Nonexclusive License to Use "The Column" on a Commemorative Stamp

Gaylord dubiously asserts that a hypothetical lump-sum royalty of $10,000 is too low because he had "refused to relinquish his copyright for $80,000," Gaylord Br. at 10, but his alleged refusal is incomparable with a hypothetical license.  In 1992, the government issued a stop work order on the construction of the Korean War Veterans Memorial ("KWVM") because Cooper-Lecky Architects ("CLA"), Gaylord, and Louis Nelson ("Nelson") refused to assign their future copyright interests to the government.  See PX 200 at 1.  Despite the stop work order, Gaylord continued to work and incurred $83,400 in expenses as a result of his physical sculpting efforts.  See PX 200 at 3 (calculating $83,400 due as a result of, *inter alia*, "Sculpture Rework," "Design Revision #4," and "Model Shipped to D.C.").  Thus, the expenses incurred in violation of the stop work order have nothing to do with the value of a nonexclusive license for "The Column"; the amount is based solely on Gaylord's physical work.  Indeed, "The Column" and its copyright did not exist as of the 1992 stop work order billing dispute.  See PX 9 at 2 (indicating the initial sketch models of "The Column" were not completed until 1993).  When the government later rescinded the stop work order, CLA paid Gaylord for his physical work.  Thus, the 1992 stop work order billing dispute has no bearing on the fair market value of a nonexclusive license to use "The Column" eleven years later.

Instead, Gaylord's actual licensing and marketing activities between 1995-2003 provide the objective view of what he would have accepted for a nonexclusive license with the Postal Service in 2003.  Gaylord repeatedly licensed "The Column" for very modest amounts.  <u>See</u> Gov. Facts ¶¶ 3, 5, 9, 14.  Third-parties had little interest in licensing "The Column," despite Gaylord's efforts.  <u>See</u> Gov. Facts ¶ 13.  Gaylord did not attempt to commercialize "The Column" after August 22, 2000.  <u>See</u> Gov. Facts ¶ 12.  The Postal Service's proposed use would not have harmed any of his business prospects, <u>see</u> Gov. Facts ¶¶ 10-11, and the Postal Service's use "actually increased the value of 'The Column.'"  <u>Gaylord v. United States</u>, 85 Fed. Cl. 59, 70 (2008) (citing DX 43 (RFA 20)); <u>Gaylord v. United States</u>, 595 F.3d 1364, 1375 (Fed. Cir. 2010).  These objective facts are directly relevant, and they strongly support the conclusion that Gaylord would have negotiated a lump-sum royalty of $10,000 or less in 2003 in return for the honor and prestige of having his work featured on the KWVM Stamp.

**B.  Retained Stamps are not the Same as Commercial Merchandise**

Gaylord asserts that retained stamps "are identical in every economic sense" to commercial merchandise, Gaylord Br. at 1, 8, but the record refutes his unsupported assertion. Retained stamps are unlike merchandise because a stamp's retail price is attributable to its ability to send mail.  <u>See</u> Gov. Facts ¶ 16; <u>see generally</u> PX 213 at 25 ("Since 1971 . . . the Postal Reorganization Act has required the Postal Service to establish postal rates that cover the cost of operating the postal system").  As such, a stamp is essentially a form of postal currency that can always be exchanged for the Postal Service's delivery services.  <u>See</u> Gov. Facts ¶¶ 15, 29. Commercial merchandise cannot be exchanged for postal services.  Indeed, the Federal Circuit suggested that stamps and merchandise should not be treated similarly for purposed of determining compensation.  <u>See</u> <u>Gaylord</u>, 678 F.3d at 1345 ("The commercial merchandise seems distinctly different from the stamps.").

The testimony cited by Gaylord in support of his contention actually proves the opposite. See Gaylord Br. at 8 (citing PPF 22).   When a customer purchases a stamp from the Postal Service, the Postal Service collects money in the amount of the face value of the stamp.   See, e.g., PX 213 at 47 ("Revenue Recognition / Estimated Prepaid Postage").   Simultaneously, however, the Postal Service becomes obligated to provide postal services to the customer in the future.   See id.   Thus, the Postal Service's considers "estimated prepaid postage – deferred revenue" to be a liability.   See id.; Tr. II at 267:9-11 (Kearney).   A calculation is then made for stamps that are retained long-term – twelve months or more after the date of issuance.   That becomes a component of "breakage," which is subtracted from the prepaid postage liability.   See Tr. II at 267:3-8 (Kearney).   The Postal Service's complex accounting treatment for the sale of postage stamps – both used and retained – is an attempt to "recognize revenue when service is rendered," PX 213 at 47, rather than recognizing revenue at the time of sale.   This unique accounting treatment distinguishes stamps from commercial merchandise, which requires no calculation for deferred revenue or breakage.[5]   Finally, several unique characteristics of retained stamps truly distinguish them from commercial merchandise.   Retained stamps "are really low-value collectibles to most people," Tr. II at 236:1-3 (Kearney), that are collected "for any number of reasons," Gaylord, 678 F.3d at 1345; see also Gov. Facts ¶¶ 24, 25, that can be exchanged for postal services at any time.   See Gov. Facts ¶ 29.

