# 𝔍𝔫 𝔱𝔥𝔢 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔬𝔣 𝔉𝔢𝔡𝔢𝔯𝔞𝔩 ℭ𝔩𝔞𝔦𝔪𝔰

No. 06-539C

(Filed: September 20, 2013)

| | | |
|---|---|---|
| ******************************************* | * | |
| | * | |
| | * | |
| FRANK GAYLORD, | * | |
| | * | Copyright Infringement; Measure |
| Plaintiff, | * | of Damages for Postal Service's |
| | * | Use of Copyrighted Image on |
| | * | Postage Stamp; 28 U.S.C. § 1498 |
| v. | * | (b); 17 U.S.C. § 504; Zone of |
| | * | Reasonableness Based Upon |
| UNITED STATES, | * | Evidentiary Record. |
| | * | |
| Defendant. | * | |
| | * | |
| ******************************************* | * | |

*Heidi E. Harvey*, Fish & Richardson P.C., Boston, Massachusetts, for Plaintiff.

*Scott Bolden*, with whom were *Tony West*, Assistant Attorney General, *John J. Fargo*, Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., *Gary L. Hausken* and *Michael F. Kiely*, Of Counsel, for Defendant.

## OPINION AND ORDER

WHEELER, Judge.

This case is before the Court on remand from the United States Court of Appeals for the Federal Circuit to determine the proper amount of damages due Plaintiff Frank Gaylord. The Federal Circuit instructed this Court to determine the fair market value of a license for the Postal Service's infringing use of Mr. Gaylord's copyright. Gaylord v. United States, 678 F.3d 1339, 1340 (Fed. Cir. 2012) ("Gaylord II"). The value of this license represents the amount Mr. Gaylord would have received if the Postal Service had paid Mr. Gaylord to use his copyright, instead of using it without his permission.

For the reasons explained below, the Court finds that Mr. Gaylord is entitled to just compensation of $684,844.94. The Court bases this conclusion on a finding that a 10 percent running royalty accurately captures the fair market value of a license to Mr. Gaylord's copyright.

A detailed factual history of this case can be found in the Court's previous opinions. See Gaylord v. United States, 85 Fed. Cl. 59 (2008); Gaylord v. United States, 98 Fed. Cl. 389, 390 (2011). The Court will provide a brief overview of the facts relevant to the issues currently on remand.

In 2006, Mr. Gaylord filed suit in this Court alleging that the Postal Service infringed upon his copyright in "The Column," a group of nineteen stainless steel soldiers that forms the centerpiece of the Korean War Veterans Memorial on the National Mall. (Joint Stipulation ("Stip.") ¶ 5, May 16, 2008.) The Court conducted a trial in Washington, D.C. from June 16 to June 20, 2008 and found that Mr. Gaylord owned a valid copyright for "The Column" but that the Postal Service made fair use of the "The Column" and therefore was not liable for copyright infringement. Gaylord, 85 Fed. Cl. at 68. On appeal, the Federal Circuit determined that the Postal Service's depiction of the sculptures on its memorial stamp did not fall within fair use and found that the Postal Service had infringed Mr. Gaylord's copyright in three categories: (1) stamps used to send mail; (2) unused stamps retained by collectors; and (3) retail goods featuring an image of the stamp. Gaylord v. United States, 595 F.3d 1364, 1371 (Fed. Cir. 2010) ("Gaylord I"). The Federal Circuit remanded the case for a determination of damages. Id.

On April 22, 2011, this Court awarded $5,000 in damages to Mr. Gaylord representing the largest amount the Postal Service had ever paid to use an image on a stamp. Gaylord, 98 Fed. Cl. at 393. Mr. Gaylord appealed the damages award, and the Federal Circuit vacated this Court's order and remanded the case for a determination of the fair market value of the Postal Service's infringing use. Gaylord II, 678 F.3d at 1340. This Court conducted a remand trial on damages in Washington, D.C. during May 13-14, 2013. Thereafter, the parties submitted post-trial briefs on July 19, 2013 and reply briefs on August 1, 2013. The Court heard closing arguments on August 20, 2013.