**C. Defendant's Exhibit 145 Supports the Conclusion that the Three-Month Retention of the KWVM Stamp Significantly Overestimates the Long-Term Retention of the KWVM Stamp**

As noted in the government's opening post-trial brief, the parties dispute the amount of KWVM Stamps that were retained long term.   See Gov. Br. at 40-42.   In 2011 and 2012, the

---

[5]   The license agreements between the Postal Service and other rights-holders also clearly distinguished stamps from commercial merchandise.   See, e.g., DX 118 at 1 (defining a postage stamp as the "Stamp," and defining philatelic products and other products as the "Products").

Postal Service determined that the long-term retention rate of a stamp is approximately 54% of the short-term retention rate of that same stamp.  See DX 145 at 9; Tr. II at 237:12-20 (Kearney). Defendant's Exhibit 145 summarizes the Postal Service's model and describes its financial application.  The government's expert utilized the model identified in Defendant's Exhibit 145 in his income approach calculations.  See DX 151 ¶¶ 37, 91.[6]

Thus, Christopher Bokhart ("Bokhart") properly used the model identified in Defendant's Exhibit 145.  Gaylord asserts that the accounting position paper is "inappropriate evidence," PPF 50; see also PPF 55-56, but his assertion lacks merit.  For example, Gaylord argues that the accounting position paper is unreliable because it "pertained only to Forever Stamps," PPF 56(a), but Gaylord ignores that the paper was created at a time when almost all first-class one-ounce stamps were Forever stamps.  See Tr. II at 219:6-16 (Owens); Tr. II at 292:12-293:8 (Kearney). The paper discusses the long-term retention rates of "collectible" stamps; and the KWVM Stamp was a collectible stamp.  Stephen Kearney ("Kearney") testified that "the largest point" of the paper was relevant to the long-term retention rate for commemorative stamps generally, without regard to whether the stamp was a Forever stamp:

> Q      So [with respect to DX 145], the change that's described in this paper would have no applicability to a commemorative stamp that was issued in 2000?
>
> A      To me, the largest point in this paper is that the survey showed that long-term retention was 54-percent of what we initially thought based on a one-quarter survey.
>
> Q      For a Forever stamp, correct?

---

[6] While Bokhart relied upon the model identified in the accounting paper as a component of his income approach calculation of the number of commemorative stamps retained by consumers, Gaylord's proposed finding that Bokhart "relied exclusively" on the paper is unsupported. PPF 55, compare with Tr. II at 421:14-19 (Bokhart).  And as discussed in detail below, Bokhart's income approach conclusions remain valid even if Gaylord's unsupported assumptions are used. See infra Section II.D.2.

REDACTED VERSION

A        Personally, I don't know why a collector would treat his behavior differently for a Forever stamp versus a non-Forever stamp.

Tr. II at 298:12-22 (Kearney).  Thus, Gaylord's distinction of Forever Stamps from non-Forever Stamps is not meaningful in this situation.

Gaylord also challenges the reliability of the accounting paper because it "was generated . . . years after the hypothetical negotiation," PPF 56(b), but Gaylord's challenge is contradicted by the legal standards he cites.  For example, Gaylord's Brief explicitly requests that the Court use the "Book of Wisdom" approach, see Gaylord Br. at 5, whereby "factual developments occurring after the date of the hypothetical negotiation can inform the damages calculation." Lucent, 580 F.3d at 1333 (citing Sinclair Refining Co. v. Jenkins Petroleum Process Co., 289 U.S. 689, 698 (1933)); see generally Fromson v. Western Litho Plate and Supply Co., 853 F.2d 1568, 1575 (Fed. Cir. 1998) ("The [hypothetical negotiation] methodology . . . permits and often requires a court to look to events and facts that occurred thereafter . . . .").  The accounting paper informs calculations relevant to damages because it provides a model to determine the long-term retention rate of collectible stamps.