## Findings of Fact

In January 1996, amateur photographer John Alli visited the Korean War Veterans Memorial ("KWVM") during a snowstorm and took a photograph that he called "Real Life." (Stip. ¶ 12.) In 2002, the Postal Service authorized the 37-cent KWVM stamp that incorporated "Real Life" into the stamp image. (Stip. ¶ 13.) Mr. Gaylord did not consent to the Postal Service's use of an image of "The Column" on the stamp. (Stip. ¶ 16.) The Postal Service released the KWVM stamp on July 27, 2003. (Stip. ¶ 14.) Between the time of the stamp's release and March 31, 2005, when it was retired, the Postal Service sold 47,910,587 KWVM stamps. (Stip. ¶ 18.) Many of these stamps were used to send mail, but others were retained by collectors.

Between 1999 and 2012, the Postal Service conducted a quarterly survey through the marketing research firm Synovate ("Synovate survey") to determine how many stamps would be retained by collectors. For the quarter that the KWVM stamp was issued, the

Postal Service expected that at least 14,500,000 KWVM stamps would be retained by collectors.  Collected stamps represent almost pure profit to the Postal Service because collected stamps are not exchanged for postal services, and the costs associated with printing and distributing stamps are minimal. (Trial II, Faris, Tr. 109.)   As such, the 14,500,000 collected stamps represented $5,400,000 that the Postal Service expected to retain in profit.  (PX 29.)  In addition to the used and collected stamps, the Postal Service also sold merchandise carrying the stamp image. (Stip. ¶ 15.) The Postal Service received $330,919.49 in revenue from the sales of retail goods that featured the KWVM stamp. (Stip. ¶ 22.)

<u>Discussion</u>

Cases before this Court on remand are governed by the mandate rule.  <u>Carolina Power & Light Co. v. United States</u>, 98 Fed. Cl. 785, 794 (2011).  "[E]very appellate court judgment vests jurisdiction in the trial court to carry out some further proceedings."  <u>Exxon Chem. Patents, Inc. v. Lubrizol Corp.</u>, 137 F.3d 1475, 1483 (Fed. Cir. 1998).  The district court's actions on remand "should not be inconsistent with either the letter or the spirit of the mandate."  <u>Laitrim Corp. v. NEC Corp.</u>, 115 F.3d 947, 950-51 (Fed. Cir. 1997).  Mandates should be interpreted by looking at the language of the judgment in combination with the accompanying opinion.  <u>Exxon Chem.</u>, 137 F.3d at 1483 (citing, *inter alia*, <u>In re Sanford Fork & Tool Co.</u>, 160 U.S. 247, 256 (1895)).

Here, the Federal Circuit remanded the case for a determination of the "fair market value of a license for the full scope of the Postal Service's infringing use."  <u>Gaylord II</u>, 678 F.3d at 1344.  The Federal Circuit's mandate requires the Court to calculate the value of this license based on "a hypothetical, arms-length negotiation between the parties."  <u>Id.</u> at 1343 (citing <u>Jarvis v. K2 Inc.</u>, 486 F.3d 526, 533–34 (9th Cir. 2007).

Furthermore, the Federal Circuit suggested that this Court consider whether different license fees were appropriate for the three categories of infringing goods identified in the Federal Circuit's 2010 opinion: (1) stamps used to send mail; (2) unused stamps purchased by collectors; and (3) commercial merchandise featuring an image of the stamp.  <u>Gaylord I</u>, 595 F.3d at 1371.

Determining the fair market value of a license to "The Column" based on the legal fiction of a hypothetical negotiation involves "more the talents of a conjurer than those of a judge."  <u>Fromson v. Western Litho Plate & Supply Co.</u>, 853 F.2d 1568, 1574 (Fed. Cir. 1988).  The Government's infringement deprived Mr. Gaylord of the opportunity to negotiate with the Postal Service for compensation, and so this Court must surmise what would have occurred if Mr. Gaylord and the Postal Service had both come to the negotiation table on July 27, 2003 to decide on a price for a license to use "The Column."  After a full

review of the evidence presented by both sides, the Court's undertaking of this task follows.[1]

## I.      Stamps Used to Send Mail

The Federal Circuit's mandate instructs this Court to determine whether an ongoing royalty or a one-time fee more accurately captures the fair market value of a license for stamps used to send mail.  As the Federal Circuit noted, it is difficult to know whether stamps in this category were purchased by consumers because the KWVM stamp featured an image of "The Column" or simply because the stamp was needed to send mail.  Due to the difficulty of calculating damages, counsel for Mr. Gaylord does not seek damages for stamps used to send mail, and the Court awards Mr. Gaylord no damages for this category.