Gaylord himself repeatedly relies on Defendant's Exhibit 145 even while simultaneously attacking the government for doing the same.  For example, Gaylord repeatedly quotes the accounting paper's statement that the Synovate surveys are a "statistically valid national sample."  PPF 25 (citing DX 145 at 6 n.4); Gaylord Br. at 2, 9 (same).  Gaylord removes key context from the quotation in a misguided effort to support his claims.[7]  Nevertheless, Gaylord's

---

[7] Gaylord argues that the short-term retention of the KWVM Stamp must be equivalent to the KWVM Stamp's long-term retention because of the quotation, but a full reading of the excerpted footnote reveals no support for his argument.  The accounting paper describes the Synovate contract as "statistically valid national sample **for its intended purpose.**"  DX 145 at 6 n.4 (emphasis added).  The intended purpose of the short-term retention numbers reported in the quarterly Synovate surveys was to analyze the relative popularity of various commemorative stamp issues.  See Gov. Facts ¶ 27.  The Postal Service did not use the short-term retention

repeated citations of this accounting paper directly contradict his arguments that the Court should have excluded the paper from evidence.  In addition, as described in detail below in Section II.D.2, Gaylord relied on a breakage rate identified in the accounting position paper in support of his alternative income approach.  See infra Section II.D.2.

### D.  Gaylord's Alternative Approaches are Flawed

Gaylord repurposes two accounting approaches used by the government's damages expert in an effort to "corroborate the royalty approach."  Gaylord Br. at 11-13.  Gaylord's use of Bokhart's income and cost approaches implicitly validates the accounting approaches used by the government's expert.  See also Tr. II at 438:4-6 (Faris) (testifying in rebuttal that he did not have any issue with respect to Bokhart's use of the market approach).  Nevertheless, the income and cost approaches cannot "corroborate" Gaylord's demand for a 10% royalty because Gaylord's conclusions are driven by faulty assumptions and facts.

### 1.  Pursuant to the Cost Approach, the Postal Service would have Paid $5,000 or Less to Use a Different Commemorative Stamp Image

Gaylord contends that he is entitled to $775,000 pursuant to the cost approach, because "the Postal Service would have to pay at least $775,000 (the amount paid to Mr. Gaylord to create 'The Column') in 1992-1995 dollars."  Gaylord Br. at 12.  Gaylord gravely errs by contending that the only alternative to "The Column" would be to pay to completely rebuild another sculpture from the ground up.  Contrary to Gaylord's contention, the Postal Service could have negotiated the right to use an alternative subject or image for $5,000 or less.  See Gov. Facts ¶ 23; Tr. II at 191:17-23, 192:15-20, 221:16-22 (Owens); Tr. II at 374:11-20 (Bokhart); DX 151 ¶¶ 94-99.  Gaylord alleges that any alternative would have had to feature the KWVM, but even if Gaylord's unsupported assertion were true, the Postal Service could have

---

numbers in the quarterly Synovate surveys as a substitute for long-term retention.  See Tr. II at 263:8-264:20 (Kearney).

used an image of a different component of the KWVM for $5,000 or less.  The Postal Service

could have used an image of the KWVM reflecting pool for free, and could have negotiated with

Nelson for the right to use an image of the KWVM mural wall.  <u>See</u> Stip. Facts ¶¶ 9-10

(identifying the mural wall and the reflecting pool as primary components of the KWVM); <u>see</u>

DX 30 at 7 (holding, in a contracting officer's decision with CLA, that the KWVM contract

granted the government unlimited copyright licenses).

In addition, there is no factual support for Gaylord's contention that Gaylord received

$775,000 to create "The Column."  <u>See</u> PPF 43 (citing no evidence).  Triano claimed $775,971

in KWVM "commission income" between 1992 and 1999, <u>see</u> DX 40, but the $100,000+ he

included as income between the "Final Installment" owed by CLA in June 1995 and 1999 cannot

have been attributable to Gaylord's work on the KWVM.  For example, the $24,851 Triano

claimed in KWVM commission income in 1997 in DX 40 is directly contradicted by his

accounting ledger.  <u>See</u> DX 40 (claiming $24,851 in KWVM commission income for 1997),

<u>compare with</u> DX 46 at G2605-06 (identifying, for calendar year 1997:  $0 in KWVM

commission income; $503 from the sale of miniatures of "The Column"; and $18.36 in royalties

from KWVMDF).