## II.     Unused Stamps Purchased by Collectors

As the Federal Circuit explained, the analysis for unused stamps purchased by collectors differs from used stamps because unused stamps "represent nearly pure profit for the Postal Service." Gaylord, 678 F.3d at 1345.  The Federal Circuit instructed the Court to consider whether the evidence supports an ongoing royalty rate or a lump sum royalty payment for the estimated $5.4 million collected by the Postal Service from unused stamps.  The Court finds that a 10 percent running royalty is the appropriate approach for assessment of damages.

Mr. Gaylord has consistently licensed images of "The Column" for retail and commemorative items at approximately a 10 percent running royalty.  At trial, Mr. Gaylord introduced evidence of his past licenses of "The Column" for various collectibles, such as t-shirts and miniature statues, for which he received a 10 percent royalty.  (PX 17, 18, 24, 42; DX 40, 41.)

Furthermore, in the hypothetical negotiation between the Postal Service and Mr. Gaylord, the Postal Service had a strong financial incentive to enter into a license agreement with Mr. Gaylord.  Stamps purchased by collectors represent nearly pure profit to the Postal Service and so the Postal Service stood to receive a significant profit from the KWVM stamp.  The record shows that the Postal Service expected the KWVM stamp to sell well among collectors.  Commemorative stamps are profitable for the Postal Service and military-themed stamps sell especially well. (Trial II, Delaney, Tr. 328-29.)  Indeed, the Synovate surveys produced by the Postal Service show that the KWVM stamp was in the top 25 percent of its class of 37-cent commemorative stamps with respect to projected

---

[1] The Court begins by considering the hypothetical arms-length negotiation at the time the infringement occurred on July 27, 2003, the day the Postal Service issued the KWVM stamp.  (Stip. ¶ 21.) Pursuant to the "Book of Wisdom" approach, the Court also considers facts about sales and market information from after July 27, 2003.  Fromson, 853 F.2d at 1575-76.  Under the Book of Wisdom approach, the Court considers not only what the Postal Service and Mr. Gaylord would have known during a hypothetical July 27, 2003 negotiation, but also subsequent facts.

retention revenue. (DX 125, 131, 135, 136.)  The Postal Service believed at the time of the hypothetical negotiation that the KWVM stamp would sell more than the average commemorative stamp because it decided to print 86 million KWVM stamps, which exceeds the average print run for commemorative stamps of 50-60 million stamps.  (Trial I, Delaney, Tr. 455-56.)

For these reasons, the Court finds that a 10 percent running royalty fairly represents the fair market value of a license to Mr. Gaylord's work.  Thus, after applying a 10 percent royalty to the estimated $5.4 million collected by the Postal Service, Mr. Gaylord is entitled to $540,000 in damages for stamps purchased by collectors.

III.    Commercial Merchandise Featuring an Image of the Stamp

The Federal Circuit also instructed the Court to determine the damages for the $330,919.49 that the Postal Service received on merchandise sales featuring images of the KWVM stamp.  The record reflects that Mr. Gaylord has consistently licensed images of "The Column" for retail and commemorative items at approximately a 10 percent royalty. In a hypothetical negotiation, Mr. Gaylord would likely have received a 10 percent royalty on merchandise.  Applying the 10 percent royalty to the estimated $330,919.49 collected by the Postal Service, Mr. Gaylord is entitled to $33,092 in damages for merchandise featuring an image of the stamp.

IV.    Percent Delay Compensation Factor

Lastly, the Federal Circuit determined that Mr. Gaylord is entitled to prejudgment interest because it is "necessary to make his compensation complete."  Gaylord II, 678 F.3d at 1345 (citing Waite v. United States, 282 U.S. 508, 508-09 (1931)). The Government and Mr. Gaylord have stipulated to a delay compensation interest percentage factor of 19.5 percent to be added to any damages assessed by the Court.  (Stipulation, Aug. 26, 2013.) This Court finds that Mr. Gaylord is entitled to $573,092 in damages for merchandise and unused stamps.  Applying the 19.5 percent factor to $573,092 results in a prejudgment interest factor of $111,752.94.  In total, the Court awards Mr. Gaylord $684,844.94.

Conclusion

Based upon the foregoing, the Court awards damages to Plaintiff of $684,844.94. The Court directs the Clerk to enter judgment in favor of Plaintiff in that amount.  No costs.

IT IS SO ORDERED.

s/ Thomas C. Wheeler
THOMAS C. WHEELER
Judge