### 2. Pursuant to the Income Approach, Gaylord Overestimates the Value of "The Column" on the KWVM Stamp

Gaylord misuses the income approach to calculate a higher incremental revenue for the

KWVM Stamp and incorrectly assumes that he is entitled to 10% of the higher amount.  As a

result, the income approach cannot justify Gaylord's alternate claim that he is entitled to

█████

As an initial matter, Gaylord's use of a ██ breakage rate in his income approach

calculations validates the relevance of Defendant's Exhibit 145.  Gaylord asserts that "[t]he only

'breakage' rate in evidence for non-forever stamps is ███," PPF 54; see also Gaylord Br. at 12, but he provides no citation to the record for his assertion.  In fact, Gaylord's breakage rate is pulled directly from the Postal Service's 2012 Accounting Position Paper at Defendant's Exhibit 145, which states that the Postal Service ███████████████████████████████████ ███████ DX 145 at 2; see also DX 145 at 4.  Even though Gaylord uses a different breakage percentage than the government to determine a long term retention rate, Gaylord's reliance on Defendant's Exhibit 145 demonstrates the admissibility and relevance of the exhibit.

Ultimately, Gaylord ignores a fundamental aspect of the income approach.  The approach examines the incremental revenue for the KWVM Stamp as a whole; the approach **does not** attempt to determine the income attributable to an individual subcomponent of the stamp, such as its image.  See Tr. II at 374:4-10 (Bokhart); see also DX 151 ¶ 93.  The KWVM Stamp is a collection of contributions from the Postal Service, Alli, and Gaylord.  See Tr. II at 380:8-13 (Bokhart).  Indeed, if 10% of the incremental revenue for a commemorative stamp was truly attributable to the stamp's image, a rights-holder would never negotiate a lump-sum royalty that was a fraction of that amount.[8]  Thus, the fact that rights-holders do negotiate lump-sum royalties of $5,000 or less demonstrates that Gaylord's use of the income approach vastly overestimates the value of "The Column."  Significantly, even assuming Gaylord's improperly inflated figures, Bokhart testified that the income approach still does not justify Gaylord's demand for a 10% royalty:

> Even if we start with the $5.4 million not reduced down by the 50-percent roughly for the Synovate study between three months and nine months for the ████ for the retention of regular stamps and go with the lower number of ███████ ███████████ **the conclusion you reach ultimately is the same**, that the value related to the 10-percent under any scenario, any variability of these numbers still

---

[8] A lump-sum royalty of $5,000 is approximately ███ of the royalty alleged by Gaylord under the income approach.

leads me to the conclusion that **the 10-percent number is not reflective of the value of the copyrights**.

Tr. II at 382:4-17 (Bokhart) (emphasis added). Accordingly, the income approach does not corroborate Gaylord's claim for a 10% royalty, and the approach cannot justify Gaylord's alternate claim that he is entitled to █████.

### III. THE EVIDENCE SUPPORTS A HYPOTHETICALLY NEGOTIATED LICENSE TO USE "THE COLUMN" ON KWVM STAMP PHILATELIC AND COMMERCIAL MERCHANDISE AT AN 8% ROYALTY RATE

With respect to the philatelic and commercial merchandise, the Court should conclude that Gaylord and the Postal Service would have negotiated an 8% running royalty in a hypothetical negotiation. As noted in the government's opening post-trial brief, the only dispute between the parties with respect to this issue is whether an 8% or 10% royalty rate is appropriate. See Gov. Br. at 48-50.

Gaylord claims that a 10% royalty is more appropriate, but the evidence he indirectly cites in support of the 10% royalty is fundamentally weak. In particular, Gaylord fails to specifically cite and discuss the terms of any of the agreements that purportedly support a 10% royalty. See generally Gaylord Br. at 6-7; PPF 17. Rather than attempting to identify specific support in the record for his claimed 10% royalty rate, Gaylord simply attempts to reverse the burden of proof by claiming that "[t]he Government presented no evidence of any lesser applicable royalty for merchandise [than a 10% royalty]."[9] Gaylord Br. at 2; see also Gaylord Br. at 7. On closer examination, the agreements in the record strongly support an 8% royalty instead of a 10% royalty rate.

---

[9] The government conceded that Gaylord and the Postal Service would have been willing to negotiate a running royalty for the philatelic and commercial merchandise in a hypothetical negotiation. See Gov. Br. at 48-50. Neither party offered expert testimony with respect to this issue. See, e.g., Tr. II at 115:21-24 (Faris).

Both Gaylord and the Postal Service agreed to license their KWVM-related works to third parties on commercial merchandise for an 8% royalty.  See PX 18 (Gaylord); Stip. Facts ¶ 19 (Postal Service).   While Gaylord's agreement with the Korean War Veterans Memorial Dedication Foundation, Inc. ("KWVMDF") nominally used a 10% royalty, Gaylord expressly agreed to return 20% of the royalties back to KWVMDF.  See PX 18 at 3-4; see also Tr. I at 323:16-23 (Triano).  Thus, the agreement demonstrates Gaylord's willingness to agree to a net 8% royalty rate.  Gaylord's three other agreements are either not relevant to a specific rate[10] or the result of litigation.[11]   Accordingly, the Court should conclude that the parties would have negotiated an 8% royalty rate on the merchandise revenues, and that Gaylord is entitled to $26,474 in compensation for this category of infringing goods.  See Stip. Facts ¶¶ 20, 22.

## IV.   PLAINTIFF'S PROPOSED FINDINGS OF FACT ARE GENERALLY FLAWED

Finally, Gaylord's proposed findings of fact contain a number of general flaws that significantly undercut his claimed support.  The general flaws include proposed findings that: fail to cite to any support in the record; rely on unadmitted exhibits; and recite broad conclusions unwarranted by the record.

Gaylord failed to provide any transcript and exhibit citations in support of at least 14 of his 59 proposed findings of fact.  See PPF 19, 20, 33, 36-38, 41, 43, 46, 48, 50, 52-54, compare with June 18, 2013 Post-Trial Order at 1 ("Proposed Findings of Fact should be supported with transcript and exhibit citations.").  Some of the 14 unsupported findings are nothing more than

---

[10] See PX 17 (royalty-splitting agreement); see also Gov. Facts ¶ 1; Gov. Br. at 20.

[11] See PX 25 (F.J. Designs); DX 41 (Alli); see also Gov. Facts ¶¶ 5-9; Gov. Br. at 21-24; see generally Rude v. Westcott, 130 U.S. 152, 164 (1889) (holding that settlement agreements are not evidence of an established royalty because "[t]he avoidance of the risk and expense of litigation will always be a potential motive for a settlement"); LaserDynamics, Inc. v. Quanta Computer, Inc., 694 F.3d 51, 77 (Fed. Cir. 2012) (holding that settlement agreements are generally unreliable evidence because such "license fees . . . are tainted by the coercive environment of patent litigation").

attorney-arguments couched as fact findings.  See, e.g., PPF 37 ("[T]he Postal Service cannot speculate about what Mr. Gaylord would have accepted as royalty.").  Gaylord's inability to cite support for more than 20% of his proposed findings demonstrates either:  (1) a lack of support in the record for the proposed findings; or (2) a lack of effort in attempting to satisfy his burden of proof.

Several of Gaylord's citations refer to unadmitted exhibits.  For example, PPF 25 refers to an "Exhibit 1" that was attached to Gaylord's proposed findings.  Exhibit 1 consists of an unoffered, inadmissible bar graph and table created by Gaylord's counsel.  The government moved to strike Gaylord's Exhibit 1 because it violates the Court's Post-Trial Order, and the government's arguments therein are incorporated by reference.  See June 18, 2013 Post-Trial Order [Dkt. No. 120] ("[T]he Court will not permit attachments to the briefs because the evidentiary record is closed."); Gov. Motion to Strike [Dkt. No. 133].  Similarly, PPF 23 and 47 both refer to David Failor's ("Failor") testimony, but Gaylord cites only Plaintiff's Trial Exhibit 30 for support – a trial exhibit that was largely excluded from the record.[12]  While Failor did adopt a few of the statements in Plaintiff's Trial Exhibit 30, Gaylord's citation of a largely excluded trial exhibit – rather than the witness's testimony – is unexplained.

Many of Gaylord's proposed findings draw unsupported conclusions from the testimony. In particular, Gaylord referenced the testimony of Charles Delaney ("Delaney"), the Postal Service's Manager of Stamp Manufacturing, in a misplaced attempt to argue that "the Korean War Veterans Memorial Stamp did better than the average commemorative stamp."  PPF 12; see

---

[12] During the first trial, counsel for the government successfully objected to Plaintiff's Exhibit No. 30 as inadmissible hearsay.  See Tr. I at 640:7-14 (Bolden).  Counsel for Gaylord subsequently "withdr[ew] [her] request to admit Exhibit 30," and the Court admitted the exhibit only to the limited extent the witness explicitly adopted statements from the exhibit during testimony.  Tr. I at 644:24-645:15.

also PPF 7-11.  First, with respect to PPF 7, 9, and 12, Delaney's testimony related only to the raw number of stamps printed, so the cited testimony cannot support Gaylord's proposed finding to the extent that Gaylord vaguely construes "did better" to mean anything other than the number of stamps printed.  See generally PPF 7, 9, 12.  Second, Gaylord cited Delaney's testimony to argue that a stamp's image is a factor in determining the number of stamps to produce, see PPF 8, but Gaylord failed to cite Delaney's testimony that the stamp image can be a minor factor, particularly with respect to the KWVM Stamp:

> Q    All right.  And who within the Postal Service decided how many [KWVM Stamps] to print?
>
> A    That would have been me.
>
> Q    And what was your decision based on?
>
> A    The decision was based on a previous assessment of stamps of a similar nature, in this case patriotic and/or military-base type stamps which we had produced previous.
>
> Q    And what effect did the particular stamp image have on your decision regarding the number of stamps to print?
>
> A    Not that much.  It was based on the theme rather than the image.

Tr. II at 313:17-314:4 (Delaney).  Finally, Gaylord also placed undue weight on Delaney's testimony that the three-month drawdown percentage[13] for the KWVM Stamp was "not bad." See PPF 11 (citing Tr. II at 314:18-315:4 (Delaney)).  Bokhart undertook a detailed analysis of the three-month drawdown percentages for the KWVM Stamp and its peers.  The KWVM Stamp was quantitatively average or below average in comparison with other commemorative:  military stamps, 2003 stamps, and stamps for which data was available.  See DX 151 at 17-18 (identifying the calculation as a "3 Month Litmus Test"); Tr. II at 383:21-385:19 (Bokhart); DX

---

[13] According to Delaney, the three-month drawdown percentage is the percent of physical stamps that have moved from the Postal Service's stamp distribution offices to direct retail outlets, such as post offices.  See Tr. II at 314:5-21, 321:7-323:6 (Delaney).

151 Exhibits 8-10 (identifying sources).   Delaney's testimony that the KWVM Stamp's drawdown percentage was "not bad" was consistent with Bokhart's quantitative conclusion that the KWVM Stamp's drawdown percentage was average or below average with respect to its peers.   But Delaney's testimony is not consistent with Gaylord's implicit suggestion that the KWVM outperformed its peers with respect to number of stamps printed.   And even if a stamp is printed in greater numbers than its peers, that fact alone cannot be correlated with above-average retention.   <u>See</u> Tr. II at 326:19-327:6 (Delaney) ("[N]ormally if I have a high-volume commemorative that I've issued, it's because we're anticipating heavy mail use, not necessarily heavier retention as a result.").

Similarly, many of proposed conclusions of law are not justified by the record.   For example, Gaylord represented that Layne Owens ("Owens") testified that "a license for a photograph (a submarine in the case of the particular question posed) is not comparable to a license for 'The Column.'"   Gaylord Proposed Findings II.D.(13).   Owens did not testify as claimed by Gaylord.   Owens was asked whether a photograph was comparable to the KWVM as a work of art; he was not asked whether the licenses were comparable.   <u>See</u> Tr. II at 221:9-10 (Harvey) ("Do you think that [the KWVM] is comparable to a photograph of a submarine **as a work of art**?") (emphasis added).   In light of the significant and pervasive flaws in his proposed findings of fact, Gaylord's conclusions become untenable.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that Court award reasonable compensation in accordance with the government's proposed findings of fact and conclusions of law.

Respectfully submitted,

STUART F. DELERY
Acting Assistant Attorney General

JOHN J. FARGO
Director

|  |  |
|---|---|
|  | s/Scott Bolden |
| Of Counsel: | SCOTT BOLDEN |
| MICHAEL F. KIELY | Assistant Director |
| United States Postal Service | Commercial Litigation Branch |
|  | Civil Division |
|  | Department of Justice |
|  | Washington, DC  20530 |
| August 1, 2013 | Email: Scott.Bolden@USDOJ.gov |
|  | Telephone:     (202) 307-0262 |
|  | Facsimile:      (202) 307-0345 |

**REDACTED VERSION